# EXHIBIT 1

PLAINTIFF'S MARCH 24, 2022 DEPOSITION
TRANSCRIPT DESIGNATED ENTIRELY
CONFIDENTIAL – FILED IN CONNECTION WITH
TWITTER'S APPLICATION TO FILE UNDER SEAL

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

        GENEVIEVE MORTON, an      )

 4      individual,               )  Video recorded deposition

 5                                )  via Zoom of:

 6          Plaintiff,            )

 7                                )  DEREK RIKER

 8      vs.                       )

 9                                )  Case No.

10      TWITTER, INC., a          )  2:20-cv-10434-W-JEM

11      Delaware corporation,     )

12      et al.,                   )

13                                )

14          Defendants.           )

15

16

17

18            March 28, 2022 * 11:07 a.m. (MST)

19

20          Location:  Jennifer Holliday Law Office

21           7190 Sunset Boulevard, Suite 1430

22              Los Angeles, California

23

24           Reporter:  Dawn M. Perry, CSR

25            Videographer:  Dan Bruun
```

Page 1

```
 1                    A P P E A R A N C E S
 2       FOR THE PLAINTIFF:
 3                    Jennifer Holliday
                      Attorney at Law
 4                    Jennifer Holliday Law Office
                      7190 Sunset Boulevard
 5                    Suite 1430
                      Los Angeles, California  90046
 6                    (310) 600-6078
                      jhollidayesq@protonmail.com
 7

         FOR THE DEFENDANT:
 8
                      Victor Jih
 9                    Eve Zelinger
                      Attorneys at Law
10                    Wilson, Sonsini, Goodrich & Rosati
                      633 West Fifth Street
11                    Suite 1550
                      Los Angeles, California  90071-2027
12                    (323) 210-2900
                      ezelinger@wsgr.com
13                    vjih@wsgr.com
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

```
 1                        I N D E X
 2    DEREK RIKER                                  PAGE
 3         Examination by Mr. Jih                  5
 4                         *  *  *
 5                     E X H I B I T S
 6    NO.                  DESCRIPTION             PAGE
 7
      Exhibit 20    Plaintiff's Supplemental       185
 8                  Responses to Twitter's Request
                    for Production, Set 2
 9
10                         *  *  *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1                      P R O C E E D I N G S

 2

 3                 THE VIDEOGRAPHER:  Good morning.  We are

 4      on the record at 10:07 a.m. on March 28th, 2022.

 5                 This is the media unit number one of the

 6      video-recorded deposition of Derek Riker in the

 7      matter of Genevieve Morton versus Twitter, Inc.

 8                 My name is Daniel Bruun, and I'm the

 9      videographer from the firm Veritext Legal Solutions.

10                 The court reporter is Dawn Perry, from the

11      firm Veritext Legal Solutions.

12                 Would counsel please introduce themselves

13      and state their affiliations for the record?

14                 MR. JIH:  Victor Jih for defendant

15      Twitter.

16                 MS. ZELINGER:  -- Zelinger for defendant

17      Twitter.

18                 THE VIDEOGRAPHER:  Would the reporter --

19      oh.

20                 MS. HOLLIDAY:  Some -- some audio is

21      breaking up on our end.  I don't know if Ms. Zelinger

22      wants to restate her appearance.  It broke up.  I'm

23      not sure if the court reporter heard that appearance.

24                 MS. ZELINGER:  Happy to if it didn't go

25      through.
```

                                                    Page 4

```
 1                    Eve Zelinger for defendant Twitter.

 2                    MS. HOLLIDAY:  And Jennifer Holliday on

 3         behalf of the witness, Derek Riker.  And I'm also the

 4         counsel of record for plaintiff in the action,

 5         Genevieve Morton.

 6                    THE VIDEOGRAPHER:  Would the reporter

 7         please swear in the witness?

 8                              DEREK RIKER,

 9             called as a witness, being first sworn,

10              was examined and testified as follows:

11                            EXAMINATION

12         BY MR. JIH:

13             Q.    Good morning.  Could you state your

14         record -- name for the record again?

15             A.    Derek Riker.

16             Q.    Have you ever been deposed before?

17             A.    I have never been deposed, no.

18             Q.    Okay.  So I'll go over some of the ground

19         rules as we get started so we have a common

20         understanding.

21                    And you just took an oath to tell the

22         truth.  This is the same oath you would take if you

23         were in court right now, and so these proceedings

24         should take place as if it were before a judge in

25         court.
```

Page 5

```
 1                    Do you understand that?
 2          A.    I understand.
 3          Q.    Okay.  And do you understand that your
 4    testimony today is under the penalty of perjury?
 5          A.    Yes.
 6          Q.    Do you understand what it means to be
 7    under the penalty of perjury?
 8          A.    Yes.
 9          Q.    What does that mean?
10          A.    If you do not -- if you are not truthful,
11    you could suffer some legal consequences.
12          Q.    Okay.  And even though this is not
13    actually occurring in front of the judge or in front
14    of a jury, the testimony can be presented to the
15    judge and to the jury, so that's why it's very
16    important today to try to do your best to recollect
17    and give the best testimony you can today.
18                    Do you understand that?
19          A.    I understand that.
20          Q.    Okay.  And you're doing a terrific job,
21    but because it's being transcribed into a written
22    document by the court reporter, we should make sure
23    that your answers are audible and verbal as opposed
24    to like a nodding of the head or a shaking of the
25    head and that we don't talk over each other.  Okay?
```

Page 6

1          A.    Got it.

2          Q.    You can take breaks, you know, whenever

3    you would like.  The only convention is usually if

4    there is a question pending, you should answer the

5    question before, you know, we take a break or

6    something like that, because -- the reason for that

7    is we want to make sure there's no even suggestion

8    that, you know, your answer is in any way affected by

9    any conversation or anything like that.  You should

10   try to get your answer out and then you can take a

11   break.

12              Is that fair?

13         A.    That's fair.

14         Q.    And if you don't understand any question,

15   you can ask me -- or tell me you don't understand it;

16   you have every right to do that, and I may or may not

17   rephrase the question.  But, you know, you certainly

18   have every right -- if you don't understand

19   something, please tell me you don't understand and

20   I'll try to do a better job.  Okay?

21         A.    Great.

22         Q.    You are represented today by counsel,

23   Ms. Holliday, correct?

24         A.    I am.

25         Q.    Okay.  Now, Ms. Holliday may object for

Page  7

```
 1    the record, and usually the objections are for the

 2    record.  There is no judge here today to rule on the

 3    objections, to say who is right or who is wrong, and

 4    so the rule is usually if there is an objection, she

 5    can state it and then you answer anyway, unless she

 6    instructs you not to answer, and you agree to follow

 7    it.

 8              Do you understand?

 9        A.   I understand.

10        Q.   So if there is an objection, you know, for

11    example, if someone says, Oh, that's vague or asked

12    and answered or something like that, unless you are

13    instructed not to answer you're still supposed to

14    answer under oath and to the best of your ability.

15    Okay?

16        A.   Uh-huh (affirmative).

17        Q.   Okay?

18        A.   Got it.

19        Q.   When did you -- when did you retain Ms.

20    Holliday as your lawyer?

21        A.   I -- it was in February.  I believe the

22    first week in February.

23        Q.   Of which year?

24        A.   Of 2022.

25        Q.   Before that, did Ms. Holliday ever act as
```

Page 8

```
 1      your lawyer?

 2           A.    No.

 3                 MS. HOLLIDAY:  Objection, calls for a

 4      legal conclusion.

 5           Q.    (BY MR. JIH)  Now, you and I have met

 6      before, correct?

 7           A.    I have no recollection of that whatsoever,

 8      although I've been told that I'm under Instagram in a

 9      photo, yes.

10           Q.    Okay.  So how would you, from your

11      perspective, describe our relationship?

12           A.    Our relationship?

13           Q.    Correct.

14           A.    We don't have a relationship.

15           Q.    Okay.  I, by the way, agree.  So you would

16      not say -- have you ever characterized our

17      relationship to anyone as a close personal

18      relationship?

19           A.    Have I ever done that?  No, I have not.

20           Q.    Okay.  So you never even made that

21      suggestion to anyone?

22           A.    No.

23           Q.    Okay.  And, in fact, I don't think we even

24      have each other's contact information, correct?

25           A.    There is -- there is definitely no way I
```

Page 9

1    have your contact information.

2          Q.    Yeah, and I -- in fact, did you ever,

3    like -- I know at the beginning -- and sometime

4    during this case I tried to reach out to you through,

5    you know, Scott Flannery, to try to, like, even just

6    message you to try to get in contact and get some

7    information from you.

8                Did you ever receive that message through

9    Facebook messenger, by the way?

10         A.    I never received any messages from Scott

11   Flannery, no.

12         Q.    And you and I have not talked about this

13   case before today, correct?

14         A.    No.

15         Q.    Okay.  Is there any reason you can think

16   of why you won't be able to testify truthfully today

17   because I'm asking you questions?

18         A.    No.

19         Q.    Can you think of any reason today why you

20   can't provide truthful testimony today at all?

21         A.    No.

22         Q.    What did you do to prepare for today's

23   deposition?

24         A.    I met with -- with counsel this morning

25   prior to -- to attending this meeting.

1          Q.     Anything else?

2          A.     And then -- and yesterday we met for about

3     15 minutes as well.

4          Q.     Okay.  How long did you meet for this

5     morning?

6          A.     About -- about the same, 15 minutes.

7          Q.     So you say you met with counsel twice to

8     prepare for this deposition?

9          A.     Correct.

10         Q.     For a total of around 30 minutes?

11         A.     That's accurate.

12         Q.     Did you do anything else to prepare for

13    the deposition?

14         A.     No, that's all.

15         Q.     Did you talk to Ms. Morton at all about

16    the deposition?

17         A.     Other -- not -- other than the fact that

18    I'm being deposed, and she said she was deposed last

19    week.

20         Q.     Do you have any idea or any information

21    about the contents of what Ms. Morton testified to?

22         A.     I do not.

23         Q.     Have you reviewed any documents to prepare

24    for the deposition?

25         A.     No, I have not reviewed any documents.

                                                    Page 11

```
 1            Q.    Did you look for any documents to -- in

 2       preparation for the deposition?

 3            A.    I, unfortunately, have not had any time,

 4       so I have not done any of that.  I don't feel like

 5       it's necessary at all.

 6            Q.    Okay.  So you haven't talked to anyone

 7       else about this deposition, correct?

 8            A.    No.

 9            Q.    Now, you're not a party to this lawsuit,

10       correct?

11            A.    I am not.

12            Q.    Did you -- when did you first learn about

13       the lawsuit?

14            A.    Oh, boy.  I --

15                  MS. HOLLIDAY:  Objection, form.

16                  THE WITNESS:  Yeah.

17                  MS. HOLLIDAY:  But you can answer if you

18       know.

19                  THE WITNESS:  I mean, I think I

20       probably -- I think I saw it, actually, on an

21       Instagram post.

22            Q.    (BY MR. JIH)  Did you know about the

23       lawsuit before it was filed?

24            A.    I was aware of what had happened on

25       Twitter, but I was not aware of the lawsuit being
```

Page 12

1      filed.

2           Q.    Were You aware of any plans to potentially

3      file a lawsuit?

4                MS. HOLLIDAY:  Objection, form.

5                You can answer if you know.

6                THE WITNESS:  It wasn't -- I have no

7      recollection or any kind of specific thing about what

8      she was -- what Genevieve's plans were, no.

9           Q.    (BY MR. JIH)  So you weren't involved in

10     discussions leading up to the lawsuit?

11          A.    I was not, no.

12          Q.    Okay.  You do have a personal relationship

13     with Ms. Morton, correct?

14          A.    I do.

15          Q.    And how would you describe that

16     relationship?

17                MS. HOLLIDAY:  Objection, form.

18                You can answer if you know.

19                THE WITNESS:  I mean, we are very good

20     friends.

21          Q.    (BY MR. JIH)  Is that it?

22          A.    And we had --

23                MS. HOLLIDAY:  Objection, form.

24                You can answer if the question makes sense

25     to you.

```
 1                      THE WITNESS:  I mean, we've -- we've known
 2      each other for a long time.
 3              Q.    (BY MR. JIH)  And is that the full extent
 4      of your personal relationship?
 5                      MS. HOLLIDAY:  Objection, form.  Asked and
 6      answered.
 7                      You can answer if you know.
 8                      THE WITNESS:  Yeah.  I mean, I -- we -- we
 9      have dated previously.
10              Q.    (BY MR. JIH)  When were you dating?
11                      MS. HOLLIDAY:  Objection, form.
12                      You can answer if you can.
13                      THE WITNESS:  I -- I really don't know any
14      dates.  We were friends for several years prior to us
15      dating.  And the friendship was based in we -- we met
16      through -- through work, and we've been -- we've
17      worked several times together.
18              Q.    (BY MR. JIH)  Is it accurate to say you
19      have been dating on and off for the period of your
20      friendship?
21                      MS. HOLLIDAY:  Objection, form.
22                      THE WITNESS:  It was over --
23                      MS. HOLLIDAY:  Answer if you know.
24                      THE WITNESS:  It was over a number of
25      years.
```

Page 14

```
 1              Q.    (BY MR. JIH)  So when was the dating --
 2      when you said over a number of years, what years, to
 3      the best of your memory?
 4                    MS. HOLLIDAY:  Objection, form.
 5                    And then you can answer if you know.
 6                    THE WITNESS:  You know, I wouldn't -- they
 7      wouldn't be accurate dates, so I'm not -- I'm not
 8      positive.  We -- we met sometime in -- in, I believe,
 9      2014, 2013, the first time we worked together.  And
10      then we became close friends after that and -- but we
11      did not date till several years -- at least a few
12      years before we ever dated.
13              Q.    (BY MR. JIH)  And then when -- are you
14      still in the on/off (indecipherable) dating, or is
15      that over, the dating --
16              A.    That's been over -- that's been over
17      for -- for several years now.
18              Q.    Okay.  Do you know how many years,
19      approximately; two, three, one?  What do you --
20                    THE WITNESS:  You know, again --
21                    MS. HOLLIDAY:  Objection, form.
22                    And you can answer if you know.
23                    THE WITNESS:  Again, I -- I have no
24      specific dates.  It's not, you know -- I wouldn't --
25      it would just purely be guessing and it wouldn't --
```

Page 15

```
 1      and I'm not even sure it would be accurate.
 2           Q.    (BY MR. JIH)  Okay.  Well, you -- your
 3      testimony is that the dating aspect has been over for
 4      a couple of years?
 5           A.    Over two years for sure.  Maybe three.
 6           Q.    So since before -- was your dating
 7      relationship over by the time the SpyIRL tweets
 8      happened?
 9                 MS. HOLLIDAY:  Objection, form.
10                 And you can answer if you know.
11                 THE WITNESS:  When -- you know what?  I'm
12      not sure.  I don't remember when those tweets were,
13      so...
14           Q.    (BY MR. JIH)  But what you remember as the
15      event -- you remember the incident when the tweets
16      happened, or did you not even know about the tweets
17      when they happened?
18                 MS. HOLLIDAY:  Objection, form.
19                 You can answer if you know.
20                 THE WITNESS:  I have absolutely -- I did
21      not know anything about the tweets.  She did not
22      mention it to me.  I'm not even sure it was at the
23      time when -- you know, I don't know when those tweets
24      were.  When she started talking to me, I don't know
25      if that was her thinking about, you know, when it --
```

Page 16

```
1        she never did it when it immediately happened, so,

2        you know, I have absolutely no recollection, like,

3        what time that was.

4             Q.    (BY MR. JIH)  Even though the dating was

5        over for a couple of years, do you still consider

6        yourself a close personal friend of Ms. Morton?

7                  MS. HOLLIDAY:  Objection, form.

8                  But you can answer if you know.

9                  THE WITNESS:  We -- yes.  We -- we are

10       close -- we are friends.  We are very good friends.

11            Q.    (BY MR. JIH)  How frequently do you talk

12       to Ms. Morton?

13            A.    Not -- she -- she's moved to Nashville, so

14       I don't -- we don't speak that often.

15            Q.    Do you communicate in any way with

16       Ms. Morton more regularly?  I mean -- so it doesn't

17       have to be limited to talking live.

18                 MS. HOLLIDAY:  Objection, form.

19                 THE WITNESS:  It's -- it's not regular.

20       It hasn't been for a long time.

21                 MR. JIH:  Okay.

22                 THE REPORTER:  Could we go off the record

23       for a moment, please?

24                 MR. JIH:  Sure.

25                 THE VIDEOGRAPHER:  Okay.  Taking us off
```

Page 17

```
 1      here.  Just one moment.  We are off the record at

 2      10:22 a.m.

 3                 (A break was taken from 11:22 a.m. to

 4                 11:23 a.m.)

 5                 THE VIDEOGRAPHER:  We are back on the

 6      record at 10:23 a.m.

 7          Q.   (BY MR. JIH)  When -- how long has it been

 8      since you've been regular -- frequent -- I don't know

 9      how to word it.  How long has it been since you've

10      been in regular communication with Ms. Morton?

11                 MS. HOLLIDAY:  Objection, relevance.

12                 THE WITNESS:  I -- I -- I don't know.  I

13      have absolutely no idea what -- a specific time, I

14      don't know.

15          Q.   (BY MR. JIH)  Well, for the -- let's say

16      the last two years, going back to before even -- so

17      talking about the last two years, have you been in

18      regular contact with Ms. Morton?

19          A.    Not -- not really, 'cause that's when she

20      moved to Nashville, and we don't -- we don't really

21      talk regularly.

22          Q.    Got it.

23                 Do you have a financial interest in the

24      outcome of this litigation?

25                 MS. HOLLIDAY:  Objection, privileged.
```

Page 18

```
 1                    You can answer.

 2                    THE WITNESS:  I don't know.  I have no

 3     idea.

 4          Q.   (BY MR. JIH)  Have you ever discussed with

 5     Ms. Morton or any of her representatives about an

 6     interest in the litigation?

 7                    MS. HOLLIDAY:  Objection, privileged.

 8                    THE WITNESS:  No.

 9          Q.   (BY MR. JIH)  Do you know how much

10     Ms. Morton is seeking in the litigation?

11          A.   I -- I -- I heard a number, yes.

12          Q.   What number did you hear?

13          A.   I heard 300 million.

14          Q.   Okay.  And as far as you know, do you have

15     any claim to any part of -- if it's 300 million that

16     she might receive?

17                    MS. HOLLIDAY:  Objection, calls for a

18     legal conclusion.  Objection, privileged.  And

19     objection, form.

20                    But you can answer if you know.

21                    THE WITNESS:  No, no, and I -- no.

22          Q.   (BY MR. JIH)  Do you know what the

23     litigation -- what the claims are about?

24                    MS. HOLLIDAY:  Objection, vague.

25                    Maybe you could rephrase the question.
```

Page 19

```
 1        That seems...
 2             Q.    (BY MR. JIH)  Do you know what the claims
 3        in this case are about?
 4             A.    Not -- I mean, not -- not really.  Not
 5        specifically, no.  I mean, it's a copyright.
 6             Q.    As far as you know, it's a copyright
 7        claim, right?
 8             A.    Yes.
 9             Q.    When did you first learn about this
10        lawsuit?
11                   MS. HOLLIDAY:  Objection, asked and
12        answered.
13                   If you recall, you may answer.
14                   (Overtalk.)
15                   THE WITNESS:  Yeah, I don't -- I -- yeah,
16        I don't -- I don't recall it, and that's -- I asked
17        that -- I was asked previously, so...
18             Q.    (BY MR. JIH)  What's your best
19        recollection, though, as to when?  Even if -- even if
20        you don't know the exact date, do you know
21        approximately?
22             A.    I do not have an accurate date, you know.
23             Q.    So you have no understanding at all as to
24        when you first learned about the lawsuit?
25             A.    Whether that's a function of the pandemic
```

Page 20

1       or whatever over the past few years, I -- you know,

2       time is really a difficult one to -- to say

3       accurately, and I wouldn't want to answer it by -- I

4       really have no real idea.

5               Q.   Well, let me try it through events, then.

6                    Did you learn about the lawsuit during the

7       pandemic?

8               A.   I'm -- I'm honestly not positive if it was

9       before or after.  I don't know.

10              Q.   Did you learn about the lawsuit before or

11      after Ms. Morton moved to Tennessee?

12                   MS. HOLLIDAY:  Objection, form.

13                   You can answer if you know.

14                   THE WITNESS:  I -- I do not.  I don't

15      know.  Do not know.

16              Q.   (BY MR. JIH)  When did you first learn

17      about the SpyIRL tweets about Ms. Morton?

18              A.   I didn't know that it -- who it was or

19      what it was, but she said something on Twitter, and

20      that it was a bunch of images that -- that were hers

21      that were being used for things, but, I mean, I don't

22      know when that was or -- I don't recall when that

23      was.  And I certainly didn't realize that she was

24      going to have a lawsuit over it, at that time.

25              Q.   Did you learn about it directly -- those

                                                   Page 21

```
 1      SpyIRL tweets directly from Ms. Morton?
 2             A.    I mean, that's the -- well, that would be
 3      the only person I would have heard it from.
 4             Q.    And do you remember if it was at or around
 5      the time it actually happened or if it was later?
 6                   MS. HOLLIDAY:  Objection, asked and
 7      answered.
 8                   But you can answer.
 9                   THE WITNESS:  Yeah.  I mean, I'm assuming
10      it was later.  I don't -- you know.
11             Q.    (BY MR. JIH)  Do you have a recollection
12      if they had just happened or if it had been a while
13      later?  Do you have any recollection as to if it was
14      something that was happening then or it had already
15      happened a while ago?
16             A.    You know, it's not something I think about
17      or thought about at all.  It's not really a part of,
18      like, what I do or my -- you know, it wasn't --
19      didn't seem significant to me in any way, so I -- I
20      mean, I wasn't -- I don't recall.
21             Q.    How long was your discussion about the
22      SpyIRL tweets with Ms. Morton?
23                   MS. HOLLIDAY:  Objection, form.
24                   THE WITNESS:  I -- I don't even know.  I
25      think -- I -- I think -- you know, she talked about
```

Page 22

```
1      it for a few minutes and I probably didn't even think
2      it was that big of a deal at the time.
3              Q.   (BY MR. JIH)  So you don't recall it being
4      longer than a few minutes?
5                   MS. HOLLIDAY:  Objection.  Asked and
6      answered.
7                   THE WITNESS:  You know, I -- I don't know.
8      I don't know if it was a few minutes or more.  I just
9      remember her being kind of shocked and upset about
10     it.  That's -- that's the extent of my recollection.
11             Q.   (BY MR. JIH)  Okay.  How did you learn --
12     first learn about this lawsuit?
13                  MS. HOLLIDAY:  Objection.  Asked and
14     answered.
15                  You can answer if you know.
16                  THE WITNESS:  I mean, I -- I don't -- like
17     I answered before, I do not recall.  I do not recall
18     the date.  It wouldn't be accurate if I -- if I even
19     tried to guess a date.  I don't even know, you know.
20             Q.   (BY MR. JIH)  The question -- I was asking
21     a different question.  I was asking how you first --
22             A.   How?
23             Q.   Yeah.
24                  (Overtalk.)
25             Q.   Yes.
```

Page 23

```
 1            A.    Of the lawsuit?  I'm pretty sure I -- I
 2    saw -- no.  I mean, she -- no, I -- she -- yeah, I
 3    mean, I -- I -- I mean -- it -- it was -- are you
 4    asking about timing of it?  What were you -- what
 5    were you --
 6            Q.    I asked how.  In other words, the manner
 7    in which you first learned about it.
 8                 MS. HOLLIDAY:  Objection.  Asked and
 9    answered.
10                 THE WITNESS:  Yeah.  I mean, I don't -- I
11    don't get the question, how that's different.
12            Q.    (BY MR. JIH)  How -- how the question
13    "how" is different than "when"?  In other words, I'm
14    not -- I know you said you don't have a specific
15    memory as to when.  I'm not asking that question.
16            A.     Yeah, but I don't have a rec -- I mean, it
17    was either between -- either it was Genevieve telling
18    me, or it was an Instagram thing that I maybe -- I'm
19    not -- I'm sure which one of those it was, through,
20    like, a -- like a post or something like that, you
21    know -- you know.  I'm not sure which one it was
22    first.
23            Q.    Okay.  So it wasn't a significant enough
24    event for you to recall if it was, like, an in-person
25    discussion or you read about it or something like
```

Page 24

```
 1      that; you don't know which one it was?

 2           A.    I don't know which --

 3                 MS. HOLLIDAY:  Objection, form.

 4                 THE WITNESS:  I don't know which one it

 5      was.  That doesn't mean it was a significant event.

 6           Q.    (BY MR. JIH)  Okay.  Do you remember if

 7      it -- if you thought it was a significant event or

 8      not?

 9                 MS. HOLLIDAY:  Objection, form.

10                 You can answer if you know.

11                 THE WITNESS:  A -- a lawsuit, yeah, it was

12      a significant event.

13           Q.    (BY MR. JIH)  Okay.  Why did you think it

14      was significant?

15           A.    It's a lawsuit.

16           Q.    Did you do anything after learning about

17      the litigation?

18           A.    I --

19                 MS. HOLLIDAY:  Objection, vague.

20                 THE WITNESS:  No, I did nothing.

21           Q.    (BY MR. JIH)  When was the first time you

22      talked to Ms. Holliday about this lawsuit?

23                 MS. HOLLIDAY:  Objection.  Calls for

24      privileged information.

25                 Do you want to rephrase your question,
```

1        Mr. -- Mr. Jih?

2                     MR. JIH:  No.  The question was when.  The

3        first time you talked to Ms. Holliday about the

4        lawsuit.

5                     MS. HOLLIDAY:  Objection, form.

6                     If you -- you can answer if you know.

7                     THE WITNESS:  I don't -- I don't -- I

8        don't remember.

9            Q.    (BY MR. JIH)  Was it before February of

10       this year?

11                    MS. HOLLIDAY:  Objection, asked and

12       answered.

13                    THE WITNESS:  I -- I don't recall.

14           Q.    (BY MR. JIH)  It could have been?

15                    MS. HOLLIDAY:  Objection, asked and

16       answered.

17                    THE WITNESS:  You know, I -- I don't

18       recall.

19           Q.    (BY MR. JIH)  So it could have been?

20                    MS. HOLLIDAY:  Objection, asked and

21       answered.

22           Q.    (BY MR. JIH)  You can answer.

23           A.    I -- I don't have any recollection of

24       talking to her about it prior to -- to February.

25           Q.    Okay.  So it is your testimony that you

                                                  Page 26

```
 1    don't believe it happened before February, or you
 2    think -- you just don't have a recollection one way
 3    or the other?
 4              MS. HOLLIDAY:  Objection, compound.
 5    Objection, form.  Objection, asked and answered.
 6              I am not to do speaking objections,
 7    Mr. Jih, but if you continue to persist in this line
 8    of questioning, you leave me no choice.  This is
 9    privileged, and there are a number of objections.
10    You can -- you -- the witness has answered the
11    question to the best of his recollection, and you can
12    move on to another line of questioning, please.
13              MR. JIH:  I don't think speaking
14    objections are okay whether you think he has no
15    choice or not, but that's okay.
16         Q.   I guess my question is --
17              (Overtalk.)
18              MS. HOLLIDAY:  -- badger the witness,
19    so...
20         Q.   (BY MR. JIH)  My question is simply this:
21    Do you have a recollection one way or the other
22    whether or not you had a conversation about this
23    lawsuit with Ms. Holliday before February of this
24    year?
25              MS. HOLLIDAY:  Objection, privileged.
```

Page 27

```
 1              You can answer the question if you know.

 2              THE WITNESS:  Yeah, no, I do not have a

 3     recollection of that.

 4        Q.   (BY MR. JIH)  Okay.  I want to go over a

 5     little bit of your work history.

 6              Where did you grow up?

 7        A.   I grew up in a -- in the suburbs of

 8     Chicago and moved to Westport, Connecticut, and went

 9     to high school in Connecticut when my dad got a job

10     in New York City.  Those are the two different

11     places.

12        Q.   So you went to high school in Connecticut.

13     I actually didn't know that.

14              Did you go to college after high school?

15        A.   I did.

16        Q.   Where?

17        A.   I went to the University of Illinois in

18     Champaign.

19        Q.   Did you graduate?

20        A.   I did.

21        Q.   When?

22        A.   In 1992.

23        Q.   Did you do any other, like, post-college

24     schooling or formal education like that?

25        A.   No.
```

Page 28

```
 1              Q.    When you graduated in 1992, what did you
 2      do for work?
 3              A.    My first job was working for Ernest and
 4      Julio Gallo in sales in Chicago.
 5              Q.    And that started -- did that start
 6      immediately after college?
 7              A.    Very soon after college.
 8              Q.    Okay.  You said that was your first job?
 9              A.    My first job post-college.
10              Q.    Did you have a lot of jobs before
11      graduating college?
12                    MS. HOLLIDAY:  Objection, relevance.
13                    THE WITNESS:  Is -- is that important
14      to --
15                    MS. HOLLIDAY:  You can answer.
16                    THE WITNESS:  Okay.
17                    I mean, like, from the time I -- like, my
18      entire life?  I had --
19              Q.    (BY MR. JIH)  Yeah.
20              A.    -- numerous jobs.  I mean, I was a
21      dishwasher, a busboy.  I mowed lawns.  I managed a
22      painting company.  I did all kinds of things, you
23      know.
24              Q.    Okay.  Seems like -- I'm not trying -- I'm
25      just trying to understand if my (indecipherable) or
```

Page 29

```
 1     not.  That's all.
 2               So I understand you've done a lot of
 3     different kinds of jobs, and that when you graduated,
 4     your first post-college job was for the Gallos in
 5     sales, correct?
 6          A.    Correct.
 7          Q.    Okay.  And then how long did you work
 8     there?
 9          A.    I worked there for a couple years.
10          Q.    And was that as a full-time employee while
11     you worked for the Gallos?
12          A.    Full-time employee, yes.
13          Q.    Do you remember when you stopped working
14     with -- for them?
15          A.    I mean, I -- not specifically, like,
16     dates, but, yeah, I -- it was a couple years.
17          Q.    Okay.  When you stopped working for the
18     Gallos, what was next?
19          A.    Well, I was -- I was scouted to be -- I
20     was on vacation -- I have an identical twin brother.
21     We were on vacation in Miami Beach, and we were
22     scouted to work with Bruce Weber, who is a very
23     famous photographer, to do modeling, which at first
24     we were, like, this is nothing we can do 'cause we
25     went to college and our parents paid for an education
```

Page 30

```
 1     and they were going to kill us if we do this, but --
 2     but, yeah, but then we -- we both ended up quitting
 3     our jobs and started working as models.
 4          Q.   Do you remember the year you started
 5     modeling?
 6          A.   '94.  I believe it was '94.  Yeah.
 7          Q.   Okay.  And did you become full-time models
 8     at that point?
 9          A.   Yes, yes.
10          Q.   And as a full-time model, were you working
11     with any company or agency or -- who were you working
12     for at the time?
13          A.   Well, you -- you're an independent
14     contractor.  You have an agent who would book you
15     work.  But, yeah, it's a full-time.  You -- you are
16     essentially employing them and giving them
17     commission.
18          Q.   Now, when you said you were scouted, were
19     you scouted for a particular agency?
20          A.   Yes, a few different, but we went with
21     Irene Marie down in Miami Beach.
22          Q.   And how long were you basically acting as
23     a full-time model?
24               MS. HOLLIDAY:  Objection, form.
25               But you can answer if you know.
```

Page 31

```
 1                    THE WITNESS:  At least through 2000.  At
 2      least through 2000, pretty much.
 3           Q.    (BY MR. JIH)  So '94 to 2000, and maybe a
 4      little bit later, but at least through 2000?
 5           A.    Through 2000, yeah.
 6           Q.    What happened in 2000 in terms of work?
 7      Did you start doing something else, or what was --
 8      what happened in 2000?
 9                    MS. HOLLIDAY:  Objection, form.
10                    You can answer if you know.
11                    THE WITNESS:  Well, I was male modeling
12      for six years and it's as though it -- it was
13      lucrative.  It is not a fulfilling career and I had a
14      very big interest in photography, and after the six
15      years that I was doing that and got to shoot with,
16      you know, some of the world's biggest photographers,
17      that's the career that I wanted.  And I had spent
18      those years observing and it was -- I consider it
19      kind of like a graduate school.  And then I thought I
20      was probably ready to go off and start doing it
21      myself in 2000.
22           Q.    (BY MR. JIH)  Did you start -- so when you
23      say started doing it yourself as a photographer in
24      2000, what do you mean by that?
25           A.    I meant I'd been, you know, observing all
```

Page 32

```
 1     these, you know, photographers doing their work, and

 2     the only way you get better at that point is to go

 3     shoot yourself.  And I also, you know -- yeah.

 4     That's -- that's just, you know -- you just got to

 5     start doing it yourself.

 6          Q.    So you started your work as a photographer

 7     in 2000?

 8          A.    I mean, it's not, like, clear lines.  This

 9     isn't like, you know, being employed by a company,

10     so -- but yes, around that time.

11          Q.    Did you open a business in 2000 to do

12     photography, or how did you do that?

13               MS. HOLLIDAY:  Objection, form.

14               THE WITNESS:  Yeah, no, I mean, I

15     didn't -- I didn't -- you know, that's not how it

16     works.

17          Q.    (BY MR. JIH)  How does it work, then, in

18     terms of your work as a photographer?

19               MS. HOLLIDAY:  Objection, form.

20               You can answer if you know.

21               THE WITNESS:  You just -- you have to --

22     to perfect your craft.  It's a -- it's a time of

23     exploration and -- and advancing and trying and

24     failing and -- you know, so that's what that is, you

25     know.  And then you're hoping to get a book at some
```

Page 33

```
 1    point, a body of work that you are proud of that you
 2    can find an agent who then -- or -- or attract
 3    clients somehow, you know, you have -- but you have
 4    to have that body of work to show people.  So that's
 5    what those years are for.
 6              Q.    (BY MR. JIH)  Do you remember your first
 7    paid job as a photographer?
 8              A.    I -- not specifically, 'cause it was
 9    probably a couple hundred bucks from shooting a model
10    test for somebody.  That was the first money, yeah.
11              Q.    I'm just wondering, at some point did --
12    you know, some people, when they open a photography
13    business, might have a name for the business or
14    might, you know -- you know -- I don't know if you've
15    ever had a name for your business or how you went
16    about sort of the business side of photography.
17              MS. HOLLIDAY:  Objection, form.
18              Q.    (BY MR. JIH)  How did you actually go
19    about setting up a business in terms of photography?
20              MS. HOLLIDAY:  Objection, form.
21              You can answer if you know.
22              THE WITNESS:  I'm not sure what -- what
23    that means even in the creative sense.  It's not
24    like -- you don't set up a shop; it's -- it's just
25    about experience and people getting to know who you
```

Page 34

```
 1      are and, you know, you -- you just got to -- you

 2      know, it's -- it's word of mouth.  It's -- it's --

 3      it's -- in the beginning, you know.  And this is pre

 4      Internet, this is pre, this is way before any kind

 5      of, you know, online type of things happen.  So you

 6      have to make a name for yourself by being around the

 7      right places and the right people and all that kind

 8      of thing.

 9          Q.    (BY MR. JIH)  Have you always conducted

10      your photography business under your own personal

11      name?

12               MS. HOLLIDAY:  Objection, form.

13               But you can answer.

14               THE WITNESS:  No.  No.  I mean, I -- right

15      now my photography business is me and my brother,

16      'cause we shoot as a team now.

17          Q.    (BY MR. JIH)  Okay.  And what's the name

18      of the -- your photography business now?

19          A.    It's -- our LLC is the Riker Brothers.

20          Q.    Okay.  Riker Brothers, LLC?

21          A.    LLC.

22          Q.    Yeah.  And when was that established?

23          A.    In 2007.

24          Q.    And before that, was there any other

25      business entity that you conducted your photography
```

Page 35

1    business through?

2              MS. HOLLIDAY:  Objection, form.

3              THE WITNESS:  No.

4         Q.   (BY MR. JIH)  And is there a formal LLC

5    agreement between you and your brother?

6         A.   Yeah.

7         Q.   And are you -- is all of your photography

8    business conducted through Riker Brothers, LLC?

9              MS. HOLLIDAY:  Objection, privilege.

10   Objection, form.

11             You can answer if you know.

12             THE WITNESS:  Yes, it is now.

13        Q.   (BY MR. JIH)  Since 2007?

14        A.   Since 2007.

15             MS. HOLLIDAY:  Okay.  I'm so sorry.

16   Objection, form.  And he's already answered the

17   question.

18             You have to wait for my objections.

19             THE WITNESS:  Sorry.

20        Q.   (BY MR. JIH)  Before 2007, did you conduct

21   your photography business for yourself or with anyone

22   else?

23        A.   I mean, for myself.  It's -- yeah.

24        Q.   So before the LLC with your brother, you

25   were basically working for yourself as a

                                                    Page 36

1    photographer?

2         A.    Correct.

3              MS. HOLLIDAY:  Objection, form.

4              THE WITNESS:  Sorry.

5         Q.   (BY MR. JIH)  At what -- have you stopped

6    modeling, or are you still modeling in addition to

7    being a photographer?

8              MS. HOLLIDAY:  Objection, compound.

9    Objection, form.

10             You can answer if you know.

11             THE WITNESS:  I haven't modeled for 20

12   year -- yeah, for 20 years.

13        Q.   (BY MR. JIH)  Did you do any modeling

14   after you started photography -- worked as a

15   photographer?

16        A.    There is one that I recall where the art

17   director of Saks Fifth Avenue, who was a friend,

18   called and asked -- asked if my brother and I -- if

19   we could send some pictures of our father, because

20   they wanted to do a Father's Day job.  And so that

21   was, like -- I'm not sure what year that was.  In the

22   mid-2000s sometime.  Did a job with my father and

23   stuff for Saks Fifth Avenue.

24        Q.    So but other than that, it sounds like

25   once you started your photography business, you

                                        Page  37

1    shifted away from the modeling?

2              MS. HOLLIDAY:  Objection, form and

3    relevance.

4              But you can answer if you know.

5              THE WITNESS:  Yes.

6         Q.   (BY MR. JIH)  Okay.  The -- so since the

7    Gallos -- I'm trying to understand -- have you had

8    any other jobs other than as a model or as a

9    photographer?

10        A.   I have not, no.

11        Q.   Okay.  So are the Gallos, like, the last

12   time you've gotten a W-2?

13             MS. HOLLIDAY:  Objection, form.

14             And you can answer if you know.

15             THE WITNESS:  I mean, I believe so, yeah.

16   That's the last -- yeah.

17        Q.   (BY MR. JIH)  Well, this is -- I guess

18   from your perspective, you obviously had a lot of

19   jobs over your life, but was the last time you worked

20   for someone else -- well, why don't I actually

21   replace this.

22             The LLC -- are you technically an employee

23   of the LLC?

24             MS. HOLLIDAY:  Objection, privileged.

25             THE WITNESS:  I'm not -- I'm not sure.  I

Page 38

1    mean, I have a partner, you know -- I would say

2    partner.

3         Q.   (BY MR. JIH)  So other than that, whatever

4    that might be, would the Gallos be the last time you

5    were someone's employee?

6              MS. HOLLIDAY:  Objection.  Calls for a

7    legal conclusion.

8              You can answer if you know.

9              THE WITNESS:  I mean -- I mean, now we are

10   just getting into jargon, so...

11        Q.   (BY MR. JIH)  Well as far as -- I mean,

12   you understand there is a difference between working

13   for yourself and working as someone else's employee,

14   correct?

15             MS. HOLLIDAY:  Objection, form.  And

16   objection, calls for a legal conclusion.

17             THE WITNESS:  Yeah.

18        Q.   (BY MR. JIH)  Do you understand there is a

19   difference there, right?

20        A.   Between -- yes.

21        Q.   And so when is the last time, as far as

22   you know, you were someone's employee?

23             MS. HOLLIDAY:  Objection, but if you --

24   form.

25             THE WITNESS:  I mean, legally, I have no

Page 39

```
 1     idea.
 2          Q.    (BY MR. JIH)  Okay.  But from your own
 3     perspective, when is the last time you believed you
 4     worked for someone else as --
 5          A.    From my own perspective, I have no idea,
 6     because in my business it's unclear.  It's -- it's a
 7     legal thing.  It's not -- you know, it's a legal
 8     thing.
 9          Q.    So you don't know the legal status of, for
10     example, when someone books you to be a photographer?
11               MS. HOLLIDAY:  Objection, form.
12               But you can answer if you know.
13               THE WITNESS:  You know what?  It -- it
14     depends.  It depends on what the job is.
15          Q.    (BY MR. JIH)  Okay.  So do you remember
16     certain instances, as a photographer, where you were
17     an independent contractor, and other instances where
18     you were an employee?
19               MS. HOLLIDAY:  Objection, form, and calls
20     for a legal conclusion.
21               You can answer.
22          Q.    (BY MR. JIH)  From your perspective.
23          A.    I mean, I don't -- you know, I don't know.
24     This is all legal stuff.
25          Q.    In your mind, do you separate certain jobs
```

Page 40

```
 1      where you act as a photographer as employee jobs or
 2      certain jobs as independent contractor jobs?
 3               MS. HOLLIDAY:  Objection, form.
 4      Objection, compound.  Objection, relevance.
 5      Objection, calls for a legal conclusion.
 6               And you can answer if you know.
 7               THE WITNESS:  I don't know, but I -- a job
 8      is a job.  I shoot the same way regardless, you
 9      know -- you know.
10          Q.   (BY MR. JIH)  Have you ever had a
11      discussion with anyone concerning a photography job
12      where you discussed, Hey, this will be as an employee
13      or this will be as an independent contractor?
14               MS. HOLLIDAY:  Objection, privileged.
15               You can answer if you know.
16               THE WITNESS:  I don't know.  I don't know.
17          Q.   (BY MR. JIH)  Do you recall any instant --
18      instance where being classified as an employee was an
19      important part of the job?
20               MS. HOLLIDAY:  Objection, form.
21               You can answer if you know.
22               THE WITNESS:  You know what?  I don't -- I
23      don't know.  I don't know.
24          Q.   (BY MR. JIH)  So you don't recall any
25      incident where people had a specific discussion with
```

Page 41

```
1      you to say that this job has to be as an employee?

2           A.    I don't recall specifically, no.

3           Q.    And it hasn't affected the way you've

4      approached any of your photo shoots?

5                 MS. HOLLIDAY:  Objection, privileged.

6                 You can answer if you know.

7                 THE WITNESS:  I mean, I -- I don't know.

8      There -- there are jobs where you do not own the

9      rights to photos when you shoot them, yes.

10          Q.    (BY MR. JIH)  Have you ever been

11     Ms. Morton's employee?

12                MS. HOLLIDAY:  Objection, calls for a

13     legal conclusion.

14                You can answer if you know.

15                THE WITNESS:  I mean, legally?  I don't --

16     you know what?  I'm not -- I don't know.

17          Q.    (BY MR. JIH)  But do you think you've ever

18     been Ms. Morton's employee?

19                MS. HOLLIDAY:  Objection, relevance.

20     Objection, calls for a legal conclusion.

21                And you can answer if you know.

22                THE WITNESS:  I -- you know, this is just

23     getting into legal semantics, so I don't know.

24     There's times that I knew I was -- I was getting

25     her -- her images and her doing her -- her -- you
```

Page 42

```
 1      know, it was very specifically geared for what she

 2      needed and what she wanted; you know, what -- what

 3      that is legally, I don't know.

 4           Q.   (BY MR. JIH)  Did you ever consider

 5      yourself legally her employee?

 6                MS. HOLLIDAY:  Objection, calls for a

 7      legal conclusion.  Objection, relevance.

 8                And you can answer if you know.

 9                THE WITNESS:  It's -- it's a legal

10      question, so I -- no.

11           Q.   (BY MR. JIH)  Well, this is actually -- if

12      you've never thought about it legally, that's fine.

13      It's actually not a legal question.  I am asking what

14      you thought about.

15                Have you ever considered yourself legally

16      to be her employee?

17                MS. HOLLIDAY:  Objection, form.  Asked and

18      answered.

19                You can answer if you know.

20                THE WITNESS:  I don't -- I don't know and

21      I don't -- you know.  I mean, it's -- it's just -- I

22      don't know.  I don't know.

23           Q.   (BY MR. JIH)  Have you ever discussed with

24      Ms. Morton that she wanted you to be her employee?

25                MS. HOLLIDAY:  Objection, privileged.
```

Page 43

```
 1                    THE WITNESS:  I mean, legally or in the

 2      term -- you know, she's asked me to -- to work for

 3      her many, many times.

 4            Q.    (BY MR. JIH)  But have you ever had the

 5      discussion that the legal status or the way you work

 6      for her has to be as an employee?

 7                    MS. HOLLIDAY:  Objection, privileged.

 8      Objection, form.

 9                    You can answer if you know.

10                    THE WITNESS:  I -- I don't know.  I

11      don't -- I don't recall any specific, you know...

12            Q.    (BY MR. JIH) Okay.  So you don't have any

13      such memory of that kind of a conversation, correct?

14                    MS. HOLLIDAY:  Objection, asked and

15      answered.

16                    You can answer.

17                    THE WITNESS:  I mean -- I mean, when --

18      when we worked together it's, like, she -- like, as

19      far as, like, owning the rights to photos, yeah, she

20      owns the rights to the photos.

21            Q.    (BY MR. JIH)  My question was about

22      whether or not you've ever had a discussion with her

23      that you would be legally her employee.

24                    MS. HOLLIDAY:  Objection, asked and

25      answered.
```

Page 44

```
 1                    You can answer.

 2                    THE WITNESS:  Not in those terms, no.

 3            Q.    (BY MR. JIH)  Okay.  Has Ms. Morton ever

 4     given you a W-2?

 5                    MS. HOLLIDAY:  Objection, privileged.

 6                    You can answer if you know.

 7                    THE WITNESS:  I don't -- I don't believe

 8     so.

 9            Q.    (BY MR. JIH)  Has she ever given you a

10     1099?

11                    MS. HOLLIDAY:  Objection, privileged.

12                    You can answer if you know.

13                    THE WITNESS:  I'm -- you know what?  I'm

14     not positive.  It's either a 1099 or -- yeah, I'm

15     sure.

16            Q.    (BY MR. JIH)  You do recall her giving you

17     some kind of formal tax --

18                    (Overtalk.)

19            A.    Yes.

20            Q.    -- for the money that she's ever paid you

21     for any of your shoots with her?

22            A.    Yeah, she's -- yeah, she's always -- yes.

23            Q.    And then when you -- is that income

24     considered money belonging to the Riker Brothers,

25     LLC, or is that -- comes to you?
```

Page 45

1      MS. HOLLIDAY:  Objection, privileged.

2           THE WITNESS:  You know what?  I don't --

3    I'm not positive how I did that on my taxes, if it

4    was through the Riker -- specifically.  I'm not --

5    I'm not positive, actually.

6      Q.   (BY MR. JIH)  Okay.  Is it possible

7    that -- well, from your -- from your understanding,

8    is -- is all your photography work supposed to be

9    going through the partnership or not?  Oh, not the

10   partnership, the LLC, or not.

11          MS. HOLLIDAY:  Objection, form.

12   Objection, speculation.

13          You can answer if you know.

14          THE WITNESS:  You know what?  I'm not --

15   I'm not sure, you know.

16     Q.   (BY MR. JIH)  So you don't recall whether

17   you booked the money concerning any of the

18   photographs you've done for Ms. Morton through the

19   LLC or through your own personal taxes?

20          MS. HOLLIDAY:  Objection, privileged.

21          THE WITNESS:  Yeah.

22          MS. HOLLIDAY:  Objection, form.

23          You can answer if you know.

24          THE WITNESS:  I -- I'm not positive, but

25   I -- you know, it could have been through -- through

Page 46

1 my personal, like, taxes, which, you know, the LLC

2 is -- is the business part and then it's -- it's --

3 you know, that wouldn't be totally unusual.

4   Q. (BY MR. JIH)  All right.  Have you talked

5 to your brother at all about this lawsuit?

6     MS. HOLLIDAY:  Objection, privileged.

7 Objection, relevance.

8     And you can answer if you know.

9     THE WITNESS:  I mean -- I mean, I've

10 spoken with my brother, yes.

11   Q. (BY MR. JIH)  Do you -- does the LLC claim

12 any interest in any of the money that might be

13 received from these photographs at issue?

14     MS. HOLLIDAY:  Objection, privileged.

15     You can answer if you know.

16     THE WITNESS:  I -- I really haven't

17 thought about it in those terms.

18   Q. (BY MR. JIH)  So you haven't talked about

19 it with your brother in terms of, you know, for

20 example, any obligations you owe to the partnership

21 in terms of any money associated with these photos?

22     MS. HOLLIDAY:  Objection, privileged.

23 Relevance.

24     THE WITNESS:  No, we have not had any

25 discussion.

Page 47

```
 1            Q.    (BY MR. JIH) Ms. Morton testified that
 2      you're entitled to 25 percent of anything that might
 3      come out of this lawsuit.
 4                  Are you aware of that?
 5            A.    I am not aware of that.
 6            Q.    So that means if they do obtain a judgment
 7      for $300 million that there would be 25 percent of
 8      that, which I think is -- my math is not very good --
 9      a fourth of 300 million -- a significant amount of
10      money, would you say?
11                  MS. HOLLIDAY:  Objection, form.
12      Objection, privileged.  Objection -- I'm not even
13      quite sure the (indecipherable).
14                  You can answer if you know.
15                  THE WITNESS:  I mean, that's an obvious --
16      it's obvious.
17            Q.    (BY MR. JIH)  An obvious, yes, right?
18            A.    Correct.
19            Q.    So, like, that's $75 million.  I used the
20      benefit of a calculator.  Is it your understanding
21      that if you did receive $75 million from this lawsuit
22      concerning these photographs that it would belong to
23      the LLC or to you personally?
24                  MS. HOLLIDAY:  Objection, privileged.
25      Objection, relevance.  Objection, form.
```

Page 48

```
 1                         You can answer.

 2                         THE WITNESS:  Obviously, I've never

 3          thought about that.

 4                Q.    (BY MR. JIH)  Did money -- how much money

 5          would you say, total, you've received from Ms. Morton

 6          for any photography work you've done for her?

 7                A.    I --

 8                         MS. HOLLIDAY:  Objection, privileged.

 9                         You can answer if you know.

10                         THE WITNESS:  I have no -- I have no idea.

11          I --

12                Q.    (BY MR. JIH)  Is it a lot of money?

13                A.    That's -- that's all relative.  I don't

14          know.  It was -- whatever.  It's -- it's a decent

15          amount of money.

16                Q.    So do you consider it a lot of money, from

17          your perspective?

18                A.    It's all relative.  I don't even know

19          where you are going with this.  I mean --

20                Q.    I'm just asking -- I'm trying to get a

21          sense of how much money --

22                A.    No, it's not -- it's not a lot of money.

23                         (Discussion off the record.)

24                Q.    Well, I'm trying to get a sense of some

25          amount, and I think you said it's not a lot of money.
```

Page 49

```
 1              How many photo shoots have you done for
 2     Ms. Morton?
 3          A.   I have -- I don't -- I don't have any
 4     specific number, but it's dozens.  It would -- it
 5     would be many, many shoots.
 6          Q.   Have you been paid by Ms. Morton for every
 7     one of those shoots?
 8          A.   No.  No.
 9          Q.   How many have you -- how many photo shoots
10     have you done for Ms. Morton that were paid photo
11     shoots, for pay?
12          A.   I -- I have -- you know what?  I don't
13     have a specific number.  I don't know.
14          Q.   Do you -- do you also do photo shoots for
15     Ms. Morton sort of as a personal matter rather than
16     as a paid gig, so to speak?
17          A.   There's no difference.
18          Q.   Why?  Why do you say that?
19          A.   A lot of times it's -- I mean, the
20     business is very personal and it's very -- it's
21     business -- often the business is personal.  It's --
22     it's the same.  It's, like -- it's -- it can be the
23     same.
24          Q.   So how -- I'm trying to understand that,
25     like how formal the arrangements are for each photo
```

Page 50

1      shoot.  Like, do you have to enter, like, a separate

2      kind of agreement for each photo shoot?

3                  MS. HOLLIDAY:  Objection, form.

4                  You can answer if you know.

5                  THE WITNESS:  It depends on -- it depends

6      on the shoot.

7           Q.    (BY MR. JIH)  Do you require, you know,

8      executed agreements before you do a photo shoot?

9           A.    Not --

10                  MS. HOLLIDAY:  Objection, calls for a

11     legal conclusion.

12                  You can answer if you know.

13                  THE WITNESS:  I mean, not always prior to.

14          Q.    (BY MR. JIH)  Sometimes, though?

15          A.    Sometimes.

16          Q.    How frequently do you -- is there a need

17     for a formal written agreement before you do a photo

18     shoot?

19          A.    It's -- I mean, it's not -- it's -- you

20     know, if you've been in the business for a long time,

21     you have personal relationships with people over long

22     periods of time and it's -- I'm in the trust

23     business.  That's what I do.  So -- and it's an

24     entertainment.  And so those people have all the

25     power a lot of times when it comes to what I do.  So

Page 51

```
 1    even if there wasn't a formal agreement, you know,

 2    they are the ones with all the power, so -- you know.

 3         Q.    So how frequently would you say you've

 4    executed a formal written agreement before doing a

 5    photo shoot?

 6              MS. HOLLIDAY:  Objection, calls for a

 7    legal conclusion.

 8              THE WITNESS:  I -- I have no idea.  I have

 9    no idea.

10         Q.   (BY MR. JIH)  Do you recall if you've ever

11    fully executed a written agreement before doing the

12    photo shoot?

13              MS. HOLLIDAY:  Objection, calls for a

14    legal conclusion.

15              But you can answer if you know.

16              THE WITNESS:  I -- I -- I mean, with

17    publicists, you are signing them all the time prior

18    to the shoot.

19         Q.   (BY MR. JIH)  Okay.  So you -- do you have

20    any idea of, like, how many of those agreements

21    you've signed before a photo shoot?

22         A.   I shoot con -- no.  I mean -- no.

23         Q.   Do you keep records of the agreements you

24    sign?

25         A.   I mean, there's -- I mean, there's -- on
```

Page 52

```
 1    the e-mails and stuff.  I don't have, like, a -- I
 2    don't really keep them around that much.  I don't --
 3    I mean, they are usually in the e-mails.
 4          Q.    So you don't have a special kind of, like,
 5    a filing system for agreements you've signed; it's
 6    just in the e-mails that you -- correspondence that
 7    you have over time?
 8                MS. HOLLIDAY:  Objection, asked and
 9    answered.
10                You can answer if you know.
11                You know, actually, if you want to answer
12    this question.
13                Can we take a break?  We've got -- now
14    at -- we're at 11:01.  We are on the record for the
15    first hour.  Maybe --
16                MR. JIH:  Yeah, I just have a few.  Let me
17    just wrap this up real quick and then I'll give you a
18    break.
19                THE WITNESS:  Okay.  What was the question
20    there again?
21          Q.    (BY MR. JIH)  I was saying -- you said --
22    I'm just trying to understand.  You don't have, like,
23    a filing system or something for the signed
24    agreements that you've signed; it sounds like you
25    said you just relied on your e-mail correspondence to
```

Page 53

1      look for them if you need to?

2              A.    If I need that, yeah.

3              Q.    Okay.  So you -- I'm just asking.  So you

4      rely on your e-mail to sort of be your recordkeeping

5      of the past, correct?

6              A.    Well, not --

7              MS. HOLLIDAY:  Objection, form.

8              THE WITNESS:  Yeah, no, no, it's -- it's

9      just -- especially in the -- in the most recent years

10     it's not -- you know, there's -- there's -- the

11     licensing has become a completely different animal

12     with the Internet and social media and all these kind

13     of stuff.  It's a constant battle.  So it's constant,

14     you know.  So it's just -- yeah, it's a -- it's just

15     a different thing than it was, like, nine, ten years

16     ago, whatever.  It's, like, now it's just -- it's

17     just a different environment, so...

18             Q.    (BY MR. JIH)  Is it your practice to keep

19     your e-mail or to have some kind of regular purging?

20             MS. HOLLIDAY:  Objection, privilege.

21     Objection, relevance.  Objection, vague as to the

22     word "purging."

23             And if you wouldn't -- you can answer if

24     you know.

25             THE WITNESS:  I mean, it's -- I mean, I

Page 54

```
 1    delete e-mails, you know.

 2         Q.    (BY MR. JIH)  So it's your practice to

 3    delete e-mails?

 4              (Overtalk.)

 5         A.    No, I -- there's e-mails that I'll get rid

 6    of or whatever, but -- I mean, I'm not, like, you

 7    know, constantly sifting through.  It's not a big

 8    part of -- it's not a big part of what I do.

 9         Q.    Okay.  So what you are saying, like, you

10    don't go out of your way to get rid of e-mails; you

11    just -- the e-mails are there, right?

12              MS. HOLLIDAY:  Objection, form.

13              And you can answer if you know.

14              THE WITNESS:  Yeah, it's not something --

15    I don't think about it.  I don't -- you know.  To

16    characterize it one way or the other, I -- I don't --

17    you know.

18              MR. JIH:  Okay, we can take a break.

19              THE VIDEOGRAPHER:  Okay.  Taking us off

20    here.  We are off the record at 11:03 a.m.

21              (A break was taken from 12:03 p.m. to

22              12:16 p.m.)

23              THE VIDEOGRAPHER:  We are back on the

24    record at 11:16 a.m.

25         Q.    (BY MR. JIH)  Did you know back in around
```

Page 55

```
 1        September of last year that Twitter was trying to

 2        serve a subpoena on you for a deposition in this

 3        case?

 4                     MS. HOLLIDAY:  Objection, form.

 5                     And you can answer if you know.

 6                     THE WITNESS:  I -- I do not know.

 7             Q.    (BY MR. JIH)  When did you first learn

 8        that there was a process server trying to serve a

 9        subpoena on you?

10                     MS. HOLLIDAY:  Objection, form.

11                     And if you -- I -- you can answer if you

12        know.

13                     THE WITNESS:  I mean, I've -- the first

14        time I recall is someone at my gym telling me that

15        some sketchy dude has come to the gym two days in a

16        row, and that was --

17             Q.    (BY MR. JIH)  When was that?

18             A.    I -- I don't know the dates.

19             Q.    Was it last year, though?

20                     MS. HOLLIDAY:  Objection.

21                     THE WITNESS:  You know, I'm not sure, but

22        it could have been last year.  I don't know.

23             Q.    (BY MR. JIH)  Did you have -- well, who is

24        this person at the gym that told you?

25             A.    A girl at the front desk.
```

Page 56

```
 1              Q.    Do you know her name?

 2              A.    Oh, boy.  What's her name?  I don't know.

 3      I see her -- I see her.  She works at the front desk

 4      at my gym.  I see her every day.  But Liv is her

 5      first name.

 6              Q.    And that was the first time that you knew

 7      that there was anyone attempting to, like, serve you

 8      with anything?

 9                    MS. HOLLIDAY:  Objection, asked and

10      answered.  Objection, form.

11                    THE WITNESS:  Yeah.

12              Q.    (BY MR. JIH)  Are you agreeing?

13              A.    Yeah, I'm agreeing.  Yeah.

14              Q.    Okay.  With the objections or that that's

15      true that was the first time?

16              A.    That's true.

17              Q.    That's true, okay.

18                    Did you have any idea what those documents

19      might be relating to, why someone was trying to serve

20      (audio distortion) on you?

21                    MS. HOLLIDAY:  Objection, relevance.

22                    Mr. Jih, Mr. Riker isn't here on any kind

23      of a criminal matter.  He's not here to answer

24      questions about evading a summons, if that's what

25      you're trying to establish.
```

Page 57

```
 1              Mr. Riker is here pursuant to the court
 2    order that was issued on March 17th that you -- that
 3    he was here to appear related to matters involving
 4    the Complaint in this action, not on any kind of a
 5    criminal charge.
 6              So if you want to tailor your questions to
 7    the scope of the deposition, I would appreciate it.
 8         Q.    (BY MR. JIH)  That's her objection.  You
 9    can answer.
10              MS. HOLLIDAY:  What was the question,
11    Mr. Jih?
12         Q.    (BY MR. JIH)  Did you know what any of
13    these papers the sketchy process server or person
14    dealt with?
15         A.    I did not, no.
16         Q.    Did you have any reason to believe it
17    might be in connection with the lawsuit Ms. Morton
18    had filed?
19         A.    I did not, no.
20         Q.    When did you first learn that there might
21    be someone attempting to serve you with papers
22    regarding Ms. Morton's lawsuit?
23              MS. HOLLIDAY:  Objection, form.
24              You can answer if you know.
25              THE WITNESS:  I don't -- I mean, besides
```

Page 58

```
 1      the gym?
 2              Q.    (BY MR. JIH)  Well, with the gym incident,
 3      you told me you didn't know what it was in regards
 4      to.
 5              A.    Yeah, I didn't know.  Yeah.
 6              Q.    So at some point did you learn that there
 7      might be someone trying to serve you something in
 8      connection with Ms. Morton?
 9              A.    Well, when it was served to my brother,
10      yes.
11              Q.    When it was actually served on your
12      brother?
13              A.    When it was actually served on my brother.
14              Q.    When was that?
15              MS. HOLLIDAY.  Object -- everyone needs to
16      slow down.  I am sure the court reporter will agree
17      with me that you're talking over each other.  And if
18      you could please slow down so that you can give me
19      time to object and the court reporter to do what the
20      court reporter needs to do, it would be great.
21              What is the question?  Is there a question
22      pending?
23              Q.    (BY MR. JIH)  When was that?
24              MS. HOLLIDAY:  Objection, form.
25              You can answer if you know.
```

Veritext Legal Solutions
866 299-5127

```
 1                    THE WITNESS:  I'm not sure.  Sometime
 2      after the incident at my gym.
 3           Q.    (BY MR. JIH)  You don't have a better
 4      recollection as to when your brother was served with
 5      the subpoena in this case?
 6           A.    On a date, no, I don't.
 7           Q.    A month?
 8                 MS. HOLLIDAY:  Objection, form.
 9      Objection, you're harassing the witness.  He's asked
10      and answered it.
11           Q.    (BY MR. JIH)  I'm asking, do you have a
12      sense of the month?
13           A.    I -- I don't recall.
14           Q.    Was it this year?
15                 MS. HOLLIDAY:  Objection, asked and
16      answered.
17                    THE WITNESS:  I -- I don't know.
18           Q.    (BY MR. JIH)  Before the service actually
19      happened, you said to your brother, did you have any
20      reason to believe that someone was trying to serve
21      you with a subpoena related to this case?
22                 MS. HOLLIDAY:  Objection, privilege.
23      Objection, asked and answered.
24                    If you want to answer, you can answer.
25                    THE WITNESS:  I don't -- I don't know, no.
```

Page 60

```
 1          Q.    (BY MR. JIH)  Okay.  And just to be clear,
 2     have you hired any attorney other than Ms. Holliday
 3     in connection with this lawsuit?
 4          A.    No.
 5          Q.    And Ms. Holliday you didn't engage until
 6     February of this year, correct?
 7          A.    Correct.
 8          Q.    Okay.  So before February of 2022, did you
 9     have an attorney at all concerning these issues?
10                MS. HOLLIDAY:  Objection, privileged.
11                MR. JIH:  Well, not if he doesn't have an
12     attorney.
13          Q.    I'm asking, did you have an attorney
14     before February 2022 concerning these issues?
15                MS. HOLLIDAY:  Objection, privileged.  And
16     this line of questioning is inappropriate, Mr. Jih.
17     You know it.  It's outside the scope of the
18     deposition.  It's outside of the scope of the court
19     order.  Please change your line of questioning so
20     that we don't have to terminate this and go in again
21     and go in for a protective order and then have to
22     reschedule this again.  You didn't serve a subpoena
23     properly in the first place.  You got a court order
24     somehow, even though you had a joint stipulation
25     prepared and pending.  Somehow the court ordered this
```

Page 61

```
 1      anyway.
 2                  We are here to answer questions within the
 3      scope of discovery.  Please tailor your questions
 4      with that in mind.
 5           Q.    (BY MR. JIH)  So you can answer the
 6      question.  The question was, before February 2022,
 7      did you have an attorney with regards to these
 8      issues?
 9                  MS. HOLLIDAY:  Asked and answered.  Please
10      move on.
11                  MR. JIH:  I don't know the answer.
12           Q.    Yes or no?
13                  MS. HOLLIDAY:  Do you not know the answer?
14      Maybe the court reporter could read it back.
15           Q.    (BY MR. JIH)  You can answer.  This is
16      just --
17           A.    No.
18           Q.    No?  Okay.
19                  Before February 2022, did you ever talk to
20      Ms. Holliday about any subpoena or attempt to serve a
21      subpoena?
22                  MS. HOLLIDAY:  Objection, privileged.
23                  THE WITNESS:  No.
24           Q.    (BY MR. JIH)  Before February 2022, did
25      you ever talk to Ms. Morton about someone trying to
```

Page 62

1    serve you a subpoena in this case?

2              MS. HOLLIDAY:  Objection, relevance.

3    Objection, form.

4              And if you are going to persist in this

5    line of questioning -- Mr. Riker is not here under a

6    criminal investigation for evading service.  And I'm

7    going to instruct --

8         Q.   (BY MR. JIH)  You can answer the question.

9              MS. HOLLIDAY:  -- the question.

10             MR. JIH:  Whether or not he's talked to

11   Ms. Morton about any efforts to serve him with a

12   subpoena in this case, you are instructing?

13             MS. HOLLIDAY:  Yep.

14             MR. JIH:  Okay.

15        Q.   So there have been representations made in

16   this case about the service of the subpoena before

17   February 2022.  It wouldn't have been based on

18   anything you said to anyone, correct?

19             MS. HOLLIDAY:  Objection, calls for a

20   legal conclusion.  Objection, form.  Objection.  This

21   is harassing the witness and it's outside the scope

22   of the -- the subpoena and of the -- it -- and the

23   court order, and it's outside the scope of discovery.

24             So Mr. Riker is here under Rule 45.  He's

25   a nonparty, and if you continue to harass him with

                                              Page 63

```
 1      threats of some sort of vague criminal accusations,

 2      it's completely inappropriate.

 3           Q.   (BY MR. JIH)  You can answer the question.

 4           A.   I don't -- I don't know what you are

 5      getting at.

 6           Q.   Well, I'm just asking whether or not you

 7      talked to anyone about a process server trying to

 8      serve you at all before February '22.

 9           A.   I have no recollection.

10           Q.   Okay.  Did you ever see a process server?

11           A.   I never saw a process server.

12           Q.   Okay.  So no process server ever, like,

13      bothered you directly in any way while in your

14      presence?

15                MS. HOLLIDAY:  Objection, asked and

16      answered.

17                THE WITNESS:  Not -- yeah, not me.

18           Q.   (BY MR. JIH)  Okay.  Did you ever try to

19      avoid a process server in connection with this case?

20                MS. HOLLIDAY:  Objection.  Instruct.

21                Mr. Jih, this is completely inappropriate,

22      and if you want me to terminate the deposition

23      because you refuse to stop asking questions that are

24      inappropriate and are likely to elicit some sort of a

25      criminal admission, I -- you did this to Ms. Morton
```

Page 64

1      as well.  This is completely inappropriate.

2                  MR. JIH:  No, I'm assuming he's going to

3      say no because he didn't see one.  I'm just asking --

4      I'm just confirming.

5          Q.    Did you ever avoid a process server in

6      connection with --

7                  MS. HOLLIDAY:  I think Mr. Riker has made

8      it clear that he has not, so we need to move on to

9      actual --

10                 MR. JIH:  Can we stipulate the answer is

11     no?

12                 MS. HOLLIDAY:  Mr. Jih, you need to move

13     on to -- within the scope of the -- of discovery.

14     This is completely inappropriate.

15         Q.    (BY MR. JIH)  You can answer.

16                 MS. HOLLIDAY:  Mr. Jih, do I need to stop

17     the deposition and move for a protective order?

18                 MR. JIH:  Ms. -- I'm letting you know it's

19     not allowed under the rules.  State relevance and

20     then just be quiet.  I'm not going to argue with you.

21                 MS. HOLLIDAY:  I'm sorry.  I can terminate

22     the deposition under Rule 30 and I can seek a

23     protective order.  And if I need to do that in order

24     to protect a witness's rights, I absolutely will.

25                 So if you want to move on to another area

Page 65

```
 1        of questioning, we will be happy to move on.  And if
 2        you don't want to do that, I'm sorry, but I will have
 3        to do that, and you are leaving me no choice.
 4                   So, please, if you want to move on to
 5        another line of questioning, we are here in good
 6        faith; we would like to continue the deposition.
 7                   MR. JIH:  Okay, but since you've
 8        testified and he hasn't, I just want to say, as long
 9        as the answer is no, I'll move on.  I just want to
10        make sure the answer is no.
11                   MS. HOLLIDAY:  You're testifying at this
12        point.
13                   MR. JIH:  I'm asking -- let me just ask,
14        then.
15             Q.    Is the answer no?
16                   (Overtalk.)
17                   MS. HOLLIDAY:  -- more today than --
18                   THE REPORTER:  Sorry.  We're having too
19        much talking over one another.
20                   MS. HOLLIDAY:  What's your pending
21        question, Mr. Jih?
22             Q.    (BY MR. JIH)  Have you tried to -- ever
23        tried to avoid a process server in connection with
24        this case?
25                   MS. HOLLIDAY:  Objection, privileged.
```

Page 66

```
 1                 Because I know the answer to this
 2     question, I will say you can -- you can answer this
 3     question truthfully, Mr. Riker.
 4                 THE WITNESS:  No.
 5          Q.   (BY MR. JIH)  Okay.  The -- do you have
 6     any -- well, you don't have any formal legal
 7     training, correct?
 8          A.    No.
 9          Q.    And do you have any familiarity with how
10     the rules of copyright law work with respect to
11     photographers?
12                 MS. HOLLIDAY:  Objection, form.
13                 You can answer if you know.
14                 THE WITNESS:  I mean, I have some
15     knowledge.
16          Q.    (BY MR. JIH)  What's your understanding of
17     how copyright works for photographers?
18          A.    Like as far as...
19          Q.    Just whatever your understanding is.
20          A.    You want to be more specific or...
21          Q.    I actually just -- you said you have some
22     knowledge --
23          A.    If I click the shutter -- if I click the
24     shutter, I -- I own the photograph.  And depending
25     on -- you know, it's -- I mean, it's -- well, I guess
```

Page 67

```
 1        in recent times I guess more -- I guess -- okay.

 2        With more -- in digital times you have to -- prior to

 3        however -- whatever year it was, if you clicked the

 4        shutter, you own the copyright.  Now you need to

 5        register images.

 6                    MS. HOLLIDAY:  Excuse me, Mr. Riker.

 7        Excuse me, Mr. Riker.

 8                    Mr. Jih and Ms. Zelinger, you seem very

 9        busy in your cameras.  You seem to be doing a lot of

10        activity and --

11                    MR. JIH:  I'm taking notes.

12                    MS. HOLLIDAY:  Are you communicating with

13        each other or is -- are you referencing something we

14        should be looking at?

15                    MR. JIH:  Ms. Holliday, first of all,

16        we're on the same side; we can communicate.  There is

17        no reason we cannot, but I'm taking notes.

18                    MS. HOLLIDAY:  Mr. Jih, the -- some of the

19        concerns we had about the nature of a remote

20        deposition, there are certain things that would be

21        inappropriate to do in an in-person deposition that

22        we try to make sure are not going on in a remote

23        deposition.

24                    So if you can't do it in an in-person

25        deposition, you would not be able to do it in a
```

Page 68

```
 1    remote deposition.  So to the extent that you might

 2    be communicating with each other or exchanging

 3    documents that we can't see or whatever else, we

 4    would just like to know if that's what's going on,

 5    because you seem very busy.

 6               MR. JIH:  Well, I'm taking notes right

 7    now, but I certainly will tell you I do communicate

 8    and pass notes to my other associate on this case.

 9    There is nothing wrong with that.

10               MS. HOLLIDAY:  Okay.  You just -- you are

11    taking these long pauses and looking at each other

12    and trying to figure something out, so I just want to

13    know what's going on.  So if you --

14               MR. JIH:  Pauses happen at a deposition.

15    I'm listening and thinking.

16          Q.   He was in the middle of answering what

17    your understanding -- some knowledge you have about

18    copyright law.  Were you done with your answer, or is

19    there more that you understand about copyright law?

20          A.   I mean, I'm -- that's the extent.  I

21    don't, you know, have a long, drawn-out legal

22    understanding.

23          Q.   Do you -- have you ever had, like, a

24    business attorney for the photography business or any

25    other attorney working for you for your business?
```

Page 69

1          A.    I've had licensing agents throughout my
2    career who deal with all copyright.  So you would --
3    any -- and this is mostly prior to more recent
4    digital, you know, dominance of photography where you
5    place them with them; they are the ones who control
6    the images, register or do whatever and -- and
7    enforce any copyright.
8          Q.    So you have people that -- if you are
9    dealing with the exploitation of your photographs,
10   you have the licensing agent that you work through to
11   handle those things?
12         A.    That's typically -- yes.  That's what
13   happens.  I don't currently have one.  I have not had
14   one for several years now.
15         Q.    When did you -- do you remember when you
16   last had a licensing agent?
17         A.    I'm not sure of the dates.  I'm not sure
18   of the dates.
19         Q.    Would it be before or after 2019?
20         A.    I'm not -- I'm not positive, but it could
21   have been, but it's -- the -- the reason I don't have
22   one now is that the -- the money and that licensing
23   game is -- isn't what it used to be.
24         Q.    Did you have a licensing agent when you
25   did the photo shoot for Ms. Morton in Borneo in 2016?

                                        Page 70

```
 1              MS. HOLLIDAY:  Objection, form.
 2              You can answer.
 3              THE WITNESS:  I probably did, but -- but
 4    you -- you license whichever images you would like to
 5    license, and -- and that's usually entertainment type
 6    of images, not more like fine art and stuff like
 7    that.
 8         Q.   (BY MR. JIH)  And would, generally, a
 9    licensing agent be involved after the photographs are
10    taken or even earlier, as part of the creation of the
11    photographs?
12         A.   It depends.  It really depends.
13         Q.   Was the licensing agent involved at all in
14    connection with the Borneo shoot for Ms. Morton?
15         A.   Not at all.
16         Q.   Did you have anyone else that you worked
17    with that dealt with the legal matters?
18         A.   No.
19         Q.   Okay.  So just in terms of your knowledge
20    of copyright law, do you have an understanding as to
21    what's necessary to transfer copyrights to other
22    people?
23         A.   I mean, generally, I guess.  I guess, I --
24    I mean -- you know, I mean, I'm not a lawyer, you
25    know.
```

Page 71

1        Q.    What's your general understanding, if any?

2        A.    Well, you can sign a contract, like,

3    transferring the copyright.

4        Q.    And is it your understanding that you need

5    to sign something to do that?

6        A.    I'm not sure.  I'm not sure.

7        Q.    Do you have any understanding one way or

8    the other as to what's required beyond some kind of

9    agreement to transfer?

10        A.    I don't -- you know, I don't know.

11        Q.    Do you have any -- you said usually it's

12    the person who clicks the shutter.  Do you have any

13    understanding as to what needs to be in place for it

14    to be someone else who gets the copyright in a

15    photograph?

16        A.    Well, if that's determined -- well...

17        Q.    Do you know -- I'm just asking, do you

18    know what is required, if anything?

19        A.    Well, it depends if it's a for-hire or

20    something like that.

21        Q.    Okay.  So you have an understanding about

22    something called work-for-hire?

23        A.    Yes.

24              MS. HOLLIDAY:  Objection, form.

25        Q.    (BY MR. JIH)  And do you have an

Page 72

```
 1      understanding as to -- I think you said, "or
 2      something else."  Do you have an understanding as to
 3      what the something else might be?
 4            A.    What do you mean?
 5            Q.    Of -- I'm just asking all the ways in
 6      which you can make it so someone other than the
 7      person who clicks the shutter owns the copyright.
 8      I'm just wondering if you know what the rules are in
 9      terms of what has to happen.
10            A.    I mean --
11                  MS. HOLLIDAY:  Objection, form.
12                  THE WITNESS:  I'm not positive, no.
13            Q.    (BY MR. JIH)  So you don't have a clear
14      understanding of how the legal rules work in that
15      context?
16                  MS. HOLLIDAY:  Objection, asked and
17      answered.  Form.
18                  You can answer again if you want.
19                  THE WITNESS:  Yeah, I don't -- I don't
20      know.
21            Q.    (BY MR. JIH)  What's your understanding of
22      what a work-for-hire is?
23                  MS. HOLLIDAY:  Objection, form.
24                  You can answer if you know.
25                  THE WITNESS:  That -- yeah, if the person
```

Page 73

```
 1    who hires you owns the images.
 2         Q.    (BY MR. JIH)  Okay.  But do you have any
 3    understanding as to what's necessary to create or to
 4    have a work-for-hire?
 5              MS. HOLLIDAY:  Objection, form.
 6              THE WITNESS:  Not --
 7              MS. HOLLIDAY:  Answer if you can.
 8              THE WITNESS:  No, I don't know
 9    specifically, no.
10         Q.    (BY MR. JIH)  Have you ever heard of
11    the -- a copyright legal concept about a work being
12    commissioned?
13              MS. HOLLIDAY:  Objection, form.
14              THE WITNESS:  That -- not really in the
15    photography world, no.
16         Q.    (BY MR. JIH)  Okay.  So you don't have a
17    recollection of ever being involved in a situation
18    where something just was -- had to be commissioned as
19    a matter of law?
20         A.    I don't recall that at all, no.
21         Q.    Have you ever registered copyrights in any
22    of your photographs?
23         A.    I have -- I mean, again, licensing agents
24    have -- are the ones in the past.
25         Q.    But you personally have never applied for
```

Page 74

```
 1      a registration in the copyright of any of your

 2      photographs?

 3                   MS. HOLLIDAY:  Objection.

 4                   THE WITNESS:  You know what?  I don't know

 5      conclus -- no, I don't know.  I -- I may have.

 6      Because there were parts -- you know -- I mean, there

 7      has been a lot over the last decade and just

 8      constantly kind of a moving target, so...

 9           Q.    (BY MR. JIH)  Do you know, when the

10      licensing agent did it, was it in the name -- your

11      name or the LLC name or some other name?  Do you know

12      whose name it was in?

13           A.    I have -- I have no idea.  I just, in good

14      faith, you know -- you know, figured they were doing

15      their job, and that's what they do.

16           Q.    What was the name of your licensing agent?

17           A.    The last one was Venus Stock.  The one

18      prior to that was Headpress Photo.

19           Q.    When did Headpress Photo get replaced with

20      Venus Stock?

21           A.    I don't -- I don't know.  I wouldn't know

22      specifically, you know.

23           Q.    Do you know approximately how long Venus

24      Stock acted as your agent?

25           A.    I wouldn't have an accurate -- I don't
```

Page 75

1    know.  Like, when it started and when it ended, I

2    don't know.  For several years.

3         Q.    I'm just asking a couple of follow-up

4    questions on the process server.  I just want to make

5    sure.

6              You don't have any information of any

7    process server stalking you at your home, do you?

8              MS. HOLLIDAY:  Objection, form.

9    Objection.  We have abandoned this line of

10   questioning earlier, and if you have continued

11   questions about this, we would appreciate it if we

12   could go in for a protective order.

13             MR. JIH:  I'm just asking if he has the

14   information.

15             MS. HOLLIDAY:  On stalking?  I'm sorry.  I

16   don't understand the -- could you repeat your

17   question?

18             MR. JIH:  Yeah.

19        Q.    I'm asking, do you have any information

20   that any process server stalked you at your home?

21             MS. HOLLIDAY:  Objection, calls for a

22   legal conclusion.  And I believe you asked and

23   answered.

24        Q.    (BY MR. JIH)  You can answer.

25        A.    Like as a legal question, like a

Page 76

```
 1      legalese stuff, like --

 2           Q.   Any --

 3           A.   What do you mean by stalking?

 4           Q.   Do you feel like any process server ever

 5      stalked you at your home?  Have you ever had that

 6      feeling or information about that?

 7           A.   I mean, other than a neighbor saying,

 8      like, that -- that one guy.

 9           Q.   I haven't heard about a neighbor.  What

10      was the neighbor that said one guy?  You only talked

11      about the gym person so far, so let me just get the

12      neighbor.  Who was --

13           A.   Well, they saw the -- the guy serve when

14      my brother was served.

15           Q.   So when it was actually served, you are

16      talking about the neighbor saw it?

17           A.   Yeah.

18           Q.   Okay.  Before then, did you have any -- do

19      you have any reason to believe or any information

20      about anyone stalking you at your home?

21                MS. HOLLIDAY:  Objection, asked and

22      answered.  Objection.

23                THE WITNESS:  I don't know.

24                MS. HOLLIDAY:  We need to abandon this

25      line of questioning, Mr. Jih.  If -- if that's what
```

Page 77

```
 1     you -- if you want to make a claim against --
 2               MR. JIH:  I'm not trying to make a claim
 3     against any -- I'm just trying to understand if he
 4     has any information about this, because you have made
 5     representations to the court that these things
 6     happened.  I want to know if he said -- he has any
 7     information on that.  That's relevant.
 8               MS. HOLLIDAY:  To what?
 9               MR. JIH:  Whether or not -- just any
10     factual basis for the statements that have been made.
11     So I'm just trying to understand if there's any
12     information where you've ever said that someone has
13     been stalking you at your home.
14               MS. HOLLIDAY:  So you would need to make
15     a -- a claim against me, and then you could call him
16     as a witness, Mr. Jih.
17               MR. JIH:  The way it works -- come on,
18     just answer the question.  I don't want to argue.
19               MS. HOLLIDAY:  -- your question.
20     That's -- Mr. Jih, I'm going to encourage you to move
21     on to another line of questioning.  Mr. -- Mr. Riker
22     has appeared here in good faith.  If you want to save
23     your time for the end and maybe ask more questions
24     about something that might involve something that you
25     might bring against me at some point, then if there's
```

Page 78

1     time left over for that, great.

2                 If not, I would encourage you to ask

3     Mr. Riker questions about the case, because he has

4     appeared here pursuant to a court order.  So within

5     the scope of discovery there -- I'm sure you must

6     have plenty of questions that you would want answers

7     to.

8                 MR. JIH:  Are you instructing or not?

9                 MS. HOLLIDAY:  I am encouraging you to

10    move on to another line of questioning so that I

11    don't have to terminate the deposition and get a

12    protective order pursuant to Rule 30.

13                MR. JIH:  Well, I would think you would

14    instruct before you terminate.  So I'm just asking

15    are you instructing him not to answer?

16                MS. HOLLIDAY:  I'm not going to instruct

17    him to answer anything.  I'm going to instruct you to

18    please stay within the bounds of the scope of

19    discovery.

20                MR. JIH:  Well, then you can answer.

21                MS. HOLLIDAY:  Will you please repeat the

22    question, Court Reporter?

23                (Record was read as follows:  "Before

24         then, did you have any -- do you have any reason

25         to believe or any information about anyone

                                            Page 79

1          stalking you at your home?")

2              MS. HOLLIDAY:  I'm going to renew my

3      objection.  Calls for a legal conclusion.  Calls

4      for -- and it's been asked and answered.

5              If you want to answer the question, you

6      can.

7              THE WITNESS:  I'm not sure I'm qualified

8      to answer that, right?  It's, like...

9          Q.    (BY MR. JIH)  No, I'm just asking if you

10     have any information.  Did you ever say to anybody or

11     do you have any reason to believe anyone was stalking

12     you at your home?

13         A.    Well, just because someone from my gym

14     said this person has come twice, and then the

15     description matched the guy who ended up showing at

16     my home.

17         Q.    And that's the extent of the information

18     that you have?

19         A.    That's the extent of my information.

20         Q.    Did anyone -- do you have any reason to

21     believe that the gym staff disclosed your private

22     contact information to this person?

23         A.    I do not know.  I do not know.

24         Q.    So you've never said, Someone tricked the

25     gym staff into giving out my private contact

Page 80

```
 1    information?
 2              MS. HOLLIDAY:  Objection, calls for
 3    attorney-client privileged information.
 4         Q.   (BY MR. JIH)  I'm just asking if it -- do
 5    you have any information?  I think you said you
 6    don't, right, about that happening?
 7              MS. HOLLIDAY:  I believe, Mr. Jih, I have
 8    already objected.  This -- you're going into
 9    privileged communications between attorney and
10    client.
11         Q.   (BY MR. JIH)  I don't want to know about
12    your communications with any attorney, which I don't
13    think you had before February anyway.  My question
14    was only, do you have any information about someone
15    at the gym disclosing your private contact
16    information to anyone?
17              MS. HOLLIDAY:  Objection.  I believe
18    you're harassing Mr. Riker into thinking that he has
19    to tattle on the gym staff.
20              MR. JIH:  No, I'm asking if it happened,
21    that's all.
22              MS. HOLLIDAY:  That's all.  Mr. Jih --
23         Q.   (BY MR. JIH)  Do you have any information
24    on that?
25              MS. HOLLIDAY:  Mr. Jih, you can bring an
```

Page 81

```
 1      action against me and you can call Mr. Riker as a

 2      witness who might have some kind of -- of information

 3      about whether or not that occurred.  But within the

 4      scope of discovery for this -- for purposes of this

 5      deposition and complying with the court's order for

 6      this deposition, the scope of discovery is around the

 7      copyright claims.  So if you could please stick to

 8      copyright claims, then we can move forward.  If you

 9      have any questions that are involving the scope of

10      discovery around a different claim, you need to bring

11      that claim.

12           Q.   (BY MR. JIH)  You can answer.

13           A.    What's the question?

14           Q.   Do you have any reason to believe that

15      someone at the gym disclosed your private contact

16      information to the process server?

17           A.   Do I have reason to believe?

18                MS. HOLLIDAY:  Objection, calls for

19      speculation.

20                THE WITNESS:  Yeah, I don't know.  I

21      mean --

22           Q.   (BY MR. JIH)  That's all I want to know.

23           A.   I don't know how the person got my

24      information.

25           Q.   Okay.  Do you have any information about
```

Page 82

```
 1     someone bypassing security gates to try to serve a

 2     subpoena in this case?

 3          A.    Well, there are gates at my home, and the

 4     person served without -- yeah, there -- they

 5     shouldn't have been on the property.

 6          Q.    Do you have any information as to how they

 7     got on the property?

 8          A.    No.  No.

 9          Q.    You testified that the photography

10     business -- I think you described it that it was a --

11     largely a trust business.  Is that fair?

12          A.    Uh-huh.  Yes, that's fair.

13          Q.    And what do you mean by a "trust

14     business"?

15          A.    That you're -- that you -- it's basically,

16     you know, long-term relationships with -- with people

17     that you work for and that, you know, they feel

18     comfortable with.  I work largely in entertainment,

19     and they don't use people that they don't trust and

20     it's, like, that -- that takes time and -- you know,

21     so, it's -- it's a relationship.  It's not -- it's --

22     you know, and you have to prove yourself over time.

23     It's a trust thing.

24          Q.    So, you know, when you did the photo shoot

25     for Ms. Morton in Borneo in 2016, do you know why she
```

Page 83

```
1        picked you to be the photographer?

2                   MS. HOLLIDAY:  Objection, form.

3                   You can answer if you know.

4                   THE WITNESS:  I -- I'm -- I'm sure it's

5        because -- I mean, I would purely be speculating --

6        but she feels very comfortable with me and, you know,

7        deciding to take photos like that is -- is an

8        important decision, and she had been approached by

9        countless people to take these type of fine art

10       photographs.  Being a six-time Sports Illustrated

11       swimsuit model and voted top 50 ever, she was a --

12       very sought after to have these kind of images.  So,

13       you know -- and -- and we had known each other for a

14       long time at that point and -- yeah, it makes perfect

15       sense that I would be the one that she trusts.

16                   And then we had worked together so many

17       times that the aesthetic was right.  And we had

18       talked about it several times before even, you know,

19       actually doing the shoot about how she would like to

20       do something like this, but, you know, the timing

21       needs to be right; it's -- you know, it's a whole

22       thing, so...

23            Q.    (BY MR. JIH)  So did she approach you with

24       the idea of the shoot, or did you approach her?

25            A.    She approached me.
```

Page 84

```
 1          Q.    When did she first approach you with the
 2    idea of the shoot?
 3          A.    You know, I don't -- I don't know
 4    specifically the dates.  She was trying to figure out
 5    where and when.
 6                And then when the Borneo trip happened for
 7    here, she, you know, was, like, I think this is a
 8    great opportunity; I will fly you in, I'll do this,
 9    we'll, you know, have that all lined up.  She
10    would -- she was there for two or three days before I
11    got there, so it -- it was kind of perfect timing.
12    And a beautiful location, which I was, like, very
13    happy about because I was -- you know, an exotic
14    location makes images much better.  So instead of
15    shooting in Venice, we're on a beautiful -- you know,
16    it was much better, so...
17          Q.    Do you recall there being at least several
18    discussions over time before you actually went to
19    Borneo?
20          A.    Yeah, several.  Yeah.  Lots.  Yeah, lots
21    of discussions.
22          Q.    Over what period of time would you say?
23          A.    I mean, about that job specific -- about
24    that shoot specifically?  I mean, it's probably
25    over -- over several weeks of, you know, looking at
```

                                                    Page 85

1    references and, you know, kind of figuring out what

2    she wanted.

3           Q.    You said -- now, when the Borneo trip

4    happened for her and that she was already there for a

5    couple of days, what do you mean by that?

6           A.    Oh, she --

7                 MS. HOLLIDAY:  Objection, form.

8                 You can answer if you know.

9                 THE WITNESS:  Yeah, oftentimes as a

10   six-time Sports Illustrated swimsuit model she's, you

11   know, working in locations like that for clients.

12   And if she's going to be there a long period of time,

13   there are several days where she isn't going to be

14   shooting and it's totally normal for them to, you

15   know, be, like, Hey, if I'm not working these days

16   I'm going to, you know, fly someone in, and that's --

17   that's just common practice.

18          Q.    (BY MR. JIH)  Do you know why she was in

19   Borneo otherwise?

20          A.    It was a World Swimsuit, which is a

21   long-time client of hers, a South African client.

22          Q.    Were there other locations for the shoot

23   that you were actively considering with her other

24   than Borneo?

25          A.    No.  No.  Because it was -- it's purely

                                           Page 86

1     based on access, so you could dream, but that was the

2     only one for that.

3          Q.    When you -- when Ms. Morton approached you

4     to take these photographs for this shoot in Borneo,

5     how many times had you already worked with

6     Ms. Morton?

7          A.    Numer -- I don't know.  A -- very many,

8     which is the reason that she wanted me to do it,

9     because she trusted me.

10         Q.    And you trusted her?

11         A.    Of course.  Yeah, of course.

12         Q.    Did you and Ms. Morton need -- need to

13    enter -- rephrase the question.

14               Before this shoot, the Borneo shoot in

15    2016, did you and Ms. Morton have written agreements

16    that applied to your different photo shoots that you

17    did for her?

18               MS. HOLLIDAY:  Objection, form.

19    Objection, as it calls for privileged information.

20               But if you answer -- if you know, you can

21    answer.

22               THE WITNESS:  I don't know.  I don't know.

23    Like...

24         Q.    (BY MR. JIH)  So you think you could have;

25    you don't know one way or the other?

                                                  Page 87

```
1            A.    I mean, in the discussions it's -- it's,
2      you know -- it's, like, I would get a certain
3      percentage and all that kind of stuff, you know.
4            Q.    I'm asking whether or not -- I'm not
5      saying whether or not you had an agreement like --
6      that you discussed with her or anything like that;
7      I'm asking a formal written agreement that then each
8      party signs.  Did you have any formal written
9      agreements that, you know, the people would sign for
10     your photo shoots with Ms. Morton before the Borneo
11     shoot?
12                 MS. HOLLIDAY:  Objection to form.
13                 But you can answer if you know.
14                 THE WITNESS:  I don't remember with this
15     one.
16            Q.    (BY MR. JIH)  I'm not asking -- any of
17     them before the Borneo.
18            A.    Yeah.
19                 MS. HOLLIDAY:  Objection, asked and
20     answered.
21                 You can answer.
22                 THE WITNESS:  Yeah, I don't remember.
23            Q.    (BY MR. JIH)  Okay.  Do you know if you
24     had a signed written agreement before the -- before
25     the Borneo shoot in 2016?
```

Page 88

```
 1                    MS. HOLLIDAY:  Objection, form.

 2                    But you can answer if you know.

 3                    THE WITNESS:  A signed written agreement

 4       about what?

 5            Q.   (BY MR. JIH)  Anything that -- like,

 6       before you do a job, if there is formal -- a formal

 7       agreement.  Sometimes, you know, you would have

 8       signatures.  I'm just asking if you had one for the

 9       Borneo 2016 shoot.

10                    MS. HOLLIDAY:  Objection, form.

11                    You can answer if you know.

12                    THE WITNESS:  Yeah, I don't -- I don't

13       remember.

14            Q.   (BY MR. JIH)  Okay.  So did you have any

15       reason to believe you would have a formal written

16       agreement with Ms. Morton for the Borneo shoot?

17                    MS. HOLLIDAY:  Objection, form.

18                    You can answer if you know.

19                    THE WITNESS:  Wait.  What was the -- if I

20       had -- if I --

21            Q.   (BY MR. JIH)  Can you think of any reason

22       why you and Ms. Morton would actually enter into a

23       formal written legal agreement that's signed by both

24       of you for the Borneo 2016 shoot?

25                    MS. HOLLIDAY:  And objection to form.
```

Page 89

1           But you can answer if you can.

2           THE WITNESS:  Yeah, I don't -- this just

3     seems like legalese, so, like -- I don't -- I

4     don't -- I don't remember specifically for this at

5     all.

6           Q.    (BY MR. JIH)  With someone that you trust

7     and have done business with, would you be willing to

8     do a photo shoot without a formal signed agreement

9     before the work?

10          MS. HOLLIDAY:  Objection, form.

11          But you can answer if you know.

12          THE WITNESS:  Yeah, if there's -- if

13    there's -- if -- yeah, at times when you have -- you

14    trust what's happening, you know.  If you've worked

15    together before or whatever, like -- I've worked with

16    Halle Berry a bunch of times, and, you know, after

17    the first time they don't do it, so...

18          Q.    (BY MR. JIH)  Do you have a standard form

19    agreement that you use for photography for the Riker

20    Brothers, LLC?

21          A.    No, I don't.

22          Q.    And did you ever have a standard form

23    agreement that you used for any of the photo shoots

24    you did as a photographer?

25          A.    A standard form, no.

Page 90

1           Q.    Or a form that may have changed?  Any kind

2      of form agreement to govern photo shoots.  Do you

3      have one?

4                 MS. HOLLIDAY:  Objection, form.

5                 You can answer if you know.

6                 THE WITNESS:  I mean, at times it's just

7      an e-mail confirmation.

8           Q.    (BY MR. JIH)  But nothing that would be a

9      formal agreement that has legalese, so to speak, that

10     you've signed; you don't have a form that you used

11     for your photography business?

12                MS. HOLLIDAY:  Objection, vague.

13     Objection, form.

14                You can answer if you know.

15                THE WITNESS:  Yeah, no.

16          Q.    (BY MR. JIH)  In the instances where there

17     were signed written agreements for photo shoots, do

18     you recall who prepared those agreements?

19                MS. HOLLIDAY:  Objection, calls for a

20     legal conclusion.

21                THE WITNESS:  I -- you know, I don't.  I

22     don't know.  And it's -- every shoot is different --

23     completely different.  Everyone's got a different way

24     of doing it.

25          Q.    (BY MR. JIH)  Have you ever hired an

                                                    Page 91

```
 1      attorney to draft a legal agreement to govern the

 2      photo shoot?

 3          A.    You know what?  I'm not positive.  Back

 4      in -- you know, at some point I -- I maybe did.  I'd

 5      have to go through -- I don't know.

 6          Q.    But it wasn't something you would usually

 7      do or did frequently?

 8          A.    Most -- you know, most jobs aren't --

 9      aren't -- you know, you're not concerned with

10      copyright as much.  There are certain types of

11      photographs that you're very concerned about them

12      being taken advantage -- or people violating that

13      stuff.  So, you know, when it's a low risk or a

14      low -- you're not really going to waste your time

15      with that kind of stuff.

16          Q.    And would there be less reason to do it

17      with people that you trust?

18          A.    Yes.

19          MS. HOLLIDAY:  Objection, form.  But you

20      can answer if you know.

21          THE WITNESS:  Wait.  Less -- wait.  Sorry.

22          Q.    (BY MR. JIH)  Less reason to hire a lawyer

23      to draft a formal written agreement with people that

24      you trust?

25          A.    Well, yeah.
```

Page 92

1           Q.    Do you ever -- if someone proposes a

2     formal written agreement for you to sign, do you

3     recall ever hiring an attorney to review it for you

4     before you signed it?

5           A.    Yeah.  Yeah.

6           Q.    Who do you recall hiring, in general,

7     ever, as an attorney to help you review?

8           A.    Do you want his name or what?

9           Q.    Sure.

10          A.    I mean, not to mention, I -- my father is

11    a lawyer, so I've had him look at things before.

12                And I'm not sure if I asked him or not, so

13    I wouldn't want to bring his name up.  There is an

14    entertainment lawyer that I'm friends with that I'm

15    pretty sure, but I wouldn't want to bring him into

16    this if it's not true, you know.  If it --

17          Q.    Okay.

18          A.    -- you know, if it's -- I'm not positive.

19          Q.    Okay.  So other than maybe your dad in

20    certain instances or maybe this person to review

21    contracts, do you actually recall asking anyone ever

22    before to review a written agreement for a photo

23    shoot before doing the shoot?

24          A.    Oh, gosh.  I'm -- I'm trying to think,

25    'cause a lot of times it will be, like, an agent or

Page 93

```
 1    someone else who then takes the agreement and then

 2    advises you that it's okay.  You know, it's maybe not

 3    a lawyer; it's -- they've got access to one or

 4    whatever, you know; it's just...

 5         Q.    So do you recall, in connection with the

 6    Borneo 2016 shoot, whether or not you got any lawyer

 7    involved, like your father or this entertainment

 8    lawyer, or a licensing agent person to review any

 9    written agreement before you signed it?

10         A.    No.

11              MS. HOLLIDAY:  Objection, form.

12              But you can answer if you know.

13              THE WITNESS:  I don't -- I don't recall

14    doing that for this, no.

15         Q.    (BY MR. JIH)  Would you ever sign formal

16    written legal agreements without anyone advising you

17    or reviewing it?

18              MS. HOLLIDAY:  Objection, form.

19              But you can answer if you know.

20              THE WITNESS:  I mean, it depends on the

21    document, clearly, and what it's for.  It's -- I

22    mean, publicists want you to sign a million things

23    that are, you know -- they are just these kind of

24    formalities of -- they are not, you know -- so when

25    you are accustomed to seeing those about -- that's --
```

Page 94

```
1    I would never have a lawyer look at them.  And I'm

2    not really concerned about there being any risk for

3    me or anyone else, you know.

4              MR. JIH:  I want to go through a series of

5    exhibits.  They should be in your exhibit share.  I

6    don't know if that's been -- you have access to that?

7              MS. HOLLIDAY:  You know, I don't think we

8    set that up yet, and I think maybe this might be a

9    right time to take a lunch break.

10             MR. JIH:  We can do that.

11             MS. HOLLIDAY:  And then we can come back

12   and look at the exhibits, and we won't want to

13   interrupt the flow of that, if that's okay with you

14   guys.

15             MR. JIH:  Yeah, we can take our lunch

16   break now.  How long do you want?

17             MS. HOLLIDAY:  Again, I would defer to the

18   court reporter.

19             MR. JIH:  I think, like -- we've been

20   doing it for 30 or we can do 45.  I'm good with

21   either.  I don't think we'll take all seven hours of

22   your time, so whatever you want to do.

23             MS. HOLLIDAY:  Okay.  Let's take 45, I

24   think.

25             MR. JIH:  Okay.
```

Page 95

```
 1                    MS. HOLLIDAY:  -- outside so it might take

 2      a little longer to get back, and I want to make sure

 3      I set up exhibit share properly, so it might --

 4                    MR. JIH:  Yeah, we can go off the record

 5      and come back in 45 minutes.

 6                    MS. HOLLIDAY:  All right.  Thank you.

 7                    THE VIDEOGRAPHER:  We are off the record

 8      at 12:02 p.m.

 9                    (A break was taken from 1:02 p.m. to

10                    1:47 p.m.)

11                    THE VIDEOGRAPHER:  We are back on the

12      record at 12:47 p.m.

13           Q.    (BY MR. JIH)  So did you get the exhibit

14      share set up so that you have access to the marked

15      exhibits now?

16           A.    We're doing it right now.

17                    MS. HOLLIDAY:  Yeah, we are trying to.  I

18      had to actually change my password, so I am just

19      trying to get that done right now.

20                    Yeah, it's -- it's not really working.

21      Can you check and see on your -- whatever browser you

22      used to open it?

23                    MR. JIH:  Uh-huh.

24                    MS. HOLLIDAY:  See if you can launch

25      exhibit share.  If you hit the back -- yeah, there.
```

Page 96

```
 1        You could hit launch exhibit --
 2                   THE WITNESS:  Yes.
 3                   MS. HOLLIDAY:  Go back to that.
 4                   THE REPORTER:  Do you want to go off the
 5        record with this?
 6                   MR. JIH:  We can go off the record.
 7                   THE VIDEOGRAPHER:  We are off the record
 8        at 12:49 p.m.
 9                   (A break was taken from 1:49 p.m. to
10                   1:49 p.m.)
11                   THE VIDEOGRAPHER:  Okay.  We are back on
12        the record at 12:49 p.m.
13        Q.    (BY MR. JIH)  So you -- in the exhibit
14        share folder in front of you you'll see a series of
15        marked exhibits, and these are exhibits that were
16        previously marked in the deposition of Ms. Morton.
17        And I wanted you to take a look at Exhibits -- they
18        are marked as Exhibits 1 through 13.  So if you could
19        just open and look.  You know, they are a series of
20        photographs.  If you can look at the Exhibits 1
21        through 13, and then I'll ask you a question about
22        them.
23        A.    Okay, so that's this here, right?
24        Q.    Your attorney will have to tell you.
25        A.    Okay.
```

Page 97

1          Q.    They should be marked as Exhibit -- I

2     think they probably say Exhibit TWI001.

3          A.    Yeah, here is 001, tab 2.

4          Q.    Yeah.  And look at Exhibits 1 through 13.

5          A.    Okay.

6          Q.    Let me know when you are done?

7          A.    Three, four, five, six, seven, eight,

8     nine, 10, 11, 12, 13.  Okay.

9                So 1 through 13?

10         Q.    Yes.

11         A.    Okay.

12         Q.    So I will represent that 1 through 12 are

13    what we understand to be the photographs at issue in

14    one of the lawsuits Ms. Morton filed against Twitter,

15    and that Exhibit 13 was another photograph that

16    hasn't been identified yet clearly in terms of

17    picture, are at issue in the second one.

18                Do you recognize all of these photographs

19    in Exhibits 1 through 13?

20         A.    Yes, I do.

21         Q.    And did you take these photographs,

22    Exhibits 1 through 13?

23                MS. HOLLIDAY:  Objection just as to the --

24    objection.

25                But you can answer the question if you

Page 98

1       know.

2                   THE WITNESS:  Yes.

3           Q.    (BY MR. JIH)  I think you used the

4       phrase -- a phrase before, you were the one who

5       actually pressed the shutter, so to speak, on

6       the camera, correct, for these photos?

7           A.    As the photographer, yes.

8           Q.    Okay.  And in addition to taking the

9       photograph, did you also edit or touch up or process

10      these photographs in any way?

11                  MS. HOLLIDAY:  Objection, form.

12                  You can answer.

13                  THE WITNESS:  Yes.

14          Q.    (BY MR. JIH)  What's the right word to use

15      for that post-taking-of-the-photograph process?

16          A.    Well, you develop the negative -- the

17      digital negative using one program.

18                  And then there's retouching, which is --

19      which is the other kind of editing, which people use

20      as editing.  But they are two very different

21      processes.

22          Q.    Okay.  And you said one of them is to

23      develop the digital negative.  The second process is

24      what you said is retouching or editing?

25          A.    Retouching, yeah.

Veritext Legal Solutions
866 299-5127

1          Q.    Do you prefer to use the word "retouching"
2     as opposed to "editing"?
3          A.    Photographers use retouching.  At least
4     old photographers.  Young -- young people use
5     different terms, so.
6          Q.    Okay.  And you -- for these photographs,
7     were you also involved in developing the digital
8     negative and in any retouching?
9          A.    Yes.
10          Q.    What program did you use to develop the
11     digital negative?
12          A.    Capture One.
13          Q.    Whose decision was it to use Capture One
14     for the developing process?
15          A.    As the photographer, it's the -- it's what
16     I use, so...
17          Q.    Did anyone tell you what program to use to
18     develop the digital negative?
19          A.    Other than, you know, make it look like
20     what we -- we've done previously.  So that's what I
21     use, Capture One.
22          Q.    But you weren't instructed on exactly how
23     to go about doing it so it looks like what was done
24     previously, correct?
25               MS. HOLLIDAY:  Objection, form.

                                        Page 100

```
 1                    THE WITNESS:  She wanted black and white.
 2          Q.   (BY MR. JIH)  Okay.  But as the
 3     photographer, did she instruct you on how to achieve
 4     the effect she wanted?
 5                    MS. HOLLIDAY:  Objection, form.
 6                    THE WITNESS:  I mean, it's -- it's a
 7     complicated -- I mean, that's why I'm a photographer;
 8     someone needs to know how to use the equipment.  So
 9     she's looking on the screen and determines, like,
10     what she likes visually, but, you know, it's a very
11     complicated, you know, program.  It's a very skilled
12     part of the -- part of the process.
13          Q.   (BY MR. JIH)  All right.  So I understand
14     she would look at certain results and see if she
15     likes it or not, but she -- did she get involved at
16     all in terms of telling you how to use the programs
17     to develop the digital negative?
18                    MS. HOLLIDAY:  Objection, form.
19                    THE WITNESS:  I mean, I think I just
20     answered that.  I don't understand what you are
21     getting at.
22          Q.   (BY MR. JIH)  No, I'm just trying to make
23     sure I understood your answer.
24          A.    How to use the program?
25          Q.    Correct.
```

Page 101

```
 1           A.    I just said that it's a very complicated
 2      program and, you know, it takes years to get good at
 3      this, so, you know, that's -- that's what -- what I'm
 4      doing here and that's what -- while -- why she's
 5      entrusting me to do this, so...
 6           Q.    Okay.  So she entrusted you to do that;
 7      she didn't instruct you on how to do it, correct?
 8           A.    She instructed --
 9           MS. HOLLIDAY:  Objection, form.
10           THE WITNESS:  -- on how it should look,
11      but she doesn't know how to get it to look that way.
12           Q.    (BY MR. JIH)  Great.
13           A.    That's where my expertise comes in.
14           Q.    Perfect.
15           And then how about in the retouching
16      process, is there a particular program that you use
17      for the retouching process?
18           A.    Photoshop, which is pretty much the
19      industry standard for 25 years.
20           Q.    And is it the same answer you gave on
21      developing in the sense that you used your know-how
22      to use Photoshop to get the results she wanted in the
23      pictures?
24           MS. HOLLIDAY:  Objection, form.
25           You can answer.
```

Page 102

```
 1                    THE WITNESS:  That one is way more
 2      specific because it's just -- it's just like she
 3      wanted it very, very natural, doesn't want it to look
 4      a certain way, so it was actually very minimal.
 5           Q.   (BY MR. JIH)  In terms of the -- I'm
 6      sorry.  Were you done?
 7           A.   But that one's not nearly as complicated
 8      as Capture One, so...
 9           Q.   In terms of being minimal retouching that
10      you referred to, are you saying the photographs still
11      were retouched to some degree but just not a lot?
12                    MS. HOLLIDAY:  Objection, form.
13                    THE WITNESS:  I mean, they -- they are
14      opened in Photoshop and there is just, like -- you
15      know, it's where you're -- you are getting little,
16      tiny things that might attract the eye out of the
17      water or a little thing, you know -- any kind of
18      like, white thing.  It could be dust on a lens,
19      whatever, stuff like that.
20           Q.   (BY MR. JIH)  So even though -- I
21      understand that she wanted the retouching to be
22      minimal because she wanted her look to be natural --
23           A.   Yes.
24           Q.   -- that doesn't mean, though, that there
25      was no retouching of the photograph, correct?
```

Page 103

```
 1            MS. HOLLIDAY:  Objection, form.

 2            THE WITNESS:  Yeah, those are -- yeah,

 3      those are different kind of things, because even an

 4      unretouched photo you get, like, dust and little --

 5      little things.  It's not necessarily -- you are not

 6      really altering the -- it's kind of like cleaning --

 7      cleaning up a negative, you know, with a -- with a --

 8      with a rocket-air thing before you -- you know.

 9         Q.    (BY MR. JIH)  And you were still

10      responsible for cleaning up the negative in these

11      shots, right?

12         A.    Yes.

13         Q.    Did Ms. Morton direct you on how to clean

14      up the negative?

15            MS. HOLLIDAY:  Objection, form.

16            THE WITNESS:  I mean, I suppose in -- in

17      some way, yeah, because she would say what she

18      didn't -- like, little things that she thought should

19      be, you know, cleaned up, you know.

20         Q.    (BY MR. JIH)  Okay.  But in large part,

21      did she trust you to use your experience as a

22      photographer to clean up the negative also?

23            MS. HOLLIDAY:  Objection.  Asked and

24      answered.

25            THE WITNESS:  Yeah.  I mean, she trusts
```

Page 104

1    me, so it's, like, at some point -- it's a very

2    tedious process, so, you know, it would be a waste of

3    almost anyone's time to sit there the whole time.

4         Q.    (BY MR. JIH)  Did Ms. Morton sit there as

5    you did the retouching on these photographs?

6              MS. HOLLIDAY:  Objection, form.

7              You can answer if you know.

8              THE WITNESS:  Not -- not for every single

9    moment, no.  But she highlights things and whatever,

10   and so there's a guide.

11        Q.    (BY MR. JIH)  Okay.  So she may, like,

12   react to photos that you are showing her or give you

13   instruction in terms of she's liking certain parts or

14   not certain parts?  Is that what you are saying?

15        A.    Correct.

16        Q.    But were you required to do the retouching

17   in her presence or under her watch?

18             MS. HOLLIDAY:  Objection, form.

19             But you can answer if you can.

20             THE WITNESS:  No.

21        Q.    (BY MR. JIH)  Were you required to do the

22   retouching during any specific hours that you were

23   supposed to work?

24        A.    No.

25             MS. HOLLIDAY:  Objection, form.

```
 1                    THE WITNESS:  Sorry.  No.  No.
 2        Q.   (BY MR. JIH)  Were you required to do the
 3   retouching at any specific location she was
 4   instructing you to -- let's take it back.
 5                    Were you required to do the retouching at
 6   any particular location?
 7                    MS. HOLLIDAY:  Objection, form.
 8                    THE WITNESS:  No.
 9        Q.   (BY MR. JIH)  How about for the
10   development process; were you under any kind of
11   instructions in terms of where or when you had to do
12   that?
13                    MS. HOLLIDAY:  Objection, form.
14                    THE WITNESS:  No.
15        Q.   (BY MR. JIH)  In terms of the taking of
16   the photographs, can you give me a general
17   understanding of what decisions were made by
18   Ms. Morton and what contributions or decisions did
19   you make with respect to the photographs?
20                    MS. HOLLIDAY:  Objection, form.
21                    But you can answer if you understand the
22   question.
23                    THE WITNESS:  Well, for example -- yeah,
24   she determined the location and time of day, to do
25   sunrise stuff on some of the stuff on the beach.  So
```

Page 106

```
 1        we wanted a very natural -- all natural light in

 2        the -- in the -- you know, in nature and stuff like

 3        that.

 4                  And then she wanted to shoot some at night

 5        that would, like, make it almost like a black

 6        background, which we had -- you know, there's

 7        references and -- that we had looked at, and she

 8        loved that, you know.

 9                  But, yeah, she -- she -- she was there two

10        days before me, too, so it was -- so she had kind of

11        scouted it out, which -- which made it actually very

12        easy.

13            Q.    (BY MR. JIH)  So what did you bring or

14        contribute in terms of these photographs?

15                  MS. HOLLIDAY:  Objection, form.

16                  But answer if you know.

17                  THE WITNESS:  I mean, I suppose a very

18        good working knowledge of how a camera works and the

19        ability to expose those images the way to get the

20        desired look, you know.  You know, knowing how to --

21            Q.    (BY MR. JIH)  Yeah.

22            A.    -- how to expose with back light, how to,

23        you know -- all -- all the things that -- that --

24        that we wanted out of the image, so...

25            Q.    And in terms of those aspects, did
```

Page 107

```
 1    Ms. Morton try to give you instructions on how to do,
 2    you know -- how to expose or, you know, how the
 3    camera works, or were those things she trusted that
 4    you would just know?
 5              MS. HOLLIDAY:  Objection, form, and
 6    objection, speculation.
 7              You can answer if you know.
 8              THE WITNESS:  As far as the camera -- I
 9    mean, she pretty much left that to me with, you know,
10    over 25 years of experience doing it, so -- it was a
11    good choice.
12         Q.    (BY MR. JIH)  How about in terms of, you
13    know -- you said how to, you know, expose, for
14    example, exposure, the ability to control exposure.
15    Is that something that you brought to the table or
16    something that she directed you on?
17              MS. HOLLIDAY:  Objection, form.
18              You can answer if you know.
19              THE WITNESS:  I mean, exposure is
20    everything in photography, so it's an absurd, kind
21    of -- yeah, I mean --
22              THE REPORTER:  Excuse me.  I didn't hear
23    that.  "Exposure is everything in photography, so"...
24              THE WITNESS:  So it's -- obviously, I'm
25    the one whose -- has expertise in that.
```

Page 108

1      Q.     (BY MR. JIH)   She didn't try to teach you
2   how to take a photograph, right?
3                  MS. HOLLIDAY:   Objection, form.
4                  THE WITNESS:   Not this time.
5      Q.     (BY MR. JIH)   Okay.   Has she in the past?
6      A.     No.   Just...
7                  MS. HOLLIDAY:   Objection.   I think you
8   should probably refrain from any jokes because
9   sarcasm doesn't read very well on the transcript.   So
10   it would be unclear if people are laughing and joking
11   about something like this, which is very serious.
12      Q.     (BY MR. JIH)   So given that, the -- the
13   answer is she has not tried to teach you how to be a
14   photographer, correct?
15      A.     No, she has not.
16      Q.     Okay.   Did she -- what camera equipment
17   did you use for the Borneo shoot in 2016?
18                  MS. HOLLIDAY:   Objection, form.
19                  But if you know, you can answer.
20                  THE WITNESS:   Sony -- I'm almost positive
21   it was Sony 7r2.
22      Q.     (BY MR. JIH)   You only use one type of
23   camera during your shoot, or do you sometimes use
24   more than one camera?
25      A.     I use the same type of camera.   Sorry.   I

Page 109

1     use the same type of camera in -- in one shoot.  I'll

2     use the same one.

3          Q.    Did you -- did she tell you to use that

4     camera, or did you decide what camera to use?

5                MS. HOLLIDAY:  Objection, form.

6                You can answer -- answer if you know.

7                THE WITNESS:  I mean, it isn't something

8     discussed.  She -- you know, it's the camera that

9     I've been using, so I -- it really didn't seem like

10    an -- you know, she didn't have to clarify that.

11         Q.    (BY MR. JIH)  If you, say, had went and

12    gotten a different camera this time, would you have

13    had to clear it with her, or did you understand this

14    is something you could just decide?

15               MS. HOLLIDAY:  Objection, form.

16               You can answer if you know.

17               THE WITNESS:  I mean, I don't -- yeah, I

18    don't know.  It's not something that would have

19    happened, so...

20         Q.    (BY MR. JIH)  But had you -- have you ever

21    been in a situation where you have to clear what

22    camera choice you use with the model?

23               MS. HOLLIDAY:  Objection, form.

24               THE WITNESS:  You never have to clear with

25    the subject.  You sometimes have to clear -- like,

Page 110

```
 1      for example, if you shoot for Netflix, you have to
 2      use a certain type of camera that has a large enough
 3      file size to print on pill boards.
 4           Q.   (BY MR. JIH)  Okay.
 5           A.   That was not this case.
 6           Q.   Did Ms. Morton pay you for any of the
 7      equipment or reimburse you for any of the equipment
 8      that you used for the photo shoot in Borneo in 2016?
 9                MS. HOLLIDAY:  Objection, form.
10                If you know the answer, you can answer.
11                THE WITNESS:  I mean, I suppose that's
12      part of our agreement billing-wise.  It wasn't
13      something that we discussed; it was assumed it was in
14      the -- the percentage agreement.
15           Q.   (BY MR. JIH) So there was no separate
16      itemization of expenses or reimbursement of expenses
17      is what you are saying?
18           A.   Not for the camera or equipment.
19           Q.   What expenses were reimbursed or something
20      that you, you know, itemized for this shoot in 2016?
21                MS. HOLLIDAY:  Objection, form.
22                You can answer if you know.
23                THE WITNESS:  I'm actually not positive,
24      but -- I mean, she paid for the hotel room and paid
25      for meals, paid for expenses while I was there.
```

Page 111

1      Q.    (BY MR. JIH)  All right, but you never

2   submitted expenses to her for reimbursement?

3      A.    No.

4      Q.    What were the terms of the financial --

5   what were the financial terms that you agreed on for

6   the photo shoot in Borneo in 2016?

7            MS. HOLLIDAY:  Objection, form.

8            If you can -- if you know, you can answer.

9            THE WITNESS:  You know, I'm not positive

10  'cause there's, like, a bunch of different things

11  of -- of the different sets that we shot.  'Cause the

12  calendar was 20 percent, I believe, and then we had

13  agreed on 25 percent of the other collections that we

14  did.

15     Q.    (BY MR. JIH)  When did you -- well, first

16  of all, let's make sure I understood.

17           So she agreed to pay you 20 percent from

18  any proceeds from the calendar, and 25 percent -- is

19  that for anything else or for the collections?

20           MS. HOLLIDAY:  Objection, form.

21           THE WITNESS:  Actually, in the agreement

22  it -- I think it -- it may include anything, not just

23  those.  It's, like, anything that we use those images

24  for, maybe.  It wasn't, you know -- if we were to

25  do -- release more images or something, it would be,

Page 112

```
1        I think -- I think --

2             Q.    (BY MR. JIH)  It is just -- go ahead.

3    Sorry.

4             A.    No, I'm, like -- yeah, that's my

5    recollection of it.

6             Q.    So there's a 20 percent for the calendar

7    and 25 percent for any other use -- other uses of the

8    images, right?

9             A.    I believe that is correct.

10            Q.    Were you compensated in any other way, or

11   was that the full extent of the compensation you

12   received for this photo shoot?

13                 MS. HOLLIDAY:  Objection, form.

14                 You can answer if you know.

15                 THE WITNESS:  That -- that was the

16   agreement, so that's -- I was not compensated more

17   than that, no.

18            Q.    (BY MR. JIH)  There was no, like, hourly

19   rate or anything like that?

20            A.    No, nothing like that.

21            Q.    When did you come to this agreement of the

22   20 percent and the 25 percent?

23                 MS. HOLLIDAY:  Objection, form.

24                 THE WITNESS:  When was -- you know what?

25   I'm not -- I'm not positive when it was.
```

Page 113

```
 1              Q.    (BY MR. JIH)  Do you know if it was before

 2       the photo shoot or after the photo shoot?

 3                    MS. HOLLIDAY:  Objection, asked and

 4       answered.

 5                    THE WITNESS:  You know, I -- I'm not

 6       positive, but I think we -- we probably did throw

 7       around like what it would be like if we shoot this,

 8       blah, blah, blah, you know.

 9                    And I would be, like, Okay, that makes

10       sense to me, you know, 'cause she had a -- she has a

11       very big following; she has millions of followers,

12       and I knew she would be able to sell the calendar

13       because people had been asking her for a long time,

14       so -- I mean, it's, like, Okay, I can pretty much

15       agree to that, and being how much money I would make

16       from it and stuff and that it would be worth -- worth

17       me doing it.

18              Q.    (BY MR. JIH)  Do you know, when you

19       actually reached an agreement on the 20 percent and

20       the 25 percent, do you have a recollection one way or

21       the other whether it was before or after the shoot?

22                    MS. HOLLIDAY:  Objection, form.

23                    You can answer if you know.

24                    THE WITNESS:  You know, I don't -- I don't

25       remember specifically when it was, you know.  Yeah, I
```

Page 114

```
1      don't -- I don't know specifically when.
2              But I was concerned about getting paid, so
3      I was, you know -- I was, like, Okay, and I knew
4      some -- we had thrown around some numbers.
5          Q.    (BY MR. JIH)  Okay.  So you may have
6      already discussed maybe the general ballpark or
7      something, but you don't remember if the final
8      agreement you actually agreed was before or after?
9              MS. HOLLIDAY:  Objection, form.
10             THE WITNESS:  There was -- yeah.  I -- I
11     don't know, like, exactly.
12         Q.    (BY MR. JIH)  Did you know going into the
13     photo shoot that the photographs might either be used
14     for a calendar or potentially in other ways?
15             MS. HOLLIDAY:  Objection, form.
16             THE WITNESS:  I mean, I did know what
17     certain things were going to be used for, yes.
18         Q.    (BY MR. JIH)  What did you know in terms
19     of how the photographs would be used going into the
20     photo shoot?
21             MS. HOLLIDAY:  Objection, speculation.
22     Form.
23             You can answer if you know.
24             THE WITNESS:  I mean, I knew we were
25     shooting a calendar, and then that we were going to
```

Page 115

```
1      shoot other things to try to do -- do more.
2            Q.    (BY MR. JIH)  So the photo shoot wasn't
3      limited to just images for a calendar, correct?
4                  MS. HOLLIDAY:  Objection, speculation.
5      Form.
6                  You can answer if you know.
7                  THE WITNESS:  I mean, we were trying to
8      get as much content as we could, honestly, to
9      monetize.
10           Q.    (BY MR. JIH)  Did you go into the photo
11     shoot already having an idea of what images you would
12     want for the calendar specifically?
13                 MS. HOLLIDAY:  Objection, speculation.
14     Form.
15                 You can answer if you know.
16                 THE WITNESS:  I mean, it happens once you
17     get to the location and you see them and then you --
18     you know, you kind of figure it out once you're --
19     you're there.  But not, like, you know, prior to
20     going to Borneo, it wasn't, you know -- you kind of
21     sort that out once you're there.
22           Q.    (BY MR. JIH)  But you took a -- you wanted
23     to just create content of which you wanted to pick
24     images for a calendar, correct?
25                 MS. HOLLIDAY:  Objection, speculation.
```

Page 116

```
 1    Form.
 2              You can answer if you know.
 3              THE WITNESS:  No, not exactly.  I mean,
 4    it's -- you know, that doesn't -- I mean, you're --
 5    you kind of know which ones were kind of images
 6    you -- we wanted for certain things and certain
 7    things for others, yeah.
 8         Q.    (BY MR. JIH)  Okay.  So you had some sense
 9    as you were taking the photos that some photos might
10    be good for the calendar and some might be good for
11    something else; is that what you are saying?
12              MS. HOLLIDAY:  Objection, asked and
13    answered.  And objection, form.
14              THE WITNESS:  Well, for example, the back
15    of the calendar, she had determined she wanted that
16    kind of shot for the back of the calendar, and that
17    was, like, clearly this setup is for that, you know.
18         Q.    (BY MR. JIH)  And the others you didn't
19    necessarily have a specific purpose in mind yet?
20              MS. HOLLIDAY:  Objection, asked and
21    answered.  Form.
22              You can answer if you know.
23              THE WITNESS:  Well, I mean, photography
24    works -- you know, you kind of -- it's a -- it's a --
25    it's an art, it's not a science, so, you know, you
```

Page 117

```
 1      kind of -- baking a cake and, like, if it tastes
 2      good, we're going to use this.  It's, like, a whole,
 3      you know -- there's a process to it.  You shoot
 4      certain setups, and then picking the actual image
 5      that makes it as a -- you know, that's a whole -- a
 6      whole different thing.
 7           Q.   (BY MR. JIH)  The only part I just want to
 8      make sure -- I understand that -- is you -- when you
 9      were taking the pictures, it was -- you weren't
10      limited to the calendar as you were taking pictures;
11      you were thinking about a wider assortment of
12      possible uses; is that right?
13                MS. HOLLIDAY:  Objection, form.  And
14      objection, asked and answered.
15                THE WITNESS:  There's -- I mean, I'm not
16      sure what you are getting at there.  What -- like,
17      what -- can you rephrase the question or...
18           Q.   (BY MR. JIH)  What I'm trying to
19      understand is were these photographs taken -- was
20      this photo shoot done solely to get images for a
21      calendar, or was it broader than that?
22                MS. HOLLIDAY:  Objection, form.
23      Objection, asked and answered.
24                If you don't understand the question, you
25      can ask to have it rephrased again.
```

Page 118

```
 1                    THE WITNESS:  Yeah, could you -- could you
 2       rephrase that again?  I'm not -- I'm not positive,
 3       like, what you're saying.
 4            Q.    (BY MR. JIH)  Were you -- so you were
 5       asked to be the photographer for this photo shoot?
 6            A.    Uh-huh (affirmative).
 7            Q.    I'm trying to get a sense of what
 8       understanding you had in terms of how those
 9       photographs were going to be used.
10            A.    Right.
11            Q.    Is it supposed to just be for a calendar,
12       or did you already understand that it might be in a
13       collection for other uses as well?
14                    MS. HOLLIDAY:  Objection, speculation.
15       Objection, form.  Asked and answered.
16                    THE WITNESS:  I mean, I'm -- I'm not sure
17       what you are getting at.  It's just, like, we knew we
18       were -- we were shooting things for -- for
19       different -- we had a few different things in mind.
20            Q.    (BY MR. JIH)  Do you recall what those
21       different possibilities were?
22                    MS. HOLLIDAY:  Objection, form.
23       Objection, speculation.
24                    THE WITNESS:  Well, the different
25       locations pretty much dictated it.
```

Page 119

```
 1            Q.    (BY MR. JIH)  How does the location
 2      dictate the possible use?
 3            A.    For example, a hotel room versus a beach
 4      versus a night shoot.
 5            Q.    Will tell you what?
 6                  MS. HOLLIDAY:  Objection, form.  Please be
 7      specific with your question.
 8            Q.    (BY MR. JIH)  You can answer.
 9            A.    Well, obviously visually they're different
10      and what we thought would be good for certain things
11      or whatever, you know.
12            Q.    Were all of them contemplated to be
13      potentially in the calendar?
14                  MS. HOLLIDAY:  Objection, speculation,
15      form.
16                  THE WITNESS:  No.  No.
17            Q.    (BY MR. JIH)  Which ones wouldn't?
18                  MS. HOLLIDAY:  Objection, speculation,
19      form.
20                  THE WITNESS:  Without all the pictures in
21      front of me, I -- you know, it's hard for me to
22      really say.  I don't -- I'm -- I'm -- I would need,
23      you know -- I would have to see them all.
24            Q.    (BY MR. JIH)  Okay.  I think I misspoke
25      earlier when I said Exhibits 1 through 13.  I think
```

Veritext Legal Solutions
866 299-5127

```
1    the mistake I made was on 13.  So I know Exhibits 1
2    through 12 were in the first lawsuit.
3                 That 13th picture -- I think it's
4    Exhibit 19 -- so if you would just look at that
5    Exhibit 19 real quick.
6         A.    Exhibit 19.
7         Q.    Yeah, because I think 13 is a repeat.
8         A.    Okay.
9         Q.    And that's also a picture that you took
10   that you recognize, correct?
11        A.    Correct.
12        Q.    Okay.  Now, in terms of these specific
13   exhibits then, 1 through 12 and 19, do you know which
14   of these images appeared on the calendar?
15              MS. HOLLIDAY:  Objection, speculation.
16   Objection, form.
17              THE WITNESS:  My gosh, it's been so long
18   I'm -- you know -- I'm not positive.
19        Q.    (BY MR. JIH)  Okay.  Do you -- can --
20        A.    -- back of the calendar.  I could have
21   known that that was the back of the calendar.
22        Q.    Which one?
23        A.    That -- the one -- the 19, whatever.
24        Q.    Okay.  So you recall Exhibit 19 as being
25   the back of the calendar.  For the other ones,
```

Page 121

1      looking at them now, you can't tell?

2              A.    I don't -- which ones?

3                    I'm pretty sure 12 was, but -- 11.  Hmm.

4              Q.    Is there anything about the Exhibits 1

5      through 12 or 19 -- I believe 19 you said clearly was

6      the back of the cover.  Certainly that's what you had

7      in mind.

8              A.    Yeah.

9              Q.    But for 1 through 12, is there anything

10     about it that allows you to remember if it was --

11     this was one of those pictures you knew from when you

12     took it was going to be for the calendar, or you

13     didn't?

14                   MS. HOLLIDAY:  Objection, form.

15                   You can answer if you know.

16                   THE WITNESS:  My gosh, my -- it's been --

17     this has been a while.  I'm not positive.

18             Q.    (BY MR. JIH)  During the photo shoot

19     itself, did Ms. Morton tell you when to cut the

20     shutter?

21                   MS. HOLLIDAY:  Objection, form.

22                   THE WITNESS:  I mean, that's not really

23     effective as far as getting a good shot.  That's not

24     really how it works.

25             Q.    (BY MR. JIH)  So she didn't?

                                            Page 122

```
 1              MS. HOLLIDAY:  Objection, form.

 2              THE WITNESS:  Specifically -- no,

 3     you're -- I mean, you're shooting a lot of frames.

 4     You're shooting tons of frames trying to capture

 5     specific amazing moments in between and stuff.

 6     That's kind of like the whole thing.  So if you get a

 7     magical, iconic image, it's because -- it's not posed

 8     normally; it's usually you're trying to catch

 9     something in between.

10         Q.    (BY MR. JIH)  So if the -- sorry.  Go

11     ahead.

12         A.    It wouldn't be specifically saying, like,

13     the moment, you know, so...

14         Q.    So there's testimony saying that she

15     directed you when to take each shot.  You would

16     disagree with that testimony?

17              MS. HOLLIDAY:  Objection, form.

18              THE WITNESS:  No, 'cause it's -- I mean,

19     she is the one who is, like, coming through the

20     water.  She's determining, like, this is the kind of

21     shot she wants, so, in effect, she is kind of telling

22     you when you should be shooting, hitting the shutter,

23     because this is what she's looking for, so clearly

24     you're shooting the shutter when she hits a certain

25     place or she's doing whatever, you know.
```

Page 123

1          Q.    (BY MR. JIH)  Wait.  Isn't that true for

2      every photo shoot; you have an idea of what the

3      client wants in terms of the results?

4          A.    Not always.

5          Q.    Okay.  Well, do you think this photo shoot

6      was one where the model told you when to click the

7      shutter?

8              MS. HOLLIDAY:  Objection, form and as to

9      the word "model."

10             THE WITNESS:  Well, all I can say about

11     that is that this is a -- a nude fine art photo

12     shoot.  It's very different than what you do

13     normally.  So there's a certain amount of respect

14     that goes into it.  There is a lot of different

15     factors that aren't typical.  There -- there -- it's

16     a completely different animal in your -- you know.

17     It's -- it's obviously something very different.

18     There's vulnerability there, there's -- you know, and

19     you are trying to be respectful.  It's not -- it's

20     not even close to the same thing.

21         Q.    (BY MR. JIH)  Oh, no, I understand that.

22     I guess I'm trying to understand in that situation

23     particularly, given the sensitivities and the

24     circumstances, is that a situation where you have to

25     exercise more judgment in terms of when to click the

                                          Page 124

```
 1      shutter, or is it one where you just -- actually

 2      there is no judgment because she told you when to

 3      click the shutter?

 4                   MS. HOLLIDAY:  Objection, form.  You can

 5      answer if you know.

 6                   THE WITNESS:  I mean, I -- I -- that

 7      doesn't -- I mean, it doesn't -- I don't know.  I

 8      mean, the judgment's kind of -- you know what

 9      you're -- I mean, the judgment is the same, you know.

10           Q.   (BY MR. JIH)  Well, in terms of the actual

11      taking of the photos, do you believe you brought

12      anything to the table as a professional photographer?

13                   MS. HOLLIDAY:  Objection, form.

14                   You can answer if you know.

15                   THE WITNESS:  I mean, I would like to

16      think so, yes.

17           Q.   (BY MR. JIH)  And do you believe you made

18      any kind of creative contribution to what these

19      photographs look like?

20                   MS. HOLLIDAY:  Objection, form.  Calls for

21      speculation, but if you can answer, you can.

22                   THE WITNESS:  It depends on what you think

23      contributes to the photograph.

24           Q.   (BY MR. JIH)  I'm asking you as a

25      photographer whether or not you think you contributed
```

Page 125

1    anything creative to the photographs.

2         A.    Well, by exposure and by certain things,

3    it's, like, you know -- and the energy you are

4    getting back to the client, to -- to them while

5    you're shooting, that's -- that is certainly

6    contributing to the photograph.

7         Q.    Okay.  Is it typical for you to be paid as

8    a photographer in this way where you get a percentage

9    off of particular uses?

10             MS. HOLLIDAY:  Objection, form.

11             You can answer if you know.

12             THE WITNESS:  It's not a common one

13   anymore, because licensing isn't -- isn't as big a

14   deal as it used to be.  Still images don't have the

15   value they did ten years ago.

16        Q.    (BY MR. JIH)  Was it common in 2016?

17             MS. HOLLIDAY:  Objection, calls for

18   speculation.  Form.

19             You can answer if you know.

20             THE WITNESS:  Common for what in 2016?

21        Q.    (BY MR. JIH)  To get paid as a

22   photographer in this way.

23        A.    As a percentage of sales of something?

24   It's --

25        Q.    (Nods head.)

Page 126

```
 1              A.     -- it's not for -- for this type of

 2      project, yes, but for most of my work, no.

 3              Q.     In terms of all of the -- is this the same

 4      arrangement that you have for all of the photo shoots

 5      you've done for Ms. Morton, or does it depend on the

 6      photo shoot?

 7                     MS. HOLLIDAY:  Objection, form.

 8      Objection, privilege.

 9                     You can answer if you know.

10                     THE WITNESS:  This is -- this is very

11      different because it was nudes and it's fine art and

12      she wanted to -- the ability to control her image

13      going out there.  And so, you know, it's -- it's very

14      different.

15              Q.     (BY MR. JIH)  How do you normally get paid

16      then?  Or what's the normal deal, then, with your --

17      other photo shoots for Ms. Morton in terms of how you

18      get paid?

19                     MS. HOLLIDAY:  Objection, privilege.

20      Objection, form.  You can answer if you know.

21                     THE WITNESS:  I mean, it depends on the

22      client.  Like, if it's a -- if it's a -- you know, a

23      catalog type of client, that client pays me to shoot

24      her and, you know, that's -- that's the arrangement,

25      you know.
```

Page 127

1            Or we did a -- you know, a -- a cover of

2      South African GQ where, you know, we went out, shot

3      the picture and, you know, the magazine pays me,

4      so...

5            Q.    (BY MR. JIH)  But in terms of how you're

6      paid, what's the typical -- is there a typical

7      arrangement, in terms of is it hourly, is it by

8      project?  Is there a typical?

9            A.    It -- it varies, but often -- oftentimes

10     it's a flat rate anymore.  It's not, you know, flat

11     rate for the licensing of one image for a cover, for

12     example, or when it's catalog you are paid for that

13     day, and then they own all the rights to the images,

14     but you're paid maybe a little more to compensate for

15     that.

16           Q.    In terms of your other photo shoots with

17     Ms. Morton, what was the typical way you were paid?

18                 MS. HOLLIDAY:  Objection, form.

19                 You can answer if you know.

20                 THE WITNESS:  I mean, it's -- you know,

21     nothing is really that typical.  It's, like, every

22     project is -- is very different in -- in my world.

23     So, you know, a magazine pays, you know, limited

24     usage; people think there's value to -- to having

25     your image on the cover of a magazine, so they would

                                          Page 128

1    take that into consideration.

2              Other people, you know, it's not a very

3    desirable photography job, so it's a slog on you and

4    you put all this time and effort into beautiful

5    images that no one will ever see or whatever, so they

6    compensate you accordingly.

7              You know, it -- it's different every time.

8    For example, in this catalog, it was, like, we'll

9    determine that -- or this calendar, I will give you a

10   percentage of sales.  You know, it's -- it's a very

11   creative business even that way.

12        Q.    (BY MR. JIH)  My question actually was

13   specific to Ms. Morton.  I was wondering what other

14   ways --

15        A.    That's what I was describing.

16        Q.    -- you've been -- oh, so she's paid you

17   different ways to be in a photo shoot?

18        A.    She hasn't.  Well, by magazines that paid

19   me to shoot her.  Commercial clients have paid me to

20   shoot her.  You know, that kind of stuff.

21        Q.    Have you had many photo shoots other than

22   the Borneo one that was directly arranged through

23   her?

24              MS. HOLLIDAY:  Objection, privileged.

25   Objection, form.

                                        Page 129

```
1              But you can answer if you know.

2              THE WITNESS:  But -- yes, I've had -- I've

3    had another one arranged.  Yeah, we did another one

4    that was arranged that same way.

5        Q.    (BY MR. JIH)  So you've done two sort of

6    direct deals with her for photo shoots?

7        A.    Yes.

8        Q.    When was the second one?

9              MS. HOLLIDAY:  Objection, form.

10             THE WITNESS:  You know, I don't know for

11   sure, but it was -- it might have been -- I think it

12   was before Borneo, and that's -- yeah, I think it was

13   the year before Borneo and she -- it was in the

14   Maldives.

15       Q.    (BY MR. JIH)  And was there ever a signed

16   written agreement concerning the Maldives photos?

17             MS. HOLLIDAY:  Objection, privileged.

18   Objection, form.

19             Answer if you know.

20             THE WITNESS:  I don't remember what we did

21   for that one.

22       Q.    (BY MR. JIH)  The Maldives photos, those

23   were not nudes though, right?

24       A.    There -- wait.  I -- there was lots of --

25   there was swimwear and there was -- and we did maybe
```

Page 130

1    a few -- a few.

2         Q.    So was Borneo the first time you shot

3    nudes -- it was not the first time you shot nudes

4    with her then; is that right?

5         A.    No, I think it was the Maldives maybe was

6    the first time we had done something like that.

7    Yeah.

8         Q.    Who owns the copyrights to the Maldives

9    photos?

10             MS. HOLLIDAY:  Objection, calls for a

11    legal conclusion.

12             You can answer if you know.

13             THE WITNESS:  You know, I'm not -- I'm not

14    sure.  I'm not positive.

15        Q.    (BY MR. JIH)  Was that something you

16    discussed with Ms. Morton ever, the ownership of the

17    Maldives photos?

18             MS. HOLLIDAY:  Objection, form.

19             THE WITNESS:  That one, there was content

20    that she was delivering to some other, like,

21    commercial clients that wanted her with certain

22    products and stuff.  There was -- it was more of a

23    influencer, I recall, like, type of stuff.

24        Q.    (BY MR. JIH)  But you don't recall exactly

25    who owns the copyright in those photos?

                                        Page 131

1                  MS. HOLLIDAY:  Objection, asked and

2       answered.

3                  THE WITNESS:  You know what?  I -- I don't

4       know on that one.

5          Q.    (BY MR. JIH)  Are those photos also ones

6       that you agreed that you couldn't just use without

7       Ms. Morton's permission?

8          A.    Oh, never.

9                  MS. HOLLIDAY:  Objection, form.

10         Q.    (BY MR. JIH)  What was that?

11         A.    Never.  I mean, never.  You could never do

12      that, no.

13         Q.    That's something you would never -- you

14      would never use the photos with Ms. Morton regardless

15      who actually owned it without her permission; is that

16      what you are saying?

17         A.    Yeah.

18                 MS. HOLLIDAY:  Objection, form.

19                 THE WITNESS:  I would never use it without

20      permission.  That's part of -- I mean -- like I said

21      before, it's the trust business.  You don't do that.

22         Q.    (BY MR. JIH)  And, in fact -- I mean, you

23      didn't misuse any of the Maldives photos, right?

24      There was no reason for her not to believe you would

25      misuse them, correct?

Veritext Legal Solutions
866 299-5127

1          MS. HOLLIDAY:  Objection, form.

2          THE WITNESS:  No, I did not.

3     Q.    (BY MR. JIH)  Okay.  So you're not sure if

4   you reached a final agreement on the financial terms

5   before or after the photo shoot in 2016.

6          Do you remember any terms or anything you

7   had agreed on before going into the photo shoot?

8     A.    I mean, this is so long ago, I don't -- I

9   don't remember specifically.

10    Q.    Okay.  I believe you testified,

11  obviously -- it's a given that you would not misuse

12  or use the photos without her permission.  Correct?

13    A.    Well, correct, yeah.

14    Q.    Was that something that was the subject of

15  a specific discussion, or is it at the point where

16  you just both know you would not do that?

17         MS. HOLLIDAY:  Objection, form.

18         THE WITNESS:  Well, especially anything

19  nude we for sure -- it was like, I've got control of

20  these, and, you know, that was the condition of even

21  doing them in the first place.

22    Q.    (BY MR. JIH)  I'm just trying to

23  understand.  I mean, obviously, I think you were in a

24  personal relationship previously with her, you knew

25  her very well, you were her friend.  Was that

Page 133

```
 1      something that had to be specifically talked about,

 2      or was that something that you just both understood?

 3                   MS. HOLLIDAY:  Objection, form.

 4                   THE WITNESS:  It was specifically talked

 5      about.  She -- when it comes to the nude stuff, for

 6      sure.

 7           Q.   (BY MR. JIH)  Okay.  So she wanted to talk

 8      specifically about control before doing the photo

 9      shoot, correct?

10                   MS. HOLLIDAY:  Objection, form.

11      Objection, speculation.

12                   THE WITNESS:  I would -- yeah, she -- I

13      mean -- yeah.

14           Q.   (BY MR. JIH)  Do you remember what she

15      said when she talk -- raised the subject before the

16      photo shoot?  Do you remember what specifically she

17      said?

18                   MS. HOLLIDAY:  Objection, form.

19                   THE WITNESS:  With regards to what?

20           Q.   (BY MR. JIH)  Control.

21           A.   Control?

22           Q.   (Nods head.)

23                   MS. HOLLIDAY:  Objection, form.

24                   THE WITNESS:  Outside of generally having

25      control, I don't know -- you know, I don't know.
```

Page 134

```
 1              Q.    (BY MR. JIH)  Did she say she wanted you
 2       to sign anything in writing to confirm it?
 3                    MS. HOLLIDAY:  Objection, asked and
 4       answered.
 5                    THE WITNESS:  I mean, at some point she
 6       did.  I don't remember when that was.
 7              Q.    (BY MR. JIH)  Okay.  You don't remember if
 8       that was before or after the photo shoot?
 9              A.    I do not recall before or after.
10              Q.    Okay.  Do you remember if she said, And we
11       need to set it up in this way in order to have
12       control, or anything specific like that?
13                    MS. HOLLIDAY:  Objection, form.
14                    THE WITNESS:  I do not recall anything
15       specific like that, no.
16              Q.    (BY MR. JIH)  Did you talk about copyright
17       ownership specifically before going to the photo
18       shoot in Borneo?
19                    MS. HOLLIDAY:  Objection, asked and
20       answered.
21                    THE WITNESS:  We -- we most likely did
22       discuss that they should be, because of the content
23       and that it would be something that she's got
24       millions of fans out there dying for this content and
25       that it would be a serious problem if she didn't.
```

Page 135

1          Q.    (BY MR. JIH)  If she didn't own the

2     copyright?

3          A.    Yeah, if you didn't do something like

4     making sure, because it's, like, her -- any kind of

5     photos just proliferate -- you know, proliferate on

6     the Internet of her.  And so clearly the nudes were a

7     huge concern.

8          Q.    But do you remember having a specific

9     conversation before the photo shoot in 2016 whether

10    or not it was more important for the copyright to be

11    in her name or in your name?

12               MS. HOLLIDAY:  Objection, asked and

13    answered.

14               You can answer if you know.

15               THE WITNESS:  I don't -- I don't know

16    specifically.

17         Q.    (BY MR. JIH)  You don't recall one way or

18    the other on that?

19               MS. HOLLIDAY:  Objection, asked and

20    answered.

21               THE WITNESS:  I don't -- I don't -- I

22    don't remember.

23         Q.    (BY MR. JIH)  Do you remember ever

24    discussing with Ms. Morton before the photo shoot in

25    2016 whether or not this work needs to be treated as

                                           Page 136

```
 1     a commissioned work under the copyright law?
 2              MS. HOLLIDAY:  Objection, asked and
 3     answered.
 4              THE WITNESS:  I mean -- no -- no.  Spoken
 5     specifically like that, like...
 6        Q.   (BY MR. JIH)  Correct?
 7        A.   I -- what -- what was the question again,
 8     just so I don't...
 9        Q.   Do you recall, you know, any discussion
10     with Ms. Morton -- well, frankly, any of her
11     representatives, but I don't think you did -- saying
12     it was important that this photo shoot be structured
13     as a commission arrangement under the copyright law?
14     The key word being "commissioned."
15              MS. HOLLIDAY:  Objection, form.
16              THE WITNESS:  No.  No.
17        Q.   (BY MR. JIH)  You mentioned that at some
18     point you were asked to sign a written agreement.
19     What were you talking -- or referring to?
20              MS. HOLLIDAY:  Objection, form.
21              You can answer if you know.
22              THE WITNESS:  What -- what -- refresh my
23     memory.  What -- which -- what --
24        Q.   (BY MR. JIH)  I think we were talking
25     about whether or not she said you needed to sign
```

Page 137

```
 1    something in writing to confirm that she would

 2    control the photographs.  But you said not at that

 3    time or at some point you were.  I'm just trying to

 4    understand what you were referring to.

 5              MS. HOLLIDAY:  Objection, form.

 6              THE WITNESS:  I'm saying I don't remember

 7    when that was, but clearly we signed something at

 8    some point.

 9         Q.   (BY MR. JIH)  So that's what I'm trying to

10    understand.  What did you sign with respect to these

11    photographs at issue in this lawsuit, what agreement?

12              MS. HOLLIDAY:  Objection, form.

13    Objection, asked and answered.

14              THE WITNESS:  Yeah, I don't know what you

15    are getting at, so...

16         Q.   (BY MR. JIH)  Have you signed any

17    agreement with respect to the photographs at issue in

18    this lawsuit, specifically Exhibits 1 through 12 and

19    19?

20              MS. HOLLIDAY:  Objection, asked and

21    answered.  I believe it was asked about maybe 9:00 or

22    10:00 this morning.  So we could look back at the

23    transcript if you want to look through it, but you've

24    asked this question; you have asked it four -- it's

25    inappropriate to continue harassing the witness with
```

Page 138

1    the same question.

2         Q.    (BY MR. JIH)  You can answer the question.

3              MS. HOLLIDAY:  You can answer if you know.

4              THE WITNESS:  Which one is this now?

5         Q.    (BY MR. JIH)  Okay.  With respect to the

6    photographs at issue in this lawsuit, have you ever

7    signed a written agreement with respect to those

8    photographs?

9         A.    I don't --

10             MS. HOLLIDAY:  Objection, form.

11             THE WITNESS:  I mean, the agreement -- I

12   don't know which agreement you're talking about or

13   what -- no.  I don't recall.

14        Q.    (BY MR. JIH)  So you don't recall

15   signing -- let's confirm it.  Have you ever signed

16   any written agreement with Ms. Morton concerning the

17   photographs at issue in this lawsuit?

18             MS. HOLLIDAY:  Objection, form.

19             Can you restate the question, Mr. Jih?

20   Maybe -- maybe that would help.

21             MR. JIH:  Okay.  I'll repeat the question.

22        Q.    Have you ever signed any written agreement

23   with Ms. Morton concerning the photographs at issue

24   in this lawsuit?

25             MS. HOLLIDAY:  Objection, form.

                                           Page 139

```
 1                    You can answer if you know.

 2                    THE WITNESS:  I -- you know what?  I don't

 3        know.  I don't know.  I mean...

 4             Q.    (BY MR. JIH)  As far as you're sitting

 5        here today, do you have any memory of signing a

 6        written legal document concerning the photographs at

 7        issue?

 8                    MS. HOLLIDAY:  Objection, asked and

 9        answered.  Form.

10                    If you know, you should answer.

11                    THE WITNESS:  I mean, a transfer of -- of

12        copyright?

13             Q.    (BY MR. JIH)  Any agreement.  Any legal

14        document that you've signed concerning these

15        photographs.

16             A.    Well, we have signed a -- a document, yes.

17             Q.    Okay.  What document are you referring to?

18                    MS. HOLLIDAY:  Objection, form.

19                    THE WITNESS:  I'm not -- I'm -- I -- I

20        don't have it in front of me, so I don't -- I'm not

21        sure.

22             Q.    (BY MR. JIH)  Can you describe it?

23                    MS. HOLLIDAY:  Objection, form.

24                    THE WITNESS:  I just know it was giving

25        her full rights, a hundred percent, like -- you know.
```

Page 140

```
1                    MS. HOLLIDAY:  Objection.

2         Q.   (BY MR. JIH)  Who drafted it?

3                    MS. HOLLIDAY:  Objection, calls for

4    attorney-client privilege.

5                    MR. JIH:  You can answer.

6                    MS. HOLLIDAY:  You can answer.

7                    THE WITNESS:  Jennifer Holliday.

8         Q.   (BY MR. JIH)  When did you sign?

9         A.   I -- I don't know.

10                   MS. HOLLIDAY:  Objection, form.

11                   But you can answer.

12                   THE WITNESS:  Yeah, I -- I'm not positive

13   of the date.

14        Q.   (BY MR. JIH)  Was it before or after the

15   photo shoot?

16                   MS. HOLLIDAY:  Objection, asked and

17   answered.  Form.

18                   You should answer if you know.

19                   THE WITNESS:  Before -- af -- after the

20   photo shoot.

21        Q.   It was after?

22        A.   Uh-huh (affirmative).

23        Q.   Do you remember how long the agreement --

24   the document was?

25                   MS. HOLLIDAY:  Objection, asked --
```

                                             Page 141

```
1          objection, form.
2                    THE WITNESS:  What do you mean, how long?
3          Q.    (BY MR. JIH)  Was it one page?  Was it two
4     pages?  Was it more?  Do you remember how long it
5     was?
6          A.    I -- it wasn't a long document.  It was
7     not a long document.
8          Q.    Do you remember what the document said?
9                    MS. HOLLIDAY:  Objection, form.
10                   But if you can --
11                   THE WITNESS:  I -- I mean, I wish I had
12    that kind of recollection that I knew, but I -- I
13    trusted, and I know when I read it I was, like,
14    100 percent was in agreement and I had no problem
15    signing it.
16         Q.    (BY MR. JIH)  Do you -- when is the last
17    time you saw this document?
18         A.    I don't -- I don't -- I mean, when I
19    signed it.
20         Q.    Do you have a copy of the signed document?
21         A.    I maybe do someplace, you know, probably
22    someplace.  I'm guessing.
23         Q.    Was this document something you signed in
24    person, meaning that you were doing -- you were with
25    Ms. Morton or Ms. Holliday when you signed it?
```

Page 142

```
 1              A.     I don't -- no, I don't think so.
 2              Q.     So it was something that they sent to you,
 3      you signed and you sent back?
 4              A.     You know what?  I do not recall how that
 5      all went down.  I do not recall.
 6              Q.     Were you ever told why you needed to sign
 7      this document?
 8                     MS. HOLLIDAY:  Objection, form.
 9                     But you can answer.
10                     THE WITNESS:  I -- I mean, it was clear to
11      me that she, you know -- for ownership of the images.
12              Q.     (BY MR. JIH)  But did you -- did you have
13      any understanding why it was important to have
14      something in writing to acknowledge that ownership --
15      why you were being asked to acknowledge that in
16      writing at the time?
17                     MS. HOLLIDAY:  Objection to form.
18                     You should answer if you know.
19                     THE WITNESS:  I was -- I -- it's -- I did
20      not -- I have no idea why at the time.  It's pretty
21      clear now, but at the time, no.
22              Q.     (BY MR. JIH)  So you --
23              A.     But -- but they are nude photographs of
24      her that she want -- and I -- and I am more than
25      happy to do that.
```

Page 143

```
1          Q.    I think you said you didn't know at the

2    time but now you sort of -- it's obvious to you why.

3    What do you mean by that?

4          A.    'Cause there's a lawsuit now.

5          Q.    So was it -- in terms of the chronology,

6    were you asked to do this, in terms of timing, close

7    in time to the filing of the lawsuit?

8                MS. HOLLIDAY:  Objection, calls for

9    speculation.  Objection, form.

10               But if you know, you should answer.

11               THE WITNESS:  I don't -- you know, I don't

12   know.

13         Q.    (BY MR. JIH)  Do you know if it was after

14   the SpyIRL tweets?

15               MS. HOLLIDAY:  Objection, speculation.

16   Form.

17               You should answer if you know.

18               THE WITNESS:  I -- I don't -- I don't know

19   what -- with the dates or anything like that.  I

20   wasn't -- it wasn't my concern.  It's, like, I'm --

21   you know, it wasn't really anything I thought about.

22         Q.    (BY MR. JIH)  So it may not have anything

23   to do with this lawsuit, then, right, since you don't

24   know when it was, if it was even before the SpyIRL

25   tweets?
```

Page 144

```
 1                MS. HOLLIDAY:  Objection, form.

 2                Is there a question there?

 3           Q.   (BY MR. JIH)  I'm just trying to

 4      understand.  You said -- you commented -- it's, like,

 5      oh, it's obvious now why you were asked.  I'm

 6      wondering, do you still think that it's obvious?

 7           A.   I mean, I'm in a deposition for -- about

 8      this.

 9           Q.   But if it happened -- if it could have

10      happened before the SpyIRL tweets, how could it have

11      anything to do with the lawsuit, then?

12                MS. HOLLIDAY:  Objection, argumentative.

13      Objection --

14           Q.   (BY MR. JIH)  I'm trying to understand if

15      it's -- if you really mean, when you say you don't

16      know whether you were asked to sign this

17      acknowledgment before or after the SpyIRL tweets.

18                MS. HOLLIDAY:  Objection as to the word

19      "acknowledgement."  Objection, calls for a legal

20      conclusion.  Objection, form.

21                THE WITNESS:  Yeah, I -- I don't know.

22           Q.   (BY MR. JIH)  Okay.

23           A.   It -- you know, it's, like, I -- it's not

24      my lawsuit.  Not my thing.  It's not -- it's not my

25      nude pictures all over the Internet, you know, after
```

                                        Page 145

```
 1     being a seven-time, you know, Sports Illustrated
 2     swimsuit, and building a whole career with this kind
 3     of intense value and having them stolen, you know.
 4          Q.    So do you --
 5          A.    It wasn't -- you know, so that's -- you
 6     know.
 7          Q.    So do you believe this document that you
 8     were asked to sign -- do you now -- do you now
 9     believe it has something to do with the lawsuit, or
10     do you still have no idea one way or the other what
11     it -- why you were being asked to sign it?
12               MS. HOLLIDAY:  Objection to form.
13               And if you could please avoid questions
14     that present the witness with one choice or another,
15     which is something that has been going on throughout
16     this deposition.  There may be a third choice that
17     the witness has not considered.  If you just would
18     like to ask a question that would call for witness
19     testimony that could be really helpful.
20          Q.    (BY MR. JIH)  You can answer.
21          A.    Can you just re -- restate the question?
22          Q.    Do you have any idea, sitting here today,
23     based on everything you know or remember, why you
24     were asked to sign this written document
25     acknowledging that Ms. Morton owns the copyrights on
```

Page 146

1    these photos?

2          A.    I -- I do not have a -- any idea why at

3    the time, but I was happy to sign them because it's

4    what we had discussed and it was -- I did not

5    question it.

6          Q.    Based on what you know now, do you have a

7    belief as to why she asked you to sign it?

8          A.    I'm not going to speculate what she -- you

9    know, I don't know.  I have no idea.

10         Q.    Because you don't even remember if it was

11   before or after, for example, the SpyIRL tweets,

12   correct?

13         A.    I --

14               MS. HOLLIDAY:  Objection, form.

15               THE WITNESS:  I -- I do not know.  It's

16   not my life.  It's not -- you know, I'm not tagged on

17   these things.  I'm not -- I don't know.  So it -- it

18   wasn't a part of what I was -- you know.  So I

19   wouldn't -- it's not something I think about.

20         Q.    (BY MR. JIH)  Do you know if you were

21   asked to sign this document in conjunction with Ms.

22   Morton's registration of the copyrights?

23               MS. HOLLIDAY:  Objection, calls for

24   speculation.  Objection, form.

25               THE WITNESS:  I do -- I do not know that.

Page 147

```
 1    I do not.
 2         Q.   (BY MR. JIH)  Did you -- were you ever
 3    told that Ms. Morton had or was going to register for
 4    the copyrights of these photos?
 5              MS. HOLLIDAY:  Objection, form.
 6              THE WITNESS:  I'm not sure.  I don't -- I
 7    don't know.  I don't recall how it all went down.  I
 8    don't -- you know, I don't remember the specifics,
 9    but I wasn't worried about it.  It wasn't, you
10    know -- I wasn't going to make money off of these and
11    what -- she owned them.  So it's, like, I didn't
12    really care.  So it's, like, whatever she was doing
13    with them, it's her power to do it.  It has nothing
14    to do with me.
15         Q.   (BY MR. JIH)  Do you recall if the
16    document, which we haven't seen before, which is why
17    I'm asking you these questions -- do you recall if --
18              MS. HOLLIDAY:  Tesifying, Mr. Jih?
19              MR. JIH:  Say what?
20              MS. HOLLIDAY:  Are you testifying,
21    Mr. Jih?
22              MR. JIH:  I'm just explaining to him
23    what --
24              MS. HOLLIDAY:  (Indecipherable.)
25              MR. JIH:  Please stop.  Please stop,
```

Page 148

1     Ms. Holliday.

2          Q.    Do you recall if the document contained a

3     lot of legalese in terms of -- that you had to agree

4     to, or was it just the general statement of

5     ownership?

6                MS. HOLLIDAY:  Objection, form.

7                THE WITNESS:  I mean, I -- I couldn't even

8     begin to, like, pretend I remember what the -- you

9     know, the wordage was on the document, you know.

10         Q.    (BY MR. JIH)  But you --

11         A.    It didn't seem -- it seemed like a proper

12    thing that I should sign.

13         Q.    And you -- did you ask anyone to review it

14    or ask any questions about the document before

15    signing it?

16               MS. HOLLIDAY:  Objection, form.

17               THE WITNESS:  I -- I did not.

18         Q.    (BY MR. JIH)  And is that because, from

19    your perspective, you were fine with her having the

20    copyright ownership of these photos?

21         A.    Yes, and that's what we had talked about,

22    so...

23         Q.    But you don't recall whether or not you

24    had any specific discussions as to legally how to

25    effectuate that, correct?

                                        Page 149

```
 1                    MS. HOLLIDAY:  Objection, calls for a
 2      legal conclusion.  Objection, form.
 3                    If you know, you can answer.
 4                    THE WITNESS:  Yeah, I don't know.  I don't
 5      know.
 6           Q.   (BY MR. JIH)  Other than the -- this one
 7      document that you said you were signing -- I think
 8      you said it was short.  So it was not longer than a
 9      page; is that fair?
10                    MS. HOLLIDAY:  Objection.  Actually, it
11      misstates testimony.
12                    MR. JIH:  Oh, then I own up.
13           Q.   Did you say how many pages it was?
14           A.   I did not say.  It -- it may have been
15      two, three.  I don't know.  It wasn't a long
16      document.
17           Q.   Okay.  Do you remember how many provisions
18      it had?
19           A.   I don't even know -- sorry, I'm not a
20      lawyer.  I don't know.
21           Q.   Do you remember if it was negotiated or
22      revised in any way, or if it was just you received it
23      and you signed it?
24           A.   I received it, I reviewed it and I signed
25      it.
```

Page 150

```
1              Q.    Okay.  Do you recall if you received it by
2       e-mail?
3                    MS. HOLLIDAY:  Objection, form.
4                    THE WITNESS:  I don't think so.  I think
5       it was a physical -- I think I physically signed it,
6       but I'm not positive.
7              Q.    (BY MR. JIH)  So it could have been mailed
8       to you, is what you said, or delivered to you by
9       somebody?
10                   MS. HOLLIDAY:  Objection, form.
11                   THE WITNESS:  It may have been.  I'm not
12      pos -- you know, I'm not positive.
13             Q.    (BY MR. JIH)  Okay.  Do you remember if
14      the document said anything about the work being a
15      commissioned work?
16             A.    No.
17             Q.    Do you recall if the agreement said -- or
18      not the agreement -- the document said anything in
19      terms of legally being a work-for-hire?
20                   MS. HOLLIDAY:  Objection, form.
21                   You can answer if you know.
22                   THE WITNESS:  No.
23             Q.    (BY MR. JIH)  Do you know if the document
24      said anything about you having been Ms. Morton's
25      employee?
```

Page 151

```
 1                    MS. HOLLIDAY:  Objection, form.

 2                    THE WITNESS:  I don't -- I don't recall.

 3          Q.    (BY MR. JIH)  Okay.  So as far as you were

 4     concerned, you were just basically acknowledging you

 5     don't own the photographs; you weren't making further

 6     specific kinds of legal representations, correct?

 7          A.    No, and I kept my word, so I was -- you

 8     know.  I just signed it.

 9          Q.    In terms of your LLC agreement with your

10     brother, is there any requirement that you do your

11     photography work through the LLC?

12          A.    No.

13                    MS. HOLLIDAY:  Objection, privilege.

14                    THE WITNESS:  No, there's not.

15          Q.    (BY MR. JIH)  Okay.  So you're both free

16     to do whatever you want or do things in the LLC,

17     either way?

18                    MS. HOLLIDAY:  Objection, privilege.

19                    THE WITNESS:  I mean, I'm free to do

20     whatever I want.

21          Q.    (BY MR. JIH)  Got it.  It's your

22     preference.

23          A.    Yeah.  I mean -- right.  We're twins,

24     so...

25          Q.    Okay.  Do you remember -- this is just to
```

Page 152

```
 1    get timing a little bit.  I'm asking it a different

 2    way.  Do you remember if you signed this document

 3    acknowledging or -- about ownership of the

 4    photographs before or after you retained

 5    Ms. Holliday?

 6                    MS. HOLLIDAY:  Objection as to form, and

 7    objection, calls for attorney-client privileged

 8    information.

 9                    THE WITNESS:  What was the question again

10    specifically?

11          Q.    (BY MR. JIH)  So this document that you

12    said you signed dealing with the ownership of the

13    copyright in these photographs, do you have any

14    memory as to whether or not that was before or after

15    you retained Ms. Holliday to be your attorney, I

16    think you said in February of 2022?

17                    MS. HOLLIDAY:  Objection as to form and

18    privilege.

19                    But if you know, you should answer the

20    question.

21                    THE WITNESS:  I -- I believe it was

22    before, 'cause --

23          Q.    (BY MR. JIH)  Okay.  So when you received

24    this document to sign from Ms. Holliday or -- was it

25    from Ms. Holliday that you got it?
```

Page 153

1           MS. HOLLIDAY:   Objection, form.

2           THE WITNESS:   Yes.

3      Q.    (BY MR. JIH)   Ms. Holliday sent it to you,

4   correct?

5      A.    Yes.

6      Q.    Okay.   Ms. Holliday was not your attorney

7   at the time, correct?

8      A.    She is Genevieve's attorney.

9      Q.    Okay.   And you didn't think of her as your

10  attorney during that time, correct?

11     A.    No.

12     Q.    Did you ask Ms. Holliday any questions

13  about the document?

14     A.    I didn't.

15     Q.    Did Ms. Holliday tell -- do you remember,

16  did she tell you anything about the document?

17          MS. HOLLIDAY:   Objection, form.

18          THE WITNESS:   No.   It was through

19  Genevieve.

20     Q.    (BY MR. JIH)   Okay.   So Genevieve had told

21  you the document was coming?

22          MS. HOLLIDAY:   Objection, form.

23          You can answer if you know.

24          THE WITNESS:   I'm -- I'm assuming 'cause

25  I -- you know, I got it somehow.

                                        Page 154

1          Q.    (BY MR. JIH)  Do you recall what

2     Ms. Morton's told you about the document?

3               MS. HOLLIDAY:  Objection, form, and

4     objection -- you know, I think actually we have

5     another hour.  We're at 1:50 now, so I think we

6     probably need a break, and the witness probably needs

7     to be reminded -- this sounds very conversational.

8     He probably needs to be reminded that he cannot

9     testify to something he does not have actual

10    knowledge about, so --

11              MR. JIH:  Well, let's get this question

12    answered first.  And the question is very much about

13    your knowledge.

14         Q.    Do you remember what Ms. Morton, if

15    anything, said to you about this document, the

16    written document that you signed concerning

17    ownership?

18         A.    I do not recall specifically what it was

19    about.

20         Q.    Do you recall generally?

21         A.    I mean, generally, it was about the

22    images.

23         Q.    Do you remember anything else?  I just

24    want your memory.  If that's all you remember, that's

25    fine.

                                          Page 155

1              Do you remember anything else?

2         A.    I don't remember any specifics.  I -- you

3    know, for me, I was just doing a solid.  I was

4    signing what we had agreed to.  That's what I was

5    doing.

6         Q.    Okay.  So the extent of your memory is

7    that it concerned the images, and that's all you

8    remember about what she told you about that document?

9         A.    Yes.

10             MR. JIH:  Great.  All right.  We can take

11   a break.  Why don't we take -- do you want 10 or 15?

12   Ms. Holliday, I was asking -- I guess I'm looking at.

13   Do you want 10 or 15 minutes?

14             MS. HOLLIDAY:  Do you want --

15             THE WITNESS:  I don't care.

16             MS. HOLLIDAY:  Ten is fine.

17             MR. JIH:  Okay.  We'll come back at 2:0 --

18   let's see.  Let's come back at 2:02 -- or 2:03.

19             THE WITNESS:  We're off the record at 1:52

20   p.m.

21             (A break was taken from 2:52 p.m. to

22             3:05 p.m.)

23             THE VIDEOGRAPHER:  We are back on the

24   record at 2:05 p.m.

25        Q.    (BY MR. JIH)  So I just want to try to

                                            Page 156

```
 1    lock down the time period where you did work
 2    concerning the Borneo 2016 photo shoot.  So do you
 3    remember when your work was completely finished with
 4    respect to the Borneo photos?
 5                 MS. HOLLIDAY:  Objection, form.
 6                 THE WITNESS:  I have no -- it's -- you
 7    bite it off in chunks and it's -- yeah, I'm not -- I
 8    don't have an idea of when things get done and -- no.
 9         Q.    (BY MR. JIH)  Do you have any -- I mean,
10    was your work on these photos complete that year,
11    like in 2016, do you know?
12         A.    The calendar was -- had to be finished
13    because that was a 2017 calendar, so I know that was
14    the first thing.
15                 And then it was, like -- I mean, I have
16    other work too, so it's finding time to, like, get to
17    the other things which weren't a calendar.  Then we,
18    you know, got to those.
19         Q.    So did you have to do further work with
20    respect to the different ways in which the
21    photographs were used beyond the calendar?
22         A.    What do you mean by that?
23         Q.    Well, you know that Ms. Morton released
24    posters, for example.  Did you do additional work for
25    the posters?
```

Page 157

```
 1              A.    I did the posters too.  I remember helping

 2       get those printed and the preparation for the images

 3       and everything, yeah.

 4              Q.    So the -- we talked about retouching

 5       process.  Would that be something you do once you

 6       have the product in mind, or is that something you

 7       did for the photos when they were first shot?

 8                   MS. HOLLIDAY:  Objection, form.

 9                   You can answer if you know.

10                   THE WITNESS:  Yeah, once you get a

11       collection together, you then retouch.  You don't

12       waste your time doing ones that you're -- know you

13       are not going to use, so...

14              Q.    (BY MR. JIH)  So you had to do work for

15       the calendar that was, I guess, sold in 2016 for

16       2017?

17              A.    Right.  Yes, 2017.  Yeah.

18              Q.    And then you did further work for the

19       images used in the posters?

20              A.    Correct.

21              Q.    And you did further work -- did you do

22       further work for the photos before they were released

23       as digital download collections?

24              A.    Yeah, as they were being released is when

25       those selections and the final retouching and stuff
```

Page 158

```
 1    and the preparation of -- yeah, those were done as
 2    they were released.
 3           Q.    And for each of those further products,
 4    were those all things that you basically had already
 5    agreed to do, or is that something that you reached
 6    an agreement to do, that additional product?
 7           A.    I mean, we had -- we -- we had an idea
 8    what we were going to do, yeah, so --
 9           Q.    Could she -- I'm just trying to
10    understand, I guess.  Let's say she suddenly decides
11    tomorrow she wants to put the image on -- do a coffee
12    table book, for example.  Is that something that's
13    already agreed to that you would do whatever work you
14    would have to do for that product, or is that
15    something that you would have separately agreed to?
16                 MS. HOLLIDAY:  Objection, form.
17                 THE WITNESS:  The idea of a coffee table
18    book, you are saying?  Like, if that was additional?
19           Q.    (BY MR. JIH)  Correct.
20                 MS. HOLLIDAY:  Objection, speculation.
21                 THE WITNESS:  Yeah, I don't -- I don't
22    really know.  I'm, like -- what -- what was the
23    question?  I don't understand.
24           Q.    (BY MR. JIH)  I'm just trying to
25    understand, you know, because different products came
```

Page 159

1      about at different times.

2              A.      Correct.

3              Q.      Were those the subject of further

4      agreement, or were those things that you already were

5      required to do for her?

6              A.      Yeah, they were -- they were things that

7      we wanted to do; yeah, those were, but they -- there

8      wasn't a rush to get those out.  It's a very

9      time-consuming -- it's time-consuming.  It's a --

10     it's a creative, you know -- you know, thing.  So

11     it's, like -- even editing of -- of images, meaning

12     selecting the images, is a time-consuming thing to

13     make the final edit.  Out of thousands of photographs

14     you are, like, which ones will make this, which ones

15     won't, is, like, a, you know -- those are -- you

16     know, she wants to think through and go through.  You

17     know, so it's not just like, Oh, we sit down one

18     time, we got that, got that, we got that; you cleanse

19     your head of all the stuff and you come back to

20     images and, oh, I like -- oh, this is what I like

21     better.  You know, so it's not -- it's not -- you

22     know, it's not very clinical; you know, it's -- you

23     know, the selection is the creativity, you know.

24             Q.      So even though there was no rush to do it,

25     you are saying you already basically had an

Page 160

```
 1     understanding that there were going to be posters and

 2     maybe digital download collections at some point in

 3     addition to the calendar?

 4          A.    Yeah, that --

 5               MS. HOLLIDAY:  Objection, form.

 6               THE WITNESS:  Yeah, that we would do --

 7     yeah, that we would do other things.  Yes.

 8          Q.    (BY MR. JIH)  Okay.  And -- but

 9     specifically digital download collections and

10     posters?

11          A.    (Indecipherable.)

12               MS. HOLLIDAY:  Objection, form.

13               THE WITNESS:  In the -- in a format of one

14     way or another, yeah.

15          Q.    (BY MR. JIH)  I'm not sure that I

16     understand.  Like, for example, was there any

17     discussion or agreement already whether or not to

18     spend the time and effort to do a coffee table book,

19     for example?  Has that ever been discussed?

20               MS. HOLLIDAY:  Objection, form.

21               THE WITNESS:  I mean --

22               MS. HOLLIDAY:  Objection.  Speculation.

23               THE WITNESS:  -- not in the context -- I

24     mean, that was probably post we've discussed doing

25     something like that but not -- but the -- what I mean
```

Page 161

1    is a calendar is printed.  The digital -- to do a

2    digital thing it was, like, Oh, wow, it's cheaper to

3    do this; you don't have to print.  It's just an

4    easier business model to, like, get it out to people.

5    You don't have to mail, pay someone to do that kind

6    of stuff or whatever, so -- you know.

7         Q.   (BY MR. JIH)  I guess I'm just trying to

8    understand this.  It sounds like there are certain

9    uses that you had already contemplated or discussed

10   that were possible, that were sort of part of your

11   understanding.  Is that fair?

12             MS. HOLLIDAY:  Objection, form.

13             THE WITNESS:  Wait.  Rephrase it.  I'm

14   sorry.

15        Q.   (BY MR. JIH)  In other words, I -- I know

16   that these works have been used as part of a

17   calendar, as part of, like, digital download

18   collections, as part of posters, and it sounds like

19   you are saying that those were all things that

20   basically were -- were within what you had already

21   discussed in -- in your agreement with Ms. Morton.

22   Correct?

23             MS. HOLLIDAY:  Objection, form.  That's a

24   very, very, very long question.  It has a lot of

25   assumed facts in it.

Page 162

```
 1                    THE WITNESS:  Yeah, I'm not -- I'm not

 2         sure, like...

 3              Q.    (BY MR. JIH)  I'm not trying to hide the

 4         ball; I'm trying to get to a sense of if something

 5         new comes along, or a new idea, and let's say, you

 6         know, she wants to suddenly say, Hey, let's turn it

 7         into a documentary or let's turn it into a video or

 8         let's turn it into a coffee table book, whatever,

 9         would that be something that you're already required

10         to do for her, or is that something you would have to

11         reach a new agreement or understanding with her

12         about?

13                    MS. HOLLIDAY:  Objection, form.

14                    THE WITNESS:  Yeah, I mean -- I mean, it

15         -- it wouldn't -- it -- it wouldn't really matter,

16         like, what format, as long as the creative kind of,

17         like, collection was, you know, whatever format -- I

18         don't -- I don't know what you are getting at is a

19         really stupid answer.

20              Q.    (BY MR. JIH)  Well, do you have any say --

21         let's say you are busy -- you are busy and you have a

22         lot of other things going on.

23              A.    Yeah.

24              Q.    Can you turn it down and say, Look, I just

25         don't have time to work on a coffee table book, so
```

Page 163

```
 1      I'm not going to do that?  Can you say that?
 2                MS. HOLLIDAY:  Objection, form.
 3                THE WITNESS:  I mean, I -- probably not,
 4      because, you know, I -- I -- I would want these out
 5      there.  And this is kind of -- this is different than
 6      my other work.  This is kind of like fine art and
 7      it's something that, you know, I love creating with
 8      her, so it -- it would take priority.  I would
 9      make -- make the time to do it.
10           Q.   (BY MR. JIH)  But would you have a say?
11           A.   Would I have a say?
12           Q.   Whether or not you were working on it.
13                MS. HOLLIDAY:  Objection, form.
14                THE WITNESS:  I mean, I don't know -- I
15      don't quite get what you're -- what you're getting at
16      here.
17           Q.   (BY MR. JIH)  Would you have to agree that
18      you would work on it?
19                MS. HOLLIDAY:  Objection, form.
20                I have to stop this line of questioning,
21      Mr. Jih.  If we go back a little bit to where your
22      question has landed, you have a lot of information in
23      there that is incorrect on -- upon which this
24      question rests.  I think the witness is very confused
25      as to what you are asking because none of it is
```

                                           Page 164

```
 1     accurate, and so it causes confusion in the question.
 2     So, I'm sorry to interrupt, but I think to get you
 3     back on track, I think you need to go back in your
 4     line of questioning and explain, because I think
 5     these photographs have already been used and so I
 6     think you guys are talking about two different
 7     things.
 8              MR. JIH:  Let me ask a clean question.
 9         Q.    If there -- of a new use -- proposed
10     use -- I was going to say something that hasn't
11     happened yet -- if a new idea comes along to use the
12     photos in a particular way.
13              MS. HOLLIDAY:  Objection as to "photos."
14     Mis...
15              MR. JIH:  What's the objection as to
16     photos?
17              MS. HOLLIDAY:  Well, it's vague because
18     the photos -- this term is -- Mr. Riker has shot
19     thousands of photos in that series, some of which are
20     published, some of which have not been published.
21              MR. JIH:  That's actually a good question.
22              MS. HOLLIDAY:  So when you guys are
23     talking about the photos, there needs to be a
24     distinction between those that have already been
25     published and those that have not been published.
```

Page 165

1          MR. JIH:  Great.

2          MS. HOLLIDAY:  Those that have been

3    published are all registered.  Those that have not

4    been published are not registered yet.

5          MR. JIH:  Let me ask --

6          MS. HOLLIDAY:  I don't think -- nobody is

7    trying to hide the ball here.

8          MR. JIH:  Okay.  Let me ask --

9          MS. HOLLIDAY:  -- same language.

10     Q.    (BY MR. JIH)  How many photographs did you

11   actually shoot in that Borneo 2016 photo shoot?

12     A.    I don't know specifically, but thousands.

13     Q.    Does Ms. Morton own the copyright on every

14   single one of those photos?

15     A.    If --

16          MS. HOLLIDAY:  Objection, calls for a

17   legal conclusion.

18          But you can answer if you know.

19          THE WITNESS:  I mean -- sure.  Yeah.

20     Q.    (BY MR. JIH)  The written document you

21   said you signed acknowledging copyright ownership,

22   did that document apply only to the photos that have

23   been published, or did it apply to every single

24   photograph taken at that photo shoot?

25          MS. HOLLIDAY:  Objection, calls for a

Page 166

 1    legal conclusion.

 2              You can answer if you know.

 3              THE WITNESS:  I -- I honestly don't -- I

 4    don't know, so -- you know -- it may be all of them

 5    from that, I think.

 6         Q.   (BY MR. JIH)  The -- in terms of the --

 7    are -- are -- do the terms of your understanding or

 8    your agreement with Ms. Morton apply to every single

 9    one of the photos taken at the photo shoot?

10              MS. HOLLIDAY:  Objection, form.

11              But if you understand, you can answer.

12              THE WITNESS:  I mean, I wouldn't have an

13    issue with it, like -- sure.  I don't -- I mean, I

14    can't remember what the agreement was, but she can --

15    yeah, they're -- I mean, the whole shoot is hers,

16    so...

17         Q.   (BY MR. JIH)  Well, do you remember if

18    your agreement, your discussions with her, were for

19    the photos actually published or for every photo at

20    the photo shoot?

21         A.   Well, usually it's -- it would be every

22    one, so -- and that doesn't -- you know.

23         Q.   Okay.  So for every photo in the photo

24    shoot, some have been used in particular ways,

25    correct?

                                        Page 167

1          A.    Correct.

2          Q.    Now, if suddenly a new idea comes along to

3     use other photos or even the same photos in different

4     ways, some new use that hasn't been discussed yet --

5          A.    Uh-huh (affirmative).

6          Q.    -- it doesn't matter really what it is, is

7     that something that you're contractually obligated

8     already to deliver, or is that something you and Ms.

9     Morton would have to discuss and agree to?

10              MS. HOLLIDAY:  Objection, form.

11              If you --

12         Q.    (BY MR. JIH)  If you know.

13              MS. HOLLIDAY:  -- your opinion.

14              THE WITNESS:  I mean, I don't -- I don't

15    know, but I would be open to doing whatever -- I

16    mean, the images are -- are of her, and she has

17    ideas.  It's a -- you know.  Absolutely be open to

18    it.

19         Q.    (BY MR. JIH)  In terms of everything

20    that's already been contemplated and discussed, is

21    there any more work you are doing now with respect to

22    the photos from the Borneo shoot?

23         A.    No.

24         Q.    As far as you're concerned, then, at least

25    as of now, the work -- your work is done?

Page 168

```
 1           A.    I mean, my work -- my work is never done
 2      with those kind of things and -- and there are lots
 3      of more images from that collection, so...
 4           Q.    Okay.  So I'm not precluding that there
 5      can be further work, but as of now there is nothing
 6      pending?
 7           A.    There is nothing pending, no.
 8           Q.    And so during this entire time period
 9      where you're doing work for Ms. Morton, did you have
10      other clients and jobs you were doing?
11           A.    Yes.
12                 MS. HOLLIDAY:  Objection, form, as to
13      "work."
14           Q.    (BY MR. JIH)  You said the answer was yes?
15           A.    I mean, was I shooting pictures for other
16      people and clients?  Yes.
17           Q.    Correct.
18                 MS. HOLLIDAY:  In Borneo?
19                 MR. JIH:  No, I didn't say Borneo.
20                 MS. HOLLIDAY:  I'm asking if you
21      understand the question.
22                 MR. JIH:  Well, I think the record is
23      clear.
24           Q.    The question is also -- I'm going to ask
25      now -- is there was nothing in your agreement with
```

```
 1        Ms. Morton that said you could not be doing work for

 2        other people while you were doing work for her.

 3        Correct?

 4                    MS. HOLLIDAY:  Objection, form.

 5                    THE WITNESS:  I mean -- no.

 6           Q.    (BY MR. JIH)  Do you use -- did you have

 7        any understanding with Ms. Morton in terms of any

 8        right to attribution, if you know what I mean by

 9        that?

10                    MS. HOLLIDAY:  Objection, form.

11                    THE WITNESS:  What do you mean by that?

12           Q.    (BY MR. JIH)  The fact that you would be

13        acknowledged as the photographer in these photos,

14        credited?

15           A.    Yeah, that I would be credited?  Yeah.

16           Q.    And was that something you understood with

17        Ms. Morton, that you would be credited as the

18        photographer of these photos?

19           A.    Yeah.

20           Q.    It wasn't something that -- that she

21        couldn't, as far as you know, pretend she took the

22        photographs, right?  She couldn't say, Photographed

23        by Genevieve Morton, for example?

24           A.    I mean, she wouldn't do that, but, I

25        mean -- if she wanted to, I suppose she could do
```

Page 170

1      that.

2              Q.    Okay.  So was there an agreement or no

3      agreement on attribution is my question.

4              A.    I mean, I -- you know, I don't recall if

5      that was part of -- I don't -- I don't remember that.

6              Q.    Do you remember if she ever said you could

7      not tell people you took these photographs?

8              A.    No, she did not say that.

9              Q.    Okay.  And, in fact, I think you went

10     on -- talked to reporters about the photo shoot in

11     Borneo, correct?

12                   MS. HOLLIDAY:  Objection, form.

13                   THE WITNESS:  I don't -- I don't remember

14     if -- it could have happened.  I'm not -- I'm not --

15     I don't -- I don't have a -- a clear recollection of

16     that happening, but it could have because -- yeah, it

17     could have happened.  It was kind of --

18             Q.    (BY MR. JIH)  I'm sorry.  Finish your

19     answer.

20             A.    No, it was kind of a -- a big deal when

21     the images came out, so publications were wanting

22     photos and stuff, so...

23             Q.    And when it came out, I mean, your

24     identity as the photographer was told to people,

25     right?  You benefited from it?

Veritext Legal Solutions
866 299-5127

```
 1              A.    Yes, and -- yeah.  Well, I was credited.

 2    Whether I benefited from it, I don't know.

 3              Q.    Was the identity -- your identity as the

 4    photographer for these photographs ever treated as a

 5    secret?

 6              A.    Not that I -- not in my world.

 7              Q.    Okay.  And no one ever told you you had to

 8    keep it a secret, correct?

 9              A.    No.

10              Q.    And, in fact, have you heard anything from

11    Ms. Morton suggesting she treated it as a secret?

12              A.    No.  No, never.

13              Q.    In fact, I think she testified she wanted

14    to help promote your name out there, correct?

15              MS. HOLLIDAY:  Objection, form.

16              THE WITNESS:  Yeah, she -- she -- she's

17    very generous with -- with crediting and all that

18    stuff, yes.

19              Q.    (BY MR. JIH)  And she's been generous like

20    that towards you, correct?

21              A.    Yes, she's been very generous.

22              Q.    Okay.  So if someone told you that your

23    identity was a trade secret, would you have any idea

24    what that would be based on?

25              A.    I would have absolutely no idea what that
```

Page 172

1        would be based on.

2               Q.    And would you say that would not be true?

3                     MS. HOLLIDAY:  Objection, form.

4                     THE WITNESS:  I -- you know, I don't -- I

5        don't know.  I don't know.  That's -- yeah.  No.

6               Q.    (BY MR. JIH)  So in terms of the

7        20 percent and 25 percent, is that based on gross, or

8        is that after expenses and costs?

9               A.    I'm almost positive it's after expenses

10       and costs.

11              Q.    Okay.  And then if there are liabilities

12       associated with the photographs and their use, are

13       you responsible in any way for a share of those

14       liabilities?

15                    MS. HOLLIDAY:  Objection, form.

16       Objection, calls for a legal conclusion.

17                    THE WITNESS:  I don't know.

18              Q.    (BY MR. JIH)  Was that something that was

19       part of your understanding or deal, or was it -- or

20       it could have been?

21              A.    Liability of what?  I don't -- I'm not

22       sure what you are getting at.

23              Q.    (BY MR. JIH)  Well, if, for example,

24       Ms. Morton owes money as a result of her use of these

25       photos or if out of this lawsuit --

Page 173

1          A.    In what context would she owe money for

2     the photos?

3          Q.    Well, I'm saying or if she, like, out of

4     this lawsuit, instead of receiving money she has to

5     pay money, do you, under your deal, have to pay a

6     portion of that or no?

7          A.    I don't even understand in what way that

8     would ever happen.

9          Q.    I guess I'm trying to get at the generic

10    question which is, are you responsible -- was there

11    any agreement on your having to contribute to any

12    liabilities?

13         A.    How would there be liability?  Can you

14    explain to me what you mean as far as liability with

15    regards to photographs that I -- that she owns?  How

16    would she --

17              (Overtalk.)

18              (Discussion off the record.)

19         Q.    (BY MR. JIH)  I'm just trying to

20    understand if, as far as you're concerned, your --

21    you had any agreement with Ms. Morton in terms of you

22    having to pay if there was any money owed.  That's

23    all I'm trying to understand.  The answer could be

24    yes or no; I just don't know.

25         A.    I've been in this business for 25 years

                                              Page 174

1    and -- owed for what?  I don't understand.  Can you

2    give me an example?

3        Q.    Well, the example I was trying to give is,

4    since this lawsuit is one of the examples how you

5    might get money, according to my understanding of the

6    deal; how about if it goes the other way and there is

7    money that's owed as a result of the lawsuit.

8              Do you have any agreement as to that with

9    Ms. Morton?

10       A.    I'm not in the lawsuit.  I'm a witness,

11   right?

12       Q.    Is it your understanding that you would

13   receive 25 percent of any recovery in this lawsuit?

14       A.    I was not aware of that until you

15   mentioned it in this deposition.

16       Q.    Okay.  So as far as you know, you're not

17   aware of, like, any agreements with respect to this

18   lawsuit, correct?

19       A.    I'm not aware, no.

20       Q.    If -- so you said in terms of your 20 or

21   25 percent, you would understand it to be after costs

22   and expenses that you would receive your share,

23   correct?

24             MS. HOLLIDAY:  Objection, form.

25             THE WITNESS:  Yes, I would.

                                           Page 175

1          Q.    (BY MR. JIH)  If it turns out that the --

2     that Ms. Morton received no money from the photos --

3     you know, let's say the calendar wasn't released

4     or -- you know, there was no money; would you,

5     therefore, receive nothing for the work you did on

6     these photos?  Is that the deal?

7          A.    That would most likely be how it went

8     down, yeah.  That's -- that's being an artist.

9          Q.    So there -- basically, you know, as an

10    artist you bear the risk of not profiting from it,

11    but you aren't guaranteed any compensation.  Correct?

12         A.    No, and that's a part of -- a creative as

13    a photographer, there's oftentimes you take jobs that

14    you aren't being paid because of status or something

15    like that.  So you're -- you're always a risk-taker

16    in those terms, so yes.

17         Q.    I assume that's something you have to take

18    into account as you decide what jobs to do or not do.

19    Is that fair?

20         A.    That is fair.

21              MS. HOLLIDAY:  Objection, form.

22              THE WITNESS:  That's fair.

23         Q.    (BY MR. JIH)  Do you ever work with

24    assistants, by the way, like when you do a photo

25    shoot?

                                              Page 176

```
 1              A.    Sometimes.

 2              Q.    What kind of people would you hire to work

 3      with you for a photo shoot?

 4              A.    Can you be more specific or, like -- I

 5      don't --

 6              Q.    I can't, which is why I'm just asking the

 7      question.  Like, what type -- are there specific

 8      types of assistants you would want to hire or use at

 9      a photo shoot?  I just don't know what kind or what

10      they are called.

11              A.    Really young, talented, eager people;

12      that's who I would want to hire, yeah.

13              Q.    But do they fulfill certain jobs or

14      responsibilities for a photo shoot?

15              A.    They would -- yeah, they would help with

16      digital capture or setting up lighting, something

17      like that.

18              Q.    And did -- I assume from the way you are

19      answering this question, sometimes you don't hire

20      assistants, sometimes you do.  Is that fair?

21              A.    Correct.

22              Q.    Do you usually tend to use assistants or

23      not on a photo shoot?

24                    MS. HOLLIDAY:  Objection, form.

25                    THE WITNESS:  I tend to not, especially --
```

Page 177

1    'cause I -- I do work as a team, and we've been doing

2    it for so long, it's -- it's -- it's not always

3    necessary.  And oftentimes with the kind of

4    high-profile stuff we do, people don't want extra

5    people around and the smaller the crew, the better,

6    so...

7        Q.    (BY MR. JIH)  Did you actually discuss

8    with Ms. Morton for this shoot about the possibility

9    of hiring assistants one way or the other?

10       A.    No.  No.

11       Q.    How much money have you received from the

12   photos taken in Borneo in 2016, total, from Ms.

13   Morton?

14           MS. HOLLIDAY:  Objection, form.

15   Objection, privilege.

16           If you know, you can answer.

17           THE WITNESS:  I do not.  I don't know.  I

18   would have to go back and look at my tax statements.

19       Q.    (BY MR. JIH)  But you have received some

20   money, correct?

21       A.    Yeah, she -- yeah, she always paid on time

22   as soon as she got money.

23       Q.    Are -- does she -- do you deal with your

24   finances yourself personally, or do you have someone

25   who works for you who deals with money?

Veritext Legal Solutions
866 299-5127

```
 1                    MS. HOLLIDAY:  Objection, form.
 2      Objection, calls for privilege.
 3                    THE WITNESS:  I mean, I mostly take care
 4      of -- between my brother and I, we do our own and
 5      then we have an accountant that we have been working
 6      with for ten years too.
 7           Q.   (BY MR. JIH)  When you got payments from
 8      Ms. Morton with regards to these photographs, do
 9      you -- did you receive some kind of, like,
10      itemization or statement that went with it, or did
11      you just get the money?
12           A.   There were statements with them always,
13      yeah.
14           Q.   Okay.  So there should be a paper -- there
15      should be paper communications indicating how much
16      money and how it was calculated for these photos?
17                    MS. HOLLIDAY:  Objection, form.
18           Q.   (BY MR. JIH)  Is that your understanding?
19                    MS. HOLLIDAY:  How long has it been?
20                    THE WITNESS:  Yeah, I -- it's been a long
21      time, but I -- but I believe so.
22           Q.   (BY MR. JIH)  When is the last time you
23      recall receiving money with respect to the Borneo
24      2016 photos?
25           A.   I -- you know what?  I have no idea what
```

Page 179

1     year that was.  Only within a couple years, maybe a

2     year -- within the year of release of everything, you

3     know.  It wasn't something that went on for a long

4     period of time.

5          Q.    It didn't have a long tail or, like --

6          A.    Like the -- the offering of whatever the

7     product was would be up for, you know, however long,

8     and so it would be -- you know, in the beginning, you

9     know, there would be a lot of people buying, so you

10    would be paid a lot then, but then, you know, after

11    interest withered and sales were down, it was, you

12    know -- they were taken down.

13         Q.    Is that typical, by the way, for

14    photographs, that the exploitation will tail off

15    after initial interest?

16              MS. HOLLIDAY:  Objection, form and

17    speculation.

18              You can answer if you know your opinion.

19              THE WITNESS:  You know what?  I have no

20    idea, you know, but, you know, in my experience with

21    those, it's, like, in the beginning the excitement of

22    the marketing of these kind of, like, images, you

23    know, would be a lot more in the beginning.

24         Q.    (BY MR. JIH)  In terms of your experience

25    with the photographs you've taken, your experience

                                        Page 180

1    has been it will be an initial period of monetization

2    and then it tails off?

3                    MS. HOLLIDAY:  Objection, form.

4                    THE WITNESS:  I mean, in this instance,

5    not -- you know, I'm not sure if it -- you know, in

6    certain other ways, like, in the past or whatever,

7    that it would be more of a -- a -- you know,

8    consistent cash flow or -- you know.

9         Q.    (BY MR. JIH)  Have -- do you know, have

10   you ever -- can you think of any of your photographs

11   that have actually resulted in consistent, regular

12   cash flow for you?

13                   MS. HOLLIDAY:  Objection, form.

14                   THE WITNESS:  Yeah, not -- I don't recall

15   anything, like, offhand.  This is kind of a very

16   specific kind of fine art type of way of, you know,

17   using images, so...

18        Q.    (BY MR. JIH)  Which way does that cut in

19   terms of this particular kind of use?

20                   MS. HOLLIDAY:  Objection, form.

21                   THE WITNESS:  Can you clarify that?  I

22   don't know what you mean.

23        Q.    (BY MR. JIH)  Well, we're talking about

24   whether or not the monetization will tail off after

25   an initial period or whether or not it would be more

                                        Page 181

```
 1      of a continuing kind of cash -- continuing cash flow.

 2              Do you -- you said fine art is sort of a

 3      unique situation.  Does that cut more in favor of a

 4      continuing cash flow or more in favor of sort of,

 5      like, an initial monetization period?

 6          A.   You know what?  I'm -- I'm -- I'm not

 7      positive on that.  You know, I couldn't answer

 8      conclusively one way or another, you know.

 9          Q.   And is more of your work, in terms of your

10      experience with your photos -- have they been more in

11      the camp of continuing cash flow or more in the camp

12      of sort of initial monetization?

13          A.   Anymore, because of licensing and -- you

14      know, imagery is, in many ways, you know, not valued

15      the way it was and more content is needed all the

16      time so that, you know, it's just economics; it's,

17      like, individual photos are not worth what they were.

18      Everyone needs more shoots, more content all the

19      time.

20              So most jobs you're -- you're paid a flat

21      rate up front agreed to, upon, and then those people

22      are able to use those images, you know, for as long

23      as they want, but anymore people want new image --

24      you know, in the past you could -- images would --

25      would get through -- people could use them for a
```

Page 182

```
 1    year, like, let's say, a publicist; nowadays those

 2    images are worth, like, maybe for a few weeks or a

 3    month before they need to shoot more images, so...

 4         Q.    Why is that (indecipherable), do you know,

 5    from your experience?

 6         A.    It's because of the Internet and social

 7    media and this insatiable need for more content.

 8         Q.    So when you agreed to do the photos in the

 9    Borneo 2016 shoot, you were fine with the fact that

10    you might end up with no money for your work if they

11    weren't actually -- if they didn't actually result in

12    any compensation, right?  And you knew -- if they

13    weren't exploited or if they -- there was no market

14    for it, you understood you might actually get nothing

15    for the work?

16              MS. HOLLIDAY:  Objection, form.

17              THE WITNESS:  Yeah, that's like I had said

18    before, you know, you're always weighing out which

19    jobs to take and which ones not.  And, like, a lot of

20    times it may seem risky or -- you know, so -- so,

21    yeah, had that been the way, yeah, that's -- that

22    wouldn't be the first time, so...

23         Q.    (BY MR. JIH)  Do you remember actually --

24    were all the photos in this Borneo 2016 shoot that

25    we've talked about for Ms. Morton -- was that all
```

Page 183

```
 1    done on one day?
 2         A.   Well, the beach was, like, sunrise.  I'm
 3    not positive.  It was either done in one day or we
 4    did it over two days.
 5         Q.   But it was all at least part of that one
 6    trip, correct?
 7         A.   Correct.
 8         Q.   Okay.  And that includes all the photos I
 9    showed you from Exhibits 1 through 12 and 1 -- and
10    19, those were all from that trip, correct?
11              MS. HOLLIDAY:  Objection.
12              Do you want to look at the photos again?
13              THE WITNESS:  Yeah, I'm not positive.
14         Q.   (BY MR. JIH)  One through 12 and then 19.
15         A.   Do we have that?  Sorry.  Wait.  Where did
16    mine go?
17              MS. HOLLIDAY:  I'll pull it up.
18              THE WITNESS:  Here.  Let me see.  Oh, here
19    they are.
20              MS. HOLLIDAY:  Okay.
21              THE WITNESS:  One through 19?
22         Q.   (BY MR. JIH)  No, 1 through 12 and then
23    19.
24         A.   Oh.
25         Q.   So there are a total of 13 exhibits.
```

Page 184

1          A.     So one -- yeah, I'm -- I'm pretty

2     confident that all of those are -- are Borneo, yeah.

3          Q.     Okay.  Do you remember -- I just can't

4     remember if I asked you this.  Do you remember when

5     the Borneo trip was?

6          A.     Man, I -- you know what?  I don't know a

7     specific.  I don't know.

8                    (EXHIBIT 20 WAS MARKED.)

9          Q.     Okay.  I would also like to direct you to

10    a new exhibit that I'm going to mark at Exhibit 20.

11    And Eve is going to go ahead and put that in the

12    exhibits, so you will see Exhibit 20.  Let me know

13    when you have it.  I guess Eve could tell us when

14    she's put it up.

15                    MS. HOLLIDAY:  Did you testify about

16    Exhibit 19 being part of Borneo?  I'm sorry, I just

17    need to keep track.

18                    THE WITNESS:  That's -- yeah, that's

19    Borneo.

20                    MS. HOLLIDAY:  Okay.

21          Q.     (BY MR. JIH)  You did, right, I believe

22    that was part of your answer.

23          A.     That is Borneo, yes.

24          Q.     Yeah.

25                    MR. JIH:  Is it in there now, Eve?

                                            Page 185

```
 1                    MS. ZELINGER:  It should be uploading now,
 2        so --
 3                    MR. JIH:  Okay.  Oh, it should be there
 4        now.  I see it.
 5                    Let me know if you see it, Mr. Riker.
 6                    MS. HOLLIDAY:  Maybe we have to refresh.
 7                    MR. JIH:  I just clicked on a different
 8        folder and clicked back in, is how I did it.
 9                    THE WITNESS:  Oh, okay.  Let me -- number
10        20 -- oh, there we go.
11                Q.    (BY MR. JIH)  Yeah.
12                A.    What is this (indecipherable)?
13                Q.    Yeah, so I'll state for the record that
14        the title of the document is Plaintiff's Supplemental
15        Responses to Twitter's Request for Production, Set 2.
16                    Do you see that?
17                    MS. HOLLIDAY:  Somewhere, I just don't
18        seem to have it in my exhibit folder.
19                    MR. JIH:  You don't have it in the
20        marked -- if you just go to -- it's marked as
21        Exhibit 20.
22                    MS. ZELINGER:  It looks like it's about
23        the sixth document in the marked exhibit folder.
24                    MS. HOLLIDAY:  I'll just share with you.
25                    THE WITNESS:  Yeah, it's here.
```

Page 186

1      Q.    (BY MR. JIH)  Okay.  So just to -- I'm

2   assuming you haven't, but have you seen this document

3   before?

4      A.    I have not seen this document, no.

5      Q.    Okay.  So these are discovery responses

6   that were served in this case by Ms. Morton and her

7   attorney.  So that's what it is, in case you were

8   wondering what the document is.

9           I want to ask you about the answer that

10  that's in here and to see what extent you know about

11  these facts or not.

12     A.    Okay.

13     Q.    So I want to start -- with on the first

14  page it starts at line 27.

15     A.    Okay.

16     Q.    Where it says, "Plaintiff had a hard drive

17  failure in 2019."

18          Do you see that?

19     A.    Yes.

20     Q.    Do you know anything, or did you know

21  about a hard drive failure in 2019?

22     A.    Of her hard drive?

23     Q.    Correct.

24     A.    I -- I do remember her losing stuff

25  because she was constantly asking me to -- to get her

Page 187

```
 1      things.
 2           Q.    Okay.
 3           A.    I'm not sure if that was specifically
 4      that, or it could have been something else, but...
 5           Q.    Okay.  And then it says, "There was only
 6      one photographer employed on the project,
 7      Derek Riker."
 8                 You were the only one photographer,
 9      correct?
10           A.    Yes.
11           Q.    Now, this answer says the word "employed,"
12      but I -- I believe you said you don't know legally
13      whether or not you were an employee or not.  Is that
14      right?
15           A.    I mean -- I don't know.
16                 MS. HOLLIDAY:  Objection, form.  Asked and
17      answered.
18                 THE WITNESS:  Yeah, I don't -- I don't
19      know.  Like, I don't know what legally that means.
20           Q.    (BY MR. JIH)  Okay.  And I believe you
21      said you don't recall any specific discussions about
22      whether or not your status should be as an employee
23      or an independent contractor.  Is that right?
24                 MS. HOLLIDAY:  Objection --
25                 THE WITNESS:  Yeah, I -- do you know
```

Page 188

```
 1     what --

 2                 MS. HOLLIDAY:  -- form.

 3                 THE WITNESS:  -- I have no idea.

 4          Q.    (BY MR. JIH)  And, in fact, you never

 5     received a W-2, for example, for this project,

 6     correct?

 7                 MS. HOLLIDAY:  Objection, form.

 8     Objection, relevance.

 9                 THE WITNESS:  Like, I don't -- I -- I

10     don't -- I don't know.  I don't -- I don't know.

11          Q.    (BY MR. JIH)  Do you remember when you

12     reported the money you've received concerning these

13     photographs to the IRS, did you report it as wages

14     earned, or did you report it as, like, independent

15     contractor 1099 income?

16                 MS. HOLLIDAY:  Objection, form.

17                 THE WITNESS:  You know what?  I'm not

18     positive.

19          Q.    (BY MR. JIH)  The -- okay.  So going on to

20     the next sentence it says, "The agreement was lost in

21     the hard drive."

22                 Do you see that?

23          A.    Where is that?

24                 MS. HOLLIDAY:  Line 28.

25          Q.    (BY MR. JIH)  This is literally the next
```

Page 189

```
1     sentence.  "The agreement was lost in the hard
2     drive."
3          A.    Oh, I gotcha.
4          Q.    Do you see that?
5          A.    I do see that.
6          Q.    Okay.  I believe your testimony is you're
7     not sure if you actually signed a written agreement
8     or something in writing that could be lost.  Is that
9     right, or do you know if there was an agreement that
10    was lost?
11              MS. HOLLIDAY:  Objection, form.
12              THE WITNESS:  Yeah, I don't -- I don't
13    know.
14         Q.    (BY MR. JIH)  So you don't know what
15    agreement that answer is referring to that was lost
16    in the hard drive?
17              MS. HOLLIDAY:  Objection, form.
18    Objection, asked and answered.
19              THE WITNESS:  I mean, that very well could
20    have been.  I don't -- I'm saying I don't know.  I
21    don't remember.
22         Q.    (BY MR. JIH)  Okay.  So -- but as you're
23    testifying today, you couldn't tell me what agreement
24    regarding you was lost in the hard drive, correct?
25              MS. HOLLIDAY:  Objection, form.
```

Page 190

```
 1                    THE WITNESS:  I -- I don't recall.  I
 2      don't recall what it was.
 3           Q.    (BY MR. JIH)  Or even if there was a
 4      written agreement, correct?
 5                    MS. HOLLIDAY:  Objection, misstates
 6      testimony.  Objection, form.
 7                    MR. JIH:  That's why I'm asking.
 8                    MS. HOLLIDAY:  Well, you've asked and
 9      answered -- he's asked and answered it multiple
10      times.  I believe his testimony, if we need to go
11      back and review it --
12                    MR. JIH:  No, don't say -- don't testify
13      for him.  Just let him answer.
14                    THE WITNESS:  I don't -- I don't recall.
15           Q.    (BY MR. JIH)  Okay.  And, in fact, if
16      there was as written agreement that you signed, it
17      might likely be in your files, correct?
18                    MS. HOLLIDAY:  Objection, form.
19                    THE WITNESS:  I have -- you know, I have
20      no idea.
21           Q.    (BY MR. JIH)  I'm saying you didn't -- you
22      have files, correct?  If it was something that was
23      sent to you or something that you signed, wouldn't
24      you have files?
25           A.    Potentially, but I don't -- I don't -- I
```

Page 191

1    don't know.

2         Q.   Did you have any kind of hard drive

3    failure or any kind of loss of documents that you are

4    aware of?

5         A.   I -- with regards to this, I don't -- I've

6    lost hard drives, but I'm not sure -- I haven't been

7    looking for things for this, so I -- I'm not sure

8    what was lost on that.

9         Q.   You said Ms. Morton sometimes, because of

10   her hard drive failure, would ask you for documents,

11   correct, or information?

12        A.   She requested images, requested stuff,

13   yes.

14        Q.   Has she ever asked you to look for any

15   written agreement regarding the Borneo 2016 shoot

16   that she may have lost?

17        A.   I don't -- I don't recall that.

18        Q.   If that agreement did exist and was in

19   your files, you would have no problem looking for it,

20   right?

21             MS. HOLLIDAY:   Objection, form.

22   Objection, speculation.

23             THE WITNESS:   Yeah.

24        Q.   (BY MR. JIH)  No one has ever asked you to

25   look for it?

Veritext Legal Solutions
866 299-5127

```
 1              MS. HOLLIDAY:  Objection, form.
 2              THE WITNESS:  You know, she -- she may
 3       have.  I have no idea.
 4          Q.    (BY MR. JIH)  But you don't remember her
 5       ever asking?
 6          A.    I don't -- no, I don't.
 7          Q.    Did she ever tell you, when she talked to
 8       you about the written acknowledgment of ownership,
 9       that the reason -- that the reason you needed to sign
10       the document was because she had lost an agreement
11       because of the hard drive failure?
12              MS. HOLLIDAY:  Objection, form.
13              THE WITNESS:  I don't -- I don't remember.
14          Q.    (BY MR. JIH)  So you don't remember her
15       saying it was because she lost or something got
16       destroyed?
17          A.    She -- she has lost hard drives before,
18       but I'm not sure what -- what specifically she was
19       calling to have recovered.  Like, I don't -- I don't
20       remember what she was, you know -- I do remember
21       images.  I do -- you know, having to get to her.
22              MR. JIH:  Just so you know, Ms. Holliday,
23       it looks like you're writing on a Post-it.  I know
24       we can see you writing something; I just don't
25       know --
```

Page 193

```
 1                    MS. HOLLIDAY:  I'm looking through your --
 2        through your deposition folder for the, like,
 3        exhibits because I have this iPad, so --
 4                    MR. JIH:  Okay, well, we can see the pen
 5        and stuff moving over, an icon.  I'm just saying -- I
 6        just want to make sure you're not communicating with
 7        someone.
 8                    MS. HOLLIDAY:  This isn't actually
 9        working.  I'm trying to figure out why it's, like a
10        Bluetooth --
11                    MR. JIH:  That's fine.  You know what?
12        I'm just saying make sure --
13                    MS. HOLLIDAY:  Yeah, I still can't find
14        any of the exhibits that Eve uploaded, so --
15                    MR. JIH:  That's fine.
16                    MS. HOLLIDAY:  -- I need a depositions
17        folder to try to see what it is, but that's all.
18                    MR. JIH:  All right.
19        Q.    So you don't have a memory of your
20        acknowledgement or the thing you signed having
21        anything to do with the loss of an agreement?
22                    MS. HOLLIDAY:  Objection, asked and
23        answered, and objection, form.
24                    THE WITNESS:  I -- no, I don't for -- no.
25        Q.    (BY MR. JIH)  And you don't remember at
```

Page 194

```
 1      that time if an agreement was lost, being asked to

 2      just look for your copy of it; you don't remember

 3      being asked that?

 4                   MS. HOLLIDAY:  Objection, asked and

 5      answered.

 6                   THE WITNESS:  Yeah, I don't -- I don't

 7      remember or...

 8           Q.    (BY MR. JIH)  If an agreement was lost, is

 9      there any reason you could think of why Ms. Morton

10      would not just ask you for your copy of it?

11           A.    Yeah, I don't -- yeah, I don't know.

12           Q.    So the last sentence of this -- on the

13      second page, it says, "Mr. Riker, therefore, signed

14      another agreement acknowledging the existence of a

15      protective agreement."

16                   Do you see that sentence?

17           A.    Right.  Yes, I see it.

18           Q.    Okay.  Does that word "therefore" -- you

19      don't know anything about that "therefore," right?

20      You don't know that this was the result of a South

21      African loss -- or a hard drive failure loss.  Do you

22      have any information on the "therefore" --

23                   MS. HOLLIDAY:  Objection.

24           Q.    (BY MR. JIH)  -- or the reason?

25           A.    Where is this now?
```

Page 195

```
 1                    MS. HOLLIDAY:  It's line 4.

 2                    THE WITNESS:  Line 4.  Where's the

 3         "therefore"?

 4                    MS. HOLLIDAY:  It's after your name.

 5                    THE WITNESS:  Oh, I see.

 6         Q.    (BY MR. JIH) It says, "Mr. Riker,

 7         therefore, signed."

 8         A.    So what -- what is your question?

 9         Q.    Do you have any -- do you agree that the

10    reason you signed it -- or do you have information

11    that the reason you signed this agreement was because

12    of the loss of a prior agreement?

13         A.    I --

14                    MS. HOLLIDAY:  Objection, form.

15                    THE WITNESS:  I don't recall, but that

16    doesn't -- I don't -- you know -- I don't remember

17    it.  Like, again, I have -- I have people asking

18    and -- about stuff like this, and I -- I wasn't

19    thinking it was any big deal.  I didn't know, you

20    know -- it's, like, images of hers and I probably

21    just was, like, I don't -- you know, it doesn't

22    really have a -- it doesn't really affect me.  You

23    know, I don't know, really, what's going on, so I --

24    whether I responded or not, you know, I -- I don't

25    remember.
```

Page 196

```
 1              Q.    (BY MR. JIH)  Now, it says, "Mr. Riker
 2    signed another agreement acknowledging the existence
 3    of a protective agreement."
 4              Do you see that?
 5         A.    I do.
 6         Q.    Yeah.  Do you know if that previous
 7    agreement was a written agreement or an oral
 8    agreement?
 9              MS. HOLLIDAY:  Objection, form, but if you
10    remember, you --
11              THE WITNESS:  I don't -- I don't remember.
12         Q.    (BY MR. JIH)  One way or the other, right?
13         A.    I don't remember, yeah.
14         Q.    And then it says that all of this happened
15    when plaintiff was in process of registering the
16    copyrights.  Do you see that?
17         A.    Okay.
18         Q.    Do you see where it says that?
19         A.    I do see that.
20         Q.    Do you have any understanding as to
21    whether or not you were asked to sign this -- this
22    later agreement acknowledging the existence of a
23    previous agreement, that this was during the time
24    plaintiff was in the process of registering the
25    copyrights?
```

Veritext Legal Solutions
866 299-5127

```
 1                    MS. HOLLIDAY:  Objection, form.
 2        Objection, speculation.
 3                    But you can answer.
 4                    THE WITNESS:  I don't -- can you read --
 5        can you just ask that again?  I'm sorry.
 6             Q.    (BY MR. JIH)  Okay.  So you were asked --
 7        according to this answer, I guess, you were asked to
 8        sign this agreement acknowledging a prior agreement
 9        sometime after the hard drive failure in 2019, so I'm
10        assuming it happened 2019 or 2020.
11                    Is that your understanding of the timing?
12             A.    It could be.  It could be, yeah.
13             Q.    Does that seem consistent with your memory
14        of when you signed this written acknowledgement?
15             A.    I mean, it -- it could be.  You know...
16             Q.    So do you have any -- I'm sorry.  Go
17        ahead.
18             A.    I don't specifically recall.  I'm sorry.
19             Q.    Do you have any understanding as to
20        whether this acknowledgement was being presented to
21        you while plaintiff was in the process of registering
22        the copyrights?
23                    MS. HOLLIDAY:  Objection as to form, and
24        vague.
25                    THE WITNESS:  I -- I mean, I do not recall
```

Page 198

1     that.

2          Q.    (BY MR. JIH)  And do you -- were you ever

3     told that you needed to sign this acknowledgement

4     because she was in the process of registering the

5     copyrights?

6               MS. HOLLIDAY:  Objection, form.

7               You can answer if you know.

8               THE WITNESS:  No, I don't.  I don't

9     remember that.

10         Q.    (BY MR. JIH)  Okay.  You have no reason,

11    though, to dispute the fact that this occurred

12    because she was in the process of registering the

13    copyrights?

14         A.    I mean, I -- I -- I have no idea.  I have

15    no idea.  I would...

16         Q.    And you have no memory of her asking you

17    to locate a prior written agreement in the process of

18    registering a copyright, correct?

19              MS. HOLLIDAY:  Objection.  Asked and

20    answered.

21              THE WITNESS:  Yeah, I don't -- I don't

22    remember.  I don't remember her doing -- she --

23    she -- she may have.  I mean, she -- you know, I

24    didn't -- I didn't know what was going on and I --

25    you know, I would -- and so...

                                           Page 199

1          Q.    (BY MR. JIH)  And to this day, have you

2     ever tried to look for any lost written agreement

3     concerning the Borneo photo shoot?

4          A.    I haven't -- I don't -- I don't recall

5     ever doing that.

6          Q.    And you don't recall anyone ever asking

7     you to, correct?  Well, I guess other than us in the

8     subpoena.

9          A.    You know what?  I don't -- I don't know.

10    I may have been asked, you know, unfortunately, but I

11    don't recall, you know, looking for it.

12         Q.    When was the -- actually, have you --

13    you've only signed one -- you only remember one

14    written agreement that you've signed concerning the

15    Borneo 2016 shoot and the photographs, right?

16         A.    Specifically, yes.

17         Q.    Okay.  And so there's no other agreement,

18    for example, a transfer of rights after the fact; is

19    that right?

20              MS. HOLLIDAY:  Objection, calls for a

21    legal conclusion.

22              THE WITNESS:  I -- I don't know.  I don't

23    know that.

24         Q.    (BY MR. JIH)  You are not aware of any

25    other written agreement that you remember, correct?

                                        Page 200

1              MS. HOLLIDAY:  Objection, form.

2              THE WITNESS:  Yeah, I don't -- I don't

3      remember any other.

4         Q.    (BY MR. JIH)  Okay.  The -- when was the

5      first time you met Ms. Holliday?

6         A.    The first time?  I mean -- well, before --

7      before this.  Probably out socially sometime.

8         Q.    Do you know approximately when?

9         A.    I -- I would be purely guessing, you know.

10        Q.    Have you known Ms. Holliday for a long

11     time?

12        A.    I've -- I've known her for several years.

13        Q.    And are you -- do you have a personal

14     relationship with her as well?  Like, are you friends

15     with her as well, or is it just as a lawyer?

16        A.    I mean, not really.  I mean, I've -- I'm

17     very close with Genevieve.  Genevieve and her are

18     friends, so it was more if I -- if I had seen

19     Genevieve, I would see, you know -- but I don't see

20     Jennifer without Genevieve, so...

21        Q.    A friend of a friend, basically?

22        A.    Friend of a friend, right.

23        Q.    In the same circle, so to speak,

24     sometimes?

25        A.    Right.  Right.

                                        Page  201

```
 1            Q.    But you -- would you -- did you ever have

 2      any personal friendship or relationship with

 3      Ms. Holliday?

 4                  MS. HOLLIDAY:   Objection, relevance.  But

 5      you can answer the question.

 6                  THE WITNESS:   I mean, I would -- I would

 7      consider her a friend.   I -- you know -- so...

 8            Q.    (BY MR. JIH)  So you would consider

 9      her from -- okay.  I get it.

10            A.    She was a friend of Genevieve's and it's,

11      like, you know, so...

12            Q.    And then before February 2022, though, you

13      never had any professional relationship with

14      Ms. Holliday, correct?

15            A.    No.

16            Q.    Okay.  All right.  Why don't we take a

17      break for ten minutes and maybe -- I may be done.  So

18      let me just confirm and make sure that I've got

19      covered what I needed to, but we may almost be done.

20            A.    Okay.

21                  MS. HOLLIDAY:   Ten or 15 minutes, Mr. Jih?

22                  MR. JIH:   Let's -- let's go to ten

23      minutes, and let's just go off the record.

24                  THE VIDEOGRAPHER:   We're off the record at

25      2:53 p.m.
```

Page 202

```
 1                        (A break was taken from 3:53 p.m. to
 2              4:01 p.m.)
 3                        THE VIDEOGRAPHER:  Okay.  We are back on
 4              the record at 3:01 p.m.
 5                        MR. JIH:  I'm done.  I have no further
 6              questions.  So I was just going to thank you for your
 7              time.  And I know depositions are strange and weird
 8              events, but I appreciate your cooperation.
 9                        I don't know if Ms. Holliday has any
10              questions, but otherwise we're done.
11                        MS. HOLLIDAY:  No, I would just like to
12              thank everyone.  Thank you so much.  Thank you for
13              not taking up the whole seven hours and being as
14              efficient as possible.  We really appreciate that.
15              I'm sure the witness does as well.
16                        And I thank you, Eve, and thank you, Dawn,
17              and thank you, Dan.  And I hope everyone has a
18              lovely, safe day.
19                        MR. JIH:  Great.  Thank you.  We can be
20              off the record.
21                        THE VIDEOGRAPHER:  Okay.  That concludes
22              today's videotaped deposition of Derek Riker, and we
23              are off the record at 3:01 p.m.
24                        (Deposition concluded at 4:01 p.m.)
25                                  * * *
```

Page 203

```
1                      REPORTER'S CERTIFICATE
2
     STATE OF UTAH            )
3                             )  ss.
     COUNTY OF SALT LAKE      )
4
               I, Dawn M. Perry, Certified Shorthand
5    Reporter for the State of Utah, do hereby certify:
6              That on March 28, 2022, prior to being
     examined, the witness, DEREK RIKER, was duly sworn by
7    me to tell the truth, the whole truth, and nothing
     but the truth;
8
               That the testimony of said witness was
9    reported by me in stenotype via Zoom, and thereafter
     transcribed, and that a full, true, and correct
10   transcription of said testimony is set forth in the
     preceding pages;
11
               That in accordance with Rule 30(e), no
12   request having been made for the witness to read and
     sign the transcript, the original transcript was
13   sealed and delivered to Victor Jih, Attorney at Law,
     for safekeeping.
14
               I further certify that I am not kin or
15   otherwise associated with any of the parties to said
     cause of action and that I am not interested in the
16   outcome thereof.
17             WITNESS MY HAND this 29th day of March,
     2022.
18
19
20
21
22
               Dawn M. Perry, CSR
23
24
25
```

Page 204

1    VICTOR JIH, ESQ.

2    vjih@wsgr.com

3                                    March 29, 2022

4    RE: MORTON VS. TWITTER, INC.

5    MARCH 28, 2022, DEREK RIKER, JOB NO. 5160981

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                              Page 205

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    _X_Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 206

```
 1   RE: MORTON VS. TWITTER, INC.

 2   DEREK RIKER, JOB NO. 5160981

 3                  E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                           Date

25
```

Page 207

**[& - absolutely]**

| & | | | |
|---|---|---|---|

**&** 2:10 205:23
206:9

**0**

**001** 98:3

**1**

**1** 97:18,20 98:4,9
98:12,19,22
120:25 121:1,13
122:4,9 138:18
184:9,22 206:1
**10** 98:8 156:11,13
**100** 142:14
**10434** 1:10
**1099** 45:10,14
189:15
**10:00** 138:22
**10:07** 4:4
**10:22** 18:2
**10:23** 18:6
**11** 98:8 122:3
**11:01** 53:14
**11:03** 55:20
**11:07** 1:18
**11:16** 55:24
**11:22** 18:3
**11:23** 18:4
**12** 98:8,12 121:2
121:13 122:3,5,9
138:18 184:9,14
184:22
**12:02** 96:8
**12:03** 55:21
**12:16** 55:22
**12:47** 96:12
**12:49** 97:8,12
**13** 97:18,21 98:4,8
98:9,15,19,22
120:25 121:1,7
184:25

**13th** 121:3
**1430** 1:21 2:5
**15** 11:3,6 156:11
156:13 202:21
**1550** 2:11
**17th** 58:2
**185** 3:7
**19** 121:4,5,6,13,23
121:24 122:5,5
138:19 184:10,14
184:21,23 185:16
**1992** 28:22 29:1
**1:02** 96:9
**1:47** 96:10
**1:49** 97:9,10
**1:50** 155:5

**2**

**2** 3:8 38:12 45:4
98:3 186:15 189:5
**20** 3:7 37:11,12
112:12,17 113:6
113:22 114:19
173:7 175:20
185:8,10,12
186:10,21
**2000** 32:1,2,3,4,5,6
32:8,21,24 33:7,11
**2000s** 37:22
**2007** 35:23 36:13
36:14,20
**2013** 15:9
**2014** 15:9
**2016** 70:25 83:25
87:15 88:25 89:9
89:24 94:6 109:17
111:8,20 112:6
126:16,20 133:5
136:9,25 157:2,11
158:15 166:11
178:12 179:24
183:9,24 192:15

**200:15**
**2017** 157:13
158:16,17
**2019** 70:19 187:17
187:21 198:9,10
**2020** 198:10
**2022** 1:18 4:4 8:24
61:8,14 62:6,19,24
63:17 153:16
202:12 204:6,17
205:3,5
**2025.520** 205:9,12
**210-2900** 2:12
**22** 64:8
**25** 48:2,7 102:19
108:10 112:13,18
113:7,22 114:20
173:7 174:25
175:13,21
**26849** 204:22
**27** 187:14
**28** 1:18 189:24
204:6 205:5
**28th** 4:4
**29** 205:3
**29th** 204:17
**2:0** 156:17
**2:02** 156:18
**2:03** 156:18
**2:05** 156:24
**2:20** 1:10
**2:52** 156:21
**2:53** 202:25

**3**

**30** 11:10 65:22
79:12 95:20
204:11 206:1
**300** 19:13,15 48:7
48:9
**310** 2:6

**323** 2:12
**3:01** 203:4,23
**3:05** 156:22
**3:53** 203:1

**4**

**4** 196:1,2
**45** 63:24 95:20,23
96:5
**4:01** 203:2,24

**5**

**5** 3:3
**50** 84:11
**5160981** 205:5
207:2

**6**

**600-6078** 2:6
**633** 2:10

**7**

**7190** 1:21 2:4
**75** 48:19,21
**7r2** 109:21

**9**

**90046** 2:5
**90071-2027** 2:11
**94** 31:6,6 32:3
**9:00** 138:21

**a**

**a.m.** 1:18 4:4 18:2
18:3,4,6 55:20,24
**abandon** 77:24
**abandoned** 76:9
**ability** 8:14 107:19
108:14 127:12
**able** 10:16 68:25
114:12 182:22
**absolutely** 16:20
17:2 18:13 65:24
168:17 172:25

Page 1

[absurd - answer]

| | | | |
|---|---|---|---|
| **absurd** 108:20 | **admission** 64:25 | 130:16 133:4 | **answer** 7:4,8,10 |
| **access** 87:1 94:3 | **advancing** 33:23 | 137:18 138:11,17 | 8:5,6,13,14 12:17 |
| 95:6 96:14 | **advantage** 92:12 | 139:7,11,12,16,22 | 13:5,18,24 14:7,12 |
| **account** 176:18 | **advises** 94:2 | 140:13 141:23 | 14:23 15:5,22 |
| **accountant** 179:5 | **advising** 94:16 | 142:14 151:17,18 | 16:10,19 17:8 |
| **accurate** 11:11 | **aesthetic** 84:17 | 152:9 159:6 160:4 | 19:1,20 20:13 |
| 14:18 15:7 16:1 | **af** 141:19 | 161:17 162:21 | 21:3,13 22:8 |
| 20:22 23:18 75:25 | **affect** 196:22 | 163:11 167:8,14 | 23:15 25:10 26:6 |
| 165:1 | **affiliations** 4:13 | 167:18 169:25 | 26:22 28:1 29:15 |
| **accurately** 21:3 | **affirmative** 8:16 | 171:2,3 174:11,21 | 31:25 32:10 33:20 |
| **accusations** 64:1 | 119:6 141:22 | 175:8 189:20 | 34:21 35:13 36:11 |
| **accustomed** 94:25 | 168:5 | 190:1,7,9,15,23 | 37:10 38:4,14 |
| **achieve** 101:3 | **african** 86:21 | 191:4,16 192:15 | 39:8 40:12,21 |
| **acknowledge** | 128:2 195:21 | 192:18 193:10 | 41:6,15,21 42:6,14 |
| 143:14,15 | **agency** 31:11,19 | 194:21 195:1,8,14 | 42:21 43:8,19 |
| **acknowledged** | **agent** 31:14 34:2 | 195:15 196:11,12 | 44:9,16 45:1,6,12 |
| 170:13 | 70:10,16,24 71:9 | 197:2,3,7,8,22 | 46:13,23 47:8,15 |
| **acknowledgement** | 71:13 75:10,16,24 | 197:23 198:8,8 | 48:14 49:1,9 51:4 |
| 145:19 194:20 | 93:25 94:8 | 199:17 200:2,14 | 51:12 52:15 53:10 |
| 198:14,20 199:3 | **agents** 70:1 74:23 | 200:17,25 | 53:11 54:23 55:13 |
| **acknowledging** | **ago** 22:15 54:16 | **agreements** 51:8 | 56:5,11 57:23 |
| 146:25 152:4 | 126:15 133:8 | 52:20,23 53:5,24 | 58:9,24 59:25 |
| 153:3 166:21 | **agree** 8:6 9:15 | 87:15 88:9 91:17 | 60:24,24 62:2,5,11 |
| 195:14 197:2,22 | 59:16 114:15 | 91:18 94:16 | 62:13,15 63:8 |
| 198:8 | 149:3 164:17 | 175:17 | 64:3 65:10,15 |
| **acknowledgment** | 168:9 196:9 | **ahead** 113:2 | 66:9,10,15 67:1,2 |
| 145:17 193:8 | **agreed** 112:5,13 | 123:11 185:11 | 67:13 69:18 71:2 |
| **act** 8:25 41:1 | 112:17 115:8 | 198:17 | 73:18,24 74:7 |
| **acted** 75:24 | 132:6 133:7 156:4 | **air** 104:8 | 76:24 78:18 79:15 |
| **acting** 31:22 | 159:5,13,15 | **al** 1:12 | 79:17,20 80:5,8 |
| **action** 5:4 58:4 | 182:21 183:8 | **allowed** 65:19 | 82:12 84:3 86:8 |
| 82:1 204:15 | **agreeing** 57:12,13 | **allows** 122:10 | 87:20,21 88:13,21 |
| **actively** 86:23 | **agreement** 36:5 | **altering** 104:6 | 89:2,11,18 90:1,11 |
| **activity** 68:10 | 51:2,17 52:1,4,11 | **amazing** 123:5 | 91:5,14 92:20 |
| **actual** 65:9 118:4 | 72:9 88:5,7,24 | **amount** 48:9 | 94:12,19 98:25 |
| 125:10 155:9 | 89:3,7,16,23 90:8 | 49:15,25 124:13 | 99:12 101:23 |
| **addition** 37:6 99:8 | 90:19,23 91:2,9 | **angeles** 1:22 2:5 | 102:20,25 105:7 |
| 161:3 | 92:1,23 93:2,22 | 2:11 | 105:19 106:21 |
| **additional** 157:24 | 94:1,9 111:12,14 | **animal** 54:11 | 107:16 108:7,18 |
| 159:6,18 | 112:21 113:16,21 | 124:16 | 109:13,19 110:6,6 |
| | 114:19 115:8 | | 110:16 111:10,10 |

[answer - attract]

111:22 112:8
113:14 114:23
115:23 116:6,15
117:2,22 120:8
122:15 125:5,14
125:21 126:11,19
127:9,20 128:19
130:1,19 131:12
136:14 137:21
139:2,3 140:1,10
141:5,6,11,18
143:9,18 144:10
144:17 146:20
150:3 151:21
153:19 154:23
158:9 163:19
166:18 167:2,11
169:14 171:19
174:23 178:16
180:18 182:7
185:22 187:9
188:11 190:15
191:13 198:3,7
199:7 202:5
**answered** 8:12
14:6 20:12 22:7
23:6,14,17 24:9
26:12,16,21 27:5
27:10 36:16 43:18
44:15,25 53:9
57:10 60:10,16,23
62:9 64:16 73:17
76:23 77:22 80:4
88:20 101:20
104:24 114:4
117:13,21 118:14
118:23 119:15
132:2 135:4,20
136:13,20 137:3
138:13,21 140:9
141:17 155:12

188:17 190:18
191:9,9 194:23
195:5 199:20
**answering** 69:16
177:19
**answers** 6:23 79:6
**anybody** 80:10
**anymore** 126:13
128:10 182:13,23
**anyone's** 105:3
**anyway** 8:5 62:1
81:13
**appear** 58:3
**appearance** 4:22
4:23
**appeared** 78:22
79:4 121:14
**appearing** 205:18
206:7
**applied** 74:25
87:16
**apply** 166:22,23
167:8
**appreciate** 58:7
76:11 203:8,14
**approach** 84:23
84:24 85:1
**approached** 42:4
84:8,25 87:3
**approximately**
15:19 20:21 75:23
201:8
**area** 65:25
**argue** 65:20 78:18
**argumentative**
145:12
**arranged** 129:22
130:3,4
**arrangement**
127:4,24 128:7
137:13

**arrangements**
50:25
**art** 37:16 71:6
84:9 117:25
124:11 127:11
164:6 181:16
182:2
**artist** 176:8,10
**asked** 8:11 14:5
20:11,16,17 22:6
23:5,13 24:6,8
26:11,15,20 27:5
37:18,18 43:17
44:2,14,24 53:8
57:9 60:9,15,23
62:9 64:15 73:16
76:22 77:21 80:4
88:19 93:12
104:23 114:3
117:12,20 118:14
118:23 119:5,15
132:1 135:3,19
136:12,19 137:2
137:18 138:13,20
138:21,24,24
140:8 141:16,25
143:15 144:6
145:5,16 146:8,11
146:24 147:7,21
185:4 188:16
190:18 191:8,9
192:14,24 194:22
195:1,3,4 197:21
198:6,7 199:19
200:10
**asking** 10:17
23:20,21 24:4,15
43:13 49:20 54:3
60:11 61:13 64:6
64:23 65:3 66:13
72:17 73:5 76:3

76:13,19 79:14
80:9 81:4,20 88:4
88:7,16 89:8
93:21 114:13
125:24 148:17
153:1 156:12
164:25 169:20
177:6 187:25
191:7 193:5
196:17 199:16
200:6
**aspect** 16:3
**aspects** 107:25
**assistants** 176:24
177:8,20,22 178:9
**associate** 69:8
**associated** 47:21
173:12 204:15
**assortment** 118:11
**assume** 176:17
177:18
**assumed** 111:13
162:25
**assuming** 22:9
65:2 154:24 187:2
198:10
**attempt** 62:20
**attempting** 57:7
58:21
**attending** 10:25
**attorney** 2:3 61:2
61:9,12,13 62:7
69:24,25 81:3,9,12
92:1 93:3,7 97:24
141:4 153:7,15
154:6,8,10 187:7
204:13
**attorneys** 2:9
**attract** 34:2
103:16

[attribution - bypassing]

**attribution**  170:8 171:3
**audible**  6:23
**audio**  4:20 57:20
**avenue**  37:17,23
**avoid**  64:19 65:5 66:23 146:13
**aware**  12:24,25 13:2 48:4,5 175:14,17,19 192:4 200:24

**b**

**b**  3:5 206:1
**back**  18:5,16 55:23,25 62:14 92:3 95:11 96:2,5 96:11,25 97:3,11 106:4 107:22 117:14,16 121:20 121:21,25 122:6 126:4 138:22 143:3 156:17,18 156:23 160:19 164:21 165:3,3 178:18 186:8 191:11 203:3
**background**  107:6
**badger**  27:18
**baking**  118:1
**ball**  163:4 166:7
**ballpark**  115:6
**based**  14:15 63:17 87:1 146:23 147:6 172:24 173:1,7
**basically**  31:22 36:25 83:15 152:4 159:4 160:25 162:20 176:9 201:21
**basis**  78:10

**battle**  54:13
**beach**  30:21 31:21 106:25 120:3 184:2
**bear**  176:10
**beautiful**  85:12,15 129:4
**beginning**  10:3 35:3 180:8,21,23
**behalf**  5:3
**belief**  147:7
**believe**  8:21 15:8 27:1 31:6 38:15 45:7 58:16 60:20 76:22 77:19 79:25 80:11,21 81:7,17 82:14,17 89:15 112:12 113:9 122:5 125:11,17 132:24 133:10 138:21 146:7,9 153:21 179:21 185:21 188:12,20 190:6 191:10
**believed**  40:3
**belong**  48:22
**belonging**  45:24
**benefit**  48:20
**benefited**  171:25 172:2
**berry**  90:16
**best**  6:16,17 8:14 15:3 20:18 27:11
**better**  7:20 33:2 60:3 85:14,16 160:21 178:5
**beyond**  72:8 157:21
**big**  23:2 32:14 55:7,8 114:11 126:13 171:20

196:19
**biggest**  32:16
**billing**  111:12
**bit**  28:5 32:4 153:1 164:21
**bite**  157:7
**black**  101:1 107:5
**blah**  114:8,8,8
**bluetooth**  194:10
**boards**  111:3
**body**  34:1,4
**book**  31:14 33:25 159:12,18 161:18 163:8,25
**booked**  46:17
**books**  40:10
**borneo**  70:25 71:14 83:25 85:6 85:19 86:3,19,24 87:4,14 88:10,17 88:25 89:9,16,24 94:6 109:17 111:8 112:6 116:20 129:22 130:12,13 131:2 135:18 157:2,4 166:11 168:22 169:18,19 171:11 178:12 179:23 183:9,24 185:2,5,16,19,23 192:15 200:3,15
**bothered**  64:13
**boulevard**  1:21 2:4
**bounds**  79:18
**boy**  12:14 57:2
**break**  7:5,11 18:3 53:13,18 55:18,21 95:9,16 96:9 97:9 155:6 156:11,21 202:17 203:1

**breaking**  4:21
**breaks**  7:2
**bring**  78:25 81:25 82:10 93:13,15 107:13
**broader**  118:21
**broke**  4:22
**brother**  30:20 35:15 36:5,24 37:18 47:5,10,19 59:9,12,13 60:4,19 77:14 152:10 179:4
**brothers**  35:19,20 36:8 45:24 90:20
**brought**  108:15 125:11
**browser**  96:21
**bruce**  30:22
**bruun**  1:25 4:8
**bucks**  34:9
**building**  146:2
**bunch**  21:20 90:16 112:10
**busboy**  29:21
**business**  33:11 34:13,13,15,16,19 35:10,15,18,25 36:1,8,21 37:25 40:6 47:2 50:20 50:21,21 51:20,23 69:24,24,25 83:10 83:11,14 90:7 91:11 129:11 132:21 162:4 174:25
**busy**  68:9 69:5 163:21,21
**buying**  180:9
**bypassing**  83:1

[c - collections]

| c |
|---|

**c** 2:1 4:1
**ca** 205:9,12,20
**cake** 118:1
**calculated** 179:16
**calculator** 48:20
**calendar** 112:12
112:18 113:6
114:12 115:14,25
116:3,12,24
117:10,15,16
118:10,21 119:11
120:13 121:14,20
121:21,25 122:12
129:9 157:12,13
157:17,21 158:15
161:3 162:1,17
176:3
**california** 1:2,22
2:5,11
**call** 78:15 82:1
146:18
**called** 5:9 37:18
72:22 177:10
**calling** 193:19
**calls** 9:3 19:17
25:23 39:6,16
40:19 41:5 42:12
42:20 43:6 51:10
52:6,13 63:19
76:21 80:3,3 81:2
82:18 87:19 91:19
125:20 126:17
131:10 141:3
144:8 145:19
147:23 150:1
153:7 166:16,25
173:16 179:2
200:20
**camera** 99:6
107:18 108:3,8

109:16,23,24,25
110:1,4,4,8,12,22
111:2,18
**cameras** 68:9
**camp** 182:11,11
**capture** 100:12,13
100:21 103:8
123:4 177:16
**care** 148:12
156:15 179:3
**career** 32:13,17
70:2 146:2
**case** 1:9 10:4,13
20:3 56:3 60:5,21
63:1,12,16 64:19
66:24 69:8 79:3
83:2 111:5 187:6
187:7
**cash** 181:8,12
182:1,1,4,11
**catalog** 127:23
128:12 129:8
**catch** 123:8
**cause** 18:19 30:24
34:8 35:16 93:25
112:10,11 114:10
123:18 144:4
153:22 154:24
178:1 204:15
**causes** 165:1
**ccp** 205:9,12
**central** 1:2
**certain** 40:16,25
41:2 68:20 88:2
92:10 93:20
101:14 103:4
105:13,14 111:2
115:17 117:6,6
118:4 120:10
123:24 124:13
126:2 131:21

162:8 177:13
181:6
**certainly** 7:17
21:23 69:7 122:6
126:5
**certificate** 204:1
**certified** 204:4
**certify** 204:5,14
**champaign** 28:18
**change** 61:19
96:18 207:4,7,10
207:13,16,19
**changed** 91:1
**characterize** 55:16
**characterized**
9:16
**charge** 58:5
**cheaper** 162:2
**check** 96:21
**chicago** 28:8 29:4
**choice** 27:8,15
66:3 108:11
110:22 146:14,16
**chronology** 144:5
**chunks** 157:7
**circle** 201:23
**circumstances**
124:24
**city** 28:10
**civil** 205:19,20
**claim** 19:15 20:7
47:11 78:1,2,15
82:10,11
**claims** 19:23 20:2
82:7,8
**clarify** 110:10
181:21
**classified** 41:18
**clean** 104:13,22
165:8

**cleaned** 104:19
**cleaning** 104:6,7
104:10
**cleanse** 160:18
**clear** 33:8 61:1
65:8 73:13 110:13
110:21,24,25
143:10,21 169:23
171:15
**clearly** 94:21
98:16 117:17
122:5 123:23
136:6 138:7
**click** 67:23,23
124:6,25 125:3
**clicked** 68:3 186:7
186:8
**clicks** 72:12 73:7
**client** 81:3,10
86:21,21 124:3
126:4 127:22,23
127:23 141:4
153:7
**clients** 34:3 86:11
129:19 131:21
169:10,16
**clinical** 160:22
**close** 9:17 15:10
17:6,10 124:20
144:6 201:17
**code** 205:9,12,19
205:20
**coffee** 159:11,17
161:18 163:8,25
**collection** 119:13
158:11 163:17
169:3
**collections** 112:13
112:19 158:23
161:2,9 162:18

Page 5

[college - contributions]

college  28:14,23
29:6,7,9,11 30:4
30:25
come  48:3 56:15
78:17 80:14 95:11
96:5 113:21
156:17,18 160:19
comes  45:25 51:25
102:13 134:5
163:5 165:11
168:2
comfortable  83:18
84:6
coming  123:19
154:21
commented  145:4
commercial
129:19 131:21
commission  31:17
137:13
commissioned
74:12,18 137:1,14
151:15
common  5:19
86:17 126:12,16
126:20
communicate
17:15 68:16 69:7
communicating
68:12 69:2 194:6
communication
18:10
communications
81:9,12 179:15
company  29:22
31:11 33:9
compensate
128:14 129:6
compensated
113:10,16

compensation
113:11 176:11
183:12
complaint  58:4
complete  157:10
completed  205:7
205:17 206:6
completely  54:11
64:2,21 65:1,14
91:23 124:16
157:3
completion  206:10
complicated  101:7
101:11 102:1
103:7
complying  82:5
compound  27:4
37:8 41:4
con  52:22
concept  74:11
concern  136:7
144:20
concerned  92:9,11
95:2 115:2 152:4
156:7 168:24
174:20
concerning  41:11
46:17 48:22 61:9
61:14 130:16
139:16,23 140:6
140:14 155:16
157:2 189:12
200:3,14
concerns  68:19
concluded  203:24
concludes  203:21
conclus  75:5
conclusion  9:4
19:18 39:7,16
40:20 41:5 42:13
42:20 43:7 51:11

52:7,14 63:20
76:22 80:3 91:20
131:11 145:20
150:2 166:17
167:1 173:16
200:21
conclusively  182:8
condition  133:20
conduct  36:20
conducted  35:9,25
36:8
confident  185:2
confirm  135:2
138:1 139:15
202:18
confirmation  91:7
confirming  65:4
confused  164:24
confusion  165:1
conjunction
147:21
connecticut  28:8,9
28:12
connection  58:17
59:8 61:3 64:19
65:6 66:23 71:14
94:5
consequences  6:11
consider  17:5
32:18 43:4 49:16
202:7,8
consideration
129:1
considered  43:15
45:24 146:17
considering  86:23
consistent  181:8
181:11 198:13
constant  54:13,13
constantly  55:7
75:8 187:25

consuming  160:9
160:9,12
contact  9:24 10:1
10:6 18:18 80:22
80:25 81:15 82:15
205:9
contained  149:2
contemplated
120:12 162:9
168:20
content  116:8,23
131:19 135:22,24
182:15,18 183:7
contents  11:21
context  73:15
161:23 174:1
continue  27:7
63:25 66:6 138:25
continued  76:10
continuing  182:1
182:1,4,11
contract  72:2
contractor  31:14
40:17 41:2,13
188:23 189:15
contracts  93:21
contractually
168:7
contribute  107:14
174:11
contributed
125:25
contributes
125:23
contributing
126:6
contribution
125:18
contributions
106:18

Veritext Legal Solutions
866 299-5127

[control - delivering]

**control** 70:5
108:14 127:12
133:19 134:8,20
134:21,25 135:12
138:2
**convention** 7:3
**conversation** 7:9
27:22 44:13 136:9
**conversational**
155:7
**cooperation** 203:8
**copy** 142:20 195:2
195:10
**copyright** 20:5,6
67:10,17 68:4
69:18,19 70:2,7
71:20 72:3,14
73:7 74:11 75:1
82:7,8 92:10
131:25 135:16
136:2,10 137:1,13
140:12 149:20
153:13 166:13,21
199:18
**copyrights** 71:21
74:21 131:8
146:25 147:22
148:4 197:16,25
198:22 199:5,13
**corporation** 1:11
**correct** 7:23 9:6
9:13,24 10:13
11:9 12:7,10
13:13 30:5,6 37:2
39:14 44:13 48:18
54:5 61:6,7 63:18
67:7 99:6 100:24
101:25 102:7
103:25 105:15
109:14 113:9
116:3,24 121:10

121:11 132:25
133:12,13 134:9
137:6 147:12
149:25 152:6
154:4,7,10 158:20
159:19 160:2
162:22 167:25
168:1 169:17
170:3 171:11
172:8,14,20
175:18,23 176:11
177:21 178:20
184:6,7,10 187:23
188:9 189:6
190:24 191:4,17
191:22 192:11
199:18 200:7,25
202:14 204:9
**corrections** 205:14
205:15 206:3,4
**correspondence**
53:6,25
**costs** 173:8,10
175:21
**counsel** 4:12 5:4
7:22 10:24 11:7
205:18,21 206:7
**countless** 84:9
**county** 204:3
**couple** 16:4 17:5
30:9,16 34:9 76:3
86:5 180:1
**course** 87:11,11
**court** 1:1 4:10,23
5:23,25 6:22 58:1
59:16,19,20 61:18
61:23,25 62:14
63:23 78:5 79:4
79:22 95:18
**court's** 82:5

**cover** 122:6 128:1
128:11,25
**covered** 202:19
**craft** 33:22
**create** 74:3 116:23
**creating** 164:7
**creation** 71:10
**creative** 34:23
125:18 126:1
129:11 160:10
163:16 176:12
**creativity** 160:23
**credited** 170:14,15
170:17 172:1
**crediting** 172:17
**crew** 178:5
**criminal** 57:23
58:5 63:6 64:1,25
**csr** 1:24 204:22
**currently** 70:13
**cut** 122:19 181:18
182:3
**cv** 1:10

---

### d

**d** 3:1 4:1
**dad** 28:9 93:19
**dan** 1:25 203:17
**daniel** 4:8
**date** 15:11 20:20
20:22 23:18,19
60:6 141:13
205:16 206:5
207:24
**dated** 14:9 15:12
**dates** 14:14 15:7
15:24 30:16 56:18
70:17,18 85:4
144:19
**dating** 14:10,15,19
15:1,14,15 16:3,6
17:4

**dawn** 1:24 4:10
203:16 204:4,22
**day** 37:20 57:4
106:24 128:13
184:1,3 200:1
203:18 204:17
**days** 56:15 85:10
86:5,13,15 107:10
184:4
**deal** 23:2 70:2
126:14 127:16
171:20 173:19
174:5 175:6 176:6
178:23 196:19
**dealing** 70:9
153:12
**deals** 130:6 178:25
**dealt** 58:14 71:17
**decade** 75:7
**decent** 49:14
**decide** 110:4,14
176:18
**decides** 159:10
**deciding** 84:7
**decision** 84:8
100:13
**decisions** 106:17
106:18
**defendant** 2:7
4:14,16 5:1
**defendants** 1:14
**defer** 95:17
**definitely** 9:25
**degree** 103:11
**delaware** 1:11
**delete** 55:1,3
**deliver** 168:8
**delivered** 151:8
204:13
**delivering** 131:20

[depend - drive]

**depend**  127:5
**depending**  67:24
**depends**  40:14,14
　51:5,5 71:12,12
　72:19 94:20
　125:22 127:21
**deposed**  5:16,17
　11:18,18
**deposition**  1:4 4:6
　10:23 11:8,13,16
　11:24 12:2,7 56:2
　58:7 61:18 64:22
　65:17,22 66:6
　68:20,21,23,25
　69:1,14 79:11
　82:5,6 97:16
　145:7 146:16
　175:15 194:2
　203:22,24 205:19
　205:22,24 206:8
　206:10
**depositions**  194:16
　203:7
**derek**  1:7 3:2 4:6
　5:3,8,15 188:7
　203:22 204:6
　205:5 207:2
**describe**  9:11
　13:15 140:22
**described**  83:10
**describing**  129:15
**description**  3:6
　80:15
**desirable**  129:3
**desired**  107:20
**desk**  56:25 57:3
**destroyed**  193:16
**determine**  129:9
**determined**  72:16
　106:24 117:15
　205:18,22 206:7

**determines**  101:9
**determining**
　123:20
**develop**  99:16,23
　100:10,18 101:17
**developing**  100:7
　100:14 102:21
**development**
　106:10
**dictate**  120:2
**dictated**  119:25
**difference**  39:12
　39:19 50:17
**different**  23:21
　24:11,13 28:10
　30:3 31:20 54:11
　54:15,17 82:10
　87:16 91:22,23,23
　99:20 100:5 104:3
　110:12 112:10,11
　118:6 119:19,19
　119:21,24 120:9
　124:12,14,16,17
　127:11,14 128:22
　129:7,17 153:1
　157:20 159:25
　160:1 164:5 165:6
　168:3 186:7
**difficult**  21:2
**digital**  68:2 70:4
　99:17,23 100:7,11
　100:18 101:17
　158:23 161:2,9
　162:1,2,17 177:16
**direct**  104:13
　130:6 185:9
**directed**  108:16
　123:15
**directly**  21:25
　22:1 64:13 129:22

**director**  37:17
**disagree**  123:16
**disclosed**  80:21
　82:15
**disclosing**  81:15
**discovery**  62:3
　63:23 65:13 79:5
　79:19 82:4,6,10
　187:5
**discuss**  135:22
　168:9 178:7
**discussed**  19:4
　41:12 43:23 88:6
　110:8 111:13
　115:6 131:16
　147:4 161:19,24
　162:9,21 168:4,20
**discussing**  136:24
**discussion**  22:21
　24:25 41:11,25
　44:5,22 47:25
　49:23 133:15
　137:9 161:17
　174:18
**discussions**  13:10
　85:18,21 88:1
　149:24 167:18
　188:21
**dishwasher**  29:21
**dispute**  199:11
**distinction**  165:24
**distortion**  57:20
**district**  1:1,2
**document**  6:22
　94:21 140:6,14,16
　140:17 141:24
　142:6,7,8,17,20,23
　143:7 146:7,24
　147:21 148:16
　149:2,9,14 150:7
　150:16 151:14,18

　151:23 153:2,11
　153:24 154:13,16
　154:21 155:2,15
　155:16 156:8
　166:20,22 186:14
　186:23 187:2,4,8
　193:10
**documentary**
　163:7
**documents**  11:23
　11:25 12:1 57:18
　69:3 192:3,10
**doing**  6:20 32:7,15
　32:20,23 33:1,5
　42:25 52:4,11
　68:9 75:14 84:19
　91:24 93:23 94:14
　95:20 96:16
　100:23 102:4
　108:10 114:17
　123:25 133:21
　134:8 142:24
　148:12 156:3,5
　158:12 161:24
　168:15,21 169:9
　169:10 170:1,2
　178:1 199:22
　200:5
**dominance**  70:4
**download**  158:23
　161:2,9 162:17
**dozens**  50:4
**draft**  92:1,23
**drafted**  141:2
**drawn**  69:21
**dream**  87:1
**drive**  187:16,21,22
　189:21 190:2,16
　190:24 192:2,10
　193:11 195:21
　198:9

Veritext Legal Solutions
866 299-5127

[drives - extra]

**drives** 192:6
193:17
**dude** 56:15
**duly** 204:6
**dust** 103:18 104:4
**dying** 135:24

**e**

**e** 2:1,1 3:1,5 4:1,1
53:1,3,6,25 54:4
54:19 55:1,3,5,10
55:11 91:7 151:2
204:11 205:9,12
206:1 207:3,3,3
**eager** 177:11
**earlier** 71:10
76:10 120:25
**earned** 189:14
**easier** 162:4
**easy** 107:12
**economics** 182:16
**edit** 99:9 160:13
**editing** 99:19,20
99:24 100:2
160:11
**education** 28:24
30:25
**effect** 101:4
123:21
**effective** 122:23
**effectuate** 149:25
**efficient** 203:14
**effort** 129:4
161:18
**efforts** 63:11
**eight** 98:7
**either** 24:17,17
45:14 95:21
115:13 152:17
184:3
**elicit** 64:24

**else's** 39:13
**employed** 33:9
188:6,11
**employee** 30:10,12
38:22 39:5,13,22
40:18 41:1,12,18
42:1,11,18 43:5,16
43:24 44:6,23
151:25 188:13,22
**employing** 31:16
**encourage** 78:20
79:2
**encouraging** 79:9
**ended** 31:2 76:1
80:15
**energy** 126:3
**enforce** 70:7
**engage** 61:5
**enter** 51:1 87:13
89:22
**entertainment**
51:24 71:5 83:18
93:14 94:7
**entire** 29:18 169:8
**entitled** 48:2
**entity** 35:25
**entrusted** 102:6
**entrusting** 102:5
**environment**
54:17
**equipment** 101:8
109:16 111:7,7,18
**ernest** 29:3
**errata** 205:14,16
206:3,5
**especially** 54:9
133:18 177:25
**esq** 205:1
**essentially** 31:16
**establish** 57:25

**established** 35:22
**et** 1:12
**evading** 57:24
63:6
**eve** 2:9 5:1 185:11
185:13,25 194:14
203:16
**event** 16:15 24:24
25:5,7,12
**events** 21:5 203:8
**everyone's** 91:23
**exact** 20:20
**exactly** 100:22
115:11 117:3
131:24
**examination** 3:3
5:11
**examined** 5:10
204:6
**example** 8:11
40:10 47:20
106:23 108:14
111:1 117:14
120:3 128:12
129:8 147:11
157:24 159:12
161:16,19 170:23
173:23 175:2,3
189:5 200:18
**examples** 175:4
**exchanging** 69:2
**excitement** 180:21
**excuse** 68:6,7
108:22
**executed** 51:8 52:4
52:11
**exercise** 124:25
**exhibit** 3:7 95:5
96:3,13,25 97:1,13
98:1,2,15 121:4,5
121:6,24 185:8,10

185:10,12,16
186:18,21,23
**exhibits** 95:5,12
96:15 97:15,15,17
97:18,20 98:4,19
98:22 120:25
121:1,13 122:4
138:18 184:9,25
185:12 194:3,14
**exist** 192:18
**existence** 195:14
197:2,22
**exotic** 85:13
**expenses** 111:16
111:16,19,25
112:2 173:8,9
175:22
**experience** 34:25
104:21 108:10
180:20,24,25
182:10 183:5
**expertise** 102:13
108:25
**explain** 165:4
174:14
**explaining** 148:22
**exploitation** 70:9
180:14
**exploited** 183:13
**exploration** 33:23
**expose** 107:19,22
108:2,13
**exposure** 108:14
108:14,19,23
126:2
**extent** 14:3 23:10
69:1,20 80:17,19
113:11 156:6
187:10
**extra** 178:4

[eye - form]

eye  103:16
ezelinger  2:12

**f**

facebook  10:9
fact  9:23 10:2
  11:17 132:22
  170:12 171:9
  172:10,13 183:9
  189:4 191:15
  199:11 200:18
factors  124:15
facts  162:25
  187:11
factual  78:10
failing  33:24
failure  187:17,21
  192:3,10 193:11
  195:21 198:9
fair  7:12,13 83:11
  83:12 150:9
  162:11 176:19,20
  176:22 177:20
faith  66:6 75:14
  78:22
familiarity  67:9
famous  30:23
fans  135:24
far  19:14 20:6
  39:11,21 44:19
  67:18 77:11 108:8
  122:23 140:4
  152:3 168:24
  170:21 174:14,20
  175:16
father  37:19,22
  93:10 94:7
father's  37:20
favor  182:3,4
february  8:21,22
  26:9,24 27:1,23
  61:6,8,14 62:6,19

62:24 63:17 64:8
  81:13 153:16
  202:12
federal  206:1,8,9
feel  12:4 77:4
  83:17
feeling  77:6
feels  84:6
fifth  2:10 37:17,23
figure  69:12 85:4
  116:18 194:9
figured  75:14
figuring  86:1
file  13:3 111:3
filed  12:23 13:1
  58:18 98:14
files  191:17,22,24
  192:19
filing  53:5,23
  144:7
final  115:7 133:4
  158:25 160:13
finances  178:24
financial  18:23
  112:4,5 133:4
find  34:2 194:13
finding  157:16
fine  43:12 71:6
  84:9 124:11
  127:11 149:19
  155:25 156:16
  164:6 181:16
  182:2 183:9
  194:11,15
finish  171:18
finished  157:3,12
firm  4:9,11
first  5:9 8:22
  12:12 15:9 20:9
  20:24 21:16 23:12
  23:21 24:7,22

25:21 26:3 29:3,8
  29:9 30:4,23 34:6
  34:10 53:15 56:7
  56:13 57:5,6,15
  58:20 61:23 68:15
  85:1 90:17 112:15
  121:2 131:2,3,6
  133:21 155:12
  157:14 158:7
  183:22 187:13
  201:5,6
five  98:7
flannery  10:5,11
flat  128:10,10
  182:20
flow  95:13 181:8
  181:12 182:1,4,11
fly  85:8 86:16
folder  97:14 186:8
  186:18,23 194:2
  194:17
follow  8:6 76:3
followers  114:11
following  114:11
follows  5:10 79:23
  205:8
form  12:15 13:4
  13:17,23 14:5,11
  14:21 15:4,21
  16:9,18 17:7,18
  19:19 21:12 22:23
  25:3,9 26:5 27:5
  31:24 32:9 33:13
  33:19 34:17,20
  35:12 36:2,10,16
  37:3,9 38:2,13
  39:15,24 40:11,19
  41:3,20 43:17
  44:8 46:11,22
  48:11,25 51:3
  54:7 55:12 56:4

56:10 57:10 58:23
  59:24 60:8 63:3
  63:20 67:12 71:1
  72:24 73:11,17,23
  74:5,13 76:8 84:2
  86:7 87:18 88:12
  89:1,10,17,25
  90:10,18,22,25
  91:1,2,4,10,13
  92:19 94:11,18
  99:11 100:25
  101:5,18 102:9,24
  103:12 104:1,15
  105:6,18,25 106:7
  106:13,20 107:15
  108:5,17 109:3,18
  110:5,15,23 111:9
  111:21 112:7,20
  113:13,23 114:22
  115:9,15,22 116:5
  116:14 117:1,13
  117:21 118:13,22
  119:15,22 120:6
  120:15,19 121:16
  122:14,21 123:1
  123:17 124:8
  125:4,13,20
  126:10,18 127:7
  127:20 128:18
  129:25 130:9,18
  131:18 132:9,18
  133:1,17 134:3,10
  134:18,23 135:13
  137:15,20 138:5
  138:12 139:10,18
  139:25 140:9,18
  140:23 141:10,17
  142:1,9 143:8,17
  144:9,16 145:1,20
  146:12 147:14,24
  148:5 149:6,16

Veritext Legal Solutions
866 299-5127

[form - graduate]

150:2 151:3,10,20
152:1 153:6,17
154:1,17,22 155:3
157:5 158:8
159:16 161:5,12
161:20 162:12,23
163:13 164:2,13
164:19 167:10
168:10 169:12
170:4,10 171:12
172:15 173:3,15
175:24 176:21
177:24 178:14
179:1,17 180:16
181:3,13,20
183:16 188:16
189:2,7,16 190:11
190:17,25 191:6
191:18 192:21
193:1,12 194:23
196:14 197:9
198:1,23 199:6
201:1
**formal** 28:24 36:4
45:17 50:25 51:17
52:1,4 67:6 88:7,8
89:6,6,15,23 90:8
91:9 92:23 93:2
94:15
**formalities** 94:24
**format** 161:13
163:16,17
**forth** 204:10
**forward** 82:8
**four** 98:7 138:24
**fourth** 48:9
**frames** 123:3,4
**frankly** 137:10
**frcp** 206:1
**free** 152:15,19

**frequent** 18:8
**frequently** 17:11
51:16 52:3 92:7
**friend** 17:6 37:17
133:25 201:21,21
201:22,22 202:7
202:10
**friends** 13:20
14:14 15:10 17:10
17:10 93:14
201:14,18
**friendship** 14:15
14:20 202:2
**front** 6:13,13
56:25 57:3 97:14
120:21 140:20
182:21
**fulfill** 177:13
**fulfilling** 32:13
**full** 14:3 30:10,12
31:7,10,15,23
113:11 140:25
204:9
**fully** 52:11
**function** 20:25
**further** 152:5
157:19 158:18,21
158:22 159:3
160:3 169:5 203:5
204:14

**g**

**g** 4:1
**gallo** 29:4
**gallos** 30:4,11,18
38:7,11 39:4
**game** 70:23
**gates** 83:1,3
**geared** 43:1
**general** 72:1 93:6
106:16 115:6
149:4

**generally** 71:8,23
134:24 155:20,21
**generic** 174:9
**generous** 172:17
172:19,21
**genevieve** 1:3 4:7
5:5 24:17 154:19
154:20 170:23
201:17,17,19,20
**genevieve's** 13:8
154:8 202:10
**getting** 34:25
39:10 42:23,24
64:5 101:21
103:15 115:2
118:16 119:17
122:23 126:4
138:15 163:18
164:15 173:22
**gig** 50:16
**girl** 56:25
**give** 6:17 53:17
59:18 105:12
106:16 108:1
129:9 175:2,3
**given** 45:4,9
109:12 124:23
133:11
**giving** 31:16 45:16
80:25 140:24
**go** 4:24 5:18 17:22
28:4,14 32:20
33:2 34:18 55:10
61:20,21 76:12
92:5 95:4 96:4
97:3,4,6 100:23
113:2 116:10
123:10 160:16
164:21 165:3
178:18 184:16
185:11 186:10,20

191:10 198:16
202:22,23
**goes** 124:14 175:6
**going** 18:16 21:24
31:1 46:9 49:19
63:4,7 65:2,20
68:22 69:4,13
78:20 79:16,17
80:2 81:8 86:12
86:13,16 92:14
115:12,17,19,25
116:20 118:2
119:9 122:12
127:13 133:7
135:17 146:15
147:8 148:3,10
158:13 159:8
161:1 163:22
164:1 165:10
169:24 185:10,11
189:19 196:23
199:24 203:6
**good** 4:3 5:13
13:19 17:10 48:8
66:5 75:13 78:22
95:20 102:2
107:18 108:11
117:10,10 118:2
120:10 122:23
165:21
**goodrich** 2:10
**gosh** 93:24 121:17
122:16
**gotcha** 190:3
**gotten** 38:12
110:12
**govern** 91:2 92:1
**gq** 128:2
**graduate** 28:19
32:19

Page 11

[graduated - holliday]

| | | | |
|---|---|---|---|
| **graduated** 29:1 | **happened** 12:24 | **hide** 163:3 166:7 | 51:3,10 52:6,13 |
| 30:3 | 16:8,16,17 17:1 | **high** 28:9,12,14 | 53:8 54:7,20 |
| **graduating** 29:11 | 22:5,12,15 27:1 | 178:4 | 55:12 56:4,10,20 |
| **great** 7:21 59:20 | 32:6,8 60:19 78:6 | **highlights** 105:9 | 57:9,21 58:10,23 |
| 79:1 85:8 102:12 | 81:20 85:6 86:4 | **hire** 72:19,22 | 59:15,24 60:8,15 |
| 156:10 166:1 | 110:19 145:9,10 | 73:22 74:4 92:22 | 60:22 61:2,5,10,15 |
| 203:19 | 165:11 171:14,17 | 151:19 177:2,8,12 | 62:9,13,20,22 63:2 |
| **grew** 28:7 | 197:14 198:10 | 177:19 | 63:9,13,19 64:15 |
| **gross** 173:7 | **happening** 22:14 | **hired** 61:2 91:25 | 64:20 65:7,12,16 |
| **ground** 5:18 | 81:6 90:14 171:16 | **hires** 74:1 | 65:21 66:11,17,20 |
| **grow** 28:6 | **happens** 70:13 | **hiring** 93:3,6 | 66:25 67:12 68:6 |
| **guaranteed** | 116:16 | 178:9 | 68:12,15,18 69:10 |
| 176:11 | **happy** 4:24 66:1 | **history** 28:5 | 71:1 72:24 73:11 |
| **guess** 23:19 27:16 | 85:13 143:25 | **hit** 96:25 97:1 | 73:16,23 74:5,7,13 |
| 38:17 67:25 68:1 | 147:3 | **hits** 123:24 | 75:3 76:8,15,21 |
| 68:1 71:23,23 | **harass** 63:25 | **hitting** 123:22 | 77:21,24 78:8,14 |
| 124:22 156:12 | **harassing** 60:9 | **hmm** 122:3 | 78:19 79:9,16,21 |
| 158:15 159:10 | 63:21 81:18 | **holliday** 1:20 2:3,4 | 80:2 81:2,7,17,22 |
| 162:7 174:9 | 138:25 | 4:20 5:2,2 7:23,25 | 81:25 82:18 84:2 |
| 185:13 198:7 | **hard** 120:21 | 8:20,25 9:3 12:15 | 86:7 87:18 88:12 |
| 200:7 | 187:16,21,22 | 12:17 13:4,17,23 | 88:19 89:1,10,17 |
| **guessing** 15:25 | 189:21 190:1,16 | 14:5,11,21,23 15:4 | 89:25 90:10 91:4 |
| 142:22 201:9 | 190:24 192:2,6,10 | 15:21 16:9,18 | 91:12,19 92:19 |
| **guide** 105:10 | 193:11,17 195:21 | 17:7,18 18:11,25 | 94:11,18 95:7,11 |
| **guy** 77:8,10,13 | 198:9 | 19:7,17,24 20:11 | 95:17,23 96:1,6,17 |
| 80:15 | **head** 6:24,25 | 21:12 22:6,23 | 96:24 97:3 98:23 |
| **guys** 95:14 165:6 | 126:25 134:22 | 23:5,13 24:8 25:3 | 99:11 100:25 |
| 165:22 | 160:19 | 25:9,19,22,23 26:3 | 101:5,18 102:9,24 |
| **gym** 56:14,15,24 | **headpress** 75:18 | 26:5,11,15,20 27:4 | 103:12 104:1,15 |
| 57:4 59:1,2 60:2 | 75:19 | 27:18,23,25 29:12 | 104:23 105:6,18 |
| 77:11 80:13,21,25 | **hear** 19:12 108:22 | 29:15 31:24 32:9 | 105:25 106:7,13 |
| 81:15,19 82:15 | **heard** 4:23 19:11 | 33:13,19 34:17,20 | 106:20 107:15 |
| | 19:13 22:3 74:10 | 35:12 36:2,9,15 | 108:5,17 109:3,7 |
| **h** | 77:9 172:10 | 37:3,8 38:2,13,24 | 109:18 110:5,15 |
| **h** 3:5 207:3 | **help** 93:7 139:20 | 39:6,15,23 40:11 | 110:23 111:9,21 |
| **halle** 90:16 | 172:14 177:15 | 40:19 41:3,14,20 | 112:7,20 113:13 |
| **hand** 204:17 | **helpful** 146:19 | 42:5,12,19 43:6,17 | 113:23 114:3,22 |
| **handle** 70:11 | **helping** 158:1 | 43:25 44:7,14,24 | 115:9,15,21 116:4 |
| **handled** 205:8 | **hey** 41:12 86:15 | 45:5,11 46:1,11,20 | 116:13,25 117:12 |
| **happen** 35:5 69:14 | 163:6 | 46:22 47:6,14,22 | 117:20 118:13,22 |
| 73:9 174:8 | | 48:11,24 49:8 | 119:14,22 120:6 |

Veritext Legal Solutions
866 299-5127

120:14,18 121:15
122:14,21 123:1
123:17 124:8
125:4,13,20
126:10,17 127:7
127:19 128:18
129:24 130:9,17
131:10,18 132:1,9
132:18 133:1,17
134:3,10,18,23
135:3,13,19
136:12,19 137:2
137:15,20 138:5
138:12,20 139:3
139:10,18,25
140:8,18,23 141:1
141:3,6,7,10,16,25
142:9,25 143:8,17
144:8,15 145:1,12
145:18 146:12
147:14,23 148:5
148:18,20,24
149:1,6,16 150:1
150:10 151:3,10
151:20 152:1,13
152:18 153:5,6,15
153:17,24,25
154:1,3,6,12,15,17
154:22 155:3
156:12,14,16
157:5 158:8
159:16,20 161:5
161:12,20,22
162:12,23 163:13
164:2,13,19
165:13,17,22
166:2,6,9,16,25
167:10 168:10,13
169:12,18,20
170:4,10 171:12
172:15 173:3,15

175:24 176:21
177:24 178:14
179:1,17,19
180:16 181:3,13
181:20 183:16
184:11,17,20
185:15,20 186:6
186:17,24 188:16
188:24 189:2,7,16
189:24 190:11,17
190:25 191:5,8,18
192:21 193:1,12
193:22 194:1,8,13
194:16,22 195:4
195:23 196:1,4,14
197:9 198:1,23
199:6,19 200:20
201:1,5,10 202:3,4
202:14,21 203:9
203:11
**home** 76:7,20 77:5
77:20 78:13 80:1
80:12,16 83:3
**honestly** 21:8
116:8 167:3
**hope** 203:17
**hoping** 33:25
**hotel** 111:24 120:3
**hour** 53:15 155:5
**hourly** 113:18
128:7
**hours** 95:21
105:22 203:13
**huge** 136:7
**huh** 8:16 83:12
96:23 119:6
141:22 168:5
**hundred** 34:9
140:25

**i**

**icon** 194:5
**iconic** 123:7
**idea** 11:20 18:13
19:3 21:4 40:1,5
49:10 52:8,9,20
57:18 75:13 84:24
85:2 116:11 124:2
143:20 146:10,22
147:2,9 157:8
159:7,17 163:5
165:11 168:2
172:23,25 179:25
180:20 189:3
191:20 193:3
199:14,15
**ideas** 168:17
**identical** 30:20
**identified** 98:16
**identity** 171:24
172:3,3,23
**illinois** 28:17
**illustrated** 84:10
86:10 146:1
**image** 107:24
118:4 123:7
127:12 128:11,25
159:11 182:23
**imagery** 182:14
**images** 21:20
42:25 68:5 70:6
71:4,6 74:1 84:12
85:14 107:19
112:23,25 113:8
116:3,11,24 117:5
118:20 121:14
126:14 128:13
129:5 143:11
155:22 156:7
158:2,19 160:11
160:12,20 168:16

169:3 171:21
180:22 181:17
182:22,24 183:2,3
192:12 193:21
196:20
**immediately** 17:1
29:6
**important** 6:16
29:13 41:19 84:8
136:10 137:12
143:13
**inappropriate**
61:16 64:2,21,24
65:1,14 68:21
138:25
**incident** 16:15
41:25 59:2 60:2
**include** 112:22
**included** 205:14
206:3
**includes** 184:8
**income** 45:23
189:15
**incorrect** 164:23
**indecipherable**
15:14 29:25 48:13
148:24 161:11
183:4 186:12
**independent** 31:13
40:17 41:2,13
188:23 189:14
**indicating** 179:15
**individual** 1:4
182:17
**industry** 102:19
**influencer** 131:23
**information** 9:24
10:1,7 11:20
25:24 76:6,14,19
77:6,19 78:4,7,12
79:25 80:10,17,19

[information - jih]

80:22 81:1,3,5,14
81:16,23 82:2,16
82:24,25 83:6
87:19 153:8
164:22 192:11
195:22 196:10
**initial**  180:15
181:1,25 182:5,12
**insatiable**  183:7
**instagram**  9:8
12:21 24:18
**instance**  41:18
181:4
**instances**  40:16,17
91:16 93:20
**instant**  41:17
**instruct**  63:7
64:20 79:14,16,17
101:3 102:7
**instructed**  8:13
100:22 102:8
**instructing**  63:12
79:8,15 106:4
**instruction**  105:13
**instructions**
106:11 108:1
**instructs**  8:6
**intense**  146:3
**interest**  18:23 19:6
32:14 47:12
180:11,15
**interested**  204:15
**internet**  35:4
54:12 136:6
145:25 183:6
**interrupt**  95:13
165:2
**introduce**  4:12
**investigation**  63:6
**involve**  78:24

**involved**  13:9 71:9
71:13 74:17 94:7
100:7 101:15
**involving**  58:3
82:9
**ipad**  194:3
**irene**  31:21
**irs**  189:13
**issue**  47:13 98:13
98:17 138:11,17
139:6,17,23 140:7
167:13
**issued**  58:2
**issues**  61:9,14 62:8
**itemization**  111:16
179:10
**itemized**  111:20

**j**

**jargon**  39:10
**jem**  1:10
**jennifer**  1:20 2:3,4
5:2 141:7 201:20
**jhollidayesq**  2:6
**jih**  2:8 3:3 4:14,14
5:12 9:5 12:22
13:9,21 14:3,10,18
15:1,13 16:2,14
17:4,11,21,24 18:7
18:15 19:4,9,22
20:2,18 21:16
22:11 23:3,11,20
24:12 25:6,13,21
26:1,2,9,14,19,22
27:7,13,20 28:4
29:19 32:3,22
33:17 34:6,18
35:9,17 36:4,13,20
37:5,13 38:6,17
39:3,11,18 40:2,15
40:22 41:10,17,24
42:10,17 43:4,11

43:23 44:4,12,21
45:3,9,16 46:6,16
47:4,11,18 48:1,17
49:4,12 51:7,14
52:10,19 53:16,21
54:18 55:2,18,25
56:7,17,23 57:12
57:22 58:8,11,12
59:2,23 60:3,11,18
61:1,11,16 62:5,11
62:15,24 63:8,10
63:14 64:3,18,21
65:2,10,12,15,16
65:18 66:7,13,21
66:22 67:5,16
68:8,11,15,18 69:6
69:14 71:8 72:25
73:13,21 74:2,10
74:16 75:9 76:13
76:18,24 77:25
78:2,9,16,17,20
79:8,13,20 80:9
81:4,7,11,20,22,23
81:25 82:12,22
84:23 86:18 87:24
88:16,23 89:5,14
89:21 90:6,18
91:8,16,25 92:22
94:15 95:4,10,15
95:19,25 96:4,13
96:23 97:6,13
99:3,14 101:2,13
101:22 102:12
103:5,20 104:9,20
105:4,11,21 106:2
106:9,15 107:13
107:21 108:12
109:1,5,12,22
110:11,20 111:4
111:15 112:1,15
113:2,18 114:1,18

115:5,12,18 116:2
116:10,22 117:8
117:18 118:7,18
119:4,20 120:1,8
120:17,24 121:19
122:18,25 123:10
124:1,21 125:10
125:17,24 126:16
126:21 127:15
128:5 129:12
130:5,15,22
131:15,24 132:5
132:10,22 133:3
133:22 134:7,14
134:20 135:1,7,16
136:1,17,23 137:6
137:17,24 138:9
138:16 139:2,5,14
139:19,21 140:4
140:13,22 141:2,5
141:8,14 142:3,16
143:12,22 144:13
144:22 145:3,14
145:22 146:20
147:20 148:2,15
148:18,19,21,22
148:25 149:10,18
150:6,12 151:7,13
151:23 152:3,15
152:21 153:11,23
154:3,20 155:1,11
156:10,17,25
157:9 158:14
159:19,24 161:8
161:15 162:7,15
163:3,20 164:10
164:17,21 165:8
165:15,21 166:1,5
166:8,10,20 167:6
167:17 168:12,19
169:14,19,22

**[jih - know]**

170:6,12 171:18
172:19 173:6,18
173:23 174:19
176:1,23 178:7,19
179:7,18,22
180:24 181:9,18
181:23 183:23
184:14,22 185:21
185:25 186:3,7,11
186:19 187:1
188:20 189:4,11
189:19,25 190:14
190:22 191:3,7,12
191:15,21 192:24
193:4,14,22 194:4
194:11,15,18,25
195:8,24 196:6
197:1,12 198:6
199:2,10 200:1,24
201:4 202:8,21,22
203:5,19 204:13
205:1

**job** 6:20 7:20 28:9
29:3,8,9 30:4 34:7
37:20,22 40:14
41:7,8,11,19 42:1
75:15 85:23 89:6
129:3 205:5 207:2

**jobs** 29:10,20 30:3
31:3 38:8,19
40:25 41:1,2,2
42:8 92:8 169:10
176:13,18 177:13
182:20 183:19

**joint** 61:24

**jokes** 109:8

**joking** 109:10

**judge** 5:24 6:13,15
8:2

**judgment** 48:6
124:25 125:2,9

**judgment's** 125:8

**julio** 29:4

**jury** 6:14,15

**k**

**keep** 52:23 53:2
54:18 172:8
185:17

**kept** 152:7

**key** 137:14

**kill** 31:1

**kin** 204:14

**kind** 13:7 23:9
32:19 35:4,7
44:13 45:17 51:2
53:4 54:12,19
57:22 58:4 72:8
75:8 82:2 84:12
85:11 86:1 88:3
91:1 92:15 94:23
99:19 103:17
104:3,6 106:10
107:10 108:20
116:18,20 117:5,5
117:16,24 118:1
123:6,20,21 125:8
125:18 129:20
136:4 142:12
146:2 162:5
163:16 164:5,6
169:2 171:17,20
177:2,9 178:3
179:9 180:22
181:15,16,19
182:1 192:2,3

**kinds** 29:22 30:3
152:6

**knew** 42:24 57:6
114:12 115:3,24
119:17 122:11
133:24 142:12
183:12

**know** 4:21 7:2,5,8
7:17 8:10 10:3,5
12:18,22 13:5,18
14:7,13,23 15:5,6
15:18,20,22,24
16:10,11,16,19,21
16:23,23,24,25
17:2,8 18:8,12,14
19:2,9,14,20,22
20:2,6,20,20,22
21:1,9,13,15,15,18
21:22 22:10,16,18
22:24,25 23:7,7,8
23:15,19,19 24:14
24:21,21 25:1,2,4
25:10 26:6,17
28:1,13 29:23
31:25 32:10,16,25
33:1,3,4,9,15,20
33:24,25 34:3,12
34:14,14,14,21,25
35:1,2,3,5 36:11
37:10 38:4,14
39:1,8,22 40:7,9
40:12,13,23,23
41:6,7,9,9,15,16
41:16,21,22,23,23
42:6,7,14,16,16,21
42:22,23 43:1,2,3
43:8,19,20,21,22
43:22 44:2,9,10,11
45:6,12,13 46:2,13
46:14,15,23,25
47:1,3,8,15,19
48:14 49:9,14,18
50:12,13 51:4,7,12
51:20 52:1,2,15
53:10,11 54:10,14
54:24 55:1,7,13,15
55:17,25 56:5,6,12
56:18,21,22 57:1,2

58:12,24 59:3,5,25
60:17,25 61:17
62:11,13 64:4
65:18 67:1,13,25
69:4,13,21 70:4
71:24,25 72:10,10
72:17,18 73:8,20
73:24 74:8 75:4,4
75:5,6,9,11,14,14
75:21,21,22,23
76:1,2 77:23 78:6
80:23,23 81:11
82:20,22,23 83:16
83:17,20,22,24,25
84:3,6,13,18,20,21
85:3,3,7,9,13,15
85:25 86:1,8,11,15
86:16,18 87:7,20
87:22,22,25 88:2,3
88:9,13,23 89:2,7
89:11,18 90:11,14
90:16 91:5,14,21
91:22 92:3,4,5,8,9
92:13,20 93:16,18
94:2,4,12,19,23,24
95:3,6,7 97:19
98:6 99:1 100:19
101:8,10,11 102:2
102:3,11,21
103:15,17 104:7,8
104:19,19 105:2,7
107:2,6,8,16,20,20
107:23 108:2,2,4,7
108:9,13,13,18
109:19 110:6,8,10
110:16,18 111:10
111:20,22 112:8,9
112:24 113:14,24
114:1,5,8,10,18,23
114:24,25 115:1,3
115:11,12,16,18

Veritext Legal Solutions
866 299-5127

[know - life]

115:23 116:6,15
116:18,19,20
117:2,4,5,17,22,24
117:25 118:3,5
120:11,21,23
121:1,13,18
122:15 123:13,25
124:16,18 125:5,7
125:8,9,14 126:3
126:11,19 127:9
127:13,20,22,24
127:25 128:1,2,3
128:10,19,20,23
128:23 129:2,7,10
129:20 130:1,10
130:10,19 131:12
131:13 132:3,4
133:16,20 134:25
134:25,25 136:5
136:14,15 137:9
137:21 138:14
139:3,12 140:1,2,3
140:3,10,24,25
141:9,18 142:13
142:21 143:4,11
143:18 144:1,10
144:11,12,13,17
144:18,21,24
145:16,21,23,25
146:1,3,5,6,23
147:6,9,9,15,16,17
147:18,20,25
148:7,8,10 149:9,9
150:3,4,5,15,19,20
151:12,21,23
152:8 153:19
154:23,25 155:4
156:3 157:11,13
157:18,23 158:9
158:12 159:22,25
160:10,10,15,16

160:17,21,22,22
160:23,23 162:6
162:15 163:6,17
163:18 164:4,7,14
166:12,18 167:2,4
167:4,22 168:12
168:15,17 170:8
170:21 171:4
172:2 173:4,5,5,17
174:24 175:16
176:3,4,9 177:9
178:16,17 179:25
180:3,7,8,9,10,12
180:18,19,20,20
180:23 181:5,5,7,8
181:9,16,22 182:6
182:7,8,14,14,16
182:22,24 183:4
183:18,20 185:6,6
185:7,12 186:5
187:10,20,20
188:12,15,19,19
188:25 189:10,10
189:17 190:9,13
190:14,20 191:19
192:1 193:2,20,21
193:22,23,25
194:11 195:11,19
195:20 196:16,19
196:20,21,23,23
196:24 197:6
198:15 199:7,23
199:24,25 200:9,9
200:10,11,22,23
201:8,9,19 202:7
202:11 203:7,9
**knowing** 107:20
**knowledge** 67:15
67:22 69:17 71:19
107:18 155:10,13

**known** 14:1 84:13
121:21 201:10,12

### l

**lake** 204:3
**landed** 164:22
**language** 166:9
**large** 104:20 111:2
**largely** 83:11,18
**laughing** 109:10
**launch** 96:24 97:1
**law** 1:20 2:3,4,9
67:10 69:18,19
71:20 74:19 137:1
137:13 204:13
**lawns** 29:21
**lawsuit** 12:9,13,23
12:25 13:3,10
20:10,24 21:6,10
21:24 23:12 24:1
25:11,15,22 26:4
27:23 47:5 48:3
48:21 58:17,22
61:3 121:2 138:11
138:18 139:6,17
139:24 144:4,7,23
145:11,24 146:9
173:25 174:4
175:4,7,10,13,18
**lawsuits** 98:14
**lawyer** 8:20 9:1
71:24 92:22 93:11
93:14 94:3,6,8
95:1 150:20
201:15
**leading** 13:10
**learn** 12:12 20:9
21:6,10,16,25
23:11,12 56:7
58:20 59:6
**learned** 20:24 24:7

**learning** 25:16
**leave** 27:8
**leaving** 66:3
**left** 79:1 108:9
**legal** 4:9,11 6:11
9:4 19:18 39:7,16
40:7,7,9,20,24
41:5 42:13,20,23
43:7,9,13 44:5
51:11 52:7,14
63:20 67:6 69:21
71:17 73:14 74:11
76:22,25 80:3
89:23 91:20 92:1
94:16 131:11
140:6,13 145:19
150:2 152:6
166:17 167:1
173:16 200:21
205:7
**legalese** 77:1 90:3
91:9 149:3
**legally** 39:25
42:15 43:3,5,12,15
44:1,23 149:24
151:19 188:12,19
**lens** 103:18
**letting** 65:18
**liabilities** 173:11
173:14 174:12
**liability** 173:21
174:13,14
**license** 71:4,5
**licensing** 54:11
70:1,10,16,22,24
71:9,13 74:23
75:10,16 94:8
126:13 128:11
182:13
**life** 29:18 38:19
147:16

[light - mean]

light 107:1,22
lighting 177:16
likes 101:10,15
liking 105:13
limited 17:17
  116:3 118:10
  128:23
line 27:7,12 61:16
  61:19 63:5 66:5
  76:9 77:25 78:21
  79:10 164:20
  165:4 187:14
  189:24 196:1,2
  205:15 206:4
  207:4,7,10,13,16
  207:19
lined 85:9
lines 33:8
listening 69:15
literally 189:25
litigation 18:24
  19:6,10,23 25:17
little 28:5 32:4
  96:2 103:15,17
  104:4,5,18 128:14
  153:1 164:21
liv 57:4
live 17:17
llc 35:19,20,21
  36:4,8,24 38:22,23
  45:25 46:10,19
  47:1,11 48:23
  75:11 90:20 152:9
  152:11,16
locate 199:17
location 1:20
  85:12,14 106:3,6
  106:24 116:17
  120:1
locations 86:11,22
  119:25

lock 157:1
locked 205:12
  206:1
long 11:4 14:2
  17:20 18:7,9
  22:21 30:7 31:22
  51:20,21 66:8
  69:11,21 75:23
  83:16 84:14 86:12
  86:21 95:16
  114:13 121:17
  133:8 141:23
  142:2,4,6,7 150:15
  162:24 163:16
  178:2 179:19,20
  180:3,5,7 182:22
  201:10
longer 23:4 96:2
  150:8
look 12:1 54:1
  93:11 95:1,12
  97:17,19,20 98:4
  100:19 101:14
  102:10,11 103:3
  103:22 107:20
  121:4 125:19
  138:22,23 163:24
  178:18 184:12
  192:14,25 195:2
  200:2
looked 107:7
looking 68:14
  69:11 85:25 101:9
  122:1 123:23
  156:12 192:7,19
  194:1 200:11
looks 100:23
  186:22 193:23
los 1:22 2:5,11
losing 187:24

loss 192:3 194:21
  195:21,21 196:12
lost 189:20 190:1,8
  190:10,15,24
  192:6,8,16 193:10
  193:15,17 195:1,8
  200:2
lot 29:10 30:2
  38:18 49:12,16,22
  49:25 50:19 51:25
  68:9 75:7 93:25
  103:11 123:3
  124:14 149:3
  162:24 163:22
  164:22 180:9,10
  180:23 183:19
lots 85:20,20
  130:24 169:2
love 164:7
loved 107:8
lovely 203:18
low 92:13,14
lucrative 32:13
lunch 95:9,15

m

m 1:24 204:4,22
magazine 128:3
  128:23,25
magazines 129:18
magical 123:7
mail 53:25 54:4,19
  91:7 151:2 162:5
mailed 151:7
mails 53:1,3,6
  55:1,3,5,10,11
making 136:4
  152:5
maldives 130:14
  130:16,22 131:5,8
  131:17 132:23

male 32:11
man 185:6
managed 29:21
manner 24:6
march 1:18 4:4
  58:2 204:6,17
  205:3,5
marie 31:21
mark 185:10
marked 96:14
  97:15,16,18 98:1
  185:8 186:20,20
  186:23
market 183:13
marketing 180:22
matched 80:15
math 48:8
matter 4:7 50:15
  57:23 74:19
  163:15 168:6
matters 58:3
  71:17
meals 111:25
mean 6:9 12:19
  13:19 14:1,8
  17:16 20:4,5
  21:21 22:2,9,20
  23:16 24:2,3,3,10
  24:16 25:5 29:17
  29:20 30:15 32:24
  33:8,14 35:14
  36:23 38:15 39:1
  39:9,9,11,25 40:23
  42:7,15 43:21
  44:1,17,17 47:9,9
  48:15 49:19 50:19
  51:13,19 52:16,22
  52:25,25 53:3
  54:25,25 55:6
  56:13 58:25 67:14
  67:25 69:20 71:23

[mean - moved]

71:24,24 73:4,10
74:23 75:6 77:3,7
82:21 83:13 84:5
85:23,24 86:5
88:1 91:6 93:10
94:20,22 101:6,7
101:19 103:13,24
104:16,25 107:17
108:9,19,21 110:7
110:17 111:11,24
114:14 115:16,24
116:7,16 117:3,4
117:23 118:15
119:16 122:22
123:3,18 125:6,7,8
125:9,15 127:21
128:20 132:11,20
132:22 133:8,23
134:13 135:5
137:4 139:11
140:3,11 142:2,11
142:18 143:10
144:3 145:7,15
149:7 152:19,23
155:21 157:9,15
157:22 159:7
161:21,24,25
163:14,14 164:3
164:14 166:19
167:12,13,15
168:14,16 169:1
169:15 170:5,8,11
170:24,25 171:4
171:23 174:14
179:3 181:4,22
188:15 190:19
198:15,25 199:14
199:23 201:6,16
201:16 202:6
**meaning** 142:24
160:11

**means** 6:6 34:23
48:6 188:19
**meant** 32:25
**media** 4:5 54:12
183:7
**meet** 11:4
**meeting** 10:25
**memory** 15:3
24:15 44:13
137:23 140:5
153:14 155:24
156:6 194:19
198:13 199:16
**mention** 16:22
93:10
**mentioned** 137:17
175:15
**message** 10:6,8
**messages** 10:10
**messenger** 10:9
**met** 9:5 10:24 11:2
11:7 14:15 15:8
201:5
**miami** 30:21 31:21
**mid** 37:22
**middle** 69:16
**million** 19:13,15
48:7,9,19,21 94:22
**millions** 114:11
135:24
**mind** 40:25 62:4
117:19 119:19
122:7 158:6
**mine** 184:16
**minimal** 103:4,9
103:22
**minutes** 11:3,6,10
23:1,4,8 96:5
156:13 202:17,21
202:23

**mis** 165:14
**misspoke** 120:24
**misstates** 150:11
191:5
**mistake** 121:1
**misuse** 132:23,25
133:11
**model** 31:10,23
34:9 38:8 84:11
86:10 110:22
124:6,9 162:4
**modeled** 37:11
**modeling** 30:23
31:5 32:11 37:6,6
37:13 38:1
**models** 31:3,7
**moment** 17:23
18:1 105:9 123:13
**moments** 123:5
**monetization**
181:1,24 182:5,12
**monetize** 116:9
**money** 34:10
45:20,24 46:17
47:12,21 48:10
49:4,4,12,15,16,21
49:22,25 70:22
114:15 148:10
173:24 174:1,4,5
174:22 175:5,7
176:2,4 178:11,20
178:22,25 179:11
179:16,23 183:10
189:12
**month** 60:7,12
183:3
**morning** 4:3 5:13
10:24 11:5 138:22
**morton** 1:3 4:7 5:5
11:15,21 13:13
17:6,12,16 18:10

18:18 19:5,10
21:11,17 22:1,22
43:24 45:3 46:18
48:1 49:5 50:2,6
50:10,15 58:17
59:8 62:25 63:11
64:25 70:25 71:14
83:25 87:3,6,12,15
88:10 89:16,22
97:16 98:14
104:13 105:4
106:18 108:1
111:6 122:19
127:5,17 128:17
129:13 131:16
132:14 136:24
137:10 139:16,23
142:25 146:25
148:3 155:14
157:23 162:21
166:13 167:8
168:9 169:9 170:1
170:7,17,23
172:11 173:24
174:21 175:9
176:2 178:8,13
179:8 183:25
187:6 192:9 195:9
205:4 207:1
**morton's** 42:11,18
58:22 132:7
147:22 151:24
155:2
**mouth** 35:2
**move** 27:12 62:10
65:8,12,17,25 66:1
66:4,9 78:20
79:10 82:8
**moved** 17:13
18:20 21:11 28:8

[moving - objection]

**moving**  75:8 194:5
**mowed**  29:21
**mst**  1:18
**multiple**  191:9

**n**

**n**  2:1 3:1 4:1
**name**  4:8 5:14
34:13,15 35:6,11
35:17 57:1,2,5
75:10,11,11,11,12
75:16 93:8,13
136:11,11 172:14
196:4
**nashville**  17:13
18:20
**natural**  103:3,22
107:1,1
**nature**  68:19
107:2
**nearly**  103:7
**necessarily**  104:5
117:19
**necessary**  12:5
71:21 74:3 178:3
205:14 206:3
**need**  51:16 54:1,2
65:8,12,16,23 68:4
72:4 77:24 78:14
82:10 87:12,12
120:22 135:11
155:6 165:3 183:3
183:7 185:17
191:10 194:16
**needed**  43:2
137:25 143:6
182:15 193:9
199:3 202:19
**needs**  59:15,20
72:13 84:21 101:8
136:25 155:6,8
165:23 182:18

**negative**  99:16,17
99:23 100:8,11,18
101:17 104:7,10
104:14,22
**negotiated**  150:21
**neighbor**  77:7,9
77:10,12,16
**netflix**  111:1
**never**  5:17 9:20
10:10 17:1 43:12
49:2 64:11 74:25
80:24 95:1 110:24
112:1 132:8,11,11
132:11,13,14,19
169:1 172:12
189:4 202:13
**new**  28:10 163:5,5
163:11 165:9,11
168:2,4 182:23
185:10
**night**  107:4 120:4
**nine**  54:15 98:8
**nodding**  6:24
**nods**  126:25
134:22
**nonparty**  63:25
**normal**  86:14
127:16
**normally**  123:8
124:13 127:15
**notating**  205:15
206:4
**notes**  68:11,17
69:6,8
**nowadays**  183:1
**nude**  124:11
133:19 134:5
143:23 145:25
**nudes**  127:11
130:23 131:3,3
136:6

**number**  4:5 14:24
15:2 19:11,12
27:9 50:4,13
186:9 205:15
206:4
**numbers**  115:4
**numer**  87:7
**numerous**  29:20

**o**

**o**  4:1
**oath**  5:21,22 8:14
**object**  7:25 59:15
59:19
**objected**  81:8
**objection**  8:4,10
9:3 12:15 13:4,17
13:23 14:5,11,21
15:4,21 16:9,18
17:7,18 18:11,25
19:7,17,18,19,24
20:11 21:12 22:6
22:23 23:5,13
24:8 25:3,9,19,23
26:5,11,15,20 27:4
27:5,5,25 29:12
31:24 32:9 33:13
33:19 34:17,20
35:12 36:2,9,10,16
37:3,8,9 38:2,13
38:24 39:6,15,16
39:23 40:11,19
41:3,4,4,5,14,20
42:5,12,19,20 43:6
43:7,17,25 44:7,8
44:14,24 45:5,11
46:1,11,12,20,22
47:6,7,14,22 48:11
48:12,12,24,25,25
49:8 51:3,10 52:6
52:13 53:8 54:7
54:20,21,21 55:12

56:4,10,20 57:9,10
57:21 58:8,23
59:24 60:8,9,15,22
60:23 61:10,15
62:22 63:2,3,19,20
63:20 64:15,20
66:25 67:12 71:1
72:24 73:11,16,23
74:5,13 75:3 76:8
76:9,21 77:21,22
80:3 81:2,17
82:18 84:2 86:7
87:18,19 88:12,19
89:1,10,17,25
90:10 91:4,12,13
91:19 92:19 94:11
94:18 98:23,24
99:11 100:25
101:5,18 102:9,24
103:12 104:1,15
104:23 105:6,18
105:25 106:7,13
106:20 107:15
108:5,6,17 109:3,7
109:18 110:5,15
110:23 111:9,21
112:7,20 113:13
113:23 114:3,22
115:9,15,21 116:4
116:13,25 117:12
117:13,20 118:13
118:14,22,23
119:14,15,22,23
120:6,14,18
121:15,16 122:14
122:21 123:1,17
124:8 125:4,13,20
126:10,17 127:7,8
127:19,20 128:18
129:24,25 130:9
130:17,18 131:10

Page 19

[objection - original]

131:18 132:1,9,18
133:1,17 134:3,10
134:11,18,23
135:3,13,19
136:12,19 137:2
137:15,20 138:5
138:12,13,20
139:10,18,25
140:8,18,23 141:1
141:3,10,16,25
142:1,9 143:8,17
144:8,9,15 145:1
145:12,13,18,19
145:20 146:12
147:14,23,24
148:5 149:6,16
150:1,2,10 151:3
151:10,20 152:1
152:13,18 153:6,7
153:17 154:1,17
154:22 155:3,4
157:5 158:8
159:16,20 161:5
161:12,20,22
162:12,23 163:13
164:2,13,19
165:13,15 166:16
166:25 167:10
168:10 169:12
170:4,10 171:12
172:15 173:3,15
173:16 175:24
176:21 177:24
178:14,15 179:1,2
179:17 180:16
181:3,13,20
183:16 184:11
188:16,24 189:7,8
189:16 190:11,17
190:18,25 191:5,6
191:18 192:21,22

193:1,12 194:22
194:23 195:4,23
196:14 197:9
198:1,2,23 199:6
199:19 200:20
201:1 202:4
**objections**   8:1,3
   27:6,9,14 36:18
   57:14
**obligated**   168:7
**obligations**   47:20
**observing**   32:18
   32:25
**obtain**   48:6
**obvious**   48:15,16
   48:17 144:2 145:5
   145:6
**obviously**   38:18
   49:2 108:24 120:9
   124:17 133:11,23
**occurred**   82:3
   199:11
**occurring**   6:13
**offering**   180:6
**offhand**   181:15
**office**   1:20 2:4
   205:11
**oftentimes**   86:9
   128:9 176:13
   178:3
**oh**   4:19 8:11 12:14
   46:9 57:2 86:6
   93:24 124:21
   129:16 132:8
   145:5 150:12
   160:17,20,20
   162:2 184:18,24
   186:3,9,10 190:3
   196:5
**okay**   5:18 6:3,12
   6:20,25 7:20,25

8:15,17 9:10,15,20
9:23 10:15 11:4
12:6 13:12 15:18
16:2 17:21,25
19:14 23:11 24:23
25:6,13 26:25
27:14,15 28:4
29:8,16,24 30:7,17
31:7 35:17,20
36:15 38:6,11
40:2,15 44:12
45:3 46:6 52:19
53:19 54:3 55:9
55:18,19 57:14,17
61:1,8 62:18
63:14 64:10,12,18
66:7 67:5 68:1
69:10 71:19 72:21
74:2,16 77:18
82:25 88:23 89:14
93:17,19 94:2
95:13,23,25 97:11
97:23,25 98:5,8,11
99:8,22 100:6
101:2 102:6
104:20 105:11
109:5,16 111:4
114:9,14 115:3,5
117:8 120:24
121:8,12,19,24
124:5 126:7 133:3
133:10 134:7
135:7,10 139:5,21
140:17 145:22
150:17 151:1,13
152:3,15,25
153:23 154:6,9,20
156:6,17 161:8
166:8 167:23
169:4 171:2,9
172:7,22 173:11

175:16 179:14
184:8,20 185:3,9
185:20 186:3,9
187:1,5,12,15
188:2,5,20 189:19
190:6,22 191:15
194:4 195:18
197:17 198:6
199:10 200:17
201:4 202:9,16,20
203:3,21
**old**   100:4
**once**   37:25 116:16
   116:18,21 158:5
   158:10
**one's**   103:7
**ones**   52:2 70:5
   74:24 117:5
   120:17 121:25
   122:2 132:5
   158:12 160:14,14
   183:19
**online**   35:5
**open**   33:11 34:12
   96:22 97:19
   168:15,17
**opened**   103:14
**opinion**   168:13
   180:18
**opportunity**   85:8
**opposed**   6:23
   100:2
**oral**   197:7
**order**   58:2 61:19
   61:21,23 63:23
   65:17,23,23 76:12
   79:4,12 82:5
   135:11
**ordered**   61:25
**original**   204:12
   205:10,21

Page 20

[outcome - photo]

**outcome** 18:24 204:16
**outside** 61:17,18 63:21,23 96:1 134:24
**overtalk** 20:14 23:24 27:17 45:18 55:4 66:16 174:17
**owe** 47:20 174:1
**owed** 174:22 175:1 175:7
**owes** 173:24
**owned** 132:15 148:11
**ownership** 131:16 135:17 143:11,14 149:5,20 153:3,12 155:17 166:21 193:8
**owning** 44:19
**owns** 44:20 73:7 74:1 131:8,25 146:25 174:15

**p**

**p** 2:1,1 4:1
**p.m.** 55:21,22 96:8 96:9,10,12 97:8,9 97:10,12 156:20 156:21,22,24 202:25 203:1,2,4 203:23,24
**page** 3:2,6 142:3 150:9 187:14 195:13 205:15 206:4 207:4,7,10 207:13,16,19
**pages** 142:4 150:13 204:10 205:14,17,17 206:3,6,6

**paid** 30:25 34:7 45:20 50:6,10,16 111:24,24,25 115:2 126:7,21 127:15,18 128:6 128:12,14,17 129:16,18,19 176:14 178:21 180:10 182:20
**painting** 29:22
**pandemic** 20:25 21:7
**paper** 179:14,15
**papers** 58:13,21
**parents** 30:25
**part** 19:15 22:17 41:19 47:2 55:8,8 71:10 101:12,12 104:20 111:12 118:7 132:20 147:18 162:10,16 162:17,18 171:5 173:19 176:12 184:5 185:16,22
**particular** 31:19 102:16 106:6 126:9 165:12 167:24 181:19
**particularly** 124:23
**parties** 204:15
**partner** 39:1,2
**partnership** 46:9 46:10 47:20
**parts** 75:6 105:13 105:14
**party** 12:9 88:8
**pass** 69:8
**password** 96:18
**pauses** 69:11,14

**pay** 50:11 111:6 112:17 162:5 174:5,5,22
**payments** 179:7
**pays** 127:23 128:3 128:23
**pdf** 205:12 206:1
**pen** 194:4
**penalty** 6:4,7 205:16 206:5
**pending** 7:4 59:22 61:25 66:20 169:6 169:7
**people** 34:4,12,25 35:7 41:25 51:21 51:24 70:8 71:22 83:16,19 84:9 88:9 92:12,17,23 99:19 100:4 109:10 114:13 128:24 129:2 162:4 169:16 170:2 171:7,24 177:2,11 178:4,5 180:9 182:21,23 182:25 196:17
**percent** 48:2,7 112:12,13,17,18 113:6,7,22,22 114:19,20 140:25 142:14 173:7,7 175:13,21
**percentage** 88:3 111:14 126:8,23 129:10
**perfect** 33:22 84:14 85:11 102:14
**period** 14:19 85:22 86:12 157:1 169:8 180:4 181:1

181:25 182:5 205:18 206:7
**periods** 51:22
**perjury** 6:4,7 205:17 206:6
**permission** 132:7 132:15,20 133:12
**perry** 1:24 4:10 204:4,22
**persist** 27:7 63:4
**person** 22:3 24:24 56:24 58:13 68:21 68:24 72:12 73:7 73:25 77:11 80:14 80:22 82:23 83:4 93:20 94:8 142:24
**personal** 9:17 13:12 14:4 17:6 35:10 46:19 47:1 50:15,20,21 51:21 133:24 201:13 202:2
**personally** 48:23 74:25 178:24
**perspective** 9:11 38:18 40:3,5,22 49:17 149:19
**photo** 9:9 42:4 50:1,9,10,14,25 51:2,8,17 52:5,12 52:21 70:25 75:18 75:19 83:24 87:16 88:10 90:8,23 91:2,17 92:2 93:22 104:4 111:8 112:6 113:12 114:2,2 115:13,20 116:2,10 118:20 119:5 122:18 124:2,5,11 127:4,6 127:17 128:16

[photo - prepare]

129:17,21 130:6
133:5,7 134:8,16
135:8,17 136:9,24
137:12 141:15,20
157:2 166:11,24
167:9,19,20,23,23
171:10 176:24
177:3,9,14,23
200:3
**photograph** 67:24
72:15 98:15 99:9
99:15 103:25
109:2 125:23
126:6 166:24
**photographed**
170:22
**photographer**
30:23 32:23 33:6
33:18 34:7 37:1,7
37:15 38:9 40:10
40:16 41:1 84:1
90:24 99:7 100:15
101:3,7 104:22
109:14 119:5
125:12,25 126:8
126:22 170:13,18
171:24 172:4
176:13 188:6,8
**photographers**
32:16 33:1 67:11
67:17 100:3,4
**photographs**
46:18 47:13 48:22
70:9 71:9,11
74:22 75:2 84:10
87:4 92:11 97:20
98:13,18,21 99:10
100:6 103:10
105:5 106:16,19
107:14 115:13,19
118:19 119:9

125:19 126:1
138:2,11,17 139:6
139:8,17,23 140:6
140:15 143:23
152:5 153:4,13
157:21 160:13
165:5 166:10
170:22 171:7
172:4 173:12
174:15 179:8
180:14,25 181:10
189:13 200:15
**photography**
32:14 33:12 34:12
34:16,19 35:10,15
35:18,25 36:7,21
37:14,25 41:11
46:8 49:6 69:24
70:4 74:15 83:9
90:19 91:11
108:20,23 117:23
129:3 152:11
**photos** 42:9 44:19
44:20 47:21 84:7
99:6 105:12 117:9
117:9 125:11
130:16,22 131:9
131:17,25 132:5
132:14,23 133:12
136:5 147:1 148:4
149:20 157:4,10
158:7,22 165:12
165:13,16,18,19
165:23 166:14,22
167:9,19 168:3,3
168:22 170:13,18
171:22 173:25
174:2 176:2,6
178:12 179:16,24
182:10,17 183:8
183:24 184:8,12

**photoshop** 102:18
102:22 103:14
**phrase** 99:4,4
**physical** 151:5
**physically** 151:5
**pick** 116:23
**picked** 84:1
**picking** 118:4
**picture** 98:17
121:3,9 128:3
**pictures** 37:19
102:23 118:9,10
120:20 122:11
145:25 169:15
**pill** 111:3
**place** 5:24 61:23
70:5 72:13 123:25
133:21
**places** 28:11 35:7
**plaintiff** 1:6 2:2
5:4 187:16 197:15
197:24 198:21
**plaintiff's** 3:7
186:14
**plans** 13:2,8
**please** 4:12 5:7
7:19 17:23 27:12
59:18 61:19 62:3
62:9 66:4 79:18
79:21 82:7 120:6
146:13 148:25,25
**plenty** 79:6
**point** 31:8 33:2
34:1,11 59:6
66:12 78:25 84:14
92:4 105:1 133:15
135:5 137:18
138:3,8 161:2
**portion** 174:6
**pos** 151:12

**posed** 123:7
**positive** 15:8 21:8
45:14 46:3,5,24
70:20 73:12 92:3
93:18 109:20
111:23 112:9
113:25 114:6
119:2 121:18
122:17 131:14
141:12 151:6,12
173:9 182:7 184:3
184:13 189:18
**possibilities**
119:21
**possibility** 178:8
**possible** 46:6
118:12 120:2
162:10 203:14
**post** 12:21 24:20
28:23 29:9 30:4
99:15 161:24
193:23
**posters** 157:24,25
158:1,19 161:1,10
162:18
**potentially** 13:2
115:14 120:13
191:25
**power** 51:25 52:2
148:13
**practice** 54:18
55:2 86:17
**pre** 35:3,4
**preceding** 204:10
**precluding** 169:4
**prefer** 100:1
**preference** 152:22
**preparation** 12:2
158:2 159:1
**prepare** 10:22
11:8,12,23

Page 22

[prepared - questioning]

**prepared**  61:25 91:18
**presence**  64:14 105:17
**present**  146:14
**presented**  6:14 198:20
**pressed**  99:5
**pretend**  149:8 170:21
**pretty**  24:1 32:2 93:15 102:18 108:9 114:14 119:25 122:3 143:20 185:1
**previous**  197:6,23
**previously**  14:9 20:17 97:16 100:20,24 133:24
**print**  111:3 162:3
**printed**  158:2 162:1
**prior**  10:25 14:14 26:24 51:13 52:17 68:2 70:3 75:18 116:19 196:12 198:8 199:17 204:6
**priority**  164:8
**private**  80:21,25 81:15 82:15
**privilege**  36:9 54:20 60:22 127:8 127:19 141:4 152:13,18 153:18 178:15 179:2
**privileged**  18:25 19:7,18 25:24 27:9,25 38:24 41:14 42:5 43:25 44:7 45:5,11 46:1

46:20 47:6,14,22 48:12,24 49:8 61:10,15 62:22 66:25 81:3,9 87:19 129:24 130:17 153:7
**probably**  12:20 23:1 32:20 34:9 71:3 85:24 98:2 109:8 114:6 142:21 155:6,6,8 161:24 164:3 196:20 201:7
**problem**  135:25 142:14 192:19
**procedure**  205:19 205:20
**proceedings**  5:23
**proceeds**  112:18
**process**  56:8 58:13 64:7,10,11,12,19 65:5 66:23 76:4,7 76:20 77:4 82:16 99:9,15,23 100:14 101:12 102:16,17 105:2 106:10 118:3 158:5 197:15,24 198:21 199:4,12,17
**processes**  99:21
**product**  158:6 159:6,14 180:7
**production**  3:8 186:15
**products**  131:22 159:3,25
**professional**  125:12 202:13
**profile**  178:4
**profiting**  176:10

**program**  99:17 100:10,17 101:11 101:24 102:2,16
**programs**  101:16
**project**  127:2 128:8,22 188:6 189:5
**proliferate**  136:5 136:5
**promote**  172:14
**proper**  149:11
**properly**  61:23 96:3
**property**  83:5,7
**proposed**  165:9
**proposes**  93:1
**protect**  65:24
**protective**  61:21 65:17,23 76:12 79:12 195:15 197:3
**protonmail.com**  2:6
**proud**  34:1
**prove**  83:22
**provide**  10:20
**provided**  205:19 206:8
**provisions**  150:17
**publications**  171:21
**publicist**  183:1
**publicists**  52:17 94:22
**published**  165:20 165:20,25,25 166:3,4,23 167:19
**pull**  184:17
**purely**  15:25 84:5 86:25 201:9

**purging**  54:19,22
**purpose**  117:19
**purposes**  82:4
**pursuant**  58:1 79:4,12
**put**  129:4 159:11 185:11,14

---

**q**

**qualified**  80:7
**question**  7:4,5,14 7:17 13:24 19:25 23:20,21 24:11,12 24:15 25:25 26:2 27:11,16,20 28:1 36:17 43:10,13 44:21 53:12,19 58:10 59:21,21 62:6,6 63:8,9 64:3 66:21 67:2,3 76:17,25 78:18,19 79:22 80:5 81:13 82:13 87:13 97:21 98:25 106:22 118:17,24 120:7 129:12 137:7 138:24 139:1,2,19 139:21 145:2 146:18,21 147:5 153:9,20 155:11 155:12 159:23 162:24 164:22,24 165:1,8,21 169:21 169:24 171:3 174:10 177:7,19 196:8 202:5
**questioning**  27:8 27:12 61:16,19 63:5 66:1,5 76:10 77:25 78:21 79:10 164:20 165:4

[questions - relationship]

**questions**  10:17
  57:24 58:6 62:2,3
  64:23 76:4,11
  78:23 79:3,6 82:9
  146:13 148:17
  149:14 154:12
  203:6,10
**quick**  53:17 121:5
**quiet**  65:20
**quite**  48:13 164:15
**quitting**  31:2

**r**

**r**  2:1 4:1 207:3,3
**r&s**  206:1,9
**raised**  134:15
**rate**  113:19 128:10
  128:11 182:21
**reach**  10:4 163:11
**reached**  114:19
  133:4 159:5
**react**  105:12
**read**  24:25 62:14
  79:23 109:9
  142:13 198:4
  204:12
**reading**  205:23
  206:9
**ready**  32:20
**real**  21:4 53:17
  121:5
**realize**  21:23
**really**  14:13 18:19
  18:20 20:4 21:2,4
  22:17 47:16 53:2
  71:12 74:14 92:14
  95:2 96:20 104:6
  110:9 120:22
  122:22,24 128:21
  144:21 145:15
  146:19 148:12
  159:22 163:15,19

168:6 177:11
  196:22,22,23
  201:16 203:14
**reason**  7:6 10:15
  10:19 58:16 60:20
  68:17 70:21 77:19
  79:24 80:11,20
  82:14,17 87:8
  89:15,21 92:16,22
  132:24 193:9,9
  195:9,24 196:10
  196:11 199:10
  207:6,9,12,15,18
  207:21
**rec**  24:16
**recall**  20:13,16
  21:22 22:20 23:3
  23:17,17 24:24
  26:13,18 37:16
  41:17,24 42:2
  44:11 45:16 46:16
  52:10 56:14 60:13
  74:20 85:17 91:18
  93:3,6,21 94:5,13
  119:20 121:24
  131:23,24 135:9
  135:14 136:17
  137:9 139:13,14
  143:4,5 148:7,15
  148:17 149:2,23
  151:1,17 152:2
  155:1,18,20 171:4
  179:23 181:14
  188:21 191:1,2,14
  192:17 196:15
  198:18,25 200:4,6
  200:11
**receive**  10:8 19:16
  48:21 175:13,22
  176:5 179:9

**received**  10:10
  47:13 49:5 113:12
  150:22,24 151:1
  153:23 176:2
  178:11,19 189:5
  189:12
**receiving**  174:4
  179:23
**recognize**  98:18
  121:10
**recollect**  6:16
**recollection**  9:7
  13:7 17:2 20:19
  22:11,13 23:10
  26:23 27:2,11,21
  28:3 60:4 64:9
  74:17 113:5
  114:20 142:12
  171:15
**record**  4:4,13 5:4
  5:14,14 8:1,2
  17:22 18:1,6
  49:23 53:14 55:20
  55:24 79:23 96:4
  96:7,12 97:5,6,7
  97:12 156:19,24
  169:22 174:18
  186:13 202:23,24
  203:4,20,23
**recorded**  1:4 4:6
**recordkeeping**
  54:4
**records**  52:23
**recovered**  193:19
**recovery**  175:13
**referenced**  205:6
**references**  86:1
  107:7
**referencing**  68:13
**referred**  103:10

**referring**  137:19
  138:4 140:17
  190:15
**refrain**  109:8
**refresh**  137:22
  186:6
**refuse**  64:23
**regarding**  58:22
  190:24 192:15
**regardless**  41:8
  132:14
**regards**  59:3 62:7
  134:19 174:15
  179:8 192:5
**register**  68:5 70:6
  148:3
**registered**  74:21
  166:3,4
**registering**  197:15
  197:24 198:21
  199:4,12,18
**registration**  75:1
  147:22
**regular**  17:19 18:8
  18:10,18 54:19
  181:11
**regularly**  17:16
  18:21
**reimburse**  111:7
**reimbursed**
  111:19
**reimbursement**
  111:16 112:2
**related**  58:3 60:21
**relating**  57:19
**relationship**  9:11
  9:12,14,17,18
  13:12,16 14:4
  16:7 83:21 133:24
  201:14 202:2,13

Veritext Legal Solutions
866 299-5127

[relationships - riker]

relationships
  51:21 83:16
relative  49:13,18
release  112:25
  180:2
released  157:23
  158:22,24 159:2
  176:3 205:21
relevance  18:11
  29:12 38:3 41:4
  42:19 43:7 47:7
  47:23 48:25 54:21
  57:21 63:2 65:19
  189:8 202:4
relevant  78:7
relied  53:25
rely  54:4
remember  16:12
  16:14,15 22:4
  23:9 25:6 26:8
  30:13 31:4 34:6
  40:15 70:15 88:14
  88:22 89:13 90:4
  114:25 115:7
  122:10 130:20
  133:6,9 134:14,16
  135:6,7,10 136:8
  136:22,23 138:6
  141:23 142:4,8
  146:23 147:10
  148:8 149:8
  150:17,21 151:13
  152:25 153:2
  154:15 155:14,23
  155:24 156:1,2,8
  157:3 158:1
  167:14,17 171:5,6
  171:13 183:23
  185:3,4,4 187:24
  189:11 190:21
  193:4,13,14,20,20

194:25 195:2,7
  196:16,25 197:10
  197:11,13 199:9
  199:22,22 200:13
  200:25 201:3
reminded  155:7,8
remote  68:19,22
  69:1
renew  80:2
repeat  76:16 79:21
  121:7 139:21
rephrase  7:17
  19:25 25:25 87:13
  118:17 119:2
  162:13
rephrased  118:25
replace  38:21
replaced  75:19
report  189:13,14
reported  189:12
  204:9
reporter  1:24 4:10
  4:18,23 5:6 6:22
  17:22 59:16,19,20
  62:14 66:18 79:22
  95:18 97:4 108:22
  204:5
reporter's  204:1
reporters  171:10
represent  98:12
representations
  63:15 78:5 152:6
representatives
  19:5 137:11
represented  7:22
request  3:8 186:15
  204:12
requested  192:12
  192:12 206:1,9,10
require  51:7

required  72:8,18
  105:16,21 106:2,5
  160:5 163:9
requirement
  152:10
reschedule  61:22
respect  67:10
  106:19 124:13
  138:10,17 139:5,7
  157:4,20 168:21
  175:17 179:23
respectful  124:19
responded  196:24
responses  3:8
  186:15 187:5
responsibilities
  177:14
responsible
  104:10 173:13
  174:10
restate  4:22
  139:19 146:21
rests  164:24
result  173:24
  175:7 183:11
  195:20
resulted  181:11
results  101:14
  102:22 124:3
retain  8:19
retained  153:4,15
retouch  158:11
retouched  103:11
retouching  99:18
  99:24,25 100:1,3,8
  102:15,17 103:9
  103:21,25 105:5
  105:16,22 106:3,5
  158:4,25
return  205:17
  206:6

review  93:3,7,20
  93:22 94:8 149:13
  191:11 205:8,10
  205:13 206:2
reviewed  11:23,25
  150:24
reviewing  94:17
revised  150:22
rid  55:5,10
right  5:23 7:16,18
  8:3 20:7 35:7,7,14
  39:19 47:4 48:17
  55:11 69:6 80:8
  81:6 84:17,21
  95:9 96:6,16,19
  97:23 99:14
  101:13 104:11
  109:2 112:1 113:8
  118:12 119:10
  130:23 131:4
  132:23 144:23
  152:23 156:10
  158:17 170:8,22
  171:25 175:11
  183:12 185:21
  188:14,23 190:9
  192:20 194:18
  195:17,19 197:12
  200:15,19 201:22
  201:25,25 202:16
rights  42:9 44:19
  44:20 65:24
  128:13 140:25
  200:18
riker  1:7 3:2 4:6
  5:3,8,15 35:19,20
  36:8 45:24 46:4
  57:22 58:1 63:5
  63:24 65:7 67:3
  68:6,7 78:21 79:3
  81:18 82:1 90:19

**[riker - shoot]**

165:18 186:5
188:7 195:13
196:6 197:1
203:22 204:6
205:5 207:2
**risk**  92:13 95:2
176:10,15
**risky**  183:20
**rocket**  104:8
**room**  111:24
120:3
**rosati**  2:10
**row**  56:16
**rule**  8:2,4 63:24
65:22 79:12
204:11
**rules**  5:19 65:19
67:10 73:8,14
206:8
**rush**  160:8,24

**s**

**s**  2:1 3:5 4:1 207:3
**safe**  203:18
**safekeeping**
204:13
**saks**  37:17,23
**sales**  29:4 30:5
126:23 129:10
180:11
**salt**  204:3
**sarcasm**  109:9
**save**  78:22
**saw**  12:20 24:2
64:11 77:13,16
142:17
**saying**  53:21 55:9
77:7 88:5 103:10
105:14 111:17
117:11 119:3
123:12,14 132:16
137:11 138:6

159:18 160:25
162:19 174:3
190:20 191:21
193:15 194:5,12
**says**  8:11 187:16
188:5,11 189:20
195:13 196:6
197:1,14,18
**schedule**  205:10
**school**  28:9,12,14
32:19
**schooling**  28:24
**science**  117:25
**scope**  58:7 61:17
61:18 62:3 63:21
63:23 65:13 79:5
79:18 82:4,6,9
**scott**  10:5,10
**scouted**  30:19,22
31:18,19 107:11
**screen**  101:9
**sealed**  204:13
**second**  98:17
99:23 130:8
195:13
**secret**  172:5,8,11
172:23
**security**  83:1
**see**  57:3,3,4 64:10
65:3 69:3 96:21
96:24 97:14
101:14 116:17
120:23 129:5
156:18 184:18
185:12 186:4,5,16
187:10,18 189:22
190:4,5 193:24
194:4,17 195:16
195:17 196:5
197:4,16,18,19
201:19,19

**seeing**  94:25
**seek**  65:22
**seeking**  19:10
**seen**  148:16 187:2
187:4 201:18
**selecting**  160:12
**selection**  160:23
**selections**  158:25
**sell**  114:12
**semantics**  42:23
**send**  37:19
**sense**  13:24 34:23
49:21,24 60:12
84:15 102:21
114:10 117:8
119:7 163:4
**sensitivities**
124:23
**sent**  143:2,3 154:3
191:23
**sentence**  189:20
190:1 195:12,16
**separate**  40:25
51:1 111:15
**separately**  159:15
**september**  56:1
**series**  95:4 97:14
97:19 165:19
**serious**  109:11
135:25
**serve**  56:2,8 57:7
57:19 58:21 59:7
60:20 61:22 62:20
63:1,11 64:8
77:13 83:1
**served**  59:9,11,13
60:4 77:14,15
83:4 187:6
**server**  56:8 58:13
64:7,10,11,12,19
65:5 66:23 76:4,7

76:20 77:4 82:16
**service**  60:18 63:6
63:16
**set**  3:8 34:24 95:8
96:3,14 135:11
186:15 204:10
**sets**  112:11
**setting**  34:19
177:16
**setup**  117:17
**setups**  118:4
**seven**  95:21 98:7
146:1 203:13
**shaking**  6:24
**share**  95:5 96:3,14
96:25 97:14
173:13 175:22
186:24
**shifted**  38:1
**shocked**  23:9
**shoot**  32:15 33:3
35:16 41:8 42:9
51:1,2,6,8,18 52:5
52:12,18,21,22
70:25 71:14 83:24
84:19,24 85:2,24
86:22 87:4,14,14
88:11,25 89:9,16
89:24 90:8 91:22
92:2 93:23,23
94:6 107:4 109:17
109:23 110:1
111:1,8,20 112:6
113:12 114:2,2,7
114:21 115:13,20
116:1,2,11 118:3
118:20 119:5
120:4 122:18
124:2,5,12 127:6
127:23 129:17,19
129:20 133:5,7

Veritext Legal Solutions
866 299-5127

[shoot - specifically]

134:9,16 135:8,18
136:9,24 137:12
141:15,20 157:2
166:11,11,24
167:9,15,20,24
168:22 171:10
176:25 177:3,9,14
177:23 178:8
183:3,9,24 192:15
200:3,15
**shooting** 34:9
85:15 86:14
115:25 119:18
123:3,4,22,24
126:5 169:15
**shoots** 42:4 45:21
50:1,5,7,9,11,14
87:16 88:10 90:23
91:2,17 127:4,17
128:16 129:21
130:6 182:18
**shop** 34:24
**short** 150:8
**shorthand** 204:4
**shot** 112:11
117:16 122:23
123:15,21 128:2
131:2,3 158:7
165:18
**shots** 104:11
**show** 34:4
**showed** 184:9
**showing** 80:15
105:12
**shutter** 67:23,24
68:4 72:12 73:7
99:5 122:20
123:22,24 124:7
125:1,3
**side** 34:16 68:16

**sifting** 55:7
**sign** 52:24 72:2,5
88:9 93:2 94:15
94:22 135:2
137:18,25 138:10
141:8 143:6
145:16 146:8,11
146:24 147:3,7,21
149:12 153:24
193:9 197:21
198:8 199:3
204:12 205:16
206:5
**signature** 204:22
205:21,23,23
206:9
**signatures** 89:8
**signed** 52:21 53:5
53:23,24 88:24
89:3,23 90:8
91:10,17 93:4
94:9 130:15 138:7
138:16 139:7,15
139:22 140:14,16
142:19,20,23,25
143:3 150:23,24
151:5 152:8 153:2
153:12 155:16
166:21 190:7
191:16,23 194:20
195:13 196:7,10
196:11 197:2
198:14 200:13,14
**significant** 22:19
24:23 25:5,7,12,14
48:9
**signing** 52:17
139:15 140:5
142:15 149:15
150:7 156:4

**signs** 88:8
**simply** 27:20
**single** 105:8
166:14,23 167:8
**sit** 105:3,4 160:17
**sitting** 140:4
146:22
**situation** 74:17
110:21 124:22,24
182:3
**six** 32:12,14 84:10
86:10 98:7
**sixth** 186:23
**size** 111:3
**sketchy** 56:15
58:13
**skilled** 101:11
**slog** 129:3
**slow** 59:16,18
**smaller** 178:5
**social** 54:12 183:6
**socially** 201:7
**sold** 158:15
**solely** 118:20
**solid** 156:3
**solutions** 4:9,11
205:7
**somebody** 34:10
151:9
**someone's** 39:5,22
**someplace** 142:21
142:22
**sonsini** 2:10
**sony** 109:20,21
**soon** 29:7 178:22
**sorry** 36:15,19
37:4 65:21 66:2
66:18 76:15 92:21
103:6 106:1
109:25 113:3
123:10 150:19

162:14 165:2
171:18 184:15
185:16 198:5,16
198:18
**sort** 34:16 50:15
54:4 64:1,24
116:21 130:5
144:2 162:10
182:2,4,12
**sought** 84:12
**sounds** 37:24
53:24 155:7 162:8
162:18
**south** 86:21 128:2
195:20
**speak** 17:14 50:16
91:9 99:5 201:23
**speaking** 27:6,13
**special** 53:4
**specific** 13:7 15:24
18:13 24:14 41:25
44:11 50:4,13
67:20 85:23 103:2
105:22 106:3
117:19 120:7
121:12 123:5
129:13 133:15
135:12,15 136:8
149:24 152:6
177:4,7 181:16
185:7 188:21
**specifically** 20:5
30:15 34:8 42:2
43:1 46:4 74:9
75:22 85:4,24
90:4 114:25 115:1
116:12 123:2,12
133:9 134:1,4,8,16
135:17 136:16
137:5 138:18
153:10 155:18

[specifically - taken]

161:9 166:12
188:3 193:18
198:18 200:16
**specifics** 148:8
156:2
**speculate** 147:8
**speculating** 84:5
**speculation** 46:12
82:19 108:6
115:21 116:4,13
116:25 119:14,23
120:14,18 121:15
125:21 126:18
134:11 144:9,15
147:24 159:20
161:22 180:17
192:22 198:2
**spend** 161:18
**spent** 32:17
**spoken** 47:10
137:4
**sports** 84:10 86:10
146:1
**spyirl** 16:7 21:17
22:1,22 144:14,24
145:10,17 147:11
**ss** 204:3
**staff** 80:21,25
81:19
**stalked** 76:20 77:5
**stalking** 76:7,15
77:3,20 78:13
80:1,11
**standard** 90:18,22
90:25 102:19
**start** 29:5 32:7,20
32:22 33:5 187:13
**started** 5:19 16:24
29:5 31:3,4 32:23
33:6 37:14,25
76:1

**starts** 187:14
**state** 4:13 5:13 8:5
65:19 186:13
204:2,5 205:9,12
**statement** 149:4
179:10
**statements** 78:10
178:18 179:12
**states** 1:1
**status** 40:9 44:5
176:14 188:22
**stay** 79:18
**stenotype** 204:9
**stick** 82:7
**stipulate** 65:10
**stipulation** 61:24
205:20
**stock** 75:17,20,24
**stolen** 146:3
**stop** 64:23 65:16
148:25,25 164:20
**stopped** 30:13,17
37:5
**strange** 203:7
**street** 2:10
**structured** 137:12
**stuff** 37:23 40:24
53:1 54:13 71:6
77:1 88:3 92:13
92:15 103:19
106:25,25 107:2
114:16 123:5
129:20 131:22,23
134:5 158:25
160:19 162:6
171:22 172:18
178:4 187:24
192:12 194:5
196:18
**stupid** 163:19

**subject** 110:25
133:14 134:15
160:3
**submitted** 112:2
**subpoena** 56:2,9
60:5,21 61:22
62:20,21 63:1,12
63:16,22 83:2
200:8
**suburbs** 28:7
**suddenly** 159:10
163:6 168:2
**suffer** 6:11
**suggesting** 172:11
**suggestion** 7:7
9:21
**suite** 1:21 2:5,11
**summons** 57:24
**sunrise** 106:25
184:2
**sunset** 1:21 2:4
**supplemental** 3:7
186:14
**suppose** 104:16
107:17 111:11
170:25
**supposed** 8:13
46:8 105:23
119:11
**sure** 4:23 6:22 7:7
16:1,5,12,22 17:24
24:1,19,21 34:22
37:21 38:25 45:15
46:15 48:13 56:21
59:16 60:1 66:10
68:22 70:17,17
72:6,6 76:5 79:5
80:7 84:4 93:9,12
93:15 96:2 101:23
112:16 118:8,16
119:16 122:3

130:11 131:14
133:3,19 134:6
136:4 140:21
148:6 161:15
163:2 166:19
167:13 173:22
181:5 188:3 190:7
192:6,7 193:18
194:6,12 202:18
203:15
**swear** 5:7
**swimsuit** 84:11
86:10,20 146:2
**swimwear** 130:25
**sworn** 5:9 204:6
**system** 53:5,23

**t**

**t** 3:5 207:3,3
**tab** 98:3
**table** 108:15
125:12 159:12,17
161:18 163:8,25
**tagged** 147:16
**tail** 180:5,14
181:24
**tailor** 58:6 62:3
**tails** 181:2
**take** 5:22,24 7:2,5
7:10 53:13 55:18
84:7,9 87:4 95:9
95:15,21,23 96:1
97:17 98:21 106:4
109:2 123:15
129:1 156:10,11
164:8 176:13,17
179:3 183:19
202:16
**taken** 18:3 55:21
71:10 92:12 96:9
97:9 118:19
156:21 166:24

[taken - time]

167:9 178:12
180:12,25 203:1
**taker** 176:15
**takes** 83:20 94:1
102:2
**talented** 177:11
**talk** 6:25 11:15
17:11 18:21 62:19
62:25 134:7,15
135:16
**talked** 10:12 12:6
22:25 25:22 26:3
47:4,18 63:10
64:7 77:10 84:18
134:1,4 149:21
158:4 171:10
183:25 193:7
**talking** 16:24
17:17 18:17 26:24
59:17 66:19 77:16
137:19,24 139:12
165:6,23 181:23
**target** 75:8
**tastes** 118:1
**tattle** 81:19
**tax** 45:17 178:18
**taxes** 46:3,19 47:1
**teach** 109:1,13
**team** 35:16 178:1
**technically** 38:22
**tedious** 105:2
**tell** 5:21 7:15,19
69:7 97:24 100:17
110:3 120:5 122:1
122:19 154:15,16
171:7 185:13
190:23 193:7
204:7
**telling** 24:17 56:14
101:16 123:21

**ten** 54:15 126:15
156:16 179:6
202:17,21,22
**tend** 177:22,25
**tennessee** 21:11
**term** 44:2 83:16
165:18
**terminate** 61:20
64:22 65:21 79:11
79:14
**terms** 32:6 33:18
34:19 45:2 47:17
47:19,21 71:19
73:9 98:16 100:5
101:16 103:5,9
105:13 106:11,15
107:14,25 108:12
112:4,5 115:18
119:8 121:12
124:3,25 125:10
127:3,17 128:5,7
128:16 133:4,6
144:5,6 149:3
151:19 152:9
167:6,7 168:19
170:7 173:6
174:21 175:20
176:16 180:24
181:19 182:9
**terrific** 6:20
**tesifying** 148:18
**test** 34:10
**testified** 5:10
11:21 48:1 66:8
83:9 133:10
172:13
**testify** 10:16 155:9
185:15 191:12
**testifying** 66:11
148:20 190:23

**testimony** 6:4,14
6:17 10:20 16:3
26:25 123:14,16
146:19 150:11
190:6 191:6,10
204:8,10
**thank** 96:6 203:6
203:12,12,12,16
203:16,17,19
**thereof** 204:16
**thing** 13:7 24:18
35:8 40:7,8 54:15
83:23 84:22
103:17,18 104:8
118:6 123:6
124:20 145:24
149:12 157:14
160:10,12 162:2
194:20
**things** 21:21 29:22
35:5 68:20 70:11
78:5 93:11 94:22
103:16 104:3,5,18
105:9 107:23
108:3 112:10
115:17 116:1
117:6,7 119:18,19
120:10 126:2
147:17 152:16
157:8,17 159:4
160:4,6 161:7
162:19 163:22
165:7 169:2 188:1
192:7
**think** 9:23 10:15
10:19 12:19,20
22:16,25,25 23:1
25:13 27:2,13,14
42:17 48:8 49:25
55:15 65:7 73:1
79:13 81:5,13

83:10 85:7 87:24
89:21 93:24 95:7
95:8,19,21,24 98:2
99:3 101:19 109:7
112:22 113:1,1
114:6 120:24,25
121:3,7 124:5
125:16,22,25
128:24 130:11,12
131:5 133:23
137:11,24 143:1
144:1 145:6
147:19 150:7
151:4,4,5 153:16
154:9 155:4,5
160:16 164:24
165:2,3,4,6 166:6
167:5 169:22
171:9 172:13
181:10 195:9
**thinking** 16:25
69:15 81:18
118:11 196:19
**third** 146:16
**thought** 22:17
25:7 32:19 43:12
43:14 47:17 49:3
104:18 120:10
144:21
**thousands** 160:13
165:19 166:12
**threats** 64:1
**three** 15:19 16:5
85:10 98:7 150:15
**throw** 114:6
**thrown** 115:4
**till** 15:11
**time** 12:3 14:2
15:9 16:7,23 17:3
17:20 18:13 21:2
21:24 22:5 23:2

[time - unclear]

25:21 26:3 29:17
30:10,12 31:7,10
31:12,15,23 33:10
33:22 38:12,19
39:4,21 40:3
51:20,22 52:17
53:7 56:14 57:6
57:15 59:19 78:23
79:1 83:20,22
84:10,14 85:18,22
86:10,12,21 90:17
92:14 95:9,22
105:3,3 106:24
109:4 110:12
114:13 129:4,7
131:2,3,6 138:3
142:17 143:16,20
143:21 144:2,7
146:1 147:3 154:7
154:10 157:1,16
158:12 160:9,9,12
160:18 161:18
163:25 164:9
169:8 178:21
179:21,22 180:4
182:16,19 183:22
195:1 197:23
201:5,6,11 203:7
205:10,18,24
206:7
**times** 14:17 42:24
44:3 50:19 51:25
68:1,2 84:17,18
87:5 90:13,16
91:6 93:25 160:1
183:20 191:10
**timing** 24:4 84:20
85:11 144:6 153:1
198:11
**tiny** 103:16

**title** 186:14
**today** 6:4,16,17
7:22 8:2 10:13,16
10:19,20 66:17
140:5 146:22
190:23
**today's** 10:22
203:22
**told** 9:8 56:24 59:3
124:6 125:2 143:6
148:3 154:20
155:2 156:8
171:24 172:7,22
199:3
**tomorrow** 159:11
**tons** 123:4
**top** 84:11
**total** 11:10 49:5
178:12 184:25
**totally** 47:3 86:14
**touch** 99:9
**track** 165:3
185:17
**trade** 172:23
**training** 67:7
**transcribed** 6:21
204:9
**transcript** 109:9
138:23 204:12,12
205:6,8,10,13,13
205:21 206:2,2
**transcription**
204:10
**transfer** 71:21
72:9 140:11
200:18
**transferring** 72:3
**treated** 136:25
172:4,11
**tricked** 80:24

**tried** 10:4 23:19
66:22,23 109:13
200:2
**trip** 85:6 86:3
184:6,10 185:5
**true** 57:15,16,17
93:16 124:1 173:2
204:9
**trust** 51:22 83:11
83:13,19,23 90:6
90:14 92:17,24
104:21 132:21
**trusted** 87:9,10
108:3 142:13
**trusts** 84:15
104:25
**truth** 5:22 204:7,7
204:7
**truthful** 6:10
10:20
**truthfully** 10:16
67:3
**try** 6:16 7:10,20
10:5,6 21:5 64:18
68:22 83:1 108:1
109:1 116:1
156:25 194:17
**trying** 29:24,25
33:23 38:7 49:20
49:24 50:24 53:22
56:1,8 57:19,25
59:7 60:20 62:25
64:7 69:12 78:2,3
78:11 85:4 93:24
96:17,19 101:22
116:7 118:18
119:7 123:4,8
124:19,22 133:22
138:3,9 145:3,14
159:9,24 162:7
163:3,4 166:7

174:9,19,23 175:3
194:9
**turn** 163:6,7,8,24
**turns** 176:1
**tweets** 16:7,12,15
16:16,21,23 21:17
22:1,22 144:14,25
145:10,17 147:11
**twi001** 98:2
**twice** 11:7 80:14
**twin** 30:20
**twins** 152:23
**twitter** 1:10 4:7,15
4:17 5:1 12:25
21:19 56:1 98:14
205:4 207:1
**twitter's** 3:8
186:15
**two** 15:19 16:5
18:16,17 28:10
56:15 85:10 99:20
107:9 130:5 142:3
150:15 165:6
184:4
**type** 35:5 71:5
84:9 109:22,25
110:1 111:2 127:1
127:23 131:23
177:7 181:16
**types** 92:10 177:8
**typical** 124:15
126:7 128:6,6,8,17
128:21 180:13
**typically** 70:12

| u |
|---|

**uh** 8:16 83:12
96:23 119:6
141:22 168:5
**unclear** 40:6
109:10

Veritext Legal Solutions
866 299-5127

[understand - way]

**understand** 6:1,2
6:3,6,18,19 7:14
7:15,18,19 8:8,9
29:25 30:2 38:7
39:12,18 50:24
53:22 69:19 76:16
78:3,11 98:13
101:13,20 103:21
106:21 110:13
118:8,19,24
119:12 124:21,22
133:23 138:4,10
145:4,14 159:10
159:23,25 161:16
162:8 167:11
169:21 174:7,20
174:23 175:1,21
**understanding**
5:20 20:23 46:7
48:20 67:16,19
69:17,22 71:20
72:1,4,7,13,21
73:1,2,14,21 74:3
106:17 119:8
143:13 161:1
162:11 163:11
167:7 170:7
173:19 175:5,12
179:18 197:20
198:11,19
**understood**
101:23 112:16
134:2 170:16
183:14
**unfortunately**
12:3 200:10
**unique** 182:3
**unit** 4:5
**united** 1:1
**university** 28:17

**unretouched**
104:4
**unusual** 47:3
**uploaded** 194:14
**uploading** 186:1
**upset** 23:9
**usage** 128:24
**use** 83:19 90:19
99:14,19 100:1,3,4
100:10,13,16,17
100:21 101:8,16
101:24 102:16,22
104:21 109:17,22
109:23,25 110:1,2
110:3,4,22 111:2
112:23 113:7
118:2 120:2 132:6
132:14,19 133:12
158:13 165:9,10
165:11 168:3,4
170:6 173:12,24
177:8,22 181:19
182:22,25
**uses** 113:7 118:12
119:13 126:9
162:9
**usually** 7:3 8:1,4
53:3 71:5 72:11
92:6 123:8 167:21
177:22
**utah** 204:2,5

**v**

**vacation** 30:20,21
**vague** 8:11 19:24
25:19 54:21 64:1
91:12 165:17
198:24
**value** 126:15
128:24 146:3
**valued** 182:14

**varies** 128:9
**venice** 85:15
**venus** 75:17,20,23
**verbal** 6:23
**veritext** 4:9,11
205:7,9,11
**versus** 4:7 120:3,4
**victor** 2:8 4:14
204:13 205:1
**video** 1:4 4:6
163:7
**videographer** 1:25
4:3,9,18 5:6 17:25
18:5 55:19,23
96:7,11 97:7,11
156:23 202:24
203:3,21
**videotaped** 203:22
**violating** 92:12
**visually** 101:10
120:9
**vjih** 2:13 205:2
**voted** 84:11
**vs** 1:8 205:4 207:1
**vulnerability**
124:18

**w**

**w** 1:10 38:12 45:4
189:5
**wages** 189:13
**wait** 36:18 89:19
92:21,21 124:1
130:24 162:13
184:15
**waived** 205:23,23
**waiving** 205:20
**want** 7:7 21:3
25:25 28:4 53:11
58:6 60:24 64:22
65:25 66:2,4,8,9
67:20 69:12 73:18

76:4 78:1,6,18,22
79:6 80:5 81:11
82:22 93:8,13,15
94:22 95:4,12,16
95:22 96:2 97:4
103:3 116:12
118:7 138:23
143:24 152:16,20
155:24 156:11,13
156:14,25 164:4
177:8,12 178:4
182:23,23 184:12
187:9,13 194:6
**wanted** 32:17
37:20 43:2,24
86:2 87:8 97:17
101:1,4 102:22
103:3,21,22 107:1
107:4,24 116:22
116:23 117:6,15
127:12 131:21
134:7 135:1 160:7
170:25 172:13
**wanting** 171:21
**wants** 4:22 123:21
124:3 159:11
160:16 163:6
**waste** 92:14 105:2
158:12
**watch** 105:17
**water** 103:17
123:20
**way** 7:8 9:15,25
10:9 17:15 22:19
27:2,21 33:2 35:4
41:8 42:3 44:5
55:10,16 64:13
72:7 78:17 87:25
91:23 99:10
102:11 103:1,4
104:17 107:19

[way - work]

| | | | |
|---|---|---|---|
| 113:10 114:20 | wilson 2:10 | 101:1,6,19 102:10 | 158:10 159:17,21 |
| 126:8,22 128:17 | wise 111:12 | 103:1,13 104:2,16 | 161:6,13,21,23 |
| 129:11 130:4 | wish 142:11 | 104:25 105:8,20 | 162:13 163:1,14 |
| 135:11 136:17 | withered 180:11 | 106:1,8,14,23 | 164:3,14,24 |
| 146:10 150:22 | witness 5:3,7,9 | 107:17 108:8,19 | 166:19 167:3,12 |
| 152:17 153:2 | 12:16,19 13:6,19 | 108:24 109:4,20 | 168:14 170:5,11 |
| 161:14 165:12 | 14:1,8,13,22,24 | 110:7,17,24 | 171:13 172:16 |
| 173:13 174:7 | 15:6,20,23 16:11 | 111:11,23 112:9 | 173:4,17 175:10 |
| 175:6 176:24 | 16:20 17:9,19 | 112:21 113:15,24 | 175:25 176:22 |
| 177:18 178:9 | 18:12 19:2,8,21 | 114:5,24 115:10 | 177:25 178:17 |
| 180:13 181:16,18 | 20:15 21:14 22:9 | 115:16,24 116:7 | 179:3,20 180:19 |
| 182:8,15 183:21 | 22:24 23:7,16 | 116:16 117:3,14 | 181:4,14,21 |
| 197:12 | 24:10 25:4,11,20 | 117:23 118:15 | 183:17 184:13,18 |
| ways 73:5 115:14 | 26:7,13,17 27:10 | 119:1,16,24 | 184:21 185:18 |
| 129:14,17 157:20 | 27:18 28:2 29:13 | 120:16,20 121:17 | 186:9,25 188:18 |
| 167:24 168:4 | 29:16 32:1,11 | 122:16,22 123:2 | 188:25 189:3,9,17 |
| 181:6 182:14 | 33:14,21 34:22 | 123:18 124:10 | 190:12,19 191:1 |
| we've 14:1,1,16,16 | 35:14 36:3,12,19 | 125:6,15,22 | 191:14,19 192:23 |
| 53:13 95:19 | 37:4,11 38:5,15,25 | 126:12,20 127:10 | 193:2,13 194:24 |
| 100:20 161:24 | 39:9,17,25 40:13 | 127:21 128:20 | 195:6 196:2,5,15 |
| 178:1 183:25 | 41:7,16,22 42:7,15 | 130:2,10,20 | 197:11 198:4,25 |
| weber 30:22 | 42:22 43:9,20 | 131:13,19 132:3 | 199:8,21 200:22 |
| week 8:22 11:19 | 44:1,10,17 45:2,7 | 132:19 133:2,18 | 201:2 202:6 |
| weeks 85:25 183:2 | 45:13 46:2,14,21 | 134:4,12,19,24 | 203:15 204:6,8,12 |
| weighing 183:18 | 46:24 47:9,16,24 | 135:5,14,21 | 204:17 205:13,16 |
| weird 203:7 | 48:15 49:2,10 | 136:15,21 137:4 | 206:2,5 207:24 |
| went 28:8,12,17 | 51:5,13 52:8,16 | 137:16,22 138:6 | witness's 65:24 |
| 30:25 31:20 34:15 | 53:19 54:8,25 | 138:14,25 139:4 | wondering 34:11 |
| 85:18 110:11 | 55:14 56:6,13,21 | 139:11 140:2,11 | 73:8 129:13 145:6 |
| 128:2 143:5 148:7 | 57:11 58:25 60:1 | 140:19,24 141:7 | 187:8 |
| 171:9 176:7 | 60:9,17,25 62:23 | 141:12,19 142:2 | word 18:9 35:2 |
| 179:10 180:3 | 63:21 64:17 67:4 | 142:11 143:10,19 | 54:22 99:14 100:1 |
| west 2:10 | 67:14 71:3 73:12 | 144:11,18 145:21 | 124:9 137:14 |
| westport 28:8 | 73:19,25 74:6,8,14 | 146:14,17,18 | 145:18 152:7 |
| whatsoever 9:7 | 75:4 77:23 78:16 | 147:15,25 148:6 | 188:11 195:18 |
| whichever 71:4 | 80:7 82:2,20 84:4 | 149:7,17 150:4 | wordage 149:9 |
| white 101:1 | 86:9 87:22 88:14 | 151:4,11,22 152:2 | words 24:6,13 |
| 103:18 | 88:22 89:3,12,19 | 152:14,19 153:9 | 162:15 |
| wider 118:11 | 90:2,12 91:6,15,21 | 153:21 154:2,18 | work 14:16 28:5 |
| willing 90:7 | 92:21 94:13,20 | 154:24 155:6 | 29:2 30:7,22 |
| | 97:2 99:2,13 | 156:15,19 157:6 | 31:15 32:6 33:1,6 |

Veritext Legal Solutions
866 299-5127

[work - zoom]

| | | | |
|---|---|---|---|
| 33:17,18 34:1,4 | **wow** 162:2 | 84:14 85:20,20,20 | 37:21 56:1,19,22 |
| 44:2,5 46:8 49:6 | **wrap** 53:17 | 86:9 87:11 88:18 | 60:14 61:6 68:3 |
| 67:10 70:10 72:22 | **writing** 135:2 | 88:22 89:12 90:2 | 130:13 157:10 |
| 73:14,22 74:4,11 | 138:1 143:14,16 | 90:12,13 91:15 | 180:1,2,2 183:1 |
| 83:17,18 90:9 | 190:8 193:23,24 | 92:25 93:5,5 | **years** 14:14,25 |
| 105:23 127:2 | **written** 6:21 51:17 | 95:15 96:4,17,20 | 15:2,2,11,12,17,18 |
| 136:25 137:1 | 52:4,11 87:15 | 96:25 98:3,4 | 16:4,5 17:5 18:16 |
| 151:14,15,19 | 88:7,8,24 89:3,15 | 99:25 104:2,2,17 | 18:17 21:1 30:9 |
| 152:11 157:1,3,10 | 89:23 91:17 92:23 | 104:25 106:23 | 30:16 32:12,15,18 |
| 157:16,19,24 | 93:2,22 94:9,16 | 107:9,21 108:21 | 34:5 37:12 54:9 |
| 158:14,18,21,22 | 130:16 137:18 | 110:17 113:4 | 54:15 70:14 76:2 |
| 159:13 163:25 | 139:7,16,22 140:6 | 114:25 115:10 | 102:2,19 108:10 |
| 164:6,18 168:21 | 146:24 155:16 | 117:7 119:1 121:7 | 126:15 174:25 |
| 168:25,25 169:1,1 | 166:20 190:7 | 122:8 130:3,12 | 179:6 180:1 |
| 169:5,9,13 170:1,2 | 191:4,16 192:15 | 131:7 132:17 | 201:12 |
| 176:5,23 177:2 | 193:8 197:7 | 133:13 134:12,13 | **yep** 63:13 |
| 178:1 182:9 | 198:14 199:17 | 136:3 138:14 | **yesterday** 11:2 |
| 183:10,15 | 200:2,14,25 | 141:12 145:21 | **york** 28:10 |
| **worked** 14:17 15:9 | **wrong** 8:3 69:9 | 150:4 152:23 | **young** 100:4,4 |
| 30:9,11 37:14 | **wsgr.com** 2:12,13 | 157:7 158:3,10,17 | 177:11 |
| 38:19 40:4 44:18 | 205:2 | 158:24 159:1,8,21 | |
| 71:16 84:16 87:5 | | 160:6,7 161:4,6,7 | **z** |
| 90:14,15 | **x** | 161:14 163:1,14 | **zelinger** 2:9 4:16 |
| **working** 29:3 | **x** 3:1,5 206:9 | 163:23 166:19 | 4:16,21,24 5:1 |
| 30:13,17 31:3,10 | **y** | 167:15 170:15,15 | 68:8 186:1,22 |
| 31:11 36:25 39:12 | | 170:19 171:16 | **zoom** 1:5 204:9 |
| 39:13 69:25 86:11 | **yeah** 10:2 12:16 | 172:1,16 173:5 | |
| 86:15 96:20 | 14:8 20:15,15 | 176:8 177:12,15 | |
| 107:18 164:12 | 22:9 23:23 24:2 | 178:21,21 179:13 | |
| 179:5 194:9 | 24:10,16 25:11 | 179:20 181:14 | |
| **works** 33:16 57:3 | 28:2 29:19 30:16 | 183:17,21,21 | |
| 67:17 78:17 | 31:2,6,15 32:5 | 184:13 185:1,2,18 | |
| 107:18 108:3 | 33:3,14 34:10 | 185:24 186:11,13 | |
| 117:24 122:24 | 35:22 36:6,23 | 186:25 188:18,25 | |
| 162:16 178:25 | 37:12 38:15,16 | 190:12 192:23 | |
| **world** 74:15 86:20 | 39:17 44:19 45:14 | 194:13 195:6,11 | |
| 128:22 172:6 | 45:22,22 46:21 | 195:11 197:6,13 | |
| **world's** 32:16 | 53:16 54:2,8,14 | 198:12 199:21 | |
| **worried** 148:9 | 55:14 57:11,13,13 | 201:2 | |
| **worth** 114:16,16 | 59:5,5 64:17 | **year** 8:23 26:10 | |
| 182:17 183:2 | 73:19,25 76:18 | 27:24 31:4 37:12 | |
| | 77:17 82:20 83:4 | | |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 3

Exhibit 3

8



LIBRARY OF CONGRESS

*Copyright Office of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that on July 29, 2020 a claim to copyright a work identified as **BORNEO 2016** was registered under number **VA 2-211-724.** This work was registered in accordance with provisions of the United States Copyright Law (Title 17 United States Code).

**THIS IS TO CERTIFY FURTHER**, that the attached is an additional certificate for this work.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on March 17, 2022.

Shira Perlmutter
United States Register of Copyrights and Director

By:   Angela Hightower
Supervisory Copyright Specialist
Records Research and Certification Section
Office of Copyright Records

Use of this material is governed by the U.S. copyright law 17 U.S.C. 101 et seq.

Exhibit 3
9

Additional Certificate (17 U.S.C. 706)

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## VA 2-211-724

**Effective Date of Registration:**
July 28, 2020

**Registration Decision Date:**
July 29, 2020

## Copyright Registration for a Group of Published Photographs
Registration issued pursuant to 37 C.F.R. § 202.4(i)
For Photographs Published:   October 01, 2016 to October 31, 2016

### Title

Title of Group:   Borneo 2016
Number of Photographs in Group:   14

### Completion/Publication

Year of Completion:   2016
Earliest Publication Date in Group:   October 01, 2016
Latest Publication Date in Group:   October 31, 2016
Nation of First Publication:   United States

### Author

Author:   Genevieve Morton
Author Created:   photographs
Citizen of:   South Africa
Domiciled in:   United States
Year Born:   1986

### Copyright Claimant

Copyright Claimant:   Genevieve Morton
7190 Sunset Blvd. # 1124, Los Angeles, CA

### Rights and Permissions

Name:   Genevieve Morton
Email:   speaktogenevieve@genevievemorton.com

### Certification

Page 1 of 2

Exhibit 3
10

|  |  |
|---|---|
| **Name:** | Genevieve Morton |
| **Date:** | June 21, 2020 |

|  |  |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group. |

Regarding group registration: A group of published photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) were created by the same author AND (b) are owned by the same copyright claimant AND (c) were published in the same calendar year AND 2. The group contains 750 photographs or less AND 3. A sequentially numbered list of photographs containing the title, file name and month of publication for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as .XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application.

Page 2 of 2

Exhibit 3
11

| | |
|---|---|
| **Registration #:** | VA0002211724 |
| **Service Request #:** | 1-8952104879 |

Jennifer Holliday
7190 Sunset Blvd. # 1430
7190 Sunset Blvd. # 1430
Los Angeles, CA 90046

Exhibit 3

12

# EXHIBIT 4

Exhibit 4

13

00015

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

**VA 2-210-005**

**Effective Date of Registration:**
June 08, 2020
**Registration Decision Date:**
July 15, 2020

---

## Title

**Title of Work:** Borneo

**Content Title:** Love on the rocks 4, Love on the rocks 5, Love on the rocks 7, Love on the rocks 8, Love on the rocks 15, Love on the rocks 16, Love on the rocks 20, Love on the rocks 2, Love on the rocks 23, Love on the rocks 29

Bathtub 1, Bathtub 2, Bathtub 3, Bathtub 4, Bathtub 5, Bathtub 6, Bathtub 7, Bathtub 8 , Bathtub 9, Bathtub 10, Bathtub 11, Bathtub 12, Bathtub 13, Bathtub 14, Bathtub 15, Bathtub 16, Bathtub 17, Bathtub 18 , Bathtub 19 , Bathtub 20, Bathtub 21, Bathtub 22, Bathtub 23, Bathtub 24, Bathtub 25, Bathtub 26, Bathtub 27, Bathtub 28, Bathtub 29, Bathtub 30, Bathtub 31, Bathtub 32, Bathtub 33

Artists Collection 1,Artists Collection 2,Artists Collection 3,Artists Collection 4,Artists Collection 5,Artists Collection 6,Artists Collection 7,Artists Collection 8,Artists Collection 9,,Artists Collection 10,Artists Collection 11,Artists Collection 12,Artists Collection 13,Artists Collection 14,Artists Collection 15,Artists Collection 16,Artists Collection 17,Artists Collection 18,Artists Collection 19,Artists Collection 20,Artists Collection 21,Artists Collection 22,Artists Collection 23,Artists Collection 24,Artists Collection 25,Artists Collection 26,Artists Collection 27,Artists Collection 28,Artists Collection 29,Artists Collection 30,Artists Collection 31,Artists Collection 32,Artists Collection 33,Artists Collection 34,Artists Collection 35,Artists Collection 36,Artists Collection 37,Artists Collection 38

Private island 1,Private island 2,Private island 3,Private island 4,Private island 5,Private island 6,Private island 7,Private island 8,Private island 9,Private island 10, Private island 11,Private island 12,Private island 13,Private island 14,Private island 15,Private island 16,Private island 17,Private island 18,Private island 19 ,Private island 20 ,Private island 21,Private island 22,Private island 23,Private island 24,Private island 25,Private island 26,Private island 27,Private island 28,Private island 29,,Private island 30

After Dark 1, After Dark 2, After Dark 3, After Dark 4, After Dark 5, After Dark 6, After Dark 7, After Dark 8, After Dark 9, After Dark 10, After Dark 11, After Dark 12, After Dark 13, After Dark 14, After Dark 15, After Dark 16, After Dark 17, After Dark 18, After Dark 19, After Dark 20, After Dark 21, After Dark 22, After Dark 23, After Dark 24, After Dark 25, After Dark 26, After Dark 27, After Dark 28, After Dark 29, After Dark 30, After Dark 31,

Page 1 of 2

00015

Exhibit 4

14

00015

After Dark 32, After Dark 33, After Dark 34, After Dark 35, After Dark 36, After Dark 37, After Dark 38, After Dark 39, After Dark 40, After Dark 41, After Dark 42, After Dark 43, After Dark 44, After Dark 45, After Dark 46, After dark 47, After Dark 48, After Dark 49

## Completion/Publication

**Year of Completion:** 2018
**Nation of 1st Publication:** United States

## Author

- **Author:** Genevieve Morton
**Author Created:** photographs
**Work made for hire:** Yes
**Citizen of:** South Africa
**Domiciled in:** United States
**Year Born:** 1986

## Copyright Claimant

**Copyright Claimant:** Genevieve Morton
7190 W. Sunset Blvd, #1124, Los Angeles, CA, 90046, United States

## Certification

**Name:** Genevieve Morton
**Date:** June 08, 2020

**Copyright Office notes:** Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group.

Regarding group registration: A group of published photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) were created by the same author AND (b) are owned by the same copyright claimant AND (c) were published in the same calendar year AND 2. The group contains 750 photographs or less AND 3. A sequentially numbered list of photographs containing the title, file name and month of publication for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as .XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application.

Regarding group registration: Photograph names within deposit submitted in lieu of photograph title list.

Page 2 of 2

Exhibit 4
15

# EXHIBIT 5

Exhibit 5

16

00014

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## VA 2-210-694

**Effective Date of Registration:**
June 21, 2020

**Registration Decision Date:**
July 21, 2020

---

## Copyright Registration for a Group of Published Photographs
Registration issued pursuant to 37 C.F.R. § 202.4(i)
> For Photographs Published:   January 01, 2017 to January 01, 2017

### Title

**Title of Group:**   Borneo 2017
**Number of Photographs in Group:**   6

- **Individual Photographs:**   posters love on the rocks 19,posters love on the rocks 10,treats love on the
rocks 6,treats love on the rocks 11,treats love on the rocks 12,treats love on the
rocks 14
**Published:**   January 2017

### Completion/Publication

**Year of Completion:**   2016
**Earliest Publication Date in Group:**   January 01, 2017
**Latest Publication Date in Group:**   January 01, 2017
**Nation of First Publication:**   United States

### Author

- **Author:**   Genevieve Morton
**Author Created:**   photographs
**Citizen of:**   United States
**Domiciled in:**   United States

### Copyright Claimant

**Copyright Claimant:**   Genevieve Morton
7190 Sunset Blvd. # 1124, Los Angeles, CA, 90046, United States

### Certification

Page 1 of 2
00014

Exhibit 5
17

…certificate issued under the seal of …

00014

**Name:** Genevieve Morton
**Date:** June 21, 2020

**Correspondence:**     Yes
**Copyright Office notes:**     Regarding title information: Deposit contains complete list of titles that
correspond to the individual photographs included in this group.

Regarding group registration: A group of published photographs may be
registered on one application with one filing fee only under limited
circumstances. ALL of the following are required: 1. All photographs (a) were
created by the same author AND (b) are owned by the same copyright claimant
AND (c) were published in the same calendar year AND 2. The group contains
750 photographs or less AND 3. A sequentially numbered list of photographs
containing the title, file name and month of publication for each photograph
included in the group must be uploaded along with other required application
materials. The list must be submitted in an approved document format such as
.XLS or .PDF. The file name for the numbered list must contain the title of the
group and the Case Number assigned to the application.

Regarding group registration: Registration extends to corresponding
photographs in contents titles and in deposit.

00014

Exhibit 5

18

# EXHIBIT 6

Exhibit 6

19

**\*\*\*Attorney Client Privileged Confidential\*\*\***

**Notices targeting @SpyIRL:**

DMCA Notice 0155741360 *(submitted May 19,2020, actioned May 19 ,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Law Offices of Jennifer Holliday
== Job title: Attorney
== Email address: jennymorrison@icloud.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Photograph of Genevieve Morton in black and white that is currently available for sale exclusively on her personal website.

== Links to original work: https://www.genevievemorton.com

---

== Reported Tweet URL: https://twitter.com/SpyIRL/status/1262692935755276290

== Description of infringement: This account has posted 3 tweets containing images that are protected under copyright held by model Genevieve Morton (Twitter account @genevievemorton) who commissioned the works and sells them exclusively on her website. The content of this tweet and two others are copyrighted. Please take down the content and suspend the account.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

**Exhibit 6**
**20**

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0155743889 *(submitted May 19,2020, actioned May 19 ,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Law Offices of Jennifer Holliday
== Job title: Attorney at Law
== Email address: jennymorrison@icloud.com

== Address: 7190 Sunset Blvd. # 1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: United States
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white photographic images of Genevieve Morton owned by Genevieve Morton and for sale exclusively on her website.

== Links to original work: http://www.genevievemorton.com

---

== Reported Tweet URL: https://twitter.com/SpyIRL/status/1262902208821186566

== Description of infringement: This is the third of three tweets from this account that contain photography protected under copyright registered to Ms. Morton. The images are for sale exclusively on Ms. Morton's website and this use is not authorized.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

Exhibit 6
21

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0155742748 *(submitted May 19,2020, actioned May 19 ,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Law Offices of Jennifer Holliday
== Job title: Attorney at Law
== Email address: jennymorrison@icloud.com

== Address: 7190 Sunset Blvd. # 1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: United States
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white photography featuring and owned by Genevieve Morton.

== Links to original work: http://www.genevievemorton.com

---

== Reported Tweet URL: https://twitter.com/SpyIRL/status/1262906872656465921

== Description of infringement: Ms. Morton sells these images exclusively on her website, and this tweet (and two others posted by this account) have taken the images and posted them, infringing her copyright.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

**Notice targeting @city_tits**

TWITTER00000835

Exhibit 6
22

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0172275586 *(submitted September 10, 2020, actioned October 19 ,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jennymorrison@icloud.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Photograph of Genevieve Morton, nude.

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/city_tits/status/1304069685680443394

== Description of infringement: Genevieve Morton is the registered copyright owner of the image at issue. This is an unauthorized use of the image used for commercial purposes to promote the Twitter user's website in violation of federal law.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000836

Exhibit 6

23

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0166017783 *(submitted July 23, 2020; actioned October 28, 2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white photograph of Genevieve Morton

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/city_tits/status/1273260487506120709

== Description of infringement: Tweet contains pictorial work owned and protected under copyright by Genevieve Morton

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000837

Exhibit 6
24

**\*\*\*Attorney Client Privileged Confidential\*\*\***

**Notice targeting @1SluttySexSlave**

DMCA Notice 0166018493 *(submitted July 23, 2020; actioned October 28, 2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jennymorrison@icloud.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: black and white image of nude Genevieve Morton in doorway

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/1SluttySexSlave/status/1217898804541739009

== Description of infringement: Pictorial work reproduced and displayed in a tweet

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000838

Exhibit 6
25

**\*\*\*Attorney Client Privileged Confidential\*\*\***

**Notices targeting @btfgirlbtf DMCA Notices**

DMCA Notice 0166021203 *(submitted July 13, 2020, Actioned on October 28, 2020)*

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white photograph of Genevieve Morton

== Links to original work: https://twitter.com/btfgirlbtf/status/1198580507296051202

---

== Reported Tweet URL: https://twitter.com/btfgirlbtf/status/1198580507296051202

== Description of infringement: Unauthorized reproduction and display of pictorial work.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000839

Exhibit 6

26

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0166020678 *(submitted July 13,2020, Actioned on October 28,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: Jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: West Hollywood
== State/Province: CA
== Postal code: 92253
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white pictorial of Genevieve Morton

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/btfgirlbtf/status/1198580466116370433

== Description of infringement: Tweet includes unauthorized pictorial reproduction and display.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

Exhibit 6

27

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0166020949 *(submitted July 13,2020, Actioned on October 28,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday Esq.
== Job title: Attorney
== Email address: jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white headshot of Genevieve Morton

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/btfgirlbtf/status/1198580477684305922

== Description of infringement: Unauthorized reproduction and display of pictorial work.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000841

Exhibit 6
28

**\*\*\*Attorney Client Privileged Confidential\*\*\***

DMCA Notice 0166018795 *(submitted July 13,2020, Actioned on October 28,2020)*

---

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white beach shot of Genevieve Morton

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/btfgirlbtf/status/1198580457895530497

== Description of infringement: Tweet includes unauthorized pictorial reproduction and display.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000842

Exhibit 6
29

**\*\*\*Attorney Client Privileged Confidential\*\*\***

**Notice targeting @bellasmujeres13:**

DMCA Notice 0166018083 *(submitted July 13,2020, Actioned on October 28,2020)*

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white photograph of Genevieve Morton in the bathtub

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/bellasmujeres13/status/1226711419737067522

== Description of infringement: Pictorial work owned by Genevieve Morton publicly reproduced and
displayed in this Twitter account without authorization

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages,
including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity
is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not
authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that
I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

Confidential

**\*\*\*Attorney Client Privileged Confidential\*\*\***

**Notice targeting @2_Deadpool_2:**

DMCA Notice 0166021667 *(submitted July 13, 2020, Actioned on October 28, 2020)*

DMCA Takedown Notice

== Copyright owner: Genevieve Morton
== Name: Jennifer Holliday
== Company: Jennifer Holliday, Esq.
== Job title: Attorney
== Email address: jhollidayesq@gmail.com

== Address: 7190 W. Sunset Blvd. #1430
== City: Los Angeles
== State/Province: CA
== Postal code: 90046
== Country: USA
== Phone (optional): n/a
== Fax (optional): n/a

-------

== Description of original work: Black and white photographs of Genevieve Morton

== Links to original work: n/a

---

== Reported Tweet URL: https://twitter.com/2_Deadpool_2/status/1091468878897692672

== Description of infringement: unauthorized reproduction and display of pictorial work.

-------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

TWITTER00000844

Exhibit 6
31

**\*\*\*Attorney Client Privileged Confidential\*\*\***

**Notice targeting @0k_show:**

DMCA Notice 0233005694 (submitted October 12,2021, Actioned on October 12,2021)

Copyright owner:
> GENEVIEVE MORTON
Name:
> JENNIFER HOLLIDAY
Company:
> Jennifer Holliday, Esq.
Job title:
> Attorney

Address:
> 7190 W. Sunset Blvd. #1430
City:
> Los Angeles
State/Province:
> California
Postal code:
> 90046
Phone (optional):
> 3106006078
Fax (optional):
>


Where is this infringement happening?
> Twitter
Description of original request:
> The original work is a photograph of a woman swinging from a rope in a body of water.

Links to original work:
> [Empty]

Please provide URL(s) to the infringing material (e.g., Tweet URL, Periscope broadcast URL, Fleet ID, etc.):
> https://twitter.com/0k_show/status/1441608396793335808

Reported content:
> Image/Photograph
Description of infringement:
> The photograph has been cropped and altered and is displaying differently on different devices. Some are displaying a version of the photograph with the head not visible, some are simply displaying a cropped version with the full body. It is also in a Tweet asking for money, implying that the Twitter Verified User who appears in the photo is soliciting funds (which is not true).

512(f) Acknowledgement:

**Exhibit 6**
32

**\*\*\*Attorney Client Privileged Confidential\*\*\***

> I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

Good Faith Belief:
> I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

Authority to Act:
> The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

Signature:
> JENNIFER HOLLIDAY
Country
> US

TWITTER00000846

Exhibit 6
33

# EXHIBIT 7

Exhibit 7

34



Confidential

TWITTER00000821

Exhibit 7
35

⇒ City/State/Region:
⇒ State/Province: CA
⇒ Postal code: 90046
⇒ Country: USA
⇒ Phone (optional): n/a
⇒ Fax (optional): n/a

-------

⇒ Description of original work: Photograph of Genevieve Morton in black and white that is currently available for sale exclusively on her personal website.

⇒ Links to original work: https://www.genevievemorton.com

---

⇒ Reported Tweet URL: https://twitter.com/SpxrRJ/status/1262692690755276290

⇒ Description of infringement: This account has posted 3 tweets containing images that are protected under copyright held by model Genevieve Morton ([Twitter account] @genevievemorton) who commissioned the works and sells them exclusively on her website. The content of this tweet and two others are copyrighted. Please take down the content and suspend the account.

--------

⇒ 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

⇒ Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

⇒ Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

⇒ Signature: Jennifer Holliday

↩ Reply    ↩ Reply All    → Forward    💬 Comment

---

🗔 Inbox 0    ⊘ Next Case    ⬀ Pop Out Lists    ⏸ Take a Break    ● Wellness Controls    ✦ Report a bug / Submit feedback    ⊘ Omni-Channel (Offline)    ⊙ History

Confidential

TWITTER00000822

**Exhibit 7**

36

# EXHIBIT 8

Exhibit 8

37



TWITTER00000823

Exhibit 8
38

== State/Province: CA
== Postal code: 90046
== Country: United States
== Phone (optional): n/a
== Fax (optional): n/a

---------

== Description of original work: Black and white photography featuring and owned by Genevieve Morton.

== Links to original work: http://www.genevievemorton.com

---

== Reported Tweet URL: https://twitter.com/SpinRLz/status/1262900872659405921

== Description of infringement: Ms. Morton sells these images exclusively on her website, and this tweet (and two others posted by this account) have taken the images and posted them, infringing her copyright.

---------

== 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

== Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

== Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

== Signature: Jennifer Holliday

↩ Reply    ↩ Reply All    → Forward    💬 Comment

🖂 Inbox 0   ⊘ Next Case   🗗 Pop Out Lists   🕮 Take a Break   ⚙ Wellness Controls   ✦ Report a bug / Submit feedback   ⭘ Omni-Channel (Offline)   🕓 History

rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com
tter.com   rbooth@twitter.com   rbooth@twitter.com

# EXHIBIT 9

Exhibit 9

40



TWITTER00000825

Exhibit 9
41

- City: Los Angeles
- State/Province: CA
- Postal code: 90046
- Country: United States
- Phone (optional): n/a
- Fax (optional): n/a

--------

-- Description of original work: Black and white photographic images of Genevieve Morton owned by Genevieve Morton and for sale exclusively on her website.

-- Links to original work: http://www.genevievemorton.com

---

-- Reported Tweet URL: https://twitter.com/SpxRL/status/1262902208821186566

-- Description of infringement: This is the third of three tweets from this account that contain photography protected under copyright registered to Ms. Morton. The images are for sale exclusively on Ms. Morton's website and this use is not authorized.

--------

-- 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

-- Good Faith Belief: I have good faith belief that use of this material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

-- Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

-- Signature: Jennifer Holliday

↩ Reply    ↩ Reply All    → Forward    💬 Comment

☐ Inbox   ⊘ Next Case   ⊡ Pop Out Lists   ☕ Take a Break   ⚙ Wellness Controls   ⚑ Report a bug / Submit feedback   ⊘ Omni-Channel (Offline)   ⏱ History

Confidential

TWITTER00000826

Exhibit 9

42

# EXHIBIT 10

Exhibit 10

43



Confidential

TWITTER00000827

Exhibit 10
44

>> State/Province: CA
>> Postal code: 90046
>> Country: USA
>> Phone (optional): n/a
>> Fax (optional): n/a

--------

>> Description of original work: Black and white photograph of Genevieve Morton

>> Links to original work: n/a

---

>> Reported Tweet URL: https://twitter.com/city_lits/status/1273360487506120709

>> Description of Infringement: Tweet contains pictorial work owned and protected under copyright by Genevieve Morton

--------

>> §12(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

>> Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

>> Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

>> Signature: Jennifer Holliday

↩ Reply      ↩ Reply All      → Forward      💬 Comment

📥 Inbox 0    ⊘ Next Case    ⧉ Pop Out Lists    ☕ Take a Break    ⊘ Wellness Controls    ✦ Report a bug / Submit feedback    ◯ Omni-Channel (Offline)    ⊙ History

Confidential

TWITTER00000828

Exhibit 10

45

# EXHIBIT 11

Exhibit 11

46



Confidential

TWITTER00000829

Exhibit 11

47

»» State/Province: CA

»» Postal code: 90046

»» Country: USA

»» Phone (optional): n/a

»» Fax (optional): n/a

----------

»» Description of original work: Photograph of Genevieve Morton, nude.

»» Links to original work: n/a

----

»» Reported Tweet URL: https://twitter.com/city_lits/status/1304060985080443394

»» Description of infringement: Genevieve Morton is the registered copyright owner of the image at issue. This is an unauthorized use of the image used for commercial purposes to promote the Twitter user's website in violation of federal law.

----------

»» 512(f) Acknowledgment: I understand that under 17 U.S.C. § 512(f), I may be liable for any damages, including costs and attorneys' fees, if I knowingly materially misrepresent that reported material or activity is infringing.

»» Good Faith Belief: I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

»» Authority to Act: The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner.

»» Signature: Jennifer Holliday

↩ Reply    ↩ Reply All    → Forward    💬 Comment

📁 Inbox 0    ⊘ Next Case    📑 Pop Out Lists    ☕ Take a Break    ⚙ Wellness Controls    ✦ Report a bug / Submit feedback    ⊘ Omni-Channel (Offline)    🕐 History

Confidential

TWITTER00000830

Exhibit 11

48

# EXHIBIT 12

Exhibit 12

49

JENNIFER HOLLIDAY, ESQ. (SBN 261343)
jhollidayesq@protonmail.com
1901 Ave. of the Stars, 2nd Floor
Los Angeles, California 90067
dir. (805) 622-0225
*Attorney for Plaintiff Genevieve Morton*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE: DMCA § 512(h) SUBPOENA TO TWITTER, INC. | 2:20-CV-10434 **PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT TWITTER'S FIRST SET OF REQUESTS FOR ADMISSION** |

PURSUANT TO THE COURT ORDER DATED JANUARY 12, 2022,
PLAINTIFF RESPECTFULLY SUPPLEMENTS HER RESPONSES TO
TWITTER'S FIRST SET OF REQUESTS FOR ADMISSION
<u>PLAINTIFF IS ORDERED TO RESPOND TO NOS. 9, 11, AND 14</u>

<u>**ALL SUPPLEMENTAL INFORMATION IS DEEMED CONFIDENTIAL**</u>

<u>**FIRST SET OF REQUESTS FOR ADMISSION**</u>

<u>**PROPOUNDING PARTY:    TWITTER**</u>
<u>**RESPONDING PARTY:      GENEVIEVE MORTON**</u>

Exhibit 12
50

**REQUEST FOR ADMISSION NO. 1:**

Admit that the PHOTOGRAPHS were offered to the public for sale on YOUR website, www.genevievemorton.com.

**RESPONSE:**

Plaintiff admits that some of the collected works in which the Photographs appeared were available for license and digital download through her website, and calendars were offered for sale, but otherwise denies.

**REQUEST FOR ADMISSION NO. 2:**

Admit that purchasers could view some or all of the PHOTOGRAPHS on YOUR website prior to purchasing the PHOTOGRAPHS, whether through a watermark, a preview image, or otherwise.

**RESPONSE:**

To the extent Plaintiff understands this Request, Plaintiff cannot admit or deny this Request because it is vague and ambiguous as to "purchasers." "Purchasers" are not "Purchasers" if the event in question occurred "prior to purchasing." To the extent that some people who accessed the site purchased a calendar or a license to download the collection, they could not view some or all of the PHOTOGRAPHS until after delivery.  Those who did not purchase but viewed the site also could not view the PHOTOGRAPHS.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the webpage titled "What happens if my account receives multiple copyright complaints?", located at  https://help.twitter.com/en/rules-and-policies/copyright-policy#:~:text=If%20multiple%20copyright%20complaints%20are,under%20our

2

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12

51

%20repeat%20infringer%20policy references the existence of a Twitter policy that provides for the termination of repeat infringers.

**RESPONSE:** DENIED.  The terms "termination" and "terminate" do not appear anywhere on this page, and at best, the Webpage references a policy that provides for "suspension" which, by definition, is temporary and not the same as termination.  Twitter has also represented to Plaintiff and to the Court that its Terms and Conditions and the Twitter Rules are merely "aspirational statements" that will not necessarily be enforced.

**REQUEST FOR ADMISSION NO. 4:**

Admit that the SPYIRL Tweets containing the PHOTOGRAPHS were posted on Twitter on May 19, 2020.

**RESPONSE:**

Plaintiff cannot admit or deny this statement on the basis that the Plaintiff is unable to know precisely when a third party posted content or when Twitter first displayed the Tweet. Plaintiff is also unaware of the location of the Twitter user or of Twitter's servers, and therefore cannot determine whether the post was made on any particular date due to the difference in time zones.  The Tweets are time-stamped and serve as best evidence of the display by Twitter and SpyIRL.

**REQUEST FOR ADMISSION NO. 5:**

Admit that YOU submitted takedown notices directed at the SPYIRL Tweets on May 19, 2020.

3

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

**Exhibit 12**

**RESPONSE:**

Plaintiff admits she submitted takedown notices on May 19, 2020 and reiterates the issue with Admission No. 4. There is best evidence of this in the form of the reports sent to and received by Twitter, Inc.

**REQUEST FOR ADMISSION NO. 6:**

Admit that the PHOTOGRAPHS were removed from the SPYIRL Tweets by May 20, 2020.

**RESPONSE:**

Plaintiff is unable to admit or deny this Request. On May 20, 2020, the PHOTOGRAPHS were still visible on Twitter as shown in the date-stamped, time-stamped exhibit to the Complaint, but may have been removed by midnight of that date, depending on time zone.  Although Plaintiff received a report from Twitter that the PHOTOGRAPHS would be removed, they were removed on what Twitter described as a "Rolling basis," such that some of the PHOTOGRAPHS remained visible others were removed.  Plaintiff also reiterates that there is a time-zone issue, and depending on the location and of a viewer, the date referenced in this Request may or may not be correct.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the SPYIRL Tweets YOU allege to be infringing were posted on Twitter before the PHOTOGRAPHS included in those Tweets were registered with the United States Copyright Office.

**RESPONSE:**

Plaintiff admits that the Photographs at issue in this case were not registered with the United States Copyright Office at the time @SpyIRL embedded them in the three SPYIRL Tweets.

4

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12

53

**REQUEST FOR ADMISSION NO. 8:**

Admit that no contracts or agreements exist in YOUR possession between YOU and ANY individuals or entities relating to the display or creation of the PHOTOGRAPHS, including "work for hire" or assignment agreements.

**RESPONSE:**

DENIED


**REQUEST FOR ADMISSION NO. 9:**

Admit that YOU did not take the PHOTOGRAPHS.

**RESPONSE:**

~~Plaintiff objects to this Request as vague and unintelligible as to "take the PHOTOGRAPHS." Plaintiff admits she is the registered Copyright Holder of the PHOTOGRAPHS with the U.S. Copyright Office.~~

**SUPPLEMENTAL RESPONSE: DENIED.** Twitter has defined "YOU" to encompass not only Plaintiff, but also without limitation ANY other PERSON acting for OR on behalf of PLAINTIFF.  (See Defendant Twitter's First Set of Requests for Admission to Plaintiff Genevieve Morton, p. 3, 4-6)  Twitter has defined "PERSON" to "refer to both natural persons AND entities, including corporations, proprietorships, partnerships, associations, joint ventures, governmental agencies, AND other entities, AND ANY combination therefor, AND ALL attorneys, agents, representatives, beneficiaries, predecessors in interest, successors, assigns, affiliates, subsidiaries AND related entities."

**REQUEST FOR ADMISSION NO. 10:**

Admit that the PERSON who took the PHOTOGRAPHS is not YOUR employee.

**RESPONSE:**

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12

1  Plaintiff objects to this Request as vague and unintelligible as to "took the

2  PHOTOGRAPHS".  Plaintiff does admit she does not currently have any

3  employees. Plaintiff admits she is the registered Copyright Holder of the

4  Photographs with the U.S. Copyright Office.

5

6  **REQUEST FOR ADMISSION NO. 11:**

7  Admit that the PHOTOGRAPHS were commissioned.

8  **RESPONSE:**

9  ~~Plaintiff OBJECTS to this Request as vague and unintelligible as to "were~~

10  ~~commissioned," and Plaintiff admits she is the registered Copyright Holder of the~~

11  ~~Photographs with the U.S. Copyright Office.~~

12  **SUPPLEMENTAL RESPONSE: DENIED IN PART, ADMITTED IN PART.**

13  Twitter defines the term "PHOTOGRAPHS" as referring "to ANY OR ALL of the

14  works, individually OR collectively, as specified in Plaintiff's Response to

15  Interrogatory 1 in Twitter's First Set of Interrogatories, served April 9, 2021, and

16  by the following copyright registration numbers: VA0002210005, VA0002210694,

17  and VA0002211724."  To the extent Plaintiff understands the phrase "were

18  commissioned" to mean the legal term of art as defined in 17 U.S.C. § 101(b), as

19  the Court has explained, some of the PHOTOGRAPHS were commissioned by

20  Plaintiff as part of contributions to collected works (i.e. a calendar that was printed

21  and sold in hard copies), and some of the PHOTOGRAPHS were taken in the

22  course of employment by a photographer Plaintiff employed.

23  **REQUEST FOR ADMISSION NO. 12:**

24  Admit that the PHOTOGRAPHS were originally intended to be in a collective

25  work.

26  **SUPPLEMENTAL RESPONSE:  ADMITTED IN PART, DENIED IN PART**

27

28

6

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

**Exhibit 12**

SUPPLEMENTAL RESPONSE: Some of the PHOTOGRAPHS were originally intended to be in a collective work, some of the PHOTOGRAPHS were originally intended to be in a different collective work.  To the extent that the statement calls for an admission that the work was intended for solely one collective work, DENIED.

**REQUEST FOR ADMISSION NO. 13:**

Admit that the PHOTOGRAPHS were not originally intended to be sold individually.

**RESPONSE:**

Plaintiff objects to "originally intended to be sold" as vague and unintelligible, particularly as to the subject of "who" intended and "sold" as being a particular type of legal transaction.  To the extent that Plaintiff understands this Request, Plaintiff denies that the PHOTOGRAPHS were intended to be sold at all but rather licensed (e.g. in a calendar and in a series of collections of digital downloads).

**REQUEST FOR ADMISSION NO. 14:**

Admit no written "works made for hire" agreement was executed with the photographer(s) before the PHOTOGRAPHS were taken.

**RESPONSE:** ~~Plaintiff objects to this Request as it is irrelevant to any claim or defense in the action. Plaintiff admits she is the registered copyright holder of the Photographs with the U.S. Copyright Office.~~

**SUPPLEMENTAL RESPONSE:  DENIED**

**REQUEST FOR ADMISSION NO. 15:**

Admit that copies of the PHOTOGRAPHS can be found on websites other than Twitter and www.genevievemorton.com.

**RESPONSE:**

Plaintiff objects to this REQUEST to the extent that other acts of infringement are not relevant to this case.  To the extent that Plaintiff understands this Request, and subject to the objection, Plaintiff denies that authorized copies or displays "can be found" currently on Twitter or even on www.genevievemorton.com.

**REQUEST FOR ADMISSION NO. 16:**

Admit that YOU have not sent takedown notices to ANY websites other than Twitter requesting the removal of unauthorized copies of ANY of the PHOTOGRAPHS.

**RESPONSE:**

DENIED.

**ALL SUPPLEMENTAL RESPONSES ARE DEEMED CONFIDENTIAL**

**SUPPLEMENTAL RESPONSES**
**Dated: Jan. 21, 2022**

____/S/_____
JENNIFER HOLLIDAY, ESQ.

8
REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12
57

JENNIFER HOLLIDAY, ESQ. (SBN 261343)
    jhollidayesq@protonmail.com
1901 Ave. of the Stars, 2nd Floor
Los Angeles, California 90067
dir. (805) 622-0225
*Attorney for Plaintiff Genevieve Morton*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

IN RE: DMCA § 512(h)
SUBPOENA TO TWITTER, INC.

2:20-CV-10434

**PLAINTIFF'S SUPPLEMENTAL
RESPONSES TO DEFENDANT
TWITTER'S FIRST SET OF
REQUESTS FOR ADMISSION,
SUPPLEMENTING RFP NOS. 19, 20,
& 22**

PURSUANT TO THE COURT ORDER DATED JANUARY 12, 2022,
PLAINTIFF RESPECTFULLY SUPPLEMENTS HER RESPONSES TO
TWITTER'S REQUESTS FOR PRODUCTION, SET THREE
PLAINTIFF IS ORDERED TO RESPOND TO NOS. 19, 20, AND 22

**ALL SUPPLEMENTAL INFORMATION IS DEEMED CONFIDENTIAL**

GENEVIEVE MORTON'S OBJECTIONS TO DEFENDANT TWITTER,

INC.'S THIRD SET OF REQUESTS FOR PRODUCTION

Exhibit 12
58

1                                  <u>PRELIMINARY STATEMENT:</u>

2         Morton's responses herein, while based upon diligent inquiry by Morton and

3 her counsel, are based upon her present understanding of the nature and type of

4 information requested and upon information presently known and available to

5 Morton.  Morton anticipates that additional documents and information may be

6 identified as discovery progresses.  Morton's responses are not admissions that any

7 documents or information provided in response to the Requests are relevant,

8 material, properly discoverable, or admissible at trial, and Morton reserves the right

9 to object to any document introduced at trial.

10         Without in any way obligating itself to do so, Morton reserves the right to

11 modify, supplement, revise or amend these responses and to correct any errors or

12 omissions that may be contained herein, in light of information that Morton may

13 subsequently obtain or discover.  Furthermore, these responses are provided

14 without prejudice to Morton's use of or reliance upon, at trial, hearing, or

15 otherwise, subsequently discovered facts or information, or facts or information

16 omitted from these responses.  Any representation by Morton regarding the

17 production of documents responsive to a Request does not constitute an admission

18 that any responsive documents exist or that Morton has possession, custody, or

19 control of such documents.

20         This preliminary statement and these objections are hereby incorporated as

21 though set forth in full, into the response to each and every Request.  Morton

22 reserves the right to make such additional objections as may be appropriate, and

23 nothing contained herein shall be construed as a waiver of any applicable objection

24 or admission of relevancy.

25

26                                <u>GENERAL OBJECTIONS</u>

27

28

MORTON makes the following general objections to each Request, including, but not limited to the Definitions contained within the Requests.  The assertion of the same, similar, or additional objections or the provision of responses to the Requests, does not constitute a waiver of any of Morton's objections as set forth below:

1. Morton objects to the Requests to the extent they seek documents and information that are protected from disclosure by the right of privacy afforded by the United States Constitution, the Constitution of the State of California and other applicable federal or state laws.

2. Morton objects to the Requests to the extent they call for the disclosure of documents or information subject to the attorney-client privilege, work product doctrine, or other applicable privilege or immunity recognized in law or equity.  Any inadvertent production of such information shall not be deemed to be a general or specific waiver of any privilege or right of Morton.  To the extent any such inadvertent disclosure is deemed to be a waiver of privilege or right, such waiver shall be deemed to be limited to a waiver of the particular information and shall not preclude Morton from objecting to disclosure on any other basis.

3. Morton is willing to provide an appropriate privilege log at an appropriate time and in accordance with an agreed or ordered process/protocol for doing so.  To the extent Twitter demands otherwise, Morton objects to the extent such a demand includes any documents or communications created after the filing of the Complaint in this action.

4. Morton objects to the Requests to the extent they call for the disclosure of confidential, proprietary, trade secret and/or sensitive business information to the extent that the Protective Order does not extend to the second complaint in the action, consolidated for pre-trial purposes.

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12

60

5.   Morton objects to the Requests ~~to the extent they seek information or documents that are reasonably available to Twitter from a more convenient, less burdensome, or less expensive source than Morton and~~ to the extent they require Morton to perform a search of all documents in her possession, custody, or control, fail to state the documents requested with reasonable particularity, and seek discovery that is not proportional to the needs of this case.

6.   Morton objects to the Requests to the extent they purport to impose any obligations exceeding those created by, or seek to expand the scope of permissible discovery under, the Federal Rules of Civil Procedure, the Federal Rules of Court, the Local Rules of the United States District Court for the Central District of California, or other applicable laws or rules.

7.   Any response stating that Morton will produce responsive documents does not indicate that such documents in fact exist, but only that Morton will produce such responsive, non-privileged documents in her possession, custody, or control as may be located after a reasonable, good faith search and subject to all stated objections.

8.   Morton objects to any form of production of electronically stored information (ESI) that imposes any differing or additional obligations from those imposed on Morton by the Federal Rules of Civil Procedure, the Federal Rules of Court, the Local Rules of the United States District Court for the Central District of California, or other applicable laws or rules.  Twitter further objects to any specifications for ESI to the extent that the parties have not reached an agreement regarding the production of ESI.

4

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

**Exhibit 12**

61

9.    Morton will produce documents on a rolling basis after a reasonable search.  To the extent Twitter demands otherwise, Morton objects on the grounds that such a demand is not reasonable and unduly burdensome.

SPECIFIC RESPONSES AND OBJECTIONS

REQUEST NO. 18

A copy of each Photograph that clearly identifies that particular Photograph's title and copyright registration number (as identified in Plaintiff's Response to Interrogatory No. 1).

**RESPONSE:**

Plaintiff objects to this Request as it is cumulative and substantively identical to previous Requests for Production. Plaintiff has already produced, at great expense, archival-quality copies of the Photographs, Bates Stamped 00001-00012 and copies of the three Certificates of Registration.  Plaintiff therefore objects to this Request as unduly burdensome and .

REQUEST NO. 19

All Documents reflecting any agreements or conditions regarding the purchase or licensing of the Photographs, including but not limited to Terms of Service or User Agreements governing the sale of the Photographs on YOUR website, www.genevievemorton.com, and the terms and conditions of any sale or license of the Photographs.

**SUPPLEMENTAL RESPONSE:**

PLAINTIFF has already provided all currently known non-privileged documents in her possession responsive to this request.

5

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12<br>62

1    REQUEST NO. 20

2    All Documents Reflecting YOUR knowledge of the appearance of any of the

3    Photographs on Twitter's platform, including but not limited to screenshots taken of

4    the Tweets containing the Photographs.

5

6    **RESPONSE:**

7    ~~Plaintiff objects on the basis that this Request calls for a substantial amount of~~

8    ~~information that is already within Twitter's control—namely the amount of times~~

9    ~~Plaintiff's images have been infringed on Twitter—and seeks information for an~~

10   ~~improper purpose—namely, to narrow the amount of damages to that which~~

11   ~~Plaintiff currently knows as opposed to the universe of events of infringement on~~

12   ~~Twitter's platform and its related applications.~~

13   **SUPPLEMENTAL RESPONSE:  There are currently no non-privileged**

14   **documents responsive to this request that have not already been provided to**

15   **Twitter or filed in the case.   Plaintiff to provide a privilege log.**

16

17   REQUEST NO. 21

18   To the extent not already produced, All Documents YOU intend to rely on in

19   connection with any of YOUR damages calculations or copyright infringement

20   claims.

21

22   **RESPONSE:**

23   Plaintiff objects on the basis that this Request is substantively identical to Request

24   No. 5, and Plaintiff has already responded that expert discovery is ongoing.

25   Plaintiff will provide documents related to expert discovery at the appropriate time.

26

27   REQUEST NO. 22

28

6

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

**Exhibit 12**

**63**

All Communications (including but not limited to text messages) between YOU and Derek Riker relating to the Photographs or the subject matter of this Lawsuit.

**SUPPLEMENTAL RESPONSE:**

There are no such responsive, non-privileged documents within Ms. Morton's custody, control or possession.

Dated:   January 22, 2021

**PROPOUNDING PARTY:     TWITTER**
**RESPONDING PARTY:       GENEVIEVE MORTON**

**ALL SUPPLEMENTAL RESPONSES ARE DEEMED CONFIDENTIAL**

**SUPPLEMENTAL RESPONSES**
**Dated: Jan. 22, 2022**

___/S/_____
JENNIFER HOLLIDAY, ESQ.

___/s/_____
Genevieve Morton, Plaintiff

REQUEST TO THE CLERK FOR ISSUANCE OF DMCA §512(h) SUBPOENA

Exhibit 12

# EXHIBIT 13

Exhibit 13

65

JENNIFER HOLLIDAY, ESQ. (SBN 261343)
jhollidayesq@protonmail.com
1901 Ave. of the Stars, 2nd Floor
Los Angeles, California 90067
dir. (805) 622-0225
*Attorney for Plaintiff Genevieve Morton*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GENEVIEVE MORTON, an individual, | No.  2:20-CV-10434 |
| Plaintiff | **PLAINTIFF'S SUPPLEMENTAL RESPONSES TO TWITTER'S INTERROGATORIES** |
| v. | |
| TWITTER, INC., a Delaware Corporation; et. al. | |
| Defendants. | |
| (Consolidated with 2:21-cv-07145) | |

PLAINTIFF HEREBY SUPPLEMENTS HER RESPONSES TO TWITTER'S REQUESTS FOR PRODUCTION, SET TWO:

**THIS RESPONSE IS SUBJECT TO THE PROTECTIVE ORDER AND IS NOT TO BE DISCLOSED**

**INTERROGATORY NO. 12**
Describe in detail the circumstances under which each of the Photographs was created, including the nature of Plaintiff's contracts or agreements with the photographer(s) who shot the Photographs and any other individuals or entities involved in the creation of the Photographs.

Exhibit 13
66

<u>Plaintiff supplements her response as follows:</u>

Plaintiff Genevieve Morton employed only one person, photographer Derek Riker, to shoot and edit photographs for a calendar Ms. Morton conceived of, planned, produced and created.  Ms. Morton financed, produced, and created the project and supervised the editing and retouching of the photographs.  The nature of the contract was an employment agreement that provided Ms. Morton would retain all copyrights to the photographs that were taken in association with the project, regardless of whether or not they were used in the final work.

By way of background, Ms. Morton had been named the Sexiest Woman in the World by FHM Magazine for 2012, but she had never shot any nude photography.  After having spent many consecutive years appearing in Sports Illustrated, Ms. Morton had been approached by multiple photographers and publications with offers to shoot her in the nude, but she declined.  Ms. Morton was particularly aware of controversy over whether Ms. Morton's breasts were augmented (Ms. Morton's breasts are natural) and therefore wanted to create and control every aspect of any project in which she appeared nude, including the shoot, the editing, the collected work in which the images would appear, and all creative elements of the project.  Ms. Morton therefore employed a professional photographer with whom she has worked on other projects.  Mr. Riker holds a degree in economics from the University of Chicago and worked as a professional model for top male fashion photographers before transitioning to photography. Mr. Riker has spent the past twenty years as a professional photographer, learning from some of the world's most prominent, successful photographers including Bruce Weber, Herb Ritts, and Patrick Demarchelier.

For several months in advance of the shoot, Ms. Morton was on a strict nutrition plan and on a rigorous workout regimen to be in the best physical condition she could achieve.  Ms. Morton also spent a considerable amount of time, money and effort in making sure that her hair and skin would be flawless to avoid editing and instead offer a high-resolution image with considerable realism and minimal retouching of the skin and hair, and this, too, was a creative choice.  In an era where many photographs are edited, filtered, and retouched (i.e. photoshopped) to the extent that they lose all sense of humanity, Ms. Morton wanted to capture images of her nude body as it appeared as naturally as possible and in the natural paradise setting of Borneo.  Having spent ten years modeling in Greece, Italy, Germany, Switzerland, the Maldives, the Seychelles and elsewhere, Ms. Morton's creative imagination was constantly fed by a number of sources and references.

Ms. Morton financed and produced the project, flew to Borneo alone in advance of the shoot and location-scouted the island to determine where to set up the shots and at what time of day each photograph should be captured.  Ms. Morton chose the specific locations and made specific lighting choices and determined how the shots should be framed and what lenses would be optimal.  Ms. Morton made arrangements to provide travel, accommodation, and expenses to Mr. Riker and instructed Mr. Riker on what equipment to bring to the shoot.  Ms. Morton chose the travel and production days and controlled all scheduling.

Ms. Morton directed the editing, ensuring there was as little retouching as possible to deliver a hyperrealistic image featuring her natural body.

Ms. Morton chose fourteen shots for the calendar which she released in 2016 in hard copy format which would be shipped to buyers who could purchase the calendar on her website, www.genevievemorton.com.  There were no promotional images of the calendar and no free calendars were provided to anyone for promotional purposes or any other purpose.  The calendar sold out.

**<u>INTERROGATORY 13:</u>**
Identify the photographer(s) who took each Photograph, and provide their name and contact information.

DEREK RIKER,
Mr. Riker can be contacted through Jennifer Holliday, Plaintiff's counsel.

**<u>INTERROGATORY 15:</u>**
Describe in detail the circumstances under which each Photograph was displayed on Plaintiff's Website, including the nature of Plaintiff's contracts or agreements with the web designer(s) and any other individuals or entities involved in the placement of the Photographs, as well as the manner in which Plaintiff requested each Photograph be displayed on Plaintiff's Website.

Plaintiff never displayed any of the photographs on her website www.genevievemorton.com .  Plaintiff does her own web design and site build and owns her own company, that consults and builds sites for other businesses, personalities, and models.  The photographs were not displayed anywhere on the web in any authorized manner.  Not on her website and not elsewhere.

3

1

2   Dated: February 11, 2022                    /s/_____

3

4                                              Jennifer Holliday
                                               Attorney for Plaintiff
5

6   DATED: _____                     ___/s/_____
                                               Plaintiff Genevieve Morton
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

MORTON V. TWITTER 2:20-CV-10434
SUPPLEMENTAL DISCOVERY RESPONSES

Exhibit 13
69

# EXHIBIT 14

Exhibit 14

70

JENNIFER HOLLIDAY, ESQ. (SBN 261343)
        jhollidayesq@protonmail.com
1901 Ave. of the Stars, 2nd Floor
Los Angeles, California 90067
dir. (805) 622-0225
*Attorney for Plaintiff Genevieve Morton*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENEVIEVE MORTON, an individual,<br><br>                Plaintiff<br><br>        v.<br><br>TWITTER, INC., a Delaware Corporation; et. al.<br><br>                Defendants.<br><br><br>(Consolidated with 2:21-cv-07145) | No.  2:20-CV-10434<br><br>**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO TWITTER'S REQUEST FOR PRODUCTION, SET TWO** |

PLAINTIFF HEREBY SUPPLEMENTS HER RESPONSES TO TWITTER'S REQUESTS FOR PRODUCTION, SET TWO:

**REQUEST NO. 12**

All Documents Relating to the creation of each Photograph (as identified in Plaintiff's Response to Interrogatory No. 1), including but not limited to communications, contracts, and agreements with all photographers or editors involved in the creation of the Photographs.

Plaintiff had a hard drive failure in 2019.  There was only one photographer employed on the project, Derek Riker.  The agreement was lost in the hard drive,

Exhibit 14
71

and Plaintiff believes a copy might have been stored in South Africa.  Plaintiff made arrangements to transport the contents of the storage facility to the United States via cargo ship in 2020, but boxes were lost in transit.

Mr. Riker therefore signed another agreement acknowledging the existence of a previous agreement when Plaintiff was in process of registering the copyrights.


Dated: February 10, 2022                                         /s/_____

                                                                Jennifer Holliday

                                                                Attorney for Plaintiff


DATED: _____

                                        _____

MORTON V. TWITTER 2:20-CV-10434
[PROPOSED] ORDER GRANTING MOTION TO QUASH NONPARTY SUBPOENA

Exhibit 14

# EXHIBIT 15

Exhibit 15

73

JENNIFER HOLLIDAY, ESQ. (SBN 261343)

7190 W. Sunset Blvd. #1430

Los Angeles, California 90046

jhollidayesq@protonmail.com

dir. (805) 622-0225

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

No.  2:20-CV-10434

Genevieve Morton, an individual,

v.

Twitter, Inc., a Delaware Corporation; SpyIRL.com; Does 1-100.

**PLAINTIFF'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S**
**SECOND SET OF INTERROGATORIES and SECOND SET OF REQUESTS FOR PRODUCTION**

Plaintiff, by and through her attorney, and pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure and the Local Rules of this Court, objects to Defendant Twitter, Inc.'s ("Twitter") Second Set of Interrogatories and Second Set of Production as follows:

## I.  PRELIMINARY STATEMENT

1

Exhibit 15
74

Plaintiff's responses herein, while based on diligent inquiry by Morton and her counsel, are based upon her present understanding of the nature and type of information requested and upon information presently known and available to Morton.  Morton's investigation and development of all facts and circumstances relating to this action is ongoing, and Morton anticipates that additional information may be identified as discovery progresses. These responses and objections are made without prejudice to, and are not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

By making the accompanying responses and objections to Defendant's interrogatories and requests for production, Plaintiff does not waive, and hereby expressly reserves, her right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, Plaintiff makes the responses and objections herein without in any way implying that she considers the interrogatories or requests for production, and responses to the interrogatories or requests for production, to be relevant or material to the subject matter of this action.

Plaintiff will produce responsive, unprivileged documents only to the extent that such documents exist and are actually in her possession, custody, or control, notwithstanding any right Plaintiff may have to compel production of such documents under color of any law.

A response to a document request or interrogatory stating that objections and/or indicating that documents will be produced shall not be deemed or construed that there are, in fact, responsive documents, that Plaintiff performed any of the acts described in the document request, interrogatory, or definitions and/or instructions applicable to the document request or interrogatory, or that Plaintiff acquiesces in

2

Exhibit 15
75

the characterization of the conduct or activities contained in the document request,
interrogatory, or definitions and/or instructions applicable to the document request
or interrogatory.

Plaintiff expressly reserves the right to supplement, clarify, revise, or correct
any or all of the responses and objections herein, and to assert additional objections
or privileges, in one or more subsequent supplemental response(s).  Publicly
available documents including, but not limited to, newspaper clippings, court
papers, and documents available on the Internet, will not be produced.

Twitter has recently updated its initial disclosures, originally due February 8,
2020, but provided six months late. Twitter has not filed an updated Rule 26(f)
Report with the Court and did not allege any facts to support its affirmative and
other defenses.  In an absence of pleading even one fact that would make any of
Twitter, Inc.'s defenses plausible, Plaintiff asserts that Twitter's requests are
overbroad and are irrelevant within the meaning of Rule 26, and Twitter should
amend its answer or withdraw the defenses.

Twitter convinced the Court to dismiss all non-copyright claims on the basis
of Section 230 of the Communications Decency Act based on its representation to
the court that @SpyIRL was a third party and that the content was created by a
third party. Twitter now asserts that @SpyIRL is liable for the infringement in this
case, but has not ceased doing business with @SpyIRL's alleged content partner,
Pornhub.com and its parent company Mindgeek. Plaintiff objects to any discovery
requests whereby Twitter, Inc. is stepping in the shoes of the third party and making
certain requests otherwise irrelevant to its own posture of secondary liability.
Plaintiff has separate outstanding claims against @SpyIRL, has no obligation to
answer requests that may aid and abet @SpyIRL in a criminal enterprise from
which Twitter has allegedly profited and from which Twitter, Inc. may still be

3

Exhibit 15
76

profiting.  Based on the recent Order denying Defendant Twitter's motion to dismiss claims of beneficiary liability in a sex trafficking venture in the Northern District of California issued on August 19, 2021 in *Doe v. Twitter, Inc.,* 3:21-cv-00485, Morton objects to providing any information that would assist Twitter, Inc. in defending claims against its user @SpyIRL.

Moreover, thirty-four plaintiffs filed a lawsuit in the Central District of California on June 17, 2021 against MindGeek whose subsidiary, Pornhub.com, maintains a verified account on Twitter (@Pornhub) with 2.5 million followers. SpyIRL.com was a "content partner" of Pornhub, and as alleged, used Twitter to promote its venture in violation of state and federal law.  The aforementioned lawsuit alleges that MindGeek and Pornhub run a dangerous global operation and have been profiting from the rape and trafficking of women and minors, just as Plaintiff alleged in the instant action.  Twitter is continuing to profit from the activity around these accounts via @Pornhub and others, and <u>Plaintiff will not share any information with Twitter that compromises the safety of third parties</u>, particularly as Twitter's counsel has already recklessly and indiscreetly published Plaintiff's counsel's unredacted e-mail correspondence regarding discovery into the record without permission or notice in a premature, misguided, improper "Joint Stipulation" filed in Plaintiff's absence and in bad faith.

## II. <u>GENERAL OBJECTIONS</u>

1. Plaintiff objects to each instruction, definition, document request, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Plaintiff objects to each document request and interrogatory that is not reasonably calculated to lead to the discovery of admissible evidence, particularly

4

Exhibit 15
77

with respect to the fact that each relate to insufficiently pleaded defenses that lack any factual support and only contain mere conclusory statements including: Third Defense (License), Fourth Defense (Failure to State a Claim)[1], Fifth Defense (Innocent Intent), Sixth Defense (*De Minimis*), Seventh Defense (Substantial Non-Infringing Use), Eighth Defense (No Valid Copyright), Ninth Defense (No Damages, Failure to Mitigate), Tenth Defense (Conduct of Third Parties), Eleventh Defense (Fair Use), Twelfth Defense (Acquiescence, Ratification and/or Consent); Thirteenth Defense (Waiver / Estoppel), Fourteenth Defense (Abandonment) and Fifteenth Defense (Laches).

3. Plaintiff objects to each instruction, definition, document request, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work product doctrine, or any other applicable privilege. Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

4. Plaintiff objects to each instruction, definition, document request, and interrogatory as unduly burdensome or duplicative to the extent it seeks documents that are readily or more accessible to Defendant from Defendant's own files, from documents or information in Defendant's possession, or from documents or information that Defendant previously produced to Plaintiff. Responding to such requests and interrogatory would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests and interrogatory is substantially the same or less for Defendant as for Plaintiff.

6. To the extent any of Defendant's document requests or its interrogatories seek documents or answers that include expert material, Plaintiff objects to any such requests and interrogatories as premature and expressly reserves the right to

---

[1] Twitter, Inc. had an opportunity to file a motion to dismiss for failure to state a claim and did not include the copyright infringement claims at that time.  Twitter, Inc. has not stated any facts to support this defense.

5

Exhibit 15
78

supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

7. Plaintiff incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Plaintiff does not waive its right to amend its responses.

### III. OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1. Plaintiff objects to Definition No. 1 regarding "Plaintiff" "Genevieve Morton" "You" or "Your." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of the interrogatories and document requests to documents in the possession, custody, or control of individuals, agencies, or entities other than Genevieve Morton, an individual, and her present employees, agents, attorneys, consultants, and/or other representatives.

2. Plaintiff objects to Definition No. 4 regarding "Photograph" or "Photographs" to the extent that it is vague and ambiguous in light of the allegations. While Plaintiff has alleged infringement of certain pictorial images, Plaintiff has also claimed infringement of copyrighted collections in which those pictorial images appeared.

3. Plaintiff objects to Definition No. 5 regarding "Website" to the extent it relies on the undefined term "content." Subject to and notwithstanding this objection, in responding to these discovery requests, Plaintiff will treat the term "content," as visible imagery appearing on the website.

4. Plaintiff objects to Instruction No. 1 to the extent that it calls for privileged

6

Exhibit 15
79

Documents or any materials subject to attorney-client privilege or any other privilege.

5. Plaintiff objects to Instruction No. 8 to the extent that "identify" is overbroad, burdensome, calls for privileged information and affects the rights, including privacy rights, of third parties and information subject to the attorney-client privilege or the attorney work-product doctrine to the extent that any such information exists.

6. Plaintiff objects to Instruction No. 9 to the extent that it calls for privileged information or communications.

## IV. <u>ADDITIONAL OBJECTION TO SET TWO</u>

All interrogatories and requests for production are based on Defendant's insufficiently pleaded, meritless defenses which were asserted without any factual allegations.  Because these defenses have been asserted without any basis in fact and are entirely speculative, Plaintiff objects to Set Two as an obvious abuse of the discovery process and a plain attempt to harass, oppress, and burden Plaintiff in plain violation of Rules 26(b)(1) and 26(b)(2), and within the meaning of Rule 26(g)(2)(B).   Twitter's discovery requests are particularly egregious in light of the fact that the requests appear to directly serve the interests of Twitter.com's user @SpyIRL, an illegal pornographer and partner of Pornhub.com who maintains a following of at least 2.5 million users on Twitter.

While Twitter has stated that it does not "concede" that it bears the burden of proof on any or all of its fifteen meritless defenses, it does bear the burden as a matter of law. (See e.g., *Feist Publications, Inc. v. Rural Tel. Serv. Co. Inc*., 499 U.S. 340, 361 (1991). It also bears the burden of alleging at least one fact that would make any of the defenses even remotely plausible, and it has failed to do so.

7

Exhibit 15
80

The defenses are thoroughly speculative, and this request is a blatant attempt to fish for evidence around theories of potential defenses rather than actual allegations.  On that basis, Plaintiff objects.

## V. <u>PLAINTIFF'S RESPONSES:</u>

## <u>INTERROGATORY NO. 12</u>

Describe in detail the circumstances under which each of the Photographs was created, including the nature of Plaintiff's contracts or agreements with the photographer(s) who shot the Photographs and any other individuals or entities involved in the creation of the Photographs.

<u>RESPONSE:</u>

Plaintiff objects on the basis that the Interrogatory assumes facts that have not been pleaded by either party, namely that there were "other individuals or entities" involved in the creation of the Photographs.  Plaintiff further objects on the basis that the interrogatory calls for proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed  to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See <u>Pinn, Inc. v. Apple, Inc.,</u> Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing <u>Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP</u>, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting <u>United States ex rel. O'Connell v. Chapman Univ.</u>, 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege

8

Exhibit 15
81

any facts relevant to this Interrogatory.

**INTERROGATORY NO. 13**

Identify the photographer(s) who took each Photograph, and provide their name and contact information.

RESPONSE:

Plaintiff objects on the basis that the interrogatory calls for proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See Pinn, Inc. v. Apple, Inc., Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting United States ex rel. O'Connell v. Chapman Univ., 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege any facts relevant to this Interrogatory.

**INTERROGATORY NO. 14**

For each Photograph, state whether the Photograph was displayed on Plaintiff's Website in any versions (such as a thumbnail, preview, banner, watermarked version, or the like) that could be seen by members of the public without having to purchase the Photograph or collections of Photographs.

RESPONSE:

Plaintiff objects to this Interrogatory on the basis that it is duplicative

Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc.

9

Exhibit 15

82

1  has failed to state any facts whatsoever regarding the validity of her copyright.

2  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or

3  by a good faith belief that such facts exist." See <u>Pinn, Inc. v. Apple, Inc.,</u> Case no.

4  8:19-cv-01805 (minute order) (C.D. Cal.) citing <u>Nat'l Acad. of Recording Arts &</u>

5  <u>Scis., Inc. v. On Point Events, LP</u>, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule

6  11 of the Federal Rules of Civil Procedure,'… requires parties have some factual

7  basis for their claims and allegations." (quoting <u>United States ex rel. O'Connell v.</u>

8  <u>Chapman Univ.</u>, 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right

9  to amend and supplement this response if and when Twitter, Inc. amends its answer

10  to allege any facts relevant to this Interrogatory.

11       Defendant has failed to allege that the Photographs were visible on Plaintiff's

12  website, this Interrogatory plainly contradicts Plaintiff's unequivocal allegations in

13  Paragraph 28 of her Complaint.

14       Moreover, Plaintiff produced documents pursuant to the last discovery

15  requests that rendered moot this Interrogatory.

16

17  **<u>INTERROGATORY NO. 15</u>**

18  Describe in detail the circumstances under which each Photograph was displayed

19  on Plaintiff's Website, including the nature of Plaintiff's contracts or agreements

20  with the web designer(s) and any other individuals or entities involved in the

21  placement of the Photographs, as well as the manner in which Plaintiff requested

22  each Photograph be displayed on Plaintiff's Website.

23

24  RESPONSE:

25  Plaintiff objects on the basis that this Interrogatory assumes facts that are not

26  pleaded, namely that the photographs were, in fact, displayed on Ms. Morton's

27  website.  If anything, the assumption underlying this Interrogatory is contradicted

28  the plain allegation of paragraph 28 of the Compliant.  Moreover, this Interrogatory

10

Exhibit 15

83

similarly assumes facts that have not been pleaded by either party: namely that (1) there were any web designers or individuals involved with the placement of the Photographs; and (2) that Ms. Morton "requested" each Photograph be displayed on her website.  The plain language of the Complaint contradicts all of these underlying assumptions, and Twitter, Inc. has not pleaded any facts that would suggest there is any basis to believe Ms. Morton had any web designers or "individuals or entities" involved in the "placement" of the Photographs.

Plaintiff further objects on the basis that the interrogatory calls for proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See Pinn, Inc. v. Apple, Inc., Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting United States ex rel. O'Connell v. Chapman Univ., 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege any facts relevant to this Interrogatory.

While Ms. Morton reserves the right to supplement her responses, this Interrogatory was rendered moot as a result of the last production of documents.

## INTERROGATORY NO. 16

For each Photograph, state whether the Photograph (and/or any thumbnail or preview version of each Photograph) was displayed on Plaintiff's Website with a watermark, describe in detail the nature of any such watermark(s), including the date(s) on which the watermarks appeared on each Photograph.

11

Exhibit 15
84

RESPONSE:

Plaintiff objects on the basis that this Interrogatory assumes facts that are not pleaded, namely that the photographs were, in fact, *displayed* on Ms. Morton's website.  If anything, the assumption underlying this Interrogatory is completely and unequivocally contradicted the plain allegation in paragraph 28 of the Compliant ("Ms. Morton <u>never displayed</u> these Images for free… but offered the Images for purchase on her website in curated collections.").

Plaintiff further objects on the basis that the interrogatory calls for proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See <u>Pinn, Inc. v. Apple, Inc.</u>, Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing <u>Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP</u>, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting <u>United States ex rel. O'Connell v. Chapman Univ.</u>, 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege any facts relevant to this Interrogatory.

While Ms. Morton reserves the right to supplement her responses, this Interrogatory was rendered moot as a result of the last production of documents.

**REQUEST NO. 12**

All Documents Relating to the creation of each Photograph (as identified in Plaintiff's Response to Interrogatory No. 1), including, but not limited to communications, contracts, and agreements with all photographer or editors involved in the creation of the Photographs.

12

Exhibit 15
85

RESPONSE:

Plaintiff objects on the basis that this Interrogatory assumes facts that are not pleaded. Plaintiff further objects to the extent that the Request calls for proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See Pinn, Inc. v. Apple, Inc., Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting United States ex rel. O'Connell v. Chapman Univ., 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege any facts relevant to this Interrogatory.

Plaintiff further objects to this Request as overbroad in terms of time, place and manner and objects to the word "creation" as vague and unintelligible because creativity is a process.  See e.g. Kaplan, The New York Times, May 5, 2020, "Five Theses on Creativity" *available at* https://www.nytimes.com/2020/05/29/opinion/human-creativity-love.html ; See also Lisette, The New York Times, Dec. 9, 1951 "Pictures as Art Instructor Defines Creative Photography as Scientific Eye That Captures Life," archive.

While Ms. Morton reserves the right to supplement her responses, this Interrogatory was rendered moot as a result of the last production of documents.

Exhibit 15
86

**REQUEST NO. 13**

All Documents Relating to the display of each Photograph, including but not limited to communications, contracts, and agreements with website designers.  This Request also specifically includes Documents sufficient to show how each Photograph was displayed and offered for sale on Plaintiff's Website.

RESPONSE:

Plaintiff objects on the basis that this Request assumes facts that are not pleaded, namely that the photographs were, in fact, displayed on Ms. Morton's website.  If anything, the assumption underlying this Interrogatory is contradicted the plain allegation of paragraph 28 of the Compliant.  Moreover, this Interrogatory similarly assumes additional facts that have not been pleaded by either party: namely that (1) there were any web designers or individuals involved with the placement of the Photographs; and (2) that Ms. Morton "requested" each Photograph be displayed on her website.  The plain language of the Complaint contradicts all of these underlying assumptions, and Twitter, Inc. has not pleaded any facts that would suggest there is any basis to believe Ms. Morton had any web designers or "individuals or entities" involved in the "placement" of the Photographs.

Plaintiff further objects on the basis that the interrogatory calls for proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See Pinn, Inc. v. Apple, Inc., Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting United States ex rel. O'Connell v. Chapman Univ., 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff

14

Exhibit 15

87

reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege any facts relevant to this Interrogatory.

While Ms. Morton reserves the right to supplement her responses, this Interrogatory was rendered moot as a result of the last production of documents.

**REQUEST NO. 14**

All Documents Relating to the marketing and sales of each Photograph, including but not limited to sales records and receipts.

RESPONSE:

Without waiving any objections, Plaintiff asserts that this Request has been rendered moot by the previous production of documents, and on that basis Plaintiff objects to this Request as duplicative.

**REQUEST NO. 15**

All Documents Relating to the ownership of each Photograph, including but not limited to any transfer or work-for-hire agreements as well as all communications with third parties relating to ownership (or disputes about ownership).

RESPONSE:

Plaintiff objects on the basis that this Interrogatory assumes facts that are not pleaded, namely that there have been any disputes about ownership or any communications about ownership or disputes about ownership.  If anything, the assumptions underlying this Interrogatory are contradicted the Compliant.  Twitter, Inc. has not pleaded any facts that would suggest there is any basis to believe Ms. Morton had any disputes about ownership or any communications regarding ownership.

Plaintiff further objects to this Request on the basis that the interrogatory calls for

15

Exhibit 15
88

proprietary and/or trade secret information or otherwise privileged and confidential information.  Plaintiff has provided prima facie evidence of a valid copyright, and Twitter, Inc. has failed to state any facts whatsoever regarding the validity of her copyright.  "Affirmatives defenses, like allegations in a complaint, must be supported by facts or by a good faith belief that such facts exist." See Pinn, Inc. v. Apple, Inc., Case no. 8:19-cv-01805 (minute order) (C.D. Cal.) citing Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP, 256 F.R.D. 678, 682 (C.D. Cal. 2009) ("… Rule 11 of the Federal Rules of Civil Procedure,'… requires parties have some factual basis for their claims and allegations." (quoting United States ex rel. O'Connell v. Chapman Univ., 245 F.R.D. 646, 649 (C.D. Cal. 2007)). Plaintiff reserves the right to amend and supplement this response if and when Twitter, Inc. amends its answer to allege any facts relevant to this Interrogatory.

While Ms. Morton reserves the right to supplement her responses, this Interrogatory was rendered moot as a result of the last production of documents which included copies of the original copyright certificates issued by the U.S. Copyright Office.

**REQUEST NO. 16**

All materials, including but not limited to all deposit copies, submitted to the U.S. Copyright Office in connection with the registration of the Photographs.

RESPONSE:

Plaintiff objects on the basis that this is duplicative of Request for Production, Set One.  While Ms. Morton reserves the right to supplement her responses, and without waiving any objections, this Interrogatory was rendered moot as a result of the last production of documents.

16

Exhibit 15
89

**REQUEST NO. 17**

To the extent not already produced, All Documents described, identified, or used in connection with preparing Your responses to Defendant's Second Set of Interrogatories.

RESPONSE:

Plaintiff objects on the basis that this Request calls for material protected under the work-product doctrine.  Without waiving any objections, Plaintiff reserves the right to supplement her Response in the event that this Request was not rendered moot by the earlier production of documents.  Plaintiff further objects in tandem with the objections asserted specifically with the Interrogatories insofar as Defendant has not pleaded any facts with respect to any of its affirmative and other defenses as herein set forth.


Dated: August 27, 2021                    /s/ Jennifer Holliday
                                          Jennifer Holliday
                                          Attorney for Plaintiff

17

Exhibit 15
90

1

## CERTIFICATE OF SERVICE

2
3
4

The undersigned, an attorney, hereby certifies that on August 28, 2021, she caused the foregoing **Plaintiff's Responses to Defendant Twitter's Second Set of Interrogatories and Second Set of Requests for Production to Genevieve Morton** to be served via electronic mail on the following:

5
6
7
8

Brian Willen (pro hac vice)
   bwillen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

9
10
11
12
13
14
15

Victor Jih
   vjih@wsgr.com
Rebecca E. Davis
   becca.davis@wsgr.com
Eve Zelinger
   ezelinger@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 W. Fifth Street, Suite 1550
Los Angeles, CA90071-2027
Telephone: (323)210-2900
Facsimile: (866) 974-7329

16

/s/ Jennifer Holliday
———————————————

17

Dated: August 28, 2021

Jennifer Holliday, Esq.

18
19
20
21
22
23
24
25
26
27
28

Exhibit 15
91